**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---

In re

WHITE STAR PETROLEUM HOLDINGS, LLC,
*et al.*,[1]

Debtors.

---

Chapter 11

Case No. (19-_____) (__)

Joint Administration Pending

**DECLARATION OF JEFFREY J. ZANOTTI IN SUPPORT OF DEBTORS'
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Jeffrey J. Zanotti, hereby declare as follows:

1.       I currently serve as the Senior Vice President, General Counsel and Secretary of Debtor White Star Petroleum, LLC.  I have been in this role since May 2016.  Previously, I served as the Assistant General Counsel and Assistant Secretary for Seventy Seven Energy Inc.  Prior to joining Seventy Seven Energy Inc., I served as the Assistant General Counsel – Corporate and Securities for Chesapeake Energy Corporation.

2.       I am an attorney and admitted to practice law in Texas.  I have been granted a special temporary permit to practice law in Oklahoma pursuant to Rule Two Sections 5 and 6 of the Rules Governing Admission to the Practice of Law in the State of Oklahoma.

3.       I am generally familiar with the Debtors' day-to-day operations, financial affairs, business affairs, and books and records.  Except as otherwise indicated, all facts set forth in this declaration (the "Declaration") are based on my personal knowledge, my review of

---

[1]    The Debtors in these chapter 11 cases, and the last four digits of their U.S. taxpayer identification numbers are: White Star Petroleum Holdings, LLC (0575) ("WSTR Holdings"), White Star Petroleum, LLC (0977) ("WSTR"), White Star Petroleum II, LLC (4347) ("WSTR II"), White Star Petroleum Operating, LLC (5387) ("WSTR Operating") and WSP Finance Corporation (9152) ("WSP Finance" and together with WSTR Holdings, WSTR, WSTR II and WSTR Operating, the "Debtors").  The Debtors' corporate headquarters is located at 301 N.W. 63rd Street, Suite 600, Oklahoma City, OK 73116.

relevant materials or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial affairs.  I am over the age of 18 and authorized to submit this Declaration on behalf of each of the Debtors.

4.      On May 28, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").  In order to enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their business operations, the Debtors request various first day relief (collectively, the "First Day Motions").  The First Day Motions seek relief aimed at, among other goals:  (i) preserving the Debtors' assets and operations; (ii) continuing the Debtors' cash management systems and other business operations; (iii) using cash collateral and securing fully committed new money financing of up to $28.5 million under a debtor-in-possession ("DIP") facility; and (iv) establishing certain administrative procedures to facilitate a smooth transition into chapter 11.  The requested relief is essential to the success of these chapter 11 cases.

## I.      The Debtors' Business

### A.      The Debtors' Corporate History

5.      Debtor WSTR Holdings is a Delaware limited liability company whose members today include affiliates of The Energy & Minerals Group LP ("EMG") and other investors (together with EMG, the "Sponsors").

6.      Debtor WSTR, previously known as American Energy – Woodford, LLC, was originally formed on October 1, 2013 by American Energy Partners, LP ("AELP"), a shared services platform founded by Aubrey McClendon to invest in and manage oil and gas exploration and production ("E&P"), infrastructure and other onshore U.S. energy-focused

companies. In February 2014, investment funds affiliated with and managed by EMG and other private equity investors made equity commitments to WSTR through WSTR Holdings, previously known as American Energy Woodford Holdings, LLC. In February 2016, WSTR Holdings and its businesses were separated from AELP to become a standalone company, fully independent of the AELP platform.

7.     As part of the separation, WSTR changed its name from "American Energy – Woodford, LLC" to "White Star Petroleum, LLC" and WSTR Holdings changed its name from "American Energy Woodford Holdings, LLC" to "White Star Petroleum Holdings, LLC" in the first quarter of 2016. The Debtors conduct their E&P activities primarily through WSTR.

8.     As of the Petition Date, WSTR Operating employs 169 individuals.

9.     Debtor WSP Finance, formerly known as AEW Finance Corporation, was incorporated in September 2014 as a wholly owned subsidiary of WSTR for the purpose of co-issuing (with WSTR) 9.00% notes due September 15, 2022 (the "Unsecured Notes").

10.    Over the course of its existence, WSTR Holdings and its subsidiaries have acquired substantial assets in the Mid-Continent region of Oklahoma by directly leasing oil and gas interests from mineral owners and through a series of transactions to purchase oil and gas leasehold and producing properties from third parties. Important transactions include:

- In February 2014, WSTR acquired certain Mississippian Lime and Woodford Shale assets from Calyx Energy, LLC, Calyx Energy II, LLC and Liberty Energy, LLC.

- In the second half of 2014, WSTR acquired certain Mississippian Lime and Woodford Shale assets from B&W Operating, LLC.

- Contemporaneously with the separation from AELP in 2016, WSTR entered into an agreement to purchase certain Mississippian Lime and Woodford Shale assets from Devon Production Company, LP for

-3-

approximately $200 million (the "<u>Devon Acquisition</u>").  The acquired assets included approximately 210,000 largely contiguous net acres, more than doubling WSTR's production, cash flow and acreage footprint.  The Devon Acquisition closed on June 30, 2016 and the majority was funded with equity contributions from the sponsors of WSTR at that time and the remainder was funded with borrowings under WSTR's revolving credit facility.

- On March 14, 2017, WSTR acquired Lighthouse Oil and Gas LP ("<u>LOG</u>"), which was approximately 49.4% owned by an affiliate of EMG (the "<u>Lighthouse Acquisition</u>").  The majority of the Lighthouse Acquisition was funded by WSTR Holdings through the issuance of Series B common units to the two largest LOG equity holders.  The remainder of the Lighthouse Acquisition was funded by WSTR with borrowings under the revolving credit facility.  The 18,500 net acres acquired extended WSTR's footprint into the Anadarko Basin in Western Oklahoma and included development targets in the Cleveland, Tonkawa and Cottage Grove formations.  Subsequent to closing, WSTR consolidated LOG and certain of its affiliates into one Oklahoma limited liability company, Debtor WSTR II.

- In 2017, WSTR invested in off the ground leasing west of the Nemaha Ridge in Garfield County, funded through borrowings under the revolving credit facility, to build WSTR's position in the Sooner Trend Anadarko Canadian Kingfisher ("<u>STACK</u>") and diversify its portfolio.

- The Debtors closed additional transactions for the purchase of producing oil and gas properties and leasehold, funded by borrowings under the revolving credit facility, which increased the Debtors' leasehold position in Alfalfa, Grant, Noble, Payne, Logan, and Garfield counties in Oklahoma.

B.    <u>The Debtors' Assets and Operations</u>

11.    The Debtors acquire, develop, operate and produce unconventional oil and natural gas properties.  Through oil and gas leases entered into with mineral rights owners throughout the Mid-Continent region, the Debtors hold working interests in oil and gas properties that provide for the right to drill and maintain wells.  The Debtors and third-party operators operate these wells with the expectation of producing hydrocarbons, and the hydrocarbons are then transported by pipeline or by tanker truck to various end users.  After

-4-

receipt of proceeds, the Debtors distribute funds to various working interest holders, royalty interest holders, governmental entities and other parties, as applicable, in addition to retaining the Debtors' proportionate share of the proceeds.

12.     As of December 31, 2018, the Debtors had proved reserves of approximately 84.4 million barrels of oil equivalent ("boe") across approximately 315,000 net leasehold acres in primarily Creek, Dewey, Garfield, Lincoln, Logan, Noble and Payne counties of Oklahoma.  The Debtors' E&P operations are focused on three distinct operating districts: Cherokee Platform, STACK and the Anadarko Basin.  Below is a map of WSTR's acreage by district:



13.     As of December 31, 2018, approximately 80% of WSTR's total acreage was held by production, meaning that WSTR is party to leases granting WSTR rights for the exploration and production of hydrocarbons as long as WSTR continues to produce hydrocarbons in paying quantities from the acreage associated with those leases.  The remaining 20% of WSTR's total acreage is associated with leasehold interests that are in their primary term,

SC1:4946465.1

meaning that the leases may expire after a period of time unless WSTR is producing hydrocarbons in paying quantities or conducting operations in an effort to discover and produce hydrocarbons or otherwise extends the primary term.

14.     As of December 31, 2018, WSTR and WSTR II had an interest in a total of 883 gross productive wells (475 net) of which 590 were operated by WSTR and WSTR II (451 net).  During the year ended December 31, 2018, the Debtors brought 32 gross wells (28.2 net) online for first production of hydrocarbons.  WSTR operated, through contractual arrangements with third parties, two horizontal drilling rigs.

15.     The Debtors' revenues are derived from the sale of oil and natural gas, as well as the sale of natural gas liquids ("NGL") that are extracted from natural gas during processing.  The majority of revenues is from oil sales.  WSTR's average daily net sales volume during the year ended December 31, 2018 was approximately 18,800 boe per day.

16.     The Debtors generally sell oil and natural gas under two common types of agreements, both of which include a transportation charge.  One is a net-back arrangement, under which the Debtors sell oil or natural gas at the wellhead and collect a lower relative price to reflect transportation costs to be incurred by the purchaser.  Alternatively, the Debtors sell oil or natural gas at a specific delivery point, pay their own transportation to a third-party carrier, and receive a price with no transportation deduction.  In this case, the Debtors record the separate transportation cost as gathering, processing and transportation costs.

17.     The Debtors focus on exploring for and producing oil and natural gas in unconventional resource plays, such as shale rock, through specialized extraction techniques, including horizontal drilling and hydraulic fracturing.  Unconventional wells developed using the hydraulic fracturing process typically produce a high percentage of reserves in their first two

-6-

years of production, followed by steep production declines and then a flattening out of production over time.  As a result of the steep initial production decline, the Debtors require constant capital investment in new wells to maintain stable production levels.

18.     Despite controlling significant leasehold and mineral acreage in the Mid-Continent region, due to the declines in commodity prices in the fourth quarter of 2018 and the Debtors' financial condition, the Debtors ceased drilling new wells in April 2019 and have not resumed such activities as of the Petition Date.

C.     The Debtors' Midstream Activities

19.     The Debtors utilize midstream services, which involve the gathering, transportation, and processing of produced hydrocarbons from various third-party providers. WSTR is a party to a long-term gas gathering and processing agreement with EnLink Oklahoma Gas Processing, LP ("EnLink"), as successor in interest to TOMPC LLC, dated as of June 21, 2014 (as amended, the "GGPA"), pursuant to which EnLink provides certain gas gathering and processing services.

20.     The Debtors also maintain certain of their own saltwater gathering and disposal systems.  The Debtors transport produced saltwater primarily through their own pipeline infrastructure to 85 saltwater disposal wells, where it is reinjected into disposal reservoirs.  This system is critical because the Mid-Continent region's carbonate formation has a relatively high rate of produced saltwater relative to produced oil and gas, resulting in comparably higher disposal costs than costs in other regions.

D.     Hedging Portfolio

21.     The Debtors use derivative instruments that are common in the E&P industry, such as swaps, collars and options, to manage their exposure to commodity price risk

for oil, gas and propane prices.  The Debtors' use of derivatives was a requirement under the debtors' RBL Credit Agreement (defined below) and the contracts were placed with certain RBL Lenders (defined below).

## II.    The Debtors' Organizational Structure, Financial Performance and Prepetition Indebtedness

### A.    Organizational Structure

22.    Debtor WSTR Holdings is the direct parent company of and owns 100% of the equity of Debtor WSTR, an Oklahoma limited liability company.  WSTR is the direct parent company of and owns 100% of the equity of each of Debtor WSTR II, an Oklahoma limited liability company, Debtor WSTR Operating, a Delaware limited liability company, and Debtor WSP Finance, a Delaware corporation.

23.    The corporate structure chart, attached hereto as Exhibit A, provides a general overview of the relationship of the Debtors.

### B.    Financial Performance and Cash Position

24.    WSTR's net loss for the year ended December 31, 2018[2] was $114 million, as compared to a net loss of $14 million in 2017.

25.    WSTR had negative working capital of approximately $61 million as of December 31, 2018 and approximately $70 million as of the Petition Date.

26.    As of the Petition Date, WSTR had no unrestricted cash as a result of the exercise of remedies by the RBL Lender (defined below).

---

[2]    Financial statements for the year ended December 31, 2018 have not been finalized yet due to issues with the Debtors' ability to continue as a going concern, and therefore all 2018 amounts presented are unaudited.

C.    The Debtors' Prepetition Indebtedness

27.    As of the Petition Date, the Debtors have approximately $346.8 million in total funded debt, excluding accrued interest.  The following table summarizes the Debtors' prepetition indebtedness:

| Debt | Maturity | Approximate Principal Amount[3] (millions) |
|---|---|---|
| First Lien Revolving Credit Facility | June 2020 | $274 |
| Second Lien Term Loan | May 2023 | 58.0 |
| Unsecured Notes | September 2022 | 10.3 |
| Sale Leaseback | Various | 4.5 |
| Total: | | 346.8 |

---

[3]    Excluding accrued interest.

SC1:4946465.1

a.   The First Lien Revolving Credit Facility

28.     The Debtors are party to the Revolving Credit Agreement, dated as of June 30, 2016, (the "RBL Credit Agreement"), which provides for a first lien revolving credit facility, among WSTR as borrower, the several lenders from time to time parties thereto (the "RBL Lenders") and MUFG Union Bank, N.A., as administrative agent and collateral agent for the RBL Lenders (the "RBL Agent").  Each of WSTR Holdings, WSTR, WSP Finance and WSTR Operating is a guarantor of the RBL Credit Agreement pursuant to the RBL Amended and Restated Guarantee Agreement, dated as of June 30, 2016.  Borrowings under the RBL Credit Agreement are to be used for, among other things, the acquisition, development and exploration of oil and gas properties, investments, capital expenditures and other transactions, working capital and other general corporate purposes.  Interest under the RBL Credit Agreement is based on the prime rate or LIBOR plus a margin that varies based on the utilization of the facility.  The RBL Credit Agreement's stated maturity is June 30, 2020.

29.     As of December 31, 2018, the facility under the RBL Credit Agreement had a borrowing base and total commitments of $275 million and was subject to scheduled semi-annual borrowing base redeterminations based on WSTR's oil and natural gas reserves as of June 30 and December 31, as well as automatic reductions of $5 million on the first date of each month beginning February 1, 2019.  The Fifth Amendment of the RBL Credit Agreement, dated as of January 31, 2019, provided, among other things, that the scheduled borrowing base reduction of $5 million on February 1, 2019 would be extended to the earlier of (i) February 28, 2019 or (ii) any default occurring under the terms of the RBL Credit Agreement.  The Sixth Amendment of the Revolving Credit Agreement, dated as of February 27, 2019 (the "Sixth RBL

Amendment"), established the borrowing base amount to be $181 million on April 30, 2019, subject to $5 million monthly borrowing base reductions starting in the subsequent months.

30.    As of the Petition Date, the Debtors have drawn substantially all of the availability under the RBL Credit Agreement (approximately $274 million).

SC1:4946465.1

b.   The Second Lien Term Loan

31.    On May 9, 2018, WSTR entered into a five-year second lien Term Loan

with EnLink (the "Term Loan" and together with the revolving facility under the RBL Credit

Agreement, the "Prepetition Secured Debt").  EnLink, the RBL Agent and the RBL Lenders

together constitute the prepetition secured parties.  The principal amount of the Term Loan is $58

million, which amortizes pursuant to a specified amortization schedule.  Interest is payable on

the Term Loan every quarter at an annual rate of 8.0%, beginning in the first quarter of 2020.

Each of the Debtors is a guarantor of the Term Loan pursuant to the Term Loan Guarantee

Agreement, dated as of May 9, 2018.

32.    In November 2018, in conjunction with the RBL Credit Agreement

borrowing base redetermination, the Term Loan was amended such that the $19.5 million

amortization payment due March 31, 2019 was broken out into two payments and increased by

$1.0 million, with $9.75 million due on April 1, 2019 and $10.75 million due on

October 1, 2019.  Additionally, each of the $2.75 million payments due September 30, 2020 and

December 31, 2020 were increased to $4.0 million, and the March 30, 2023 payment was

reduced from $9.5 million to $6.0 million.  In February 2019, in conjunction with the RBL

Credit Agreement borrowing base redetermination, the Term Loan was amended such that the

$9.75 million due on April 1, 2019 was extended to May 15, 2019.

c.   The Unsecured Notes due September 15, 2022

33.    In September 2014, WSTR and its wholly owned subsidiary WSP Finance

completed the issuance of $350 million of Unsecured Notes at a 9% cash-pay coupon.  In 2015,

WSTR and WSP Finance privately exchanged their outstanding Unsecured Notes for new 12%

second lien notes due 2020 (the "Second Lien Notes") as part of a distressed debt restructuring

-12-

(such transaction, the "Exchange").  Approximately $10.3 million in principal of the Unsecured

Notes was left after the Exchange.  As a result of the Exchange, the previous covenants are no

longer applicable to the Unsecured Notes.  Beginning in late 2015 and extending through August

of 2016, the Debtors entered into a series of cash and equity transactions to fully redeem all

outstanding Second Lien Notes.

34.     The Unsecured Notes mature on September 15, 2022 and interest is

payable at an annual rate of 9.0%, semi-annually in arrears on March 15 and September 15 of

each year.  For the years ended December 31, 2018 and 2017, WSTR recorded approximately

$0.9 million in interest expense for the Unsecured Notes each year.

### d.  Sale-Leaseback

35.     On May 31, 2017, WSTR entered into a sale-leaseback transaction for its

primary field office in Stillwater, Oklahoma for $4.9 million.  Approximately $4.5 million

currently remains outstanding.  WSTR has remained the tenant and leased back the 17-acre

property, which is its central northern Oklahoma field office.

## III.  Events Leading to the Commencement of the Debtors' Chapter 11 Cases

### A.     Adverse Market Conditions

36.     The Debtors' primary sources of liquidity, outside of equity contributions

from the Sponsors, have historically been cash flows from producing oil and gas properties as

well as borrowings under the RBL Credit Agreement.  Additionally, non-strategic asset

dispositions have provided a source of cash flow for use in enhancing the Debtors' liquidity.

The cash flow from the Debtors' producing oil and gas properties is largely dependent on the

prices received for oil, natural gas and NGL.  Historically, these prices have been extremely

-13-

volatile, impacting both cash flows from operations and WSTR's borrowing base under its RBL Credit Agreement.

37.     Independent oil and gas companies, such as the Debtors, with Mississippian Lime-weighted assets in the Mid-Continent region have been particularly hard-hit by volatile market conditions in recent years and the majority of the Debtors' peers in the region have filed for chapter 11 since 2015.  This is in large part due to operational challenges unique to the region, including complex geological characteristics.  One of these challenges is the Mississippian Lime's relatively high ratio of "saltwater" to produced oil and gas.  During the normal production of oil and gas, saltwater mixed with hydrocarbon byproducts comes to the surface, and its separation and disposal increases production costs.  Low production volumes and higher than expected production costs, together with allegations that increased saltwater injection by the operators in the area caused increased seismic activity, resulted in many operators reducing activity and many capital providers discounting asset values in the region.

B.     Financial Response

38.     The Debtors have employed a number of strategies designed to achieve competitive returns and diversify their asset base since 2014.  This includes aggressive cost reduction initiatives in both drilling and completion expenditures as well as lease operating expenditures.  Additionally, following the Devon Acquisition in June 2016, the Debtors implemented a strategy to expand and diversify their oil and gas portfolio to establish development opportunities outside the Mississippian Lime, all while remaining focused on achieving the best possible results from its legacy Mississippian Lime-weighted assets.

39.     The Devon Acquisition facilitated a recapitalization of the Debtors, including a refinancing of WSTR's prior revolving credit facility (the "Original RCF").

-14-

Contemporaneously with the closing of the Devon Acquisition in June 2016, WSTR entered into the new RBL Credit Agreement with an initial borrowing base of $220.0 million and commitments of $210.0 million.  At that time, WSTR repaid the remaining balance of $48.8 million to eliminate the Original RCF.  In November 2016, the RBL Credit Agreement was amended to increase the borrowing base and total commitments to $230.0 million.  As of December 31, 2016, WSTR had $142.6 million borrowed under the RBL Credit Agreement and $1.0 million in outstanding letters of credit.

40.     The Debtors also have strengthened their balance sheet and extended their liquidity runway through strategic repurchases of indebtedness.  At the beginning of 2016, WSTR had approximately $348 million of Second Lien Notes outstanding.  In February 2016, WSTR repurchased Second Lien Notes with a carrying value of $196.3 million (par value of $141.6 million which includes paid-in-kind interest) for $18.2 million.  Additionally, in April and June 2016, WSTR repurchased $42.9 million in carrying amount (par value of $31.8 million which includes paid-in-kind interest) of the Second Lien Notes for $23.2 million.  In June 2016, WSTR exchanged an additional $109.4 million in carrying amount (par value of $81.2 million which includes paid-in-kind interest) of the Second Lien Notes for $63.2 million in equity of WSTR Holdings.  Finally, on August 11, 2016, WSTR redeemed all of the remaining outstanding Second Lien Notes, which had a carrying value of $0.3 million, for $0.4 million. The net result was an elimination of the Second Lien Notes and a substantial reduction in WSTR's funded debt.

41.     For the two years ending December 31, 2018, the Debtors have also proactively sold midstream assets and non-strategic properties in an aggregate amount of approximately $52.3 million to strengthen their balance sheet and enhance liquidity:

-15-

- In July 2017, WSTR sold its interest in a midstream gathering system and associated assets to 4 AM Midstream, LLC ("4 AM"), a midstream company based in Oklahoma City. The assets included 253 miles of gas gathering pipelines, including 26 miles of high pressure lines and 214 miles of crude oil gathering pipelines. In connection with the transaction, WSTR and 4 AM entered into crude and gas gathering agreements covering a defined dedication area with a fixed-fee structure for a 20-year term.

- In November 2017, WSTR sold non-strategic properties located in Payne, Noble and Pawnee counties to a third party. The sale included approximately 20,000 net acres of developed leasehold, but represented an immaterial portion of WSTR's proved reserves.

- In December 2018, WSTR sold approximately 21,600 net acres of developed leasehold in Noble County to a third party. This sale also represented an immaterial portion of WSTR's proved reserves.

42.    Finally, the Debtors adjusted their midstream pipeline commitments to EnLink in light of the changes in their business. The EnLink GGPA initially included annual minimum volume commitments ("MVC") of natural gas from a portion of WSTR's acreage and required WSTR to make annual deficiency payments if there was a shortfall in delivering the specified MVC each contract year. The GGPA was amended, effective December 1, 2015, to waive the deficiency payment that would have otherwise been payable by WSTR in 2016, reduce the deficiency payment due in 2017 by $7.5 million and extend the MVC period two additional years until 2023. WSTR paid $5.5 million in 2017 in deficiency payments, net of the $7.5 million credit. In addition, as of May 2018, WSTR projected that its future MVC shortfall payments to EnLink from 2018 through 2023 would be approximately $115 million. As a result, on May 9, 2018, WSTR and EnLink amended the GGPA to eliminate the MVC. In return, WSTR conveyed to EnLink a one percent overriding royalty interest on EnLink gathered volumes from current and future wells on existing leases, as well as an upfront payment of $19.5 million (in line with the existing minimum volume deficiency payment for 2018, plus

-16-

$0.2 million in transaction-related fees), and a five-year second lien Term Loan of $58.0 million.

As a result, the Debtors do not currently have minimum volume commitments, drilling

commitments or firm tariffs.

C.    Loss of Access to Working Capital Facility

43.    Despite all of these efforts, the Debtors have lost access to liquidity under

their RBL Credit Agreement and have been unable to successfully negotiate alternative

arrangements that are acceptable to their RBL Lenders.  The Debtors require access to

substantial working capital to pay third party vendors whom the Debtors contract with to obtain

necessary goods and services, such as drilling rig operators, truckers and midstream vendors.

44.    The RBL Credit Agreement is a borrowing base facility pursuant to which

funds can be borrowed only to the extent adequately covered by collateral.  WSTR's borrowing

base under its RBL Credit Agreement was initially set at $220.0 million at June 30, 2016 and

was increased to $230 million at December 31, 2016.  Following the Lighthouse Acquisition in

March 2017, the borrowing base reached a peak of $285 million.  Outstanding borrowings under

the revolver at December 31, 2016 were $142.6 million with availability of $87.4

million.  However, for the two years ending December 31, 2018, WSTR's cash flows from

operations were approximately $145.9 million while capital expenditures, inclusive of

acquisitions, were $302.3 million, a deficit of approximately $156.6 million.  The deficit was

funded primarily from borrowings under the RBL Credit Agreement as well as proceeds of

approximately $52.3 million from the sale of certain non-core assets.  Following a scheduled

borrowing base redetermination, WSTR's borrowing base was reduced from $275 million at

December 31, 2018 to $181 million on April 30, 2019.  WSTR did not have the ability to make

-17-

the borrowing base deficiency payment of $94 million which became due at that time,

precipitating a potential Event of Default[4] under the RBL Credit Agreement.

45.     In response to anticipated problems under the RBL Credit Agreement, the

Debtors negotiated a Sixth RBL Amendment in February 2019.  This Sixth Amendment required

the Debtors to attempt to secure a capital raise to refinance the indebtedness under RBL Credit

Agreement and approximately $70 million in other debt.  The Debtors were unable to reach

acceptable terms with interested investors by April 15, 2019.

46.     The terms of the Sixth Amendment next required WSTR to begin a

marketing process to sell its business and use the proceeds to repay the RBL Lenders.  The

Debtors engaged an investment banker, Guggenheim Securities, LLC ("Guggenheim

Securities"), to commence this process, which is currently underway.  The Debtors intend to

present more information about the marketing process in connection with a subsequent motion to

approve bidding procedures.

47.     In order to continue operations during the marketing process the Debtors

required additional liquidity.  On April 29, 2019, WSTR, as borrower, submitted a notice of

borrowing to the RBL Agent to draw the remaining $800,000 in availability under the RBL

Credit Agreement.  The RBL Agent denied WSTR's borrowing request on the grounds that

WSTR, as borrower, was not solvent.

48.     The Debtors also requested that the RBL Lenders forbear from exercising

remedies and permit the Debtors, notwithstanding the April 30 borrowing base Event of Default,

to continue to access cash and cash receipts to pay operating expenses.  A draft forbearance

agreement was circulated and under negotiation on April 30 when the Debtors received notice

---

4   As defined in Section 11.01 of the RBL Credit Agreement.

-18-

that the RBL Agent had declared an Event of Default and swept $8.1 million of cash from the Debtors' accounts.  The sweep by the RBL Agent left the Debtors without sufficient cash to continue their operations.

49.     After the sweep, the Debtors continued negotiations with the RBL Agent with the goal to obtain liquidity sufficient, at a minimum, to carry over into an organized chapter 11 restructuring process.  As part of these negotiations, the RBL Lenders agreed to provide the Debtors with access to some of the swept cash to fund outstanding checks and ACH revenue payments, as well as other expenditures specifically approved by the RBL Agent.  The Debtors have been operating with the RBL Agent authorizing specific expenditures since the April 30 sweep.  As a result, the Debtors have extremely limited access to liquidity.

50.     The Debtors remain cash flow positive on an operating basis (without taking into account debt service or restructuring expenses).  The liquidity situation caused by the borrowing base reduction and the related Event of Default under the RBL Credit Agreement is the primary driver of these chapter 11 cases, which provide the Debtors with additional liquidity in the form of the proposed DIP Credit Agreement in order to facilitate a sale of their business or other strategic transaction pursuant to the process started with Guggenheim Securities in April.

D.     Notice of Term Loan Default

51.     Following the cash sweep by the RBL Lenders, on May 3, 2019, EnLink provided notice of the existence of certain specified defaults as a result of:  (i) WSTR's failure to furnish to EnLink the audited consolidated balance sheets and annual financial statements for the year ended December 31, 2018, among other deliverables; (ii) WSTR's failure to pay by April 30, 2019 interest that was due on March 15, 2019 under the Unsecured Notes; and (iii) the payment default that occurred on April 30, 2019 under the RBL Credit Agreement.

-19-

52.     EnLink has provided notice that, pursuant to the terms of the Term Loan, the Term Loan is now bearing interest, payable upon demand, at a rate per annum equal to the interest rate as set forth in the Term Loan (8.00% per annum) plus 2.00%.

E.     Notice of Unsecured Notes Default

53.     In addition to normal ordinary operating expenses, the Debtors are required to make periodic interest payments on account of the Unsecured Notes.  Failure to make such interest payments before the expiration of the thirty-day grace period results in events of default under the Indenture, dated as of September 16, 2015, as amended by the First Supplemental Indenture, dated as of June 24, 2015 (as amended, the "Indenture").[5]

54.     While the Debtors had some cash available from dispositions and royalty payments, the Debtors determined that using the cash proceeds to make interest payments was not prudent and not in the best interests of the Debtors and the Debtors' stakeholders.  WSTR did not pay interest that was due on March 15, 2019 under the Unsecured Notes.

F.     Actions by Unpaid Trade Vendors

55.     The Debtors also have numerous suppliers and vendors that have not been paid amounts due to them as a result of the loss of liquidity by the Debtors.  Certain of these suppliers and vendors have filed liens against the Debtors and taken other debt collection steps.

56.     Late in the afternoon on Friday, May 24, 2019, five purported vendor creditors filed an involuntary bankruptcy petition against WSTR in the United States Bankruptcy Court for the Western District of Oklahoma (the "Oklahoma Court").  The Debtors had already substantially finished their preparations for the filing of these chapter 11 cases and were not given advance notice of the involuntary petition.

---

[5]     *See* § 6.1 of the Indenture.

SC1:4946465.1

57.     The Debtors are reviewing the circumstances surrounding the petition to the Oklahoma Court and have informed the Oklahoma Court of the filing of these cases.  A copy of the Debtors' letter to the Oklahoma Court is attached as <u>Exhibit B</u>.  The Debtors' letter describes the emergency relief requested in the First Day Motions, and the Debtors' intention to proceed with the hearing on the First Day Motions before this Court pending a response to the involuntary petition and summons before the Oklahoma Court.

G.     <u>Appointment of Independent Manager to WSTR Holdings</u>

58.     In anticipation of a potential restructuring or sale transaction, and after reviewing the qualifications of the candidates, on May 6, 2019, the members of the board of WSTR Holdings (the "<u>Managers</u>") unanimously approved the appointment of Patrick J. Bartels, Jr. as independent manager (the "<u>Independent Manager</u>") to advise on and act for the Debtors on matters related to a potential restructuring or sale transaction.  The responsibilities of the Independent Manager include:  (i) reviewing the terms of any plan of reorganization or liquidation, any sale or offering of equity interests in the Debtors, and any pre- or postpetition asset purchase agreement to which any affiliate of the Debtors is proposed to act as sponsor or party thereto; and (ii) supervising the structuring of a plan of reorganization or liquidation for the Debtors.  Since his appointment, the Independent Manager has been involved with the prepetition negotiations with the RBL Agent and RBL Lenders and their advisors and the preparation for these chapter 11 cases.

H.     <u>The Debtors' Prepetition DIP Financing Marketing Efforts</u>

59.     Prior to commencing these chapter 11 cases, the Debtors engaged in unsuccessful efforts to raise capital sufficient to refinance all their Prepetition Secured Debt. Following the determination that chapter 11 proceedings would likely be required for an

-21-

effective restructuring of the Debtors' balance sheet, the Debtors, with the assistance of

Guggenheim Securities as well as the Debtors' restructuring advisor, Alvarez & Marsal North

America, LLC ("A&M"), and the Debtors' restructuring counsel, Sullivan & Cromwell LLP

("S&C", and, collectively with Guggenheim Securities and A&M, the "Advisors"), immediately

began to size a DIP financing facility and identify potential sources of postpetition financing.

60.     The Debtors, with the assistance of Guggenheim Securities, made

extensive inquiries into alternatives for financing and solicited proposals for DIP financing from

various lending institutions with experience in providing such financing and other potential

sources of capital.  More specifically, 20 prospective third-party lenders were contacted, 13 of

which were either already subject to non-disclosure agreements with the Debtors or entered into

new non-disclosure agreements to evaluate the financing opportunity.

61.     Concurrently with these marketing efforts, the Debtors, with the assistance

of their Advisors, engaged in discussions with the RBL Agent and the RBL Lenders' advisors

regarding their interest in providing postpetition financing or their willingness to consent to

third-party postpetition financing.

62.     The Debtors ultimately received three indicative term proposals, including

that of the DIP Lenders (as defined below).  The two other proposals only expressed an interest

in providing the Debtors with DIP financing with a superpriority priming lien on the existing

first lien interests.  Further, the third-party DIP proposals required upfront work fees and an

expense deposit.  The RBL Lenders, however, were unwilling to disburse cash for such work

fees.  Furthermore, because the RBL Agent and the RBL Lenders' advisors insisted that they

would not consent to priming and the Debtors do not have assets of sufficient value to support

enough collateralized financing to meet the Debtors' cash needs during these chapter 11 cases,

-22-

the Debtors concluded that the postpetition financing facility being discussed with the RBL

Agent and the RBL Lenders' advisors was the only practical option.

    I.    <u>DIP Financing</u>

    63.    During negotiations for a postpetition financing facility, WSTR and the

RBL Lenders finalized a commitment letter, expected to be executed on the date hereof (the

"<u>DIP Commitment Letter</u>").  The DIP Commitment Letter expressly contemplates a bankruptcy

proceeding in the District of Delaware.

    64.    In the DIP Commitment Letter, certain of the RBL Lenders agree,

severally and not jointly, to provide a DIP financing facility to the Debtors with the consent of a

majority of the RBL Lenders (the "<u>DIP Facility</u>"), as detailed in the Debtor-In-Possession Credit

Agreement by and among WSTR as borrower, WSTR Holdings, MUFG Union Bank, N.A. as

administrative agent and collateral agent and the lenders party thereto (the "<u>DIP Lenders</u>") (as

such agreement may be amended, restated, supplemented or otherwise modified from time to

time pursuant to the terms thereof, the "<u>DIP Credit Agreement</u>").

    65.    The DIP Facility contemplates postpetition financing in the form of a non-

amortizing senior secured priming multi-draw term loan in the aggregate principal amount of up

to $28.5 million, $15 of which is proposed to be available on an interim basis.  The proposed

DIP Facility and the authorized use of "cash collateral" within the meaning of section 363(a) of

the Bankruptcy Code will provide the Debtors with immediate access to the liquidity necessary

to fund critical payments in the ordinary course of business, including obligations such as

employee payroll and vendor payments, that are essential to the Debtors' operational viability.

Without access to the DIP Facility, the Debtors could rapidly destabilize and be forced to shut

down their facilities in the near term, which would have irreparable consequences to the Debtors'
restructuring and to the Debtors' stakeholders.

**IV.     The Debtors' Chapter 11 Cases**

66.     The Debtors intend to continue to operate their businesses in the ordinary
course during the pendency of the chapter 11 cases.  To minimize disruptions to the Debtors'
operations on the Petition Date, the Debtors intend to seek to have all of the chapter 11 cases
assigned to the same bankruptcy judge and administered jointly and to file various motions
seeking important and urgent relief from the Bankruptcy Court.

I declare under penalty of perjury that the foregoing is true and correct.


Date:  May 28, 2019                     */s/ Jeffrey J. Zanotti*
                                        Name:   Jeffrey J. Zanotti
                                        Title:   Senior Vice President, General Counsel and
                                                Secretary

-24-

**<u>EXHIBIT A</u>**

**Corporate Structure Chart**

# White Star Organizational Structure



White Star
Petroleum
Holdings, LLC

White Star
Petroleum, LLC

White Star
Petroleum II, LLC

White Star
Petroleum
Operating, LLC

WSP Finance
Corporation



**<u>EXHIBIT B</u>**

**Letter to Oklahoma Court**

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588

WWW.SULLCROM.COM

*125 Broad Street*

*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

May 28, 2019

Via Fed Ex and Hand Delivery

Honorable Janice Loyd,
    United States Bankruptcy Court for the Western District of Oklahoma,
       215 Dean A McGee Ave, 2nd Floor,
          Oklahoma City, OK  73102.

          Re:   *In re White Star Petroleum, LLC*, Case No. 19-12145-JDL

Dear Chief Judge Loyd:

        We represent White Star Petroleum, LLC ("White Star") in connection with its ongoing financial restructuring and write to inform the Court that White Star and certain affiliates (collectively, the "White Star Entities") will be commencing voluntary chapter 11 cases (the "Voluntary Proceedings") with the Bankruptcy Court of the District of Delaware (the "Delaware Court") today, May 28, 2019.  The White Star Entities, along with their first lien secured lenders and their respective legal, restructuring and financial advisors, have been preparing for nearly a month to initiate the Voluntary Proceedings. Debtor-in-possession financing is being provided by certain of the first lien secured lenders to fund a smooth transition into bankruptcy and an orderly administration of the case in the best interests of the estates and all their stakeholders.

        White Star did not receive notice from the petitioners in the above-referenced case of their intention to file an involuntary bankruptcy petition just prior to the holiday weekend, and White Star has not been formally served with any summons. White Star and its advisors are proceeding as planned with the Voluntary Proceedings because emergency relief is required.  But White Star is currently reviewing the circumstances surrounding the involuntary petition and intends to respond to the petition and summons within the statutorily prescribed period to answer.[1]  White Star is working to retain Oklahoma counsel to assist with filings to be made in this Court.

---

[1]    Based on a preliminary review of the business records of the Debtors over the weekend, the five purported creditors (the "Involuntary Petitioners") may not have allowable claims in the chapter 11 case of White Star.  During the 90-day preference period under section 547 of the Bankruptcy Code, each received substantial payments on account of antecedent debts.  The total amount paid to the Involuntary Petitioners during the preference period was $3,745,731, broken down as follows: Latshaw $1,035,610; Mustang Heavy Haul $263,425; Multi-Shot $799,160; Cactus $952,292; Baker

Honorable Janice Loyd                                                              -2-

The White Star Entities require emergency relief in the Voluntary Proceeding to obtain the liquidity provided by the debtor-in-possession financing facility and to continue to operate their businesses as debtors in possession. The emergency relief being requested from the Delaware Court includes typical "first day" relief (i) to make payments to employees, taxing authorities, utilities, insurance providers, royalty interest owners and other critical vendors, (ii) to enter into the debtor-in-possession financing facility and use the cash collateral of the prepetition lenders, (iii) to provide for the joint administration of the cases and (iv) to retain a claims and noticing agent. The White Star Entities will be seeking much of this relief on an interim basis, with final approval pending a "second day" hearing before the Delaware Court.

In order to provide general background to this Court about the White Star Entities and the Voluntary Cases, we attach (i) a copy of the Declaration of Jeffrey J. Zanotti in Support of Debtors' Chapter 11 Petitions and First Day Pleadings, as it will be filed on the docket of the Delaware Court (the "Zanotti Declaration"), and (ii) a copy of the proposed agenda for the first day hearing before the Delaware Court. We have requested a first day hearing on Wednesday, May 30, but the hearing has not yet been scheduled.

We are copying Linda Richenderfer of the Office of the United States Trustee for the District of Delaware; Derek Abbott, proposed Delaware co-counsel to the White Star Entities in the Voluntary Proceedings; and Justin Rawlins of Winston & Strawn, LLP, counsel to the administrative agent for the debtor-in-possession facility. A copy of this letter will also be filed on the docket in the Voluntary Proceedings before the Delaware Court as Exhibit B to the Zanotti Declaration.

We are available to further address these matters if the Court should so request.

Respectfully submitted,

Andrew G. Dietderich

---

Hughes $695,244. WSTR no longer does business with any of the Involuntary Petitioners. *See* Bankruptcy Code §502(d).

Honorable Janice Loyd                                                    -3-

cc:    Linda Richenderfer
       (Office of the United States Trustee)

       Derek C. Abbott
       (Morris, Nichols, Arsht & Tunnell LLP)

       Justin E. Rawlins
       (Winston & Strawn, LLP )

       Mark A. Craige
       (Crowe & Dunlevy, P.C.)

       Phil F. Snow
       (Snow Spence Green LLP)

       Brian D. Glueckstein
       (Sullivan & Cromwell LLP)

(Enclosures)