# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>WHITE STAR PETROLEUM HOLDINGS, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. (19-\_\_\_\_\_) (\_\_)<br><br>Joint Administration Pending |

## DECLARATION OF EDGAR W. MOSLEY II, MANAGING DIRECTOR AT ALVAREZ & MARSAL NORTH AMERICA, LLC IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Edgar W. Mosley II, hereby declare under penalty of perjury:

1.  I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M") and was engaged in April 2019 to be a restructuring advisor for White Star Petroleum Holdings, LLC and certain of its direct and indirect subsidiaries as debtors and debtors-in-possession (collectively, the "Debtors"). I have over 18 years of experience in corporate restructuring.

2.  I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I submit this declaration (the "Declaration") to assist the Court and parties-in-interest in understanding the circumstances that resulted in the commencement of these chapter 11 cases and in support of: (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code") filed on May 28, 2019 (the "Petition Date") and (b) the emergency relief that the Debtors

---

[1] The Debtors in these chapter 11 cases, and the last four digits of their U.S. taxpayer identification numbers are: White Star Petroleum Holdings, LLC (0575) ("WSTR Holdings"), White Star Petroleum, LLC (0977) ("WSTR"), White Star Petroleum II, LLC (4347) ("WSTR II"), White Star Petroleum Operating, LLC (5387) ("WSTR Operating") and WSP Finance Corporation (9152) ("WSP Finance" and together with WSTR Holdings, WSTR, WSTR II and WSTR Operating, the "Debtors"). The Debtors' corporate headquarters is located at 301 N.W. 63rd Street, Suite 600, Oklahoma City, OK 73116.

have requested from the Court pursuant to the motions and applications described herein (collectively, the "First Day Pleadings").

3.      In April 2019, the Debtors retained A&M to assist in the process of preparing for a potential chapter 11 filing. Since A&M's retention, I have overseen the team of A&M professionals that has been helping the Debtors complete cash forecasting and related analyses, compile the diligence necessary to draft the First Day Pleadings and otherwise prepare for these chapter 11 cases. A description of the relief requested in and the facts supporting each of the First Day Pleadings is set forth below.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information obtained from the Debtors' management team and advisors, including the A&M team working under my supervision, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives or my opinions based upon my experience and knowledge. If called as a witness, I would testify competently to the statements set forth in this Declaration.

**I.      Relief Sought in the Debtors' First Day Pleadings**

   A.    Debtors' Motion for an Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion").

5.      Pursuant to the Joint Administrative Motion, the Debtors request entry of an order authorizing joint administration of the Debtors' chapter 11 cases. Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

6.      Many of the motions, hearings and orders in these chapter 11 cases will affect each and every Debtor entity. For example, virtually all of the relief sought by the Debtors

in the First Day Pleadings is sought on behalf of all of the Debtors. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration of these chapter 11 cases for procedural purposes only under a single docket will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of numerous independent chapter 11 cases. For these reasons, the relief requested in the Joint Administration Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

      B.     <u>Debtors' Motion for an Order Authorizing the Debtors to (I) File (A) a Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor and (B) a Consolidated List of the Debtors' Top 30 Creditors and (II) File Under Seal Certain Personal Identification Information for Individual Creditors (the "Creditor Consolidation List Motion").</u>

      7.     Pursuant to the Creditor Consolidation List Motion, the Debtors seek entry of an order authorizing the debtors to: (a) file (i) a consolidated list of creditors in lieu of submitting a separate matrix for each Debtor and (ii) a consolidated list of the Debtors' top 30 creditors, (b) file the portions of the Creditor Matrix containing the home addresses of the Debtors' former and current employees and parties covered by the European Union General Data Protection Regulation (the "<u>GDPR</u>") under seal, (c) file a redacted version of the Creditor Matrix with the applicable Debtors' corporate mailing address in place of each former and current employee's home address and "ADDRESS ON FILE" in place of the home addresses of the parties covered by the GDPR, (d) provide the Debtors' proposed claims and noticing agent with the home addresses and instruct them to serve the employees and the parties covered by the GDPR at their home addresses and (e) provide the sealed Creditor Matrix to the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>"), any official committee appointed in these chapter 11 cases and any other party upon Court order.

8. Although the list of creditors usually is filed on a debtor-by-debtor basis, in a chapter 11 bankruptcy case involving more than one debtor, the debtors may file a consolidated creditor matrix. Here, the preparation of a separate list of creditors for each Debtor would be expensive, time consuming, administratively burdensome and of little incremental benefit. Further, because a large number of creditors may be shared among the Debtors, the Debtors request authority to file a single, consolidated list of the 30 largest general unsecured creditors. This will help alleviate administrative burdens, costs and the possibility of duplicative service.

9. The Debtors also seek authorization to file under seal portions of the consolidated creditor matrix containing the home addresses of the Debtors' former and current employees and parties covered by the GDPR, and then file a redacted version of such matrix that includes the applicable Debtors' corporate mailing address in place of each employee's home address and "ADDRESS ON FILE" in the place of the home address of each of the parties covered by the GDPR. The Debtors will provide the Court, its noticing agent, the U.S. Trustee and any other party upon Court order with the sealed version of the consolidated creditor matrix and will instruct its noticing agent to serve the employees and other parties at their home addresses. The Debtors believe that this will minimize the risk of identity theft or injury to individual employees and allow the Debtors to comply with the GDPR. For these reasons, the relief requested in the Creditor Consolidation List Motion is appropriate under the circumstances.

      C.      <u>Debtors' Application for Authorization to Employ and Retain Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective Nunc Pro Tunc to the Petition Date (the "KCC Retention Application").</u>

      10.      Pursuant to the KCC Retention Application, the Debtors seek to retain Kurtzman Carson Consultants LLC ("<u>KCC</u>") as their claims and noticing agent in the chapter 11 cases. I believe that the Debtors' estates, creditors, parties-in-interest and the Court will benefit from KCC's experience and cost-effective methods. Prior to retaining KCC, the Debtors also solicited and reviewed engagement proposals from two other potential claims and noticing agents. The Debtors believe that KCC's rates are competitive and reasonable given KCC's quality of services and expertise, and that the appointment of KCC as claims and noticing agent is the most effective and efficient manner by which to provide noticing and claims processing services in the chapter 11 cases and is necessary and in the best interest of the Debtors and their estates.

      D.      <u>Debtors' Motion for Interim and Final Orders (I) Approving Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service and (IV) Granting Related Relief (the "Utilities Motion").</u>

      11.      Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders (a) approving the Debtors' proposed form of adequate assurance of payment for postpetition utility services, (b) establishing procedures for resolving objections by utility companies relating to the adequacy of the proposed adequate assurance and (c) prohibiting the utility companies from altering, refusing or discontinuing service to, or discriminating against, the Debtors on the basis of the commencement of these chapter 11 cases or that a debt owed by the Debtors to utility services rendered before the Petition Date was not paid when due.

12. To operate their businesses and manage their properties, the Debtors obtain telecommunications, waste disposal, water, gas, electricity and other utility services from a number of utility companies. Uninterrupted utility services are essential to the Debtors' ongoing operations. Should any utility company refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage their reorganization efforts.

13. The Debtors intend to pay all postpetition obligations owed to the utility companies in a timely manner and anticipate having sufficient funds to do so. Nevertheless, to provide the utility companies with adequate assurance pursuant to sections 366(b) and 366(c) of the Bankruptcy Code, the Debtors propose to deposit cash in an amount equal to two weeks' payment for utility services, calculated using the historical average for such payments during the past twelve months, into a segregated account to be opened within 7 days of entry of a final order for the benefit of the utility companies. Based on the foregoing, the Debtors estimate that the total amount of such deposit will be approximately $44,270.49.[2]

14. The relief requested in the Utilities Motion will ensure the continuation of the Debtors' businesses as the Debtors transition into chapter 11. The relief requested also provides the utility companies with a fair and orderly procedure for determining requests for additional adequate assurance. For these reasons, the relief requested in the Utilities Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

---

[2] As discussed in greater detail in the Utilities Motion, the Debtors' proposed adequate deposit does not include any amounts for utility companies who currently have active surety bonds.

E.     <u>Debtors' Motion for Interim and Final Orders (I) Authorizing but Not Directing Debtors to Pay Certain Prepetition Taxes and Assessments, (II) Authorizing Financial Institutions to Honor Related Payment Requests and (III) Granting Related Relief (the "Taxes and Fees Motion").</u>

15.     Pursuant to the Taxes and Fees Motion, the Debtors seek authority, but not direction, to remit and pay certain taxes and fees that accrued prior the Petition Date and will become payable during the pendency of these chapter 11 cases. The Debtors' ordinary course taxes include ad valorem taxes, oil and natural gas severance taxes, franchise taxes, sales and use taxes, amounts withheld and remitted to the Federal and State government on behalf of the owners of oil and natural gas properties and other business licenses and permitting fees. The Debtors estimate that as of the Petition Date, they owe approximately $5.335 million in outstanding taxes and fees, with approximately $3.13 million payable during the first 30 days following the Petition Date:

| Category | Description | Approximate Amount Accrued and Unpaid as of Petition Date | Approximate Amount Due Within 30 Days |
|---|---|---|---|
| Property Taxes | Taxes on owned and leased real and personal property | $75,000 | $0 |
| Severance Taxes | State taxes on natural resources extracted from land or water | $4.5 million | $3 million |
| Franchise Taxes and Fees | State taxes and fees imposed on Debtors' business for licenses and privileges | $300,000 | $50,000 |
| Sales and Use Taxes | State taxes on sale prices | $10,000 | $5,000 |
| Backup Withholding | Taxes withheld by the Debtors on behalf of owners of oil and natural gas properties | $450,000 | $75,000 |

16.     Any failure by the Debtors to pay the taxes and fees could materially disrupt the Debtors' business operations. Certain taxing authorities may attempt to revoke the Debtors' licenses and permits, subject the Debtors to audits, seek to lift the automatic stay or impose liens on the Debtors' real or personal property. The Debtors' directors and officers could

also be held personally liable for unpaid taxes and fees.  Moreover, taxes and fees not paid on the due date as required by law may result in fines and penalties, the accrual of interest or both.  Lastly, the Debtors collect certain taxes from their customers on behalf of taxing authorities; these funds may not constitute property of the Debtors' estates.  I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors and all other parties-in-interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

      F.      <u>Debtors' Motion for Interim and Final Orders (I) Authorizing, but Not Directing, the Debtors to Continue (A) Their Insurance Program and Pay Prepetition Obligations Relating Thereto and (B) Their Surety Bond Program and Pay Prepetition Obligations Relating Thereto, (II) Modifying the Automatic Stay to Permit Debtors' Employees to Proceed With Workers' Compensation Claims and (III) Authorizing Financial Institutions to Honor Related Payment Requests (the "Insurance/Surety Bonds Motion").</u>

      17.      Pursuant to the Insurance/Surety Bonds Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors, in their sole discretion, to continue to administer their insurance program and to pay any related prepetition obligations, and to revise, extend, supplement or change insurance coverage as needed, (b) authorizing, but not directing, the Debtors, in their sole discretion, to continue their surety bond program and to pay any related prepetition obligations, and to renew, acquire additional bonding capacity and execute other agreements, (c) modifying the automatic stay to permit Debtors' employees to proceed with workers' compensation claims and (d) authorizing financial institutions to honor related payment requests.

      18.      In the ordinary course of their businesses, the Debtors maintain an insurance program that provides millions of dollars of coverage for the Debtors' operations.  The insurance program provides coverage for, among other things, pollution risk, operation of


vehicles, breach of duty by officers or directors, the Debtors' development and production facilities, various other property-related and general liabilities and workers' compensation. Failure to pay insurance premiums owed under the insurance program may harm the Debtors' estates. The insurance carriers may refuse to renew the Debtors' insurance policies or attempt to terminate the Debtors' existing insurance policies. Any disruption to the Debtors' insurance program and any material change in the terms thereof would place additional risk on the Debtors and other parties who benefit from the Debtors' insurance program.

19. Under the Debtors' workers' compensation insurance program, one employee has a pending workers' compensation claim against the Debtors and another has a pending litigation in connection with a pending workers' compensation claim against the Debtors. The Debtors believe that permitting such employees to proceed with their claims in accordance with the terms of the Debtors' prepetition workers' compensation insurance program would preserve employee morale and prevent employee departure, which would in turn preserve the Debtors' businesses. Accordingly, the Debtors request that the automatic stay imposed by section 362(d)(1) of the Bankruptcy Code be modified to allow the Debtors' employees to pursue workers' compensation claims.

20. In the ordinary course of business, the Debtors are also required to provide surety bonds to certain governmental units or other public agencies to secure the Debtors' payment or performance of certain obligations. Failing to provide, maintain or timely replace their surety bonds will prevent the Debtors from undertaking essential functions related to their operations. The Debtors believe that all material premiums in connection with the insurance program and surety bond program that were due and payable on or prior to the Petition Date have been fully paid. Out of an abundance of caution, the Debtors seek authority to satisfy any

SC1:4946464.1

unpaid amounts, including any amounts arising in connection with ongoing insurance policy audits.  For these reasons, the relief requested in the Insurance/Surety Bonds Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

      G.    <u>Debtors' Motion for Interim and Final Orders (I) Authorizing but Not Directing Debtors to Pay or Honor Oil and Gas Interests, (II) Authorizing Financial Institutions to Honor Related Payment Requests and (III) Granting Related Relief (the "Royalty Payments Motion")</u>.

      21.    Pursuant to the Royalty Payments Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors, in their sole discretion, to pay or honor payments owed to owners of royalty and mineral and other interests, including those currently held in suspense, and joint-interest billings payments that accrued before the Petition Date and will become payable during the pendency of these chapter 11 cases and (b) authorizing financial institutions to honor related payment requests.

      22.    The Debtors are party to a number of oil and gas leases, pursuant to which they have the right to explore, drill and produce oil, natural gas and certain other minerals from a parcel of property, subject to applicable law.  In exchange, at the time of execution of the leases, the Debtors pay the property owners a lump sum payment, and for the duration of the lease, in consideration of the royalty interest retained by the property owner, provide the property owners with either a share of the production or royalty payments in lieu of production.  Additionally, the Debtors must distribute some of the revenue to holders of working and certain other interests in the parcel of property.  As of the Petition Date, the Debtors estimate that they hold approximately $28.5 million in such payments that accrued prepetition, of which approximately $18.8 million are or will become due within the first 30 days of these chapter 11 cases.  With respect to these payments, the Debtors also have certain funds on hand that are subject to minimum threshold amounts, various disputes or other open commercial issues.  As of the

Petition Date, the Debtors estimate that they hold approximately $19.8 million in such suspense payments, of which approximately $1.2 million are or will become due and payable within the first 30 days of these chapter 11 cases.

        23.     Additionally, whenever a new well on the Debtors' property is complete and begins production, the Debtors accrue payments for the first six months of the well's production. After seven months, the Debtors pay these new well suspense obligations along with the accrued royalty interests for the seventh month. Royalty interests are commonly governed by state laws that set strict payment deadlines and contain enforcement mechanisms including interest. As of the Petition Date, the Debtors estimate that they hold approximately $5.1 million in such new well suspense obligations accrued prepetition, of which approximately $1.9 million will become due within the first 30 days of these chapter 11 cases.

        24.     The Debtors from time to time also enter into joint operating agreements, pooling agreements, unitization agreements or similar agreements, pursuant to which the Debtors make joint-interest billings payments and other reimbursements to third-party operators. As of the Petition Date, the Debtors estimate that they owe approximately $4.9 million on account of such joint-interest billings payments, of which the Debtors owe approximately $1.9 million within the first 30 days of these chapter 11 cases.

        25.     Any failure by the Debtors to pay the royalty payments could materially disrupt the Debtors' business operations in several ways. Royalty payments not paid on the due date as required by law may result in fines and penalties, the accrual of interest, or both. Additionally, some of the royalty payments may not even constitute property of the Debtors' estates. I believe that the relief requested in the Royalty Payments Motion is in the best interests

-11-

SC1:4946464.1

of the Debtors' estates, their creditors and all other parties-in-interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

      H.      <u>Debtors' Motion for Interim and Final Orders (I) Authorizing, but Not Directing Debtors to Pay Certain Prepetition Claims of Vendors and (II) Authorizing Financial Institutions to Honor Related Payment Requests (the "Vendor Motion").</u>

      26.      Pursuant to the Vendor Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay certain prepetition claims of vendors and (b) authorizing financial institutions to honor related payment requests.

      27.      The Debtors operate the majority of their oil and gas wells, and are, as operators, responsible for paying all of the operating expenses required for the production of the wells.  In the ordinary course of business, the Debtors purchase goods and services from vendors that are unaffiliated with the Debtors and are, by and large, sole source or limited source suppliers, provide unique materials or services, provide services needed for compliance with certain laws and regulations or provide a material economic or operational advantage when compared to other available vendors.  Without these vendors, the Debtors could not operate. Additionally, most, if not all, of these vendors may currently hold, or may assert in the future, liens against the Debtors' property under applicable lien statutes.  As of the Petition Date, the Debtors estimate that these vendors have prepetition claims in excess of $50 million.  Pursuant to the Vendor Motion, the Debtors are requesting authority to pay vendor claims up to $10.8 million on an interim basis and up to $15.2 million on a final basis.

      28.      While the Debtors hope and expect to ensure a continuing postpetition supply of goods and services by consensual negotiation with the vendors, the Debtors recognize that their fiduciary duties bind them to consider and plan for the vendors that may assert liens against the Debtors' property or that may refuse to provide future goods and services unless their

prepetition claims are paid.  Replacement vendors, even where available, would likely result in substantially higher costs for the Debtors and severe operation disruption.  Moreover, replacement vendors may lack knowledge of the Debtors' operations or fail to match the Debtors' high performance standards, thereby placing the safety of the Debtors' employees and the reputation of the Debtors' businesses at risk.

29.     If the Debtors have the authority to pay the vendors some or all of their prepetition claims, and thereby maintain lower costs of goods and services purchased during the postpetition period and avoid the severe disruption and safety risks to their employees that might result from the cessation of such essential goods and services, it is prudent for the Debtors to do so.  Failure to do so would cause significant harm to the Debtors and to the recoveries of all of the Debtors' creditors that would far outweigh the cost of payment of the prepetition vendor claims.  For these reasons, the relief requested in the Vendor Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

I.     <u>Debtors' Motion for Interim and Final Orders Authorizing, but Not Directing, the Debtors to (A) Pay Certain Prepetition Compensation and Reimbursable Expenses, (B) Pay and Honor Benefits and Other Programs and (C) Continue Workforce Obligations (the "Employee Wages and Benefits Motion").</u>

30.     Pursuant to the Employee Wages and Benefits Motion, the Debtors seek entry of interim and final orders to (a) authorize, but not direct, the Debtors, in their sole discretion to (i) pay certain prepetition compensation and reimbursable expenses, (ii) meet their obligations in the ordinary course of business with respect to benefits, withholdings and other programs and (iii) continue to honor their various workforce obligations on a postpetition basis, and (b) authorize financial institutions to honor related payment requests.

31.     As of the Petition Date, the Debtors engaged the services of approximately 169 employees, all on a full-time basis.  The Debtors also contract with local staffing agencies to

perform certain administrative and operational functions. The Debtors currently rely on the services of 12 contractors. The skills and expertise of the workforce in overseeing and running the Debtors' operations, as well as their knowledge of the Debtors' industry, are essential to the ongoing operation of the Debtors' businesses.

32. The Debtors pay and incur a number of obligations in compensating the workforce. These obligations, which are described in the Employee Wages and Benefits Motion, include wages, deductions and payroll taxes, contractor fees, employee health and welfare benefits, paid leave benefits, retirement, severance, workers' compensation, reimbursed expenses and other benefit plans, as well as semi-annual incentives, non-insider retention programs, director fees, and other benefits and obligations that the Debtors have provided in the ordinary course of business. The Debtors estimate that they owe an aggregate of approximately $1,893,500 on account of these obligations accrued and unpaid as of the Petition Date.

33. In the proposed interim order, the Debtors request the authority in their sole discretion to (a) pay unpaid compensation, not to exceed $13,650 in the aggregate to any employee or contractor, (b) pay amounts accrued prepetition pursuant to the Benefit Obligations and continue to honor such obligations in the ordinary course of business, with the exception of obligations under the Debtors' severance program, (c) forward or contribute payroll taxes and deductions, (d) pay third party providers who administer the workforce obligations and (e) pay any prepetition director compensation and continue to pay director compensation in the ordinary course of business.

34. The Debtors sponsor a severance plan pursuant to which all full-time employees are eligible for severance benefits on an involuntary termination of employment other than for "cause" or in the event that the employee resigns under circumstances constituting

constructive termination within 30 days following a "change in control". The Debtors are discussing the terms of the severance plan with their stakeholders and will supplement or withdraw the relief requested in light of any changes prior to a hearing on the final order, *provided* that the Debtors are not requesting the authority to pay any severance to an insider under the severance plan that would exceed the limitations set forth in section 503(c) of the Bankruptcy Code.

35. In November 2018, the Debtors granted retention awards to non-insider employees. The aggregate remaining value of these awards, which are currently held by approximately 152 non-insider employees, is $1,800,000. In addition, 12 non-insider employees hired after November 27, 2018 (the initial date of eligibility under the retention plan) would be entitled to retention awards with an aggregate award value of approximately $92,000 if granted awards under the retention plan. The Debtors are discussing the terms of the non-insider retention awards with their stakeholders and will supplement or withdraw the relief requested in light of any changes prior to a hearing on the final order. For the avoidance of doubt, to the extent the Debtors amend, modify or supplement the non-insider retention program, the awards under such program in the aggregate will not exceed $1,892,000.

36. In the ordinary course of business, each employee may earn an incentive payment on a semi-annual basis. The estimated aggregate target value of the semi-annual incentives for non-insiders for the January through June 2019 performance period is approximately $1,500,000. The Debtors are discussing the terms of the semi-annual non-insider incentive awards for the January through June 2019 performance period with their stakeholders and will supplement or withdraw the relief requested in light of any changes prior to a hearing on the final order; provided that such incentives will not exceed $1,500,000. The Debtors are not

requesting the authority to pay any semi-annual incentives to insider employees at this time but reserve the right to request such authority upon the filing of a separate motion on notice to the parties-in-interest.

37. In the proposed final order, the Debtors request the authority to (a) pay Unpaid Prepetition Compensation, if any, that exceeds $13,650 for any employee or contractor and (b) any severance, retention and incentive programs as agreed with the Debtors' stakeholders and parties-in-interest.

38. Payment of these workforce obligations is critical to the Debtors' ability to continue to operate their business as a going concern. If the Debtors do not continue to timely pay and provide compensation and benefits, members of the workforce may seek alternative employment. It would not be possible to replace the workforce on a short timeframe and the Debtors would be left without the essential services provided by the workforce. As a result, the payment of the workforce obligations are necessary for the preservation of the Debtors' estates and the Debtors' ability to reorganize would be severely impaired if they were not honored. For these reasons, I believe that the relief requested in the Employee Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors and all other parties-in-interest.

J. <u>Debtors' Motion for an Order (I) Authorizing, but Not Directing, Debtors to (A) Continue Their Existing Cash Management System, (B) Honor Certain Related Obligations and (C) Maintain Existing Bank Accounts and Utilize Existing Check Stock and (II) Granting Related Relief (the "Cash Management Motion").</u>

39. The Debtors use a cash management system in the ordinary course of their business to collect, transfer and disburse funds generated from their operations. The Debtors' treasury department maintains daily oversight over the cash management system and implements cash management controls for entering, processing and releasing funds. The cash management

system provides significant benefits to the Debtors, including the ability to: (a) closely track and control all funds flow; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds.  In the ordinary course of business, in connection with the Debtors' cash management system, MUFG charges certain service charges and other fees, costs and expenses.  The Debtors request authority to satisfy any prepetition bank fees.  A disruption in the cash management system would likely cause delays in the collection and disbursement of funds, thus impeding the Debtors' ability to carry out their normal business operations.

40. In the ordinary course, the Debtors also make monthly payments on their credit cards.  The Debtors monitor the expenses charged to the credit cards to ensure compliance with company policies.  As of the Petition Date, there is approximately $94,000 incurred under the credit cards.  The Debtors seek authorization to make these payments as they become due in the ordinary course postpetition.

41. The Debtors' inability to continue using the cash management system and their credit cards would severely, and perhaps irreparably, disrupt their operations.  The Debtors' corporate and financial structure make it difficult, if not impossible, and in any event, unduly burdensome, for the Debtors to establish an entirely new system of accounts and a new cash management system.  Thus, under the circumstances, maintenance of the cash management system is not only essential, but also in the best interests of the Debtors' estates and creditors.  Furthermore, preserving "business as usual" conditions and avoiding the difficulties triggered by a substantial disruption of the cash management system will facilitate the Debtors' stabilization of their postpetition business operations and assist the Debtors in their reorganization efforts.  For these reasons, the relief requested in the Cash Management Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: May 28, 2019

/s/ *Edgar W. Mosley II*
Edgar W. Mosley II
Alvarez & Marsal North America, LLC
Managing Director