## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

————————————————————x

In re                                                    :        Chapter 11

                                                         :        Case No. (19-_____) (__)
WHITE STAR PETROLEUM HOLDINGS, LLC,                       :
*et al.*,[1]                                              :        Joint Administration Pending

                                                         :
                              Debtors.                    :

————————————————————x

## MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507, (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

White Star Petroleum Holdings, LLC and certain of its affiliated debtors and

debtors-in-possession (collectively, the "Debtors") hereby submit this motion (the "Motion") for

entry of an interim order, substantially in the form attached hereto as Exhibit A (the "Interim

Order"), and a final order (the "Final Order"), pursuant to sections 105, 361, 362, 363(b),

363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), and 507 of title 11 of

the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), and rules 2002, 4001,

6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i)

authorizing the Debtors to obtain senior secured superpriority postpetition financing, (ii) granting

liens and superpriority administrative expense claims, (iii) authorizing the use of cash collateral,

(iv) granting adequate protection, (v) modifying the automatic stay, (vi) scheduling a final

---

[1]     The Debtors in these chapter 11 cases, and the last four digits of their U.S. taxpayer identification numbers are: White Star Petroleum Holdings, LLC (0575) ("WSTR Holdings"), White Star Petroleum, LLC (0977) ("WSTR"), White Star Petroleum II, LLC (4347) ("WSTR II"), White Star Petroleum Operating, LLC (5387) ("WSTR Operating") and WSP Finance Corporation (9152) ("WSP Finance" and together with WSTR Holdings, WSTR, WSTR II and WSTR Operating, the "Debtors"). The Debtors' corporate headquarters is located at 301 N.W. 63rd Street, Suite 600, Oklahoma City, OK 73116.

hearing and (vii) granting related relief.  In support of this Motion, the Debtors rely upon the *Declaration of Jeffrey J. Zanotti in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "Zanotti First Day Declaration") and the *Declaration of Edgar W. Mosley II, Managing Director at Alvarez & Marsal North America, LLC in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "Mosley First Day Declaration" and together with the Zanotti First Day Declaration, the "First Day Declarations"), filed contemporaneously herewith and incorporated herein by reference and respectfully submit the *Declaration of Ajay Bijoor in Support of Motion of Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, and 507, (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling Final Hearing, and (VII) Granting Related Relief* (the "Bijoor Declaration") attached hereto as Exhibit B. In further support of this Motion, the Debtors respectfully state as follows:

## Background

1.      The Debtors engage in the acquisition, development, exploration and production of oil, natural gas, and natural gas liquids located in the Mid-Continent region in the United States.

2.      The Debtors are headquartered in Oklahoma City, Oklahoma and employ 169 people.  As of December 2018, the Debtors owned approximately 315,000 net leasehold acres primarily in Creek, Dewey, Garfield, Lincoln, Logan, Noble, and Payne counties of Oklahoma.  Approximately 80% of the total acreage was held by production.  As of December 31, 2018, the Debtors had an interest in a total of 883 gross productive wells (475 net) of which 590 were operated (451 net).  The Debtors are not currently drilling any new wells.

3.      On May 28, 2019 (the "Petition Date"), each of the Debtors filed with the Court a voluntary petition for relief under the Bankruptcy Code.  Each Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrent with the filing of this Motion, the Debtors filed a motion with the Court pursuant to Bankruptcy Rule 1015 and rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") seeking joint administration of the Debtors' cases.  No creditors' committee, trustee or examiner has been appointed in these chapter 11 cases.

4.      Additional factual background relating to the Debtors' businesses and the commencement of these chapter 11 cases is set forth in detail in the First Day Declarations.

<u>Facts Specific to the Relief Requested</u>

**I.      The Debtors' Prepetition Indebtedness.**

A.      <u>The First Lien Revolving Credit Facility.</u>

5.      The Debtors are party to the Revolving Credit Agreement, dated as of June 30, 2016, (the "RBL Credit Agreement"), which provides for a first lien revolving credit facility, among WSTR as borrower, the several lenders from time to time parties thereto (the "RBL Lenders") and MUFG Union Bank, N.A., as administrative agent and collateral agent for the RBL Lenders (the "RBL Agent").  Each of WSTR Holdings, WSTR, WSP Finance and WSTR Operating is a guarantor of the RBL Credit Agreement pursuant to the RBL Amended and Restated Guarantee Agreement, dated as of June 30, 2016.  Borrowings under RBL Credit Agreement are to be used for, among other things, the acquisition, development and exploration of oil and gas properties, investments, capital expenditures and other transactions, working capital and other general corporate purposes.  Interest under the RBL Credit Agreement is based

on the prime rate or LIBOR plus a margin that varies based on the utilization of the facility.  The RBL Credit Agreement's stated maturity is June 30, 2020.

6.      As of the Petition Date, the Debtors have drawn substantially all of the availability under the RBL Credit Agreement (approximately $274 million).

B.      The Second Lien Term Loan.

7.      On May 9, 2018, WSTR entered into a five-year second lien Term Loan with EnLink (the "Term Loan" and together with the revolving facility under the RBL Credit Agreement, the "Prepetition Secured Debt").  EnLink Oklahoma Gas Processing, LP ("EnLink"), the RBL Agent and the RBL Lenders together constitute the prepetition secured parties (collectively, the "Prepetition Secured Parties").  The principal amount of the Term Loan is $58 million, which amortizes pursuant to a specified amortization schedule.  Interest is payable on the Term Loan every quarter at an annual rate of 8.0%, beginning in the first quarter of 2020.  Each of the Debtors is a guarantor of the Term Loan pursuant to the Term Loan Guarantee Agreement, dated as of May 9, 2018.

C.      Unsecured Notes due September 15, 2022.

8.      WSTR and its wholly owned subsidiary WSP Finance have approximately $10.3 million outstanding in 9% senior notes due 2022 (the "Unsecured Notes").  The Unsecured Notes mature on September 15, 2022 and interest is payable at an annual rate of 9.0%, semi-annually, in arrears, on March 15 and September 15 of each year.  For the years ended December 31, 2018 and 2017, WSTR recorded approximately $0.9 million in interest expense for the Unsecured Notes each year.

D.      Sale-Leaseback

9.      On May 31, 2017, WSTR entered into a sale-leaseback transaction for its primary field office in Stillwater, Oklahoma for $4.9 million.  Approximately $4.5 million

4

currently remains outstanding.  WSTR has remained the tenant and leased back the 17-acre

property, which is its central northern Oklahoma field office.

## II.    The Debtors' Immediate Need for Postpetition Financing and Access to Cash Collateral.

10.    The Debtors' need to obtain credit pursuant to postpetition financing is

immediate and critical in order to enable the Debtors to continue operations and to administer

and preserve the value of their estates until a sale of substantially all of the Debtors' assets is

completed.  The Debtors are operating with extremely limited access to liquidity following the

events of May 1, 2019, whereby the Debtors learned that the RBL Agent had declared an event

of default and swept $8.1 million of cash from the Debtors' accounts.

11.    Pursuant to negotiations with the RBL Agent and its advisors, the RBL

Lenders agreed to provide the Debtors with access to some of the swept cash to fund outstanding

checks and ACH revenue payments, as well as other expenditures specifically approved by the

RBL Agent.  The Debtors have been operating with the RBL Agent authorizing specific

expenditures since the April 30 sweep.

12.    The Debtors do not have sufficient available sources of working capital

and financing to operate their businesses or to maintain their properties in the ordinary course of

business—let alone to pursue the various options available to create value for stakeholders—

without debtor-in-possession financing and the authorized use of "cash collateral" within the

meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral").

13.    The DIP Lenders (as defined below) are willing to provide liquidity on the

terms provided in the DIP Documents (as defined below) and the Interim Order and the Final

Order (each as defined below).  The Debtors, moreover, believe that the liquidity to be provided

by the DIP Facility (as defined below), together with the use of Cash Collateral, will enable the Debtors to fund their operations during the course of these chapter 11 cases.

14.    The ability of the Debtors to finance their operations, maintain business relationships, pay their employees, protect the value of their assets and pursue a strategy to maximize value for their creditors requires the availability of working capital from the DIP Facility and the ability to use Cash Collateral.  The absence of such would immediately and irreparably harm the Debtors, their estates, and their creditors and the possibility for successful administration of these chapter 11 cases.

## III.    The Debtors' Prepetition Debtor-in-Possession Financing Marketing Efforts.

15.    Prior to commencing these chapter 11 cases, the Debtors engaged in unsuccessful efforts to raise capital to refinance their Prepetition Secured Debt.  Following the Debtors' determination that chapter 11 proceedings would be required for an effective restructuring of the Debtors' balance sheet, the Debtors, with the assistance of Guggenheim Securities, LLC ("Guggenheim Securities") as well as the Debtors' restructuring advisor, Alvarez & Marsal North America, LLC ("A&M") and the Debtors' restructuring counsel, Sullivan & Cromwell LLP ("S&C" and, collectively with Guggenheim Securities and A&M, the "Advisors"), immediately began to size the debtor-in-possession financing facility and identify potential sources of postpetition financing.

16.    Since May 6, 2019, the Debtors, with the assistance of Guggenheim Securities, made extensive inquiries into alternatives for financing and solicited proposals for debtor-in-possession financing from various lending institutions with experience in providing such financing and other potential sources of capital.  More specifically, 20 prospective third-party lenders were contacted, 13 of which were either already subject to non-disclosure agreements with the Debtors or entered into new non-disclosure agreements to evaluate the

6

financing opportunity.  The Debtors ultimately received three indicative term proposals, including that of the DIP Lenders.  The Debtors believe that the marketing process used to determine the most viable postpetition financing facility for the Debtors was appropriate under the circumstances, including, without limitation, in light of the Debtors' condition, timing concerns and existing capital structure.

17.     Concurrently with these marketing efforts, the Debtors, with the assistance of their Advisors, had been engaged in discussions with the RBL Agent and the RBL Lenders' advisors regarding their interest in providing debtor-in-possession financing or their willingness to consent to third-party debtor-in-possession financing.  The RBL Agent and the RBL Lenders' advisors insisted that they would not consent to any priming of their security interests as part of a third-party debtor-in-possession financing.  The Debtors do not have unencumbered assets of sufficient value to support enough collateralized financing to meet the Debtors' cash needs during these chapter 11 cases, and all of the proposals received by the third-parties contacted only expressed an interest in providing the Debtors with debtor-in-possession financing with a superpriority priming lien on the existing first lien interests.  Further, each of the other third-party debtor-in-possession financing proposals required an upfront work fee and an expense deposit in order to provide a financing commitment.  The RBL Lenders, however, were unwilling to disburse cash for such work fees.  Consequently, the Debtors concluded that the debtor-in-possession financing facility being discussed with the RBL Agent and the RBL Lenders' advisors was the only practical option, given that the other prospective lenders were unwilling to undertake a priming fight without such a work fee and expense deposit and that the priming of liens was likely to be contested by the RBL Lenders and potentially involve costly and disruptive litigation at the early stages of these chapter 11 cases.  As a result, in parallel with

7

seeking third-party financing proposals, the Debtors continued to negotiate the terms of a potential debtor-in-possession financing with the RBL Agent and the RBL Lenders' advisors.

18.    Following negotiations with the RBL Agent and the RBL Lenders' advisors, the Debtors proposed that certain of the RBL Lenders provide a debtor-in-possession financing facility to the Debtors with the consent of a majority of the RBL Lenders (the "DIP Facility"), as detailed in the Debtor-In-Possession Credit Agreement by and among WSTR as borrower (the "DIP Borrower"), WSTR Holdings, MUFG Union Bank, N.A., as administrative agent and collateral agent (collectively, solely in such capacities, the "DIP Agent") and the lenders party thereto (the "DIP Lenders" and together with the DIP Agent, the "DIP Secured Parties") (as such agreement may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "DIP Credit Agreement" and together with the schedules and exhibits attached thereto and all agreements, documents, instruments and amendments executed and delivered in connection therewith, including the Approved Budget (as defined therein and including any permitted variances), the "DIP Documents").  The negotiations among the Debtors and the DIP Lenders with respect to the DIP Facility were conducted at arm's length.  Negotiations over the economic terms, milestones and structure of the DIP Facility continued into the days leading up to the Petition Date.

## IV.    The Debtors' Proposed Adequate Protection Is Fair and Reasonable.

19.    The proposed DIP Facility, as contemplated by the DIP Documents, in each case subject to customary exclusions including Permitted Prior Senior Liens (as defined in the Interim Order) and the Carve-Out (as defined in the Interim Order) will provide the DIP Lenders continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (as defined in the Interim Order), including the Prepetition Collateral (as defined in the Interim Order), which liens

8

will prime and be senior to the Prepetition Liens (as defined in the Interim Order).  In addition,

the Interim Order authorizes the Debtors to use Prepetition Collateral (including such Prepetition

Collateral consisting of Cash Collateral), subject to the terms and conditions set forth therein.

20.     The adequate protection contemplated by the DIP Facility and the Interim

Order is designed to protect the interests of the Prepetition Secured Parties in the Debtors'

property from any diminution in value caused by the imposition of the automatic stay and the

Debtors' use of the Prepetition Collateral, including Cash Collateral, during the pendency of

these chapter 11 cases.  Specifically, the Debtors have agreed to provide to the Prepetition

Secured Parties the following forms of adequate protection to the extent of any diminution in

value of their collateral and subject, in each case, to Permitted Prior Senior Liens and the Carve-

Out (collectively, the "Adequate Protection Obligations"):

(a)     Current cash reimbursement of the reasonable and documented fees, costs, and expenses (including reasonable and documented professional fees) of the RBL Agent;

(b)     Replacement or, if applicable, new liens on the DIP Collateral to secure adequate protection claims that are junior to the DIP Liens and ranking in the same relative priority and right as do the respective security interests and liens of the respective Prepetition Secured Parties; and

(c)     Superpriority claims as provided for in section 507(b) of the Bankruptcy Code that are junior to the DIP Superpriority Claims and ranking among the Prepetition Secured Parties in the same relative priority and right as do the respective claims thereof as of the Petition Date.

21.     The DIP Facility further provides the liquidity necessary to stabilize and

fund the Debtors' operations during the course of these chapter 11 cases as they seek to preserve

and maximize the value of their estates for the benefit of all parties in interest.  Without the

proposed DIP Facility, the Debtors' estates could be required to undertake a liquidation process

on a highly expedited basis and, in that scenario, secured creditor recoveries would likely be

materially impaired when compared to recoveries available if the Debtors are able to access the

proposed DIP Facility.  The proposed DIP Facility therefore eliminates the risk of an expedited

liquidation and, by avoiding that possible near-term outcome, provides a direct benefit to the

Prepetition Secured Parties.

**V.     The DIP Facility Is in the Best Interest of the Estates.**

22.     The DIP Facility will provide the Debtors with immediate access to the

liquidity necessary to stabilize the Debtors' businesses during the pendency of these chapter 11

cases.  Moreover, the liquidity provided under the DIP Facility is necessary to facilitate the

administration of these chapter 11 cases, fund all payments contemplated by the Debtors' "first

day motions" and ensure that the Debtors are able to conduct and consummate a strategy to

maximize value for their creditors.[2]  The Debtors believe that the immediate approval of the DIP

Facility is critical to sending a signal to the Debtors' vendors, suppliers, customers, regulators

and approximately 169 employees that the Debtors intend, and will have the ability, to maintain

current operations and successfully consummate a value-maximizing strategy.

23.     For these reasons, and for the reasons set forth below, in the Bijoor

Declaration, the Zanotti First Day Declaration and the Mosley First Day Declaration, the Debtors

believe that entering into the DIP Credit Agreement will maximize the value of the Debtors'

estates and is a sound exercise of the Debtors' business judgment.  Accordingly, the Debtors

respectfully request that the Court enter the Interim Order.

---

[2]     In the event that the Debtors pursue a sale of all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code, then in connection with such sale and prior to the consummation of such sale, the Debtors anticipate negotiating with the DIP Lenders to establish a reasonable wind-down budget (the "Wind-Down Budget") to pay all allowed (i) postpetition claims, (ii) administrative expense and priority claims and (iii) professional fees and expenses necessary to wind down the Debtors' estates in a reasonable and appropriate timeline.

10

## Jurisdiction

24.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014.  Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order or judgment by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Relief Requested

25.     By this Motion, the Debtors seek entry of the Interim Order and the Final Order, granting the following relief:

(a)     authorizing the DIP Borrower to obtain, and the DIP Borrower's Debtor parent and subsidiaries (collectively, in their capacity as such, the "DIP Guarantors" and, together with the DIP Borrower, the "DIP Loan Parties") to guaranty, debtor-in-possession credit financing in an aggregate principal amount of up to $28.5 million to be funded by the DIP Lenders under the DIP Facility;

(b)     authorizing the DIP Loan Parties, in connection with the DIP Facility, to (A) execute and enter into the DIP Credit Agreement, substantially in the form attached to the Interim Order as Exhibit 1 and (B) to perform all such other and further acts as may be required in connection with the DIP Documents;

(c)     granting to the DIP Agent, for the benefit of the DIP Lenders, valid, enforceable, non-avoidable and fully perfected liens and security interests, subject to the Carve-Out and the Permitted Prior Senior Liens, to secure

11

the DIP Obligations (as defined in the Interim Order), which liens and security interests shall have the rankings and priorities set forth herein;

(d) granting superpriority administrative claims to the DIP Secured Parties payable from, and having recourse to, all prepetition and postpetition property of the DIP Loan Parties' estates and all proceeds thereof (other than Avoidance Actions (as defined in the Interim Order), but, upon entry of the Final Order, including proceeds of Avoidance Actions), subject to the Carve-Out;

(e) authorizing the DIP Loan Parties (A) upon entry of this Interim Order, to incur in a single draw on the Closing Date (as defined in the DIP Credit Agreement), a term loan in an aggregate principal amount of up to $15 million (the "Interim Loan") and (B) upon entry of the Final Order, to incur delayed draw term loans up to an aggregate principal amount of $28.5 million, in each case subject to the terms and conditions set forth in the DIP Documents, this Interim Order, and the Final Order;

(f) authorizing the Debtors to use Cash Collateral (but excluding any Cash Collateral subject to Permitted Prior Senior Liens) in accordance with the DIP Credit Agreement;

(g) authorizing the Debtors to provide adequate protection of the liens and security interests granted by Debtors for the benefit of the Prepetition Secured Parties;

(h) modifying the automatic stay as set forth herein to the extent necessary to implement and effectuate the foregoing and the other terms and provisions of the DIP Documents, the Interim Order and Final Order;

(i) waiving of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order;

(j) subject to entry of a Final Order, waiving any right to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code; and

(k) scheduling a final hearing (the "Final Hearing"), to be held within 30 days after the Petition Date, to consider entry of the Final Order approving the DIP Facility and use of Cash Collateral, as set forth in the DIP Motion and the DIP Documents.

## Concise Summary of Terms of the DIP Facility

26.    Under the disclosure requirements of Bankruptcy Rule 4001(b), (c), and (d) and Local Rule 4001-2(a)(i) and (ii), the following table concisely summarizes the significant terms of the DIP Facility and the Interim Order:[3]

| Summary of Relevant Provisions | |
| --- | --- |
| **Bankruptcy Code/Local Rule** | **Summary of Material Terms** |
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | White Star Petroleum, LLC<br><br>*See* DIP Credit Agreement, Introductory Statement |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | White Star Petroleum Holdings, LLC and each subsidiary of the Borrower that becomes a party to the Guarantee (as defined in the DIP Credit Agreement).<br><br>*See* DIP Credit Agreement § 1.01 (Definition of "Guarantor") |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | The lenders from time to time party to the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, Recitals |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | MUFG Union Bank, N.A.<br><br>*See* DIP Credit Agreement, Recitals |
| **Amount and Facility**<br>Bankruptcy Rule 4001(c)(1)(B) | A senior secured priming debtor-in-possession financing (the "***DIP Facility***") consisting of the Term Loan Commitments (as defined in the DIP Credit Agreement), the aggregate amount of which is $26,884,640, and the L/C Commitments (as defined in the DIP Credit Agreement), the aggregate amount of which is $1,615,360, with a total maximum principal availability of $28,500,000 (the "***Total Aggregate Commitment***" and the loans and letters of credit issued thereunder, the "***Loans***") to be funded in multiple borrowings as follows: (a) up to $15,000,000 million made available not later than one business day following the entry of the Interim Order (as defined below) (the "***Initial Borrowing***"), and (b) the remainder of the Total Aggregate Commitment, other than the L/C Commitments (the "***Subsequent Borrowing***"), made available in a single draw following the entry of the Final Order (as defined below).<br><br>The L/C Commitments will be reserved and used solely for the issuance of letters of credit (the "***DIP Letters of Credit***") to replace the letters of credit issued under the Prepetition RBL Credit Agreement (as defined in the Interim Order) (the "***Existing Letters of Credit***"). The DIP Letters of Credit will be issued on terms substantially similar to those contained in the Prepetition RBL Credit Agreement, except that the DIP Letters of Credit (a) will be issued solely in replacement of the Existing Letters of Credit (i.e. in the same amount and in favor of the same beneficiaries or any successors, assigns or replacements of such beneficiaries), (b) will be conditioned upon the substantially simultaneous termination of the corresponding Existing Letter of Credit, and (c) will not be issued prior to 5 business days after entry of the Interim |

---

[3]    This summary, including the defined terms it uses (whether or not defined within the summary), is qualified in its entirety by the provisions of the DIP Documents and the Interim Order, as applicable. To the extent that there are any conflicts between this summary, on the one hand, and any DIP Document or the Interim Order, as applicable, on the other, the terms of such DIP Document or the Interim Order, as applicable, shall govern.

| | |
|---|---|
| | Order. |
| | *See* DIP Credit Agreement §§ 1.01 (Definitions of "Term Loan Commitment" and "L/C Commitment", 2.01 (DIP Term Loan Facility), 3.01 (Letters of Credit) |
| **Funding Use of Proceeds** Bankruptcy Rule 4001(c)(1)(B) | For (i) the payment of the allowed administrative costs and expenses of the Chapter 11 Cases, (ii) the payment of certain payments pursuant to any First Day Orders (as defined in the DIP Credit Agreement), (iii) the payment of adequate protection payments as set forth in the Financing Orders (as defined in the DIP Credit Agreement), (iv) current interest and fees due to the DIP Agent and the Lenders pursuant to the terms of the DIP Credit Agreement, and (v) working capital purposes, in each case, solely in a manner consistent with the Approved Budget (as defined below) (as in effect from time to time and subject to the Permitted Variance (as defined in the DIP Credit Agreement)) and the Financing Orders.<br><br>The Borrower will use Letters of Credit for general corporate purposes.<br><br>*See* DIP Credit Agreement § 9.12 (Use of Proceeds) |
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B) | Loans under the DIP Facility will bear interest at a rate, at Borrower's option, equal to the Base Rate (as defined in the DIP Credit Agreement) plus 9.00% per annum or the Eurodollar Rate (as defined in the DIP Credit Agreement) plus 10.00% per annum.<br><br>*See* DIP Credit Agreement § 2.08 (Interest) |
| **Default Interest** Bankruptcy Rule 4001(c)(1)(B) | If any Event of Default (as defined below) is in existence, the principal amount of all Loans outstanding and, to the extent permitted by applicable Requirements of Law (as defined in the DIP Credit Agreement), any interest, fees or other amounts owed under the DIP Credit Agreement will bear interest at a rate per annum (the "***Default Rate***") equal to the rate per annum, (i) in the case of outstanding principal, the rate that would otherwise be applicable thereto <u>plus</u> two percent (2.00%), and (ii) in the case of any other amount, the rate otherwise payable at such time on Base Rate Loans (as defined in the DIP Credit Agreement) <u>plus</u> two percent (2.00%), but in no event to exceed an amount not permitted by the applicable Requirements of Law.  Interest that accrues at the Default Rate will be payable on demand and shall otherwise be payable in arrears on each Interest Payment Date (as defined in the DIP Credit Agreement).<br><br>*See* DIP Credit Agreement §§ 1.01 (Definition of "Applicable Margin"), 2.08 (Interest) |

14

| | |
|---|---|
| **Maturity**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility will mature on the earliest of (such earliest date, the "***Maturity Date***"):<br><br>(a) December 31, 2019 (the "***Scheduled Maturity Date***"); <u>provided</u> that the Scheduled Maturity Date may be extended one time by up to three months upon request by the DIP Borrower received by the DIP Agent no later than 10 business days prior to December 31, 2019 and with the prior written consent of the DIP Agent; <u>provided</u>, that as of December 31, 2019, no default or Event of Default under the DIP Facility shall have occurred and be continuing;<br><br>(b) the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases;<br><br>(c) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code or otherwise, other than in connection with a confirmed plan of reorganization or liquidation in the Chapter 11 Cases or as otherwise approved by the DIP Agent in its reasonable discretion;<br><br>(d) without the DIP Agent's prior written consent, the date of filing or express written support by any Debtor of a plan of liquidation or reorganization and related disclosure statement that is not an Acceptable Plan (as defined below). As used herein, an "***Acceptable Plan***" means a plan of reorganization or liquidation and related disclosure statement for each of the Chapter 11 Cases filed by the Debtors, in form and substance reasonably satisfactory to the DIP Agent, as confirmed in writing by the DIP Agent, that (i) contemplates a sale, to be indefeasibly paid for in cash, of all or substantially all of the assets of the Debtors, (ii) provides for the consideration for such sale to be indefeasibly paid in cash on the effective date of such sale, and (iii) provides for the application of the proceeds of such sale in a manner permitted by the Bankruptcy Code; or<br><br>(e) the date of termination of the DIP Lenders' commitments and the acceleration of any outstanding Loans, in each case, under the DIP Facility in accordance with the terms of the credit agreement (the "***DIP Credit Agreement***") and the other definitive documentation with respect to the DIP Facility (collectively with the DIP Credit Agreement and the related security documents, the "***Operative Documents***").<br><br>*See* DIP Credit Agreement § 1.01 (Definition of "Maturity Date") |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Agent will receive, for the ratable benefit of each Lender, an unused commitment fee in the amount of 1.00% per annum of the unfunded portion of the aggregate commitments, which shall be paid in full in cash on a monthly basis.<br><br>The DIP Agent will receive an administrative agency fee in an amount equal to $35,000.<br><br>The DIP Agent will receive a commitment premium in an amount equal to 2.00% of the aggregate amount of the commitments, for the ratable benefit of each commitment party.<br><br>The DIP Agent will receive a closing premium equal to 3.00% of the commitments of each Lender on the Closing Date, for the ratable benefit of each Lender.<br><br>The DIP Agent will receive a fee for the account of the Lenders pro rata on the basis of their respective Letter of Credit Exposure (as defined in the DIP Credit Agreement) in respect of each Letter of Credit (as defined in the DIP Credit Agreement) for the |

SC1:4946601.1

| | |
|---|---|
| | period from the date of issuance of such letter of credit until the termination or expiration date of such Letter of Credit, computed at the per annum rate for each day equal to the applicable margin for Eurodollar Loans (as defined in the DIP Credit Agreement) times the daily stated amount of such Letter of Credit, due and payable (i) quarterly in arrears on the last business day of each March, June, September and December and (ii) on the Termination Date (as defined in the DIP Credit Agreement) (for the period for which no payment has been received pursuant to clause (i) above. <br><br> Each Issuing Bank (as defined in the DIP Credit Agreement) will receive a fee in respect of each Letter of Credit issued by it, for the period from the date of issuance of such Letter of Credit to the termination or expiration date of such Letter of Credit, computed at the rate for each day equal to one quarter of a percent (0.25%) per annum (or such other rate per annum as agreed in writing between the Borrower and the Issuing Bank), due and payable (i) quarterly in arrears on the last business day of each March, June, September and December and (ii) on the Termination Date (for the period for which no payment has been received pursuant to clause (i) above. <br><br> *See* DIP Credit Agreement § 4.01 (Fees) |
| **Optional Prepayments** <br> Bankruptcy Rule 4001(c)(1)(B) | The DIP Borrower may, upon written notice, prepay the Loans in full or in part, without premium or penalty; <u>provided</u>, that each such partial prepayment shall be in a minimum amount of $500,000 and in multiples of $100,000 in excess thereof. <br><br> *See* DIP Credit Agreement § 5.01 (Voluntary Prepayments) |
| **Mandatory Prepayments** <br> Bankruptcy Rule 4001(c)(1)(B) | Mandatory prepayments of the Loans in an amount equal to (a) 100% of net cash proceeds of insurance and condemnation events, (b) 100% of net cash proceeds from the issuance of post-petition indebtedness not permitted by the DIP Credit Agreement and (c) 100% of the net cash proceeds of any asset sales (other than dispositions of hydrocarbons and mineral products in the ordinary course of business and dispositions specifically approved by the DIP Agent in advance (including, to the extent applicable, via the DIP Agent's approval of the Approved Budget) (without any reinvestment rights but with a de minimis dollar carveout for sales less than $25,000); <u>provided</u>, that if the DIP Agent so consents, asset sale proceeds and insurance and condemnation proceeds received pursuant to this section may be utilized by the Debtors in accordance with the Approved Budget (subject to the Permitted Variance). <br><br> Any voluntary prepayments and mandatory prepayments shall be applied as follows: <u>first</u>, to the payment of any accrued interest on the Loans being prepaid at the Default Rate, if any, until paid in full; <u>second</u>, to the payment of any accrued and unpaid interest on the Loans being prepaid (other than that calculated at the Default Rate and paid in clause "<u>first</u>" above) and Letter of Credit fees until paid in full; and <u>third</u>, to prepay the principal amount of Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof) until paid in full. <br><br> *See* DIP Credit Agreement § 5.02 (Mandatory Prepayments; Application of Prepayments) |
| **Security and Priority** <br> Bankruptcy Rule 4001(c)(1)(B)(i) | As security for the DIP Obligations (as defined in the Interim Order), the DIP Agent on behalf and for the benefit of the Secured Parties is granted (effective upon the date of the Interim Order, without the necessity of the execution by the Debtors or the filing or recordation of security agreements, lockbox or control agreements, financing statements, or any other instruments or otherwise) valid, binding and fully-perfected security interests in and liens upon (the "***DIP Liens***") all present and after-acquired property of the Debtors of any nature whatsoever (including, without limitation, "Collateral," as defined in the DIP Credit Agreement), including, without limitation, licenses issued by any federal or state regulatory authority, any leasehold or other real |

16

<table>
<tr>
<td></td>
<td>

property interests, and commercial tort claims of the Debtors; all cash and cash equivalents contained in any account maintained by any of the Debtors; and, subject to entry of a Final Order, all proceeds of Avoidance Actions of the Debtors or their estates (collectively with all proceeds and products of any or all of the foregoing, the "***Collateral***"), subject only to the payment of the Carve-Out and Permitted Prior Senior Liens (as defined in the Interim Order), which shall consist of:

(a)        pursuant to section 364(d)(1), a first priority, priming security interest in an lien on all encumbered property of the Debtors and their estates, which shall be senior to any existing liens or claims, subject and subordinated only to valid, perfected and non-avoidable liens on property of the Debtors that are Permitted Prior Senior Liens (as defined in the Interim Order);

(b)        pursuant to 364(c)(3) of the Bankruptcy Code, a junior, perfected lien and security interest upon all of the Debtors' right, title and interest in, to and under property of the Debtors and their estates that is subject to any unavoidable Permitted Prior Senior Lien that was validly perfected prior to the Petition Date, or is validly perfected subsequent to the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code, and is not subject to Section 552(a) of the Bankruptcy Code; and

(c)        pursuant to section 364(c)(2) of the Bankruptcy Code, a continuing, enforceable, first priority, fully-perfected lien and security interest upon all of the Debtors' right, title and interest in, to, and under all property of the Debtors and their estates that was not, as of the Petition Date, encumbered by a validly perfected, enforceable, and nonavoidable security interest or lien (collectively, the "***Unencumbered Property***").

The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoidable for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any intercompany or affiliate liens among the Debtors.

In accordance with section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall constitute superpriority administrative expense claims against each of the Debtors with priority in payment over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors.

*See* Interim Order ¶¶ 10, 11

</td>
</tr>
<tr>
<td>

**DIP Budget and Related Covenants**
Bankruptcy Rule 4001(c)(1)(B)

</td>
<td>

From time to time (but not more than twice per month unless otherwise agreed by the DIP Agent), the Borrower may deliver a proposed updated 13-week cash flow projection and DIP budget substantially in the form of the Initial Budget (as defined below) or in such other form as the DIP Agent may agree in its reasonable discretion (the "***Proposed Budget***").  To the extent such Proposed Budget is approved by the DIP Agent in its reasonable discretion, such Proposed Budget shall thereafter be the "***Approved Budget***" for such period contained therein and for all purposes hereunder. No such Proposed Budget shall become an Approved Budget until so approved; <u>provided</u> that the DIP Agent shall be deemed to have approved such Proposed Budget if it has not objected thereto within five (5) business days after delivery thereof.  In the event that any Proposed Budget is not so approved, the last Approved Budget without giving effect to any update, modification or supplement shall apply to the projection period (with appropriate adjustments for the timing of monthly or semi-monthly disbursements) until such time as a Proposed Budget is approved by the DIP Agent in its reasonable discretion.

The Debtors will be required to deliver to the DIP Agent by 12:00 p.m., Eastern time, on Thursday of each week, a report in a form reasonably acceptable to the DIP Agent reflecting variance from the Approved Budget.

</td>
</tr>
</table>

17

The Debtors' cumulative actual receipts plus the amount of any carryover receipts from the immediately preceding Test Period (as defined below) which are not included in the current Test Period may not be less than 85% of projected receipts for each applicable Test Period (the "*Permitted Collections Budget Variances*"), as set forth in the Approved Budget.

The Debtors' cumulative operating disbursements may not be more than (i) 110% of the budgeted operating disbursements for the applicable Test Period as set forth in the Approved Budget for the Test Period plus the amount of any carryover budgeted operating disbursements from the immediately preceding Test Period which are not included in the current Test Period and (ii) with respect to each of the "Employee Related" expenditures, "Lease Operating Expense", "CapEx" and "Transportation Fees" line items in the Approved Budget, in each case, 115% of the budgeted disbursements for each such line-item, plus the amount of any carryover budgeted disbursements for each such line item from the immediately preceding Test Period which are not included in the current Test Period (the variances described in clauses (i) and (ii), the "*Permitted Budget Variances*" and together with the Permitted Collections Budget Variances, the "*Budget Variances*").

The Permitted Budget Variances will be tested weekly, on a rolling four-week basis (each such four-week period, a "*Test Period*").

*See* DIP Credit Agreement §§ 1.01 (Definitions of "Approved Budget" and "Budget Test Period"), 9.23 (Additional Reporting), 10.11 (Variance Covenants)

| | |
|---|---|
| **Reporting**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement requires compliance with certain periodic reporting covenants that are usual and customary for similar debtor-in-possession financings, including delivery of (A) annual audited consolidated balance sheets of the Borrower and certain of its subsidiaries and (B) quarterly and monthly unaudited balance sheets, income statements and related statements of cash flows of the Borrower and certain of its subsidiaries.<br><br>The Borrower will also be required to furnish to the DIP Agent (A) a weekly report reflecting variances in actual receipts and operating disbursements from the Approved Budget on a line-by-line basis and a cumulative basis, with explanations of any variances; (B) a weekly report with respect to the Sale Process; (C) promptly, and in any event no later than 10 business days after the end of each calendar month, a production report with respect to such calendar month, (D) as soon as available following the end of each calendar month, a lease operating statement with respect to such calendar month; (E) promptly, and in any event no later than 10 business days after the end of each calendar month, a detailed accounts payable aging report of each Credit Party as of the end of such calendar month; and (F) substantially concurrently with the filing thereof with the Bankruptcy Court, copies of the monthly operating reports required to be filed with the Bankruptcy Court, and prior to the filing thereof, copies of all material pleadings, motions and applications to be filed by or on behalf of the Credit Parties with the Bankruptcy Court or provided to the U.S. Trustee or the Committee.<br><br>*See* DIP Credit Agreement §§ 9.01 (Reports and Other Information), 9.20 (Additional Reporting) |
| **Borrowing Conditions**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement contains the following conditions precedent to the Initial Borrowing under the DIP Facility:<br><br>(a)  The DIP Agent shall have received a signed counterpart of the DIP Credit Agreement or written evidence that the DIP Credit Agreement has been signed.<br><br>(b)  The DIP Agent shall have received the officer's certificates from the parties |

to the DIP Credit Agreement.

(c) The DIP Agent shall have received executed copies of the Guarantee (as defined in the DIP Credit Agreement) and the Collateral Agreement (as defined in the DIP Credit Agreement).

(d) (i) The First Day Orders shall have been entered and (ii) the Interim Order shall have been entered and shall be in full force and effect no later than two business days after the Petition Date and shall not have been amended or otherwise modified in any manner adverse in any material respect to the Lenders without the prior written consent of the DIP Agent, it being agreed that any modification in connection with a transfer of venue of the Chapter 11 Cases shall not be deemed to be adverse to the Lenders. The form and substance of the First Day Orders shall be reasonably satisfactory to the DIP Agent.

(e) All fees and expenses required to be paid shall have been paid, including all fees and documented out-of-pocket expenses for which invoices have been presented.

(f) The DIP Agent shall have received a cash flow forecast and initial budget for the 13-week period commencing on the Petition Date setting forth line items of sufficient detail to reflect the Credit Parties' projected receipts and operating disbursements for such 13-week period, in form and substance reasonably satisfactory to the DIP Agent, as confirmed in writing by the DIP Agent (the "***Initial Budget***").The Debtors shall have delivered projections covering the tenor of the DIP Facility in form and substance reasonably satisfactory to the DIP Agent.

(g) The DIP Agent shall have received projections of the financial condition of the Debtors for each period from the Closing Date through the Maturity Date, which projections shall be in form and substance reasonably satisfactory to the Administrative Agent.

(h) The Debtors shall have established a cash management system reasonably satisfactory to the DIP Agent.

(i) The Debtors' financial advisors shall have commenced a marketing process for a sale of all or substantially all of the Debtors' assets (the "***Purchased Assets***") by having prepared a buyers list, a non-disclosure agreement to utilize in the marketing process and a marketing teaser that have been approved by the Debtors.

The DIP Credit Agreement contains the following conditions precedent to each Credit Event (as defined in the DIP Credit Agreement), including the Initial Borrowing:

(a) (i) no Default or Event of Default shall have occurred and be continuing or would result from such proposed Credit Event, (ii) all representations and warranties made by any Credit Party contained in the DIP Credit Agreement or in the other Credit Documents (as defined in the DIP Credit Agreement) shall be true and correct in all material respects (except to the extent that such representations and warranties are qualified by materiality, in which case such representations and warranties shall be true and correct in all respects) with the same effect as though such representations and warranties had been made on and as of the date of such Credit Event (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date, without duplication of any materiality qualifier) and (iii) the aggregate amount of all Loans made by Lenders (including the Loans requested to be made on such date) shall not

19

<table>
<tr>
<td></td>
<td>

exceed the aggregate amount of Term Loan Commitments, and (iv) the aggregate amount of Letter of Credit Exposure of all Lenders shall not exceed the aggregate amount of L/C Commitments.

(b) Prior to the making of each Loan (other than as described in the DIP Credit Agreement), the DIP Agent shall have received a notice of borrowing in accordance with the DIP Credit Agreement.

(c) Prior to the issuance of each DIP Letter of Credit (or an amendment, extension or renewal of a DIP Letter of Credit), the DIP Agent and the applicable Issuing Bank shall have received a letter of credit application in accordance with the DIP Credit Agreement.

(d) The making of the Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(e) The Financing Orders (or, in the case of the Initial Borrowing, only the Interim Order) shall be in full force and effect and shall not have been vacated, reversed, modified, amended or subjected to a stay, in any manner adverse in any material respect to the Lenders without the prior written consent of the DIP Agent, it being agreed that any modification in connection with a transfer of venue of the Chapter 11 Cases shall not be deemed to be adverse to the Lenders.

(f) The Debtors shall not have filed any motion or pleading objecting to (or in support of an objection to) an Acceptable Plan.

(g) No shareholder of any Debtor (or any affiliate of any shareholder of a Debtor) shall have filed or supported a motion, or sought an order contesting in any respect, the relief requested with respect to entry into the DIP Facility.

*See* DIP Credit Agreement, Article VI (Conditions Precedent) and Article VII (Conditions Precedent to All Credit Events).

</td>
</tr>
<tr>
<td>

**Stipulations as to Prepetition Claims and Liens**
Bankruptcy Rule 4001(c)(1)(B)(iii)

</td>
<td>

The Debtors stipulate that:

(a) As of the Petition Date, the Debtors were truly and justly indebted, to the Prepetition RBL Secured Parties (as defined in the Interim Order), without defense, counterclaim or offset of any kind, pursuant to the Prepetition RBL Loan Documents (as defined in the Interim Order) in the aggregate principal amount in respect of the loans made under the prepetition revolving credit facility and payment-in-kind interest under the DIP Credit Agreement (including Letter of Credit Obligations totaling $1,615,360) of $275,416,546.64 (the "***Prepetition RBL Loans***"), *plus* accrued and unpaid interest at the default rate with respect thereto and any additional fees, costs and expenses (including any fees and expenses of attorneys, financial advisors, and other professionals that are chargeable or reimbursable under the Prepetition RBL Loan Documents due under the Prepetition RBL Credit Agreement  and the other Prepetition RBL Loan Documents (collectively, together with all other obligations of the obligors arising under the Prepetition RBL Loan Documents (including, without limitation, the "Obligations" as defined in the Prepetition RBL Credit Agreement), the "***Prepetition RBL Obligations***");

(b) The mortgages, any control agreement and other collateral documents and agreements (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof, collectively, the "***Prepetition RBL Security Documents***"), and the other Prepetition RBL Loan Documents, Debtors granted to and/or for the benefit of the Prepetition RBL Secured Parties first priority (subject only to RBL Permitted Liens (as defined in the Interim Order)), valid, perfected and enforceable security

</td>
</tr>
</table>

20

<table>
<tr><td></td><td>

interests and liens (the "**Prepetition RBL Liens**") in and on all Prepetition Collateral (as defined in the Interim Order);

(c) The Prepetition RBL Agent (as defined in the Interim Order), as prepetition first lien collateral agent, and the Prepetition Term Lender (as defined in the Interim Order) entered into that certain intercreditor agreement (the "**Prepetition Intercreditor Agreement**") dated as of May 9, 2018 to govern the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the assets and properties of the Debtors.    Each of the Debtors under the Prepetition Documents acknowledged and agreed to the Prepetition Intercreditor Agreement.

(d) The Prepetition RBL Obligations constitute legal, valid and binding obligations of the Debtors; (b) no offsets, defenses or counterclaims to the Prepetition RBL Obligations exist; (c) no portion of the Prepetition RBL Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition RBL Loan Documents are valid and enforceable by the Prepetition RBL Agent for the benefit of the Prepetition RBL Secured Parties against each of the applicable Debtors; (e) the liens and security interests of the Prepetition RBL Secured Parties constitute valid, binding, enforceable and perfected liens in and to the Prepetition RBL Collateral having the priority set forth in the Prepetition RBL Loan Documents and subject and subordinate only to (after giving effect to Prepetition Intercreditor Agreement) Permitted Liens (as defined in the Interim Order); (f) the Prepetition RBL Obligations constitute allowed secured claims against the applicable Debtors' estates; and (g) no claim of or cause of action held by the Debtors exists against the Prepetition RBL Agent, any of the Prepetition RBL Lenders or any of their respective agents, in each case in their capacity as such, whether arising under applicable state or federal law, arising out of, based upon or related to, in whole or in part, the Prepetition RBL Obligations or their prepetition relationship with any Debtor or any affiliate thereof relating to any of the Prepetition RBL Loan Documents or any transaction contemplated thereby; and

(e) All of Debtors' cash, including any cash in all deposit accounts and collection accounts, wherever located, comprising proceeds of or otherwise arising from or relating to the Prepetition RBL Collateral, constitutes Cash Collateral (as defined in the DIP Credit Agreement) of the Prepetition RBL Secured Parties.

*See* Interim Order ¶ D
</td></tr>
<tr><td>

**Effect of Stipulations**
Bankruptcy Rules
4001(c)(1)(B)(iii) and
4001(c)(1)(B)(viii)
</td><td>

The Debtors' stipulations, admissions, agreements, and releases contained in the Interim Order shall be binding upon all parties in interest, and all parties-in-interest shall be barred from bringing a Challenge (as defined below) if not brought during the Investigation Termination Date (as defined below).

The official committee of creditors holding unsecured claims appointed in the Chapter 11 Cases ("**Committee**") shall have the later of 60 days from the date of the Committee's appointment (provided that such appointment occurs within 75 days of the entry of the Interim Order) or 75 days from the entry of the Interim Order, and all other parties-in-interest shall have 75 days from the Petition Date (the "**Investigation Termination Date**") to investigate the validity, perfection and enforceability of the Prepetition RBL Liens and the Prepetition RBL Obligations and to file and prosecute an objection or claim related to the investigation (a "**Challenge**").

*See* Interim Order ¶ 17
</td></tr>
</table>

21

| | |
|---|---|
| **Release of Claims Belonging to the Estate or the Trustee** Bankruptcy Rule 4001(c)(1)(B)(viii) | Subject to entry of the Final Order, the Debtors release and discharge each of the secured parties, in their capacity as such, together with their respective affiliates, agents, attorneys, officers, directors and employees, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of the DIP Loan Documents (as defined in the Interim Order) or any loans under the DIP Facility, any aspect of the relationship between the Debtors, on the one hand, and any or all of the released parties, on the other hand, relating to any of the DIP Loan Documents or any transaction contemplated thereby or any other acts or omissions by any or all of the released parties in connection with the DIP Facility or any of the DIP Loan Documents or their prepetition relationship with such Debtor or any affiliate thereof relating to any of the DIP Loan Documents or any transaction contemplated thereby, including, without limitation, any claims or defense sunder chapter 5 of the Bankruptcy Code or any other causes of action. *See* Interim Order ¶ 33 |
| **Adequate Protection** Bankruptcy Rule 4001(c)(1)(B)(ii) | Each of the secured parties is entitled to adequate protection of its interests in the Collateral on account of and in equal amount to the diminution in the value thereof as a result of (a) the provisions of the Interim Order granting priming liens on such Collateral to the DIP Agent for the benefit of the secured parties; (b) the authorization of the use of Cash Collateral and other Collateral; (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code; and/or (d) otherwise, pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code (collectively, the "***Adequate Protection Claims***"). Each of the Prepetition RBL Agent (as defined in the Interim Order), on behalf and for the benefit of the Prepetition RBL Lenders, and the Prepetition Term Lender (as defined in the Interim Order) are hereby granted the following (collectively, the "***Adequate Protection Obligations***"): (a) valid, enforceable, unavoidable and fully perfected replacement liens and security interests in postpetition Collateral ("***Adequate Protection Liens***"); (b) superpriority administrative expense claims ("***Adequate Protection Superpriority Claims***"); and (c) payment of reasonable, documented, prepetition and postpetition out-of-pocket fees, costs and expenses incurred or accrued by the Prepetition RBL Secured Parties (as defined in the Interim Order) for legal counsel and financial advisors retained by the Prepetition RBL Lenders. *See* Interim Order ¶ 12 |
| **Covenants** Bankruptcy Rule 4001(c)(1)(B) | <u>Affirmative Covenants</u>: Customary and appropriate for financings of this type, including, without limitation, (a) financial reporting and notices of material events, (b) delivery of reports, (c) payment of tax obligations, (d) operation and maintenance of properties; (e) maintenance of insurance, (f) keeping of books and records and granting of inspection rights, (g) compliance with applicable laws, (h) cash management, (i) additional reporting, (j) ERISA compliance, (k) use of proceeds, (l) milestones and (m) certain other bankruptcy matters. <u>Negative Covenants</u>: Customary and appropriate for financings of this type, including, without limitation, restrictions on (a) restricted payments, (b) subsidiary distributions, (c) indebtedness, (d) asset sales, (e) transactions with affiliates, (f) liens, (g) investments, (h) fundamental changes, (i) debt payments and amendments, (j) hedge agreements, (k) variance covenants, (l) negative pledge agreements, (m) drilling and completion capital expenditures, (n) modifications to orders and (o) certain conduct without the prior written consent of the DIP Agent. *See* DIP Credit Agreement, Article IX (Affirmative Covenants) and Article X (Negative Covenants) |
| **Events of Default** | The DIP Credit Agreement contains certain events of default (collectively, the |

SC1:4946601.1

| Bankruptcy Rule 4001(c)(1)(B) | "*Events of Default*") including: |
|---|---|
| | (a) failure to (i) pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or upon redemption, acceleration or otherwise, (ii) pay when due any interest on the Loans, fees or any other amounts owing hereunder or under any other Credit Document; |
| | (b) any representation, warranty, or statement made or deemed made by any Credit Party or in any other Credit Document or any certificate delivered or required to be delivered pursuant thereto shall prove to be untrue in any material respect on the date as of which made or deemed made; |
| | (c) noncompliance with the obligations, covenants or agreements set forth in the DIP Credit Agreement or related documents; |
| | (d) failure of the Borrower or its subsidiaries to pay final, non-appealable judgments with respect to any post-Petition Date liability aggregating in excess of $1,000,000, which remains unpaid for more than 60 days after such judgment becomes final; |
| | (e) the occurrence of a Change of Control (as defined in the DIP Credit Agreement), other than as a part of a transaction reasonably acceptable to the DIP Agent; and |
| | (f) various bankruptcy matters, including if: |
| |     (i) the Bankruptcy Court shall enter any order dismissing any of the Chapter 11 Cases (other than in connection with a transfer of venue, so long as there remains a pending proceeding under the Bankruptcy Code with respect to each Credit Party) or converting any of the Chapter 11 Cases to a Chapter 7 case; |
| |     (ii) the Bankruptcy Court shall enter any order appointing a Chapter 11 trustee or a receiver, or appointing an examiner with enlarged powers relating to the operation of the business of any Credit Party under Section 1106(b) of the Bankruptcy Code in any of the Chapter 11 Cases; |
| |     (iii) the Bankruptcy Court shall enter an order granting relief from the any stay of proceeding (including the automatic stay) to any Person holding or asserting a Lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Credit Party or any subsidiary which have an aggregate value in excess of $500,000, except as otherwise approved by the DIP Agent in its reasonable discretion; |
| |     (iv) the Bankruptcy Court shall enter any order granting or allowing any other superpriority claim (other than the Carve-Out) or granting any other lien (including any adequate protection lien) having a priority equal or superior to the claims and liens in favor of the Collateral Agent (as defined in the DIP Credit Agreement) securing the obligations under the DIP Credit Agreement in any of the Chapter 11 Cases, without the prior written consent of the DIP Agent (or as otherwise provided in the Financing Orders or in the Credit Documents); |
| |     (v) (A) the Bankruptcy Court shall enter an order confirming (or the filing by any Credit Party of any motion or pleading requesting confirmation of or otherwise in support of) a plan of reorganization or liquidation with respect to any Debtor, in each case, that is |

SC1:4946601.1

not an Acceptable Plan, without the prior written consent of the DIP Agent or (B) the termination of the Credit Parties' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization;

(vi)     the Bankruptcy Court shall enter any order staying, reversing, vacating or otherwise modifying, without the prior written consent of the DIP Agent, the DIP Facility, the Interim Order or the Final Order (and such order is not stayed or reversed within two business days after entry thereof), other than in connection with a transfer of venue of the Chapter 11 Cases;

(vii)     the payment or granting of adequate protection with respect to Prepetition Indebtedness (other than as described in the DIP Credit Agreement or the applicable Financing Order) in a manner that requires cash expenditures either (x) not contemplated by the Approved Budget or (y) that would have a material adverse effect on the Collateral (as reasonably determined by the DIP Agent), in each case, without the prior written consent of the DIP Agent;

(viii)     the Final Order (x) shall not have been entered within 40 days after the Petition Date (or such later date as the DIP Agent) or (y) shall, at any time, cease to be in full force and effect, or the Bankruptcy Court shall enter any order amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Final Order, other than in connection with a transfer of venue of the Chapter 11 Cases (and such order is not stayed or reversed within two business days after entry thereof), without the prior written consent of the DIP Agent;

(ix)     any Lien granted in favor of Collateral Agent in any of the Collateral under the Financing Orders or any Security Document (as defined in the DIP Credit Agreement) or any DIP Superpriority Claims (as defined in the Financing Orders) shall cease to have the validity, perfection or priority set forth in the DIP Credit Agreement, the other Credit Documents or the Financing Orders;

(x)     the filing of a motion or seeking of an order to approve any employee incentive or retention plan, in each case, that includes proposed payments to insiders (as that term is defined in the Bankruptcy Code), that is not reasonably acceptable to the DIP Agent in its reasonable discretion;

(xi)     the occurrence of any Production Decrease Event (as defined in the DIP Credit Agreement);

(xii)     any Credit Party fails to comply with any material term of the Financing Orders and such failure continues for five days after the earlier of the date on which (A) any Credit Party or any subsidiary receives notice thereof and (B) an authorized officer of any Credit Party obtains or, with the exercise of reasonable diligence, should have obtained, knowledge thereof;

(xiii)     the filing by any Credit Party of any motion, pleading or other paper seeking or otherwise consenting to or supporting the appointment of a Chapter 11 trustee, a receiver, or appointment of an examiner with enlarged powers relating to the operation of the business of

24

any Credit Party under Section 1106(b) of the Bankruptcy Code in any of the Chapter 11 Cases;

(xiv)    other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget (subject to the Permitted Budget Variances) and which are authorized by one or more First Day Orders or other orders reasonably satisfactory to the DIP Agent, any Credit Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition debt or payables;

(xv)    (A) any Credit Party engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of any of the Credit Documents or the Prepetition Credit Documents or the Liens securing the Obligations or the Prepetition Obligations, including without limitation seeking to equitably subordinate or avoid the Liens securing such obligations; or (B) any Credit Party engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly supports assertion of the same) against the DIP Agent, any Lender, the Prepetition Agent or any Prepetition Lenders, in each case, in their capacity as such; provided, however, that it shall not constitute an Event of Default if the Credit Parties provide information with respect to the Prepetition Credit Documents to a party in interest, or are compelled to provide information by an order of the Bankruptcy Court so long as the DIP Agent has been served with the request for such an order or, if no such service has been made prior to the time the Credit Parties are required to provide information, so long as the Credit Parties provide prior written notice to the DIP Agent of any intention or requirement to do so;

(xvi)    the filing of any motion by any Credit Party seeking an order from the Bankruptcy Court substantively consolidating any of the Credit Parties' estates, other than in connection with an Acceptable Plan;

(xvii)    any Credit Party shall file a motion in any of the Chapter 11 Cases to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code pari passu with, or senior to, the Obligations;

(xviii)    any Credit Party shall file a motion seeking the relief under Section 506(c) or 552(b) of the Bankruptcy Code that would have an adverse effect on the Collateral, without prior written consent of the DIP Agent;

(xix)    the consummation of a sale of any material portion of the Collateral (other than a sale in the ordinary course of business that is contemplated by the Approved Budget) other than pursuant to the Approved Sale or as otherwise permitted under the Credit Documents; or

(xx)    the filing by any Credit Party with the Bankruptcy Court, prior to the consummation of the Approved Sale (as defined in the DIP Credit Agreement) and indefeasible payment in full in cash of all Obligations, of any disclosure statement or plan of reorganization or liquidation other than in support of an Acceptable Plan.

| | |
|---|---|
| | *See* DIP Credit Agreement § 11.01 (Events of Default) |
| **Carve-Out**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The "***Carve-Out***" means the sum of:<br><br>(a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code;<br><br>(b) to the extent allowed by the Bankruptcy Court, (i) prior to and as of the date of delivery of the Carve-Out Notice (as defined below), all accrued and unpaid fees and expenses incurred by persons or firms retained by the Debtors or the Committee as estate professionals (collectively, the "***Professionals***") and payable under sections 328, 330 and/or 331 of the Bankruptcy Code;<br><br>(c) up to a maximum amount of $1,250,000.00 of fees, costs and expenses accrued or incurred by Professionals following the delivery of a Carve-Out Notice, payable under sections 328, 330 and/or 331 of the Bankruptcy Code and allowed by the order of the Bankruptcy Court; and<br><br>(d) all reasonable and documented fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $50,000.<br><br>For purposes of the foregoing, "***Carve-Out Notice***" shall mean a written notice delivered by the DIP Agent to the Debtors and their counsel, the Office of the United States Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuance of an Event of Default.<br><br>The Debtors shall also fund a reserve in an amount equal to the Carve-Out (the "***Carve-Out Reserve***") from all cash on hand for the benefit of the Debtors in a segregated non-interest bearing account at the DIP Agent or another financial institution agreed to by the Debtors and the DIP Lenders in trust to pay the fees to the Professionals and other obligations benefitting from the Carve-Out until paid in full.<br><br>*See* Interim Order ¶ 15 |
| **Milestones**<br>Bankruptcy Rule<br>4001(c)(1)(B)(v) and (vi) | The Debtors shall achieve the following milestones (collectively, the "***Sale Process***") in accordance with the deadlines specified below (or, to the extent any Milestone requires a court hearing, as soon as practicable thereafter based on scheduling availability of the Bankruptcy Court), which deadlines in all cases may be extended by the DIP Agent in its reasonable discretion (collectively, the "***Milestones***"):<br><br>(a) On the Petition Date, the Debtors shall have filed a motion seeking approval of the DIP Facility in an interim and final basis;<br><br>(b) On or before the date that is 5 calendar days after the Petition Date, the Interim Order, in form and substance reasonably satisfactory to the DIP Agent, shall have been entered by the Bankruptcy Court;<br><br>(c) On or before the date that is 14 calendar days after the Petition Date, the Debtors shall have filed a motion (the "***Bid Procedures Motion***") with the Bankruptcy Court to approve bid procedures and establish the date of an auction (the "***Auction***") to determine a winning bidder or bidders for the Debtors' assets and sell the Purchased Assets. The bid procedures shall require that any bid contain a cash component sufficient to repay in full all Obligations outstanding under the DIP Facility. The Bid Procedures Motion shall allow for the selection of a stalking horse bidder and entry into a stalking horse asset purchase agreement, subject to better and higher bids as set forth therein, in form and substance reasonably satisfactory to the DIP |

26

Agent (a "**Stalking Horse Asset Purchase Agreement**");

(d) On or before the date that is 40 calendar days following the entry of the Interim Order, a final order approving the DIP Facility on a final basis (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**") shall have been entered by the Bankruptcy Court;

(e) On or before the date that is 60 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Bid Procedures Motion (the "**Bid Procedures Order**"), in form and substance reasonably satisfactory to the DIP Agent in its reasonable discretion as confirmed by the DIP Agent in writing;

(f) On or before the date that is 120 calendar days after the Petition Date, the Debtors shall conduct the Auction for the Purchased Assets (if qualified bids are received);

(g) On or before the date that is 30 calendar days (or 45 calendar days, to the extent such proposed sale is contested) after the Auction, the Bankruptcy Court shall have entered an order approving the sale (the "**Approved Sale**") of the Purchased Assets to the party determined to have made the highest or otherwise best bid (which shall also include a "successful back-up bidder") (the "**Sale Order**"), which shall be in form and substance reasonably satisfactory to the DIP Agent as confirmed by the DIP Agent in writing; and

(h) On or before the date that is 35 calendar days (or 60 calendar days, to the extent such proposed sale is contested) after the Auction, the Debtors shall have consummated the Approved Sale to the party determined to have made the highest or otherwise best bid for the Debtors' assets in accordance with the Sale Order.

*See* DIP Credit Agreement § 9.21 (Milestones)

| | |
|---|---|
| **Limitations on Use of DIP Financing** Bankruptcy Rule 4001(c)(1)(B) | No portion of the Carve-Out, DIP Facility or Collateral shall include, apply to or be available for any fees, costs or expenses incurred by any party, including the Debtors or any committee, in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Secured Parties (as defined in the DIP Credit Agreement); provided, however, that up to $75,000 of the proceeds of the DIP Facility or any proceeds of the DIP Collateral and/or the Carve-Out shall be made available to any committee appointed in the Chapter 11 Cases to fund a reasonable investigation into the validity, perfection and enforceability of the Prepetition RBL Liens (as defined in the Interim Order) and the Prepetition RBL Obligations (as defined in the Interim Order).<br><br>*See* Interim Order ¶ 16 |
| **506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | Upon entry of the Final Order, except to the extent of the Carve-Out, the Debtors, on behalf of themselves and their estates, shall irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection, or enhancement of, or realization upon the Collateral.<br><br>*See* Interim Order ¶ 21 |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject only to and effective upon entry of the Final Order, liens shall attach to the proceeds of estate causes of action under chapter 5 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code. |

SC1:4946601.1

| | *See* Interim Order ¶ 11 |
|---|---|
| **Indemnification**<br>Bankruptcy Rule<br>4001(c)(1)(B)(ix) | The DIP Documents provide for customary indemnification of the DIP Agent and DIP Lenders.<br><br>*See* DIP Credit Agreement § 12.07 (Indemnification) |
| **Automatic Stay Waiver/Modification**<br>Bankruptcy Rule<br>4001(c)(1)(B)(iv) | The automatic stay provisions of the DIP Credit Agreement and the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the exercise of all rights and remedies provided for in the Operative Documents and to, upon the DIP Agent's provision of five (5) business days' written notice: (a) foreclose on the Collateral; (b) enforce all guaranty rights; (c) accelerate all Loans and other outstanding obligations under the DIP Facility; and (d) declare the principal of and accrued interest, premiums, fees and expenses constituting the obligations under the DIP Facility Loans to be due and payable.<br><br>*See* Interim Order ¶ 24 |

## <u>Provisions to Be Highlighted Pursuant to Local Rule 4001-2</u>

27. Local Rule 4001-2(a)(i) requires a debtor to recite whether the proposed form of postpetition financing order contains certain provisions of the type enumerated therein, identify the location of such provisions in the proposed order, and justify the inclusion of such provisions in the proposed order. The Debtors hereby disclose the below provisions contained in the proposed Interim Order in accordance with Local Rule 4001-2(a)(i):

- **Cross-Collateralization Provisions (Local Rule 4001-2(a)(i)(A)):** The Interim Order does not provide for cross collateralization, other than replacement liens as adequate protection.

- **Findings of Fact (Local Rule 4001-2(a)(i)(B)):** Pursuant to paragraph D of the Interim Order, the Debtors have provided certain agreements and stipulations concerning the Prepetition RBL Obligations (as defined in the Interim Order). The stipulations are subject to challenge by parties in interest (subject to the limitations set forth in paragraph 17 of the Interim Order) and will not be binding upon any party in interest until the Investigation Termination Date (as defined in the Interim Order). With respect to all potential defendants, the Investigation Termination Date will not occur until, at the latest, (Y) 75 days after entry of the Interim Order and, (Z) in the case of any Committee (as defined in the Interim Order) that is appointed, 60 days from such appointment, as set forth in paragraph 17 of the Interim Order (for the avoidance of doubt, if a Committee is appointed after the period in sub-clause (Y) has expired, the Investigation Termination Date shall occur).

- **506(c) Waiver (Local Rule 4001-2(a)(i)(C)):** Subject to entry of the Final Order, the Debtors are seeking approval of a waiver of rights under

28

section 506(c) of the Bankruptcy Code in respect of the DIP Collateral (as defined in the Interim Order).  Accordingly, parties will have notice of (and an opportunity to object to) the Debtors' proposed waiver.

- **Liens on Avoidance Actions (Local Rule 4001-2(a)(i)(D)):**  Pursuant to paragraph 11 of the Interim Order, the Debtors are seeking approval of liens only on the proceeds of Avoidance Actions and only upon entry of the Final Order.  Accordingly, parties will have notice of, and an opportunity to object to, the Debtors' proposed liens.

- **Provisions Authorizing "Roll Up" or Repayment of Prepetition Debt (Local Rule 4001-2(a)(i)(E)):**  The Interim Order does not provide for the authorization of "roll up" or repayment of any prepetition debt.

- **Disparate Treatment of Debtor and Committee Professionals in Carve-Out (Local Rule 4001-2(a)(i)(F)):**  The Interim Order contains no provision for disparate treatment for professionals retained by the Committee, if any, with respect to the Carve-Out.

- **Nonconsensual Priming of Prepetition Liens (Local Rule 4001-2(a)(i)(G)):**  The Interim Order does not provide for non-consensual priming of any existing lien.

- **552(b) Waiver (Local Rule 4001-2(a)(i)(H)):**  Pursuant to paragraph M of the Interim Order, the Debtors are seeking approval of a waiver of rights under Bankruptcy Code section 552(b) in respect of the DIP Secured Parties and Prepetition RBL Secured Parties (as defined in the Interim Order) only upon entry of the Final Order.  Accordingly, parties will have notice of (and an opportunity to object to) the Debtors' proposed waiver.

### Basis for Relief

I. **The Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.**

    A.      <u>The Debtors Exercised Sound and Reasonable Business Judgment in Deciding to Enter into the DIP Facility.</u>

    29.      Provided that an agreement to obtain postpetition credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment in obtaining such credit.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost

always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Dura Auto Sys. Inc.*, 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) ("To determine if the business judgement test is met, the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'") (citation omitted); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

30.     Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed action *appears* to enhance the debtor's estate." *Crystalin, LLC* v. *Selma Props. Inc.* (*In re Crystalin, LLC*), 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp.* v. *Food Barn Stores, Inc.* (*In re Food Barn Stores, Inc.*), 107 F.3d 558, 566 n.16 (8th Cir. 1997) (emphasis in original, internal alterations, and quotations omitted)).  Courts require only that the debtors "show that a sound business purpose justifies such actions."  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted).  *See also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).

31.     Further, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Documents, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition

facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern

District of New York observed that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms,
> a business decision to obtain credit from a particular lender is
> almost never based purely on economic terms.  Relevant features
> of the financing must be evaluated, including noneconomic
> elements such as the timing and certainty of closing, the impact on
> creditor constituencies and the likelihood of a successful
> reorganization.  This is particularly true in a bankruptcy setting
> where cooperation and established allegiances with creditor groups
> can be a vital part of building support for a restructuring that
> ultimately may lead to a confirmable reorganization plan.  That
> which helps foster consensus may be preferable to a notionally
> better transaction that carries the risk of promoting unwanted
> conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

32.    Under the circumstances, the Debtors' determination to proceed with the

DIP Facility is a sound exercise of their business judgment following a thorough process and

careful evaluation of alternatives.  *First*, and most importantly, without access to the DIP Facility,

the Debtors will not be able to pay expenses necessary to sustain their ongoing operations and,

thus, they could be forced to shut down, which would irreparably impair the value of the Debtors

during these Chapter 11 Cases.  *See* Zanotti First Day Decl. ¶ 65.  *Second*, the Debtors are

operating with limited access to liquidity, and the DIP Facility would provide a source of

liquidity to make such payments.  *Id.* ¶¶ 49, 65.  *Third*, the Debtors negotiated the DIP Credit

Agreement and other DIP Documents with the DIP Lenders in good faith, at arms' length and

with the assistance of their advisors.  Bijoor Decl. ¶¶ 21, 23-24.  The Debtors' management team

and legal and financial advisors were actively involved throughout the process of negotiating the

DIP Credit Agreement and other DIP Documents with the DIP Lenders.  The Debtors believe

that they have obtained the best financing option presently available given the Debtors'

marketing process for alternative debtor-in-possession financing proposals and the Debtors' stated urgent need for liquidity.  *Id.* ¶ 24.  *Fourth*, the Debtors believe that the terms of the DIP Facility are reflective of the market for financings of this type.  The pricing, fees, interest rate, default rate, and other economic terms provided for in the proposed DIP Facility are generally consistent with the cost of debtor-in-possession financings in comparable circumstances, particularly for a distressed borrower with a stated urgent need for liquidity and without access to alternative proposals on an unsecured or non-superpriority basis.  *Id.* ¶ 24.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as it is a reasonable exercise of the Debtors' business judgment.

B.    The Debtors Meet the Conditions Necessary Under Section 364(c) and (d) to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.

33.    The Debtors propose to obtain financing under the DIP Facility by providing the DIP Secured Parties superpriority claims and liens pursuant to section 364(c) and (d)(1) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Secured Parties first priority liens on substantially all of the Debtors' assets and administrative expense claims in these chapter 11 cases with priority over all other claims (subject in each case only to the Permitted Prior Senior Liens, and the Carve-Out).

34.    The Debtors meet the requirements for relief under section 364(c) of the Bankruptcy Code, which permits a debtor, with Court authorization, to obtain postpetition financing and, in return, to grant superpriority administrative status and liens on its property.  Specifically, section 364(c) of the Bankruptcy Code provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:

(1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and consider whether (a) unencumbered credit or alternative financing without superpriority status is available to the debtor, (b) the credit transactions are necessary to preserve assets of the estate, and (c) the terms of the credit agreement are fair, reasonable, and adequate.  *See*, *e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011); *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991); *In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *In re Crouse Group, Inc.*, 71 B.R. 544, 549–51 (Bankr. E.D. Pa. 1987).

35.    Further, the Debtors meet the requirements for relief under section 364(d) of the Bankruptcy Code, which permits a debtor, with Court authorization, to obtain postpetition financing secured by liens that are senior to prepetition liens.  Specifically, section 364(d) of the Bankruptcy Code provides as follows:

(1)    The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

(A)    the trustee is unable to obtain such credit otherwise; and

(B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2)    In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

33

11 U.S.C. § 364(d).  Accordingly, the Debtors may incur "priming" liens under the DIP Facility

if either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties'

interests in collateral are adequately protected.

36.     Here, the Debtors have amply satisfied the necessary conditions under

section 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Documents.

Given the circumstances, the Debtors could not obtain credit on an unsecured, junior secured, or

administrative expense basis.  For all the reasons discussed further below, the Debtors

respectfully submit that the Court should grant the Debtors' request to enter into the DIP Facility

pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.

(i)     The Debtors Are Unable to Obtain Financing on More Favorable
        Terms Than the DIP Facility.

37.     In order to satisfy this test, a debtor need only demonstrate "by a good

faith effort that credit was not available without" the protections afforded to potential lenders by

section 364(c) or 364(d) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088

(4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before

concluding that such credit is unavailable"); *In re Pearl-Phil GMT (Far East) Ltd.* v. *Caldor*

*Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized

where debtor could not obtain credit as an administrative expense); *In re Ames Dep't Stores, Inc.*,

115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor

made reasonable efforts to satisfy the standards of section 364(c), to obtain less onerous terms

where debtor approached four lending institutions, was rejected by two and selected the least

onerous financing option from the remaining two lenders).  This is especially true where time is

of the essence.  *See In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).

38.    Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor on an unsecured or administrative priority basis, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that the requirements of section 364 of the Bankruptcy Code were met).

39.    As described more fully above and in the Bijoor Declaration, the Debtors sought financing from multiple market sources and engaged in extensive and good faith negotiations with the DIP Lenders to obtain the best financing terms available. *See* Bijoor Decl. ¶¶ 14, 18-24.  However, none of the prospective third-party lenders contacted in connection with the Debtors' inquiries into debtor-in-possession financing alternatives were willing to provide postpetition financing to meet the Debtors' immediate cash need in the timing required on an unsecured, junior secured, or administrative priority basis, or otherwise on terms better than those under the DIP Documents. *See id.* ¶¶ 19, 20, 24.  Simply put, the DIP Facility provides the Debtors with the liquidity they need at the lowest cost available, and, therefore, the Debtors have concluded that it the represents the Debtors' best (and only) available postpetition financing option.  For these reasons, the Debtors submit that they have met the standard for obtaining the proposed DIP Facility.

(ii)    The DIP Facility Is Necessary to Preserve the Value of the Debtors' Estates.

40.    The Debtors, as debtors-in-possession, have a fiduciary duty to protect and maximize their estates' assets. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). The Debtors' immediate access to postpetition financing is essential to their ability to effectively carry out that duty. The Debtors currently have no unrestricted cash on hand. *See* Zanotti First Day Decl. ¶ 26. Without the proceeds of the DIP Facility, the Debtors (a) would be unable to fund critical payments, including obligations such as employee payroll and vendor payments, in the ordinary course of business that are essential to the Debtors' operational viability and (b) could be rapidly destabilized and forced to shut down their facilities in the near term, which would have irreparable consequences to the Debtors' restructuring and to the Debtors' stakeholders. Zanotti First Day Decl. ¶ 65. The DIP Facility will provide the Debtors with sufficient liquidity to fund their operations and maximize the value of their assets as they work toward an efficient resolution of these Chapter 11 Cases. *Id.* ¶ 65.

(iii)    The Terms of the DIP Facility and the Proposed Adequate Protection Are Fair, Reasonable, and Adequate Under the Circumstances.

41.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp.* v. *First Nat'l Bank & Trust Co.* (*In re Ellingsen MacLean Oil Co.*), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. *See* Transcript of Record at 740:4-6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [postpetition financing] pricing terms are, I find the provisions [of the financing] reasonable here and now.").

36

42.     Here, the terms of the DIP Facility are fair, appropriate, reasonable, and adequate under the circumstances, and in the best interests of the Debtors, their estates and their creditors.  As set forth in the Bijoor Declaration, the financial terms included in the DIP Documents are customary and usual for debtor-in-possession financings of this type.  *See* Bijoor Decl. ¶ 24.  The terms of the DIP Facility are also fair and reasonable under the circumstances, including, most notably, that there was only one viable, committed provider of incremental postpetition financing for the Debtors: the DIP Lenders.

43.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lenders.  In particular, as noted above, the Debtors have agreed to pay:

(a)     <u>DIP Facility Interest Rate</u>:  The Base Rate (as defined in the DIP Credit Agreement) plus 9.00% per annum or the Eurodollar Rate (as defined in the DIP Credit Agreement) plus 10.00% per annum, compounded monthly and payable monthly in arrears; and default interest at the rate of 2.00% per annum.

(b)     <u>Unused Commitment Fee</u>:  2.00% per annum payable on the aggregate amount of undrawn commitments under the DIP Facility.

(c)     <u>Letter of Credit Fee</u>: The Eurodollar Rate plus 10.00% per annum in respect of the stated amount of each outstanding letter of credit.

(d)     <u>Letter of Credit Fronting Fee</u>: 0.25% per annum payable in respect of the stated amount of each outstanding letter of credit.

(e)     <u>Administrative Agent Fee</u>: $35,000 per annum.

(f)     <u>Commitment Premium</u>:  2.00% of the aggregate principal amount of DIP Facility commitments, payable on the Closing Date.

(g)     <u>Closing Premium</u>:  3.00% of the aggregate principal amount of DIP Facility commitments, payable on the Closing Date.

44.     As set forth in the Bijoor Declaration, the Debtors believe that the financial terms proposed under the DIP Facility are customary and usual for debtor-in-possession

SC1:4946601.1

financings of this type and are in the aggregate generally consistent with the cost of debtor-in-possession financings in comparable circumstances.  *See id.* ¶ 24.

45.    The economic terms of the DIP Facility were the subject of arm's length, good faith negotiations between the Debtors, with the assistance of their advisors, and the DIP Lenders, and the Debtors believe that such terms are appropriate for the critical financing being provided by the DIP Lenders.  *Id.* ¶¶ 20-24.  Accordingly, the fees provided for under the DIP Facility are reasonable and within market practice for debtor-in-possession financings of this size and type, and the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with the DIP Facility.

46.    Although the Bankruptcy Code does not define "adequate protection," section 361 of the Bankruptcy Code delineates a non-exhaustive list of the available types of adequate protection, which include additional liens, replacement liens, and the "indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361.  The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted). When priming of liens is sought under section 364(d) of the Bankruptcy Code, the courts also examine whether the prepetition secured creditors are being provided adequate protection for the value of their liens.  *See In re Utah 7000, LLC*, No. 08-21869, 2008 WL 2654919, at *3 (Bankr. D. Utah July 3, 2008); *In re Beker Indus. Corp.*, 58 B.R. 725, 737 (Bankr. S.D.N.Y. 1986).

47.    As described more fully above, the Debtors propose to provide a variety of adequate protection to protect the interests of the Prepetition Secured Parties in the Debtors'

property from any diminution in value of the Prepetition Collateral (including Cash Collateral) resulting from the use of the Cash Collateral by the Debtors and the imposition of the automatic stay, subject, in each case, to the liens and claims of the DIP Lenders, the Permitted Prior Senior Liens and the Carve-Out.

48.     In addition to the proposed Adequate Protection Obligations, the critical liquidity provided by the proposed DIP Facility permits the Debtors to avoid a disorderly chapter 7 liquidation and instead conduct a strategy to maximize value for their creditors in an orderly manner, thereby maximizing the value of the Prepetition Collateral for the benefit of all parties in interest, particularly the Prepetition Secured Parties.  Courts have held enhancement of collateral is a critical component of adequate protection and have considered "whether the value of the debtor's property will increase as a result of the" use of the collateral.  *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992) (finding that improvements to collateral financed by postpetition financing proceeds would improve collateral value in excess of loans and, therefore, provided adequate protection); *see In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996) (approving postpetition financing to be used, in part, to fund cleanup costs of encumbered property anticipated to improve the value of the collateral, thereby serving the goal of adequate protection).  The Debtors, therefore, further submit that the adequate protection as described herein is fair and reasonable, and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

## II.     The Debtors Should Be Authorized to Use the Cash Collateral.

49.     The Debtors should be permitted to use Cash Collateral pursuant to section 363(c)(2) of the Bankruptcy Code, which provides, in relevant part, that a debtor "may not use, sell, or lease cash collateral . . . unless: (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease

in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code further provides that "on request of an entity that has an interest in property . . . to be used, sole, or leased by the trustee, the court . . . shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." *Id*. § 362(e).

50.     The Adequate Protection Obligations, described above, are intended to protect the Prepetition Secured Parties from any diminution in the value of their interests in the Prepetition Collateral resulting from the Debtors' use thereof during the pendency of these chapter 11 cases.

51.     While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes adequate protection on a case-by-case basis. *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985) ("[S]uch matters are [to be] left to case-by-case interpretation and development." (brackets in original) (quotations omitted)). That said, it is clear that the adequate protection offered here is traditional, appropriate, and routinely granted. *See*, *e.g.*, *In re Offshore Grp. Inv. Ltd.*, Case No. 15-12422 (BLS) (Bankr. D. Del. Jan. 8, 2016), D.I. 158 (granting prepetition secured parties adequate protection liens, superpriority claims subject to a carve out, fees and expenses, and requiring that the debtors deliver certain financial reports and budget compliance documents); *In re CTI Foods, LLC*, No. 19-10497 (CSS) (Bankr. D. Del. Apr. 05, 2019) (D.I. 141) (granting certain prepetition secured parties indemnification liens, adequate protection liens, superpriority administrative claims, fees and expenses, and requiring the debtors to provide written financial reporting and other periodic reporting).

52.     In light of the foregoing, the Debtors further submit that the proposed

Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties

are fair and appropriate under the circumstances to ensure that the Debtors are able to continue

using the Cash Collateral, subject to the terms and conditions set forth in the Interim Order and

Final Order, for the benefit of all parties in interest and the Debtors estates.

### III.     The DIP Agent and the DIP Lenders Should Be Afforded Good Faith Protection Under Section 364(e) of the Bankruptcy Code.

53.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right

to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal.  11 U.S.C. § 364(e).  Section 364(e) of the Bankruptcy Code provides as follows:

> The reversal or modification on appeal of an authorization under
> this section [364 of the Bankruptcy Code] to obtain credit or incur
> debt, or of a grant under this section of a priority or a lien, does not
> affect the validity of any debt so incurred, or any priority or lien so
> granted, to an entity that extended such credit in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and the incurring of such debt, or the
> granting of such priority or lien, were stayed pending appeal. *Id*.

54.     The DIP Facility is the result of (a) the Debtors' reasonable and informed

determination that the DIP Lenders offered the most favorable terms on which to obtain vital

postpetition financing and (b) extensive arm's length, good faith negotiations between the

Debtors and the DIP Lenders.  The Debtors submit that the terms and conditions of the DIP

Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP

Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further,

no consideration is being provided to the DIP Agent, the DIP Lenders, or any other party to the

DIP Documents other than as described herein.  Accordingly, the Court should find that the

obligations arising under the DIP Facility and other financial accommodations made to the

41

Debtors have been extended by the DIP Agent and the DIP Lenders in "good faith" within the

meaning of section 364(e) of the Bankruptcy Code and, therefore, the DIP Agent and the DIP

Lenders are entitled to all of the protections afforded thereby.

## IV.    The Automatic Stay Should Be Modified on a Limited Basis.

55.    The proposed Interim Order provides that the automatic stay provisions of

section 362 of the Bankruptcy Code will be modified to permit (a) the Debtors to grant the liens

and claims provided for under the DIP Facility, (b) the Debtors to incur the liabilities and

obligations contemplated in the DIP Documents, (c) the Debtors to pay all amounts required in

accordance with the DIP Documents, (d) the DIP Secured Parties, subject to certain limitations,

to exercise remedies upon the occurrence and during the continuation of an event of default

under the DIP Documents, and (e) the DIP Secured Parties to implement all of the terms, rights,

benefits, privileges, remedies, and provisions of the Interim Order and the DIP Documents,

including allowing the DIP Lenders to file any financing statements, security agreements, notices

of liens, and other similar instruments and documents in order to validate and perfect the liens

and security interests granted to them under the Interim Order.[4]

## V.    The Scope of the Carve-Out Is Appropriate.

56.    The DIP Facility and the Interim Order subject the security interests and

administrative expense claims under the DIP Facility and Adequate Protection Obligations to the

Carve-Out.  Such carve-outs for professional fees have been found to be reasonable and

---

[4]    Stay modifications of this kind are ordinary and standard features of postpetition financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Pernix Sleep, Inc.*, Case No. 19-10323 (CSS) (Bankr. D. Del. Feb. 21, 2019); *In re Eastern Outfitters, LLC*, Case No. 17-10243 (LSS) Bankr. D. Del. Feb. 8, 2017); *In re Basic Energy Servs., Inc.*, Case No. 16-12320 (KJC) (Bankr. D. Del. Oct. 26, 2016); *In re Verso Corp.*, Case No. 16-10163 (Bankr. D. Del. Jan. 27, 2016); *In re the Standard Register Co., et al.*, No. 15-10541 (BLS) (Bankr. D. Del. Apr. 16, 2015); *In re Cache, Inc. et al.*, No. 15-10172 (MFW) (Bankr. D. Del. May 20, 2015); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010).

necessary to ensure that a debtor's estate and any official committee appointed can reimburse their professionals in certain circumstances during an event of default under the terms of the debtor's postpetition financing. *See Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) ("Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that, notwithstanding the grant of superpriority claims and liens under the DIP Facility and Adequate Protection Obligations, assets remain for the payment of the fees of the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") and professional fees of the Debtors and any official committee.[5]

## VI.     Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm.

57.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

58.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to withdraw and borrow funds under the DIP Facility. The Debtors will suffer immediate and irreparable harm if the Interim Order approving the DIP Facility is not

---

[5]     Courts in this district and others routinely approve carve-out provisions agreed to by the debtors and their postpetition lenders. *See, e.g.*, *In re Pernix Sleep, Inc.*, Case No. 19-10323 (CSS) (Bankr. D. Del. Feb. 21, 2019); *In re Eastern Outfitters, LLC*, Case No. 17-10243 (LSS) (Bankr. D. Del. Feb. 8, 2017); *In re Modular Space Holdings, Inc.*, Case No. 16-12825 (KJC) (Bankr. D. Del. Dec. 22, 2016); *In re Basic Energy Servs., Inc.*, Case No. 16-12320 (KJC) (Bankr. D. Del. Oct. 26, 2016); *In re Halcón Resources Corp.*, Case No. 16-11724 (BLS) (Bankr. D. Del. July 29, 2016); *In re RCS Capital Corp.*, Case No. 16-10223 (MFW) (Bankr. D. Del. Feb. 3, 2016) *In re Verso Corp.*, Case No. 16-10163 (KG) (Bankr. D. Del. Jan. 27, 2016); *In re Swift Energy Co.*, Case No. 15-12670 (Bankr. D. Del. Jan. 5, 2016).

43

entered sooner than 14 days after service of the DIP Motion and if the Debtors are not permitted

to interim access to the $15 million Interim Loan.  The Debtors require access to the Interim

Loan prior to the Final Hearing and entry of the Final Order in order to continue operating, to

pay their administrative expenses and to implement the relief requested in the Debtors' other

"first day" motions.  This relief is necessary for the Debtors to preserve and maximize value and,

therefore, to avoid immediate and irreparable harm and prejudice to the Debtors' estates and all

parties in interest.

### Request for Final Hearing

59.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors

request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the

time and date prior to the Final Hearing for parties to file objections to this Motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

60.     Given the nature of the relief requested herein, the Debtors respectfully

request a waiver of (a) the notice requirements under Bankruptcy Rule 6004(a) and (b) the 14-

day stay under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order

authorizing the use, sale, or lease of property other than cash collateral is stayed until expiration

of 14 days after entry of the order, unless the court orders otherwise."  For the reasons described

above, the relief that the Debtors seek in this Motion is essential to prevent potentially

irreparable damage to the Debtors' operations, value and ability to reorganize.

### Bankruptcy Rule 6003 Is Satisfied

61.     In order for a debtor to obtain relief to incur an obligation regarding

property of the estate within 21 days of the Petition Date, it must establish that incurring such

obligation satisfies the requirements mandated by Bankruptcy Rule 6003—namely, the relief

requested is necessary to avoid "immediate and irreparable harm."  If a debtor's prospect of

44

reorganizing is threatened, or swift diminution in value of the debtor's estate is likely absent the granting of the requested relief, immediate and irreparable harm likely exists.  *See In re WorldSpace, Inc*., No. 08-12412-PJW, 2008 WL 8153639, at *2 (Bankr. D. Del. Oct. 20, 2008) (finding that relief requested by the debtors was necessary to avoid irreparable harm to the debtors and their estates because such relief was essential for the continued operation of the debtors' businesses).

62.     Immediate and irreparable harm would result if the relief requested herein is not granted.  As described above, approval of the DIP Facility is essential to the preservation of the value of the Debtors' businesses, properties and assets and their ability to successfully prosecute these chapter 11 cases.  For the reasons discussed above, the relief requested herein is critical to the Debtors' prospects for reorganization.  Without the proceeds of the DIP Facility, the Debtors will not be able to fund employee payroll, pay their vendors or maintain the value of their businesses.  Accordingly, the Debtors respectfully submit that they have satisfied Bankruptcy Rule 6003 as it relates to the relief requested herein.

## **Reservation of Rights**

63.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their rights to contest any claims related to the DIP Facility under applicable bankruptcy and non-bankruptcy law. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

**Notice**

64.    No creditors' committee, trustee, or examiner has been appointed in these chapter 11 cases.  Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) the United States Attorney's Office for the District of Delaware; (c) the Internal Revenue Service; (d) counsel to the agent of the Debtors' prepetition first lien lenders; (e) counsel to the Debtors' prepetition second lien lender; (f) counsel to the DIP Lenders; and (g) the parties identified on the Debtors' consolidated list of 30 largest unsecured creditors.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

**No Prior Request**

65.    No prior motion for the relief requested herein has been made to this or any other Court.

SC1:4946601.1

## Conclusion

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the

Court (a) enter the Interim Order, substantially in the form attached hereto as Exhibit A, (b) enter

the Final Order, and (c) grant such other and further relief as is just and proper.

Dated: May 28, 2019　　　　　　　　MORRIS, NICHOLS, ARSHT & TUNNELL LLP
　　　　Wilmington, Delaware

　　　　　　　　　　　　　　　　/s/ Derek C. Abbott
　　　　　　　　　　　　　　　　Derek C. Abbott (No. 3376)
　　　　　　　　　　　　　　　　Gregory W. Werkheiser (No. 3553)
　　　　　　　　　　　　　　　　Tamara K. Mann (No. 5643)
　　　　　　　　　　　　　　　　Joseph C. Barsalona II (No. 6102)
　　　　　　　　　　　　　　　　1201 N. Market Street, 16th Floor
　　　　　　　　　　　　　　　　P.O. Box 1347
　　　　　　　　　　　　　　　　Wilmington, Delaware 19899-1347
　　　　　　　　　　　　　　　　Telephone: (302) 658-9200
　　　　　　　　　　　　　　　　Facsimile: (302) 658-3989
　　　　　　　　　　　　　　　　dabbott@mnat.com
　　　　　　　　　　　　　　　　gwerkheiser@mnat.com
　　　　　　　　　　　　　　　　tmann@mnat.com
　　　　　　　　　　　　　　　　jbarsalona@mnat.com

　　　　　　　　　　　　　　　　-and-

　　　　　　　　　　　　　　　　SULLIVAN & CROMWELL LLP

　　　　　　　　　　　　　　　　Andrew G. Dietderich
　　　　　　　　　　　　　　　　Brian D. Glueckstein
　　　　　　　　　　　　　　　　Alexa J. Kranzley
　　　　　　　　　　　　　　　　125 Broad Street
　　　　　　　　　　　　　　　　New York, New York  10004
　　　　　　　　　　　　　　　　Telephone:　(212) 558-4000
　　　　　　　　　　　　　　　　Facsimile:　(212) 558-3588
　　　　　　　　　　　　　　　　Email:　　　dietdericha@sullcrom.com
　　　　　　　　　　　　　　　　　　　　　　gluecksteinb@sullcrom.com
　　　　　　　　　　　　　　　　　　　　　　kranzleya@sullcrom.com

　　　　　　　　　　　　　　　　*Proposed Counsel to the Debtors and Debtors-in-Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---

|  |  |
|---|---|
| In re | Chapter 11 |
| WHITE STAR PETROLEUM HOLDINGS, LLC, *et al.*,[1] | Case No. (19-_____) (__) |
| Debtors. | Jointly Administered |

---

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING AND (VII) GRANTING RELATED RELIEF**

This matter is before the Court on the motion dated May 28, 2019 (the "Motion")[2] of White Star Petroleum, LLC Holdings, LLC and its affiliated debtors, as debtors-in-possession (collectively, the "Debtors") in the above-referenced chapter 11 cases (collectively, the "Chapter 11 Cases"), for entry of an interim order (this "Interim Order") and a final order ("Final Order"), under sections 105, 361, 362, 363(c)(2), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules") and rule 4001-2 and

---

[1]    The Debtors in these chapter 11 cases, and the last four digits of their U.S. taxpayer identification numbers are: White Star Petroleum Holdings, LLC (0575) ("WSTR Holdings"), White Star Petroleum, LLC (0977) ("WSTR"), White Star Petroleum II, LLC (4347) ("WSTR II"), White Star Petroleum Operating, LLC (5387) ("WSTR Operating") and WSP Finance Corporation (9152) ("WSP Finance" and together with WSTR Holdings, WSTR, WSTR II and WSTR Operating, the "Debtors"). The Debtors' corporate headquarters is located at 301 N.W. 63rd Street, Suite 600, Oklahoma City, OK 73116.

[2]    All defined terms shall have the meaning ascribed to them in the Motion or DIP Credit Agreement (as defined below) unless otherwise defined herein.

9103-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), seeking, among other things:

(1)    authorization for White Star Petroleum, LLC ("<u>WSTR</u>"), as debtor and debtor-in-possession (the "<u>DIP Borrower</u>"), to obtain postpetition financing (the "<u>DIP Facility</u>") and for White Star Petroleum Holdings, LLC ("<u>WSTR Holdings</u>"), WSP Finance Corporation, White Star Petroleum Operating, LLC, and White Star Petroleum II, LLC (each a "<u>DIP Guarantor</u>" and collectively, the "<u>DIP Guarantors</u>"), as debtors and debtors-in-possession, to guarantee unconditionally the DIP Borrower obligations under the DIP Facility, consisting of a delayed draw term loan facility (the "<u>DIP Facility Loans</u>") in the aggregate maximum principal amount of up to $28.5 million, of which up to $15 million may be advanced immediately following the entry of this Interim Order, with MUFG Union Bank, N.A., formerly known as Union Bank, N.A. ("<u>MUFG</u>"), as administrative agent (in such capacity, the "<u>DIP Agent</u>") for itself and the DIP Lenders (as defined below), subject and pursuant to the terms of this Interim Order, that certain Debtor-In-Possession Credit Agreement by and among the DIP Borrower, the DIP Guarantors, the DIP Agent, and the lenders party thereto (the "<u>DIP Lenders</u>"), which shall be in form and substance acceptable to the DIP Agent and the DIP Lenders and substantially similar to the form attached hereto as <u>Exhibit 1</u> (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "<u>DIP Credit Agreement</u>") and any related documents and instruments delivered pursuant to or in connection therewith (collectively, and together with the DIP Credit Agreement, the "<u>DIP Loan Documents</u>");

SC1:4946509.1

(2)      authorization for the Debtors to (i) execute and enter into the DIP Loan Documents and (ii) perform such other and further acts as may be required in connection with the DIP Loan Documents;

(3)      authorization for the Debtors to grant (i) valid, enforceable, nonavoidable and fully perfected security interests and liens (including liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on Prepetition Collateral (as defined below)) to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders (collectively, the "DIP Secured Parties") to secure all obligations of the Debtors under and with respect to the DIP Facility (collectively, the "DIP Obligations"), subject to the Carve-Out and Permitted Prior Senior Liens and (ii) superpriority claims (including a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code) to the DIP Agent, for the benefit of the DIP Secured Parties, having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired, including, solely upon entry of the Final Order, proceeds of Avoidance Actions (as defined below), whether received by judgment, settlement or otherwise, subject to the Carve-Out;

(4)      authorization for the Debtors' use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (but excluding any cash collateral subject to Permitted Prior Senior Liens) ("Cash Collateral") in accordance with the terms and conditions set forth in this Interim Order and the DIP Credit Agreement;

(5)      authorization to provide adequate protection of the liens and security interests granted by Debtors for the benefit of the prepetition secured lenders pursuant to (A) that certain Revolving Credit Agreement dated as of June 30, 2016 (as amended by that certain Amendment

Agreement dated as of January 24, 2017, that certain Second Amendment dated as of March 16, 2017, that certain Third Amendment of Revolving Credit Agreement and First Amendment to Collateral Agreement dated as of April 30, 2018, and that certain Fourth Amendment of Revolving Credit Agreement dated as of November 16, 2018, that certain Fifth Amendment of Revolving Credit Agreement dated as of January 31, 2019, that certain Sixth Amendment of Revolving Credit Agreement dated as of February 27, 2019, the "Prepetition RBL Credit Agreement"), among WSTR, as borrower, WSTR Holdings, the lenders parties thereto (the "Prepetition RBL Lenders"), and MUFG as administrative agent and collateral agent (in such capacity, the "Prepetition RBL Agent" and together with the Prepetition RBL Lenders, the "Prepetition RBL Secured Parties"), the Prepetition RBL Security Documents (as defined below) and all collateral and ancillary documents executed or delivered in connection therewith (collectively, the "Prepetition RBL Loan Documents") and (B) that certain term loan credit agreement dated as of May 9, 2018 (in as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Term Loan Credit Agreement" and together with the Prepetition RBL Credit Agreement, the "Prepetition Credit Agreements") among WSTR, as borrower, WSTR Holdings, and EnLink Oklahoma Gas Processing, LP (the "Prepetition Term Lender" and together with Prepetition RBL Secured Parties, the "Prepetition Secured Parties") and all collateral and ancillary documents executed or delivered in connection therewith (collectively, the "Prepetition Term Loan Credit Documents") and as more fully set forth in this Interim Order;

(6)     subject to entry of a Final Order, the waiver of any right to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

4

(7)    the scheduling of a final hearing (the "Final Hearing") on the Motion no later than

30 days after the entry of this Interim Order, to consider entry of the Final Order granting the

relief requested in the Motion on a final basis in form and substance reasonably acceptable to the

DIP Agent (as to the DIP Facility) and the Prepetition RBL Agent (as to the use of Cash

Collateral) and adequate protection;

(8)    modification of the automatic stay imposed under section 362 of the Bankruptcy

Code to the extent necessary to permit the (i) Debtors, (ii) DIP Agent and DIP Lenders, and

(iii) Prepetition Secured Parties (defined below) to implement the terms of this Interim Order;

and

(9)    waiver of any applicable stay (including under Bankruptcy Rule 6004) and

provision for immediate effectiveness of this Interim Order.

An interim hearing ("Interim Hearing") having been held by this Court on May [●],

2019; and this Court having found that, under the circumstances, due and sufficient notice of the

Motion and Interim Hearing was provided by the Debtors as set forth in Paragraph C below, and

this Court having considered all the pleadings filed with this Court; and having overruled all

unresolved objections (if any) to the relief granted in this Interim Order; and upon the record

made by the Debtors at the Interim Hearing, and after due deliberation and consideration and

good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS[3]:**

A.    **Petition Date**.  On May 28, 2019 (the "Petition Date"), each of the Debtors filed a

voluntary petition (collectively, the "Petitions") with this Court commencing the Chapter 11

Cases. The Debtors are continuing to operate their respective businesses and manage their

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

SC1:4946509.1

respective properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.  **Jurisdiction; Venue**.  This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105, 361, 362, 363(c)(2), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014.

C.  **Notice**.  The Interim Hearing was held pursuant to the authorization of Bankruptcy Rule 4001.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, on May [●], 2019, to certain parties-in-interest, including: (i) the Office of the United States Trustee for the District of Delaware, (the "U.S. Trustee") (ii) the 30 largest non-insider unsecured creditors of the Debtors on a consolidated basis, (iii) counsel to MUFG, as DIP Agent and Prepetition RBL Agent, (iv) counsel to the Prepetition Term Lender; (v) the Internal Revenue Service, and (vi) the United States Attorney's Office for the District of Delaware. Under the circumstances, such notice of the Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rule 4001(b), (c) and (d) and the Local Rules.

D.  **Debtors' Stipulations With Respect to Prepetition RBL Obligations**. Subject to the limitations described below in Paragraph 15, the Debtors hereby admit, acknowledge, agree and stipulate that:

6

(i)        As of the Petition Date, the Debtors were truly and justly indebted, to the Prepetition RBL Secured Parties, without defense, counterclaim or offset of any kind, pursuant to the Prepetition RBL Loan Documents in the aggregate principal amount in respect of the loans made under the prepetition revolving credit facility and payment-in-kind interest under the Credit Agreement (including Letter of Credit Obligations totaling $1,615,360) of $275,416,546.64 (the "Prepetition RBL Loans"), *plus* accrued and unpaid interest at the default rate with respect thereto and any additional fees, costs and expenses (including any fees and expenses of attorneys, financial advisors, and other professionals that are chargeable or reimbursable under the Prepetition RBL Loan Documents) due under the Prepetition RBL Credit Agreement and the other Prepetition RBL Loan Documents (collectively, together with all other obligations of the obligors arising under the Prepetition RBL Loan Documents (including, without limitation, the "Obligations" as defined in the Prepetition RBL Credit Agreement), the "Prepetition RBL Obligations");

(ii)        Pursuant to that certain Amended and Restated Collateral Agreement dated as of June 30, 2016, the Guarantee (as defined in the Prepetition RBL Credit Agreement), the mortgages, any control agreement and other collateral documents and agreements (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof, collectively, the "Prepetition RBL Security Documents"), and the other Prepetition RBL Loan Documents, Debtors granted to and/or for the benefit of the Prepetition RBL Secured Parties first priority (subject only to RBL Permitted Liens (as defined below)), valid, perfected and enforceable security interests and liens (the "Prepetition RBL Liens") in and on all Property (as defined in the Prepetition RBL Credit Agreement) then owned or thereafter acquired, upon which a lien

7

was purported to be created by any Prepetition RBL Security Document (the "Prepetition RBL Collateral" and together with any Property (as defined in the Prepetition Term Loan Credit Agreement) upon which a lien was purported to be created by the Prepetition Term Loan Credit Documents, the "Prepetition Collateral");

(iii)    The Prepetition RBL Agent, as prepetition first lien collateral agent, and the Prepetition Term Lender entered into that certain intercreditor agreement (the "Prepetition Intercreditor Agreement") dated as of May 9, 2018 to govern the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the assets and properties of the Debtors. Each of the Debtors under the Prepetition Documents acknowledged and agreed to the Prepetition Intercreditor Agreement;

(iv)    (a) The Prepetition RBL Obligations constitute legal, valid and binding obligations of the Debtors; (b) no offsets, defenses or counterclaims to the Prepetition RBL Obligations exist; (c) no portion of the Prepetition RBL Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition RBL Loan Documents are valid and enforceable by the Prepetition RBL Agent for the benefit of the Prepetition RBL Secured Parties against each of the applicable Debtors; (e) the liens and security interests of the Prepetition RBL Secured Parties constitute valid, binding, enforceable and perfected liens in and to the Prepetition RBL Collateral having the priority set forth in the Prepetition RBL Loan Documents and subject and subordinate only to (after giving effect to Prepetition Intercreditor Agreement) Permitted Liens (as defined in the Prepetition RBL

8

Credit Agreement and referred to herein as "<u>RBL Permitted Liens</u>");[4] (f) the Prepetition RBL Obligations constitute allowed secured claims against the applicable Debtors' estates; and (g) no claim of or cause of action held by the Debtors exists against the Prepetition RBL Agent, any of the Prepetition RBL Lenders or any of their respective agents, in each case in their capacity as such, whether arising under applicable state or federal law, arising out of, based upon or related to, in whole or in part, the Prepetition RBL Obligations or their prepetition relationship with any Debtor or any affiliate thereof relating to any of the Prepetition RBL Loan Documents or any transaction contemplated thereby; and

   (v) All of Debtors' cash, including any cash in all deposit accounts and collection accounts, wherever located, comprising proceeds of or otherwise arising from or relating to the Prepetition RBL Collateral, constitutes Cash Collateral of the Prepetition RBL Secured Parties.

  E. <u>**DIP Facility Budget**</u>.  Section 6.01(f) of the DIP Credit Agreement requires that the Debtors deliver a cash-flow budget setting forth all projected unencumbered and unrestricted cash receipts and cash disbursements (by line item) on a weekly basis for the 13-week period commencing on the Petition Date (the "<u>Initial Approved Budget</u>").  The DIP Credit Agreement further provides that: (i) the Initial Approved Budget may be modified or supplemented from time to time by additional budgets prepared by the Debtors in the form of the Initial Budget or in such other form as the DIP Agent may agree in its reasonable discretion (the "<u>Proposed Budget</u>"); (ii) to the extent such Proposed Budget is approved by the DIP Agent in its reasonable discretion, such Proposed Budget shall thereafter be the supplemental approved budget, without

---

[4] Nothing shall prejudice the rights of any party-in-interest including, but not limited to, the Debtors, the Prepetition RBL Agent and the Prepetition RBL Lenders to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such liens and/or security interests.

subsequent notice to or order of the Court (each such additional budget, a "Supplemental Approved Budget" and together with the Initial Approved Budget, the "Approved Budget"); (iii) in the event that any Proposed Budget is not so approved, the last Approved Budget without giving effect to any update, modification or supplement shall apply to the projection period (with appropriate adjustments for the timing of monthly or semi-monthly disbursements); (iv) the Debtors' actual receipts will not be less than 85% of budgeted receipts for each applicable Test Period (as defined below) (the "Permitted Collections Budget Variances"), as set forth in the Approved Budget and tested on a cumulative basis; provided, that any positive receipt variance to the Approved Budget from the immediately preceding Test Period may be applied to the current Test Period's receipts for the purpose of determining compliance with the foregoing for such Test Period; (v) the Debtors' actual disbursements (excluding professional fees and expenses and any required payments in connection with the Adequate Protection Obligations), on a cumulative basis, will be not more than (a) in the aggregate, 10% greater than the budgeted disbursements for the corresponding Test Period as set forth in the Approved Budget and tested on a cumulative basis and (b) with respect to each of the "Employee Related" expenditures, "Lease Operating Expense", "CapEx" and "Transportation Fees" line items in the Approved Budget, in each case, 15% greater than the budgeted disbursements for each such line item for the corresponding Test Period as set forth in the Approved Budget and tested on a line-item basis (the variances described in clauses (a) and (b), the (the "Permitted Expenditures Budget Variances" and together with the Permitted Collections Budget Variances, the "Budget Variances"); provided, that any negative disbursement variance to the Approved Budget from the immediately preceding Test Period may be applied to the current Test Period's disbursements for the purpose of determining compliance for such Test Period, as applicable; (vi) the Budget

SC1:4946509.1

Variances shall be tested weekly, on a rolling-four week basis (each such four-week period, a "Test Period"), beginning with the first full week ended following the Petition Date; provided, that until such time as four weeks shall have elapsed since the Petition Date, (a) in the case of Permitted Expenditures Budget Variances, "Test Period" shall mean such shorter period from the Petition Date to the date of determination and (b) in the case of Permitted Collections Budget Variances, "Test Period" shall include time elapsed prior to the Petition Date to the relevant date of determination (*e.g.*, the test period for week one shall include a three week pre-Petition Date period); and (vii) the Debtors shall deliver to the DIP Agent by 12:00 p.m., Eastern time, on Thursday of each week, a report in a form reasonably acceptable to the DIP Agent reflecting variance from the Approved Budget on a line item and cumulative basis.  The Initial Approved Budget is an integral part of the DIP Credit Agreement and has been relied upon by the DIP Secured Parties to provide the DIP Facility and to consent to this Interim Order.

F.    **Immediate Need for Funding**. Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Facility and authorized use of Cash Collateral.  As a result of the Debtors' financial condition, the use of Cash Collateral alone will be insufficient to meet the Debtors' immediate postpetition liquidity needs. The Debtors' ability to maintain business relationships with their vendors, suppliers and distributors, pay their employees, pursue strategic alternatives such as a disposition and otherwise finance their operations prior to the consummation of any such strategy is essential to the Debtors' continued viability and to their ability to maximize the value of their assets.  In the absence of the DIP Facility and the authorization by this Court to use Cash Collateral, the

SC1:4946509.1

Debtors' businesses and estates would suffer immediate and irreparable harm, including, without limitation, the potential cessation of substantially all of their operations.

G.      **No Credit on More Favorable Terms**.      Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facility and the DIP Loan Documents, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Credit Agreement without the Debtors (i) granting to the DIP Agent and the DIP Lenders, subject to the Carve-Out, (a) the DIP Superpriority Claims (as defined below) and (b) the DIP Liens (as defined below) in the DIP Collateral (as defined below), in each case under the terms and conditions set forth in this Interim Order and the DIP Loan Documents and (ii) providing the Prepetition Secured Parties the adequate protection as provided herein.

H.      **Reasonable; Good Faith**.  The DIP Lenders have indicated a willingness to provide postpetition secured financing to the Debtors but solely on the terms and conditions set forth in this Interim Order and the DIP Loan Documents.   After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Facility to be provided by the DIP Lenders and the authorization to use the Cash Collateral to be provided by the Prepetition RBL Agent, on behalf of the Prepetition RBL Lenders, represent the best financing presently available to the Debtors.   Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment

12

consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Facility has been negotiated in good faith and at arm's length among the Debtors, the DIP Agent and the DIP Lenders and (iii) any credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Lenders have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

I.    **Consent of Prepetition Secured Parties**.  The Prepetition Secured Parties have consented, are deemed, pursuant to the Prepetition Intercreditor Agreement, to have consented or have not objected to the Debtors' use of Cash Collateral and the other Prepetition Collateral, and the Debtors' entry into the DIP Loan Documents solely in accordance with and subject to the terms and conditions in this Interim Order and the DIP Loan Documents.

J.    **Adequate Protection**.    The Prepetition Secured Parties are entitled to the adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral; provided that nothing in this Interim Order of the other DIP Loan Documents shall (a) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Facility authorized by this Interim Order, (b) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether junior or senior) or (c) prejudice, limit or otherwise impair the

13

rights of any of the Prepetition Secured Parties, subject to any applicable provisions of the Intercreditor Agreement, to seek new, different or additional adequate protection for any diminution in value of their interests in the Prepetition Collateral from and after the Petition Date or assert the interests of any of the Prepetition Secured Parties and the rights of any other party in interest to object to such relief are hereby preserved.

K.      **Good Cause Shown; Best Interest**.   The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-2(b).   Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.   This Court concludes that good cause has been shown and that entry of this Interim Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for either a successful reorganization or the sale of all or substantially all of their assets pursuant to any subsequent orders of this Court.

L.      **No Liability to Third Parties**.  The Debtors stipulate and the Court finds that in making decisions to advance loans to the Debtors, in administering any loans, in accepting the Interim Approved Budget or any future Supplemental Approved Budget or in taking any other actions permitted by this Interim Order or the DIP Loan Documents in their respective capacities as DIP Lenders or DIP Agent, none of the DIP Secured Parties shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

M.      **Section 552**.  In light of the subordination of their liens and superpriority administrative claims (i) in the case of the DIP Secured Parties, to the Carve-Out and the

14

Permitted Prior Senior Liens and (ii) in the case of the Prepetition RBL Secured Parties to the Carve-Out and the DIP Liens, each of the DIP Secured Parties and the Prepetition RBL Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply to any of the DIP Secured Parties or the Prepetition RBL Secured Parties with respect to the proceeds, products, rents, issues or profits of any of the DIP Collateral or the Prepetition RBL Collateral, and no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the DIP Collateral or the Prepetition RBL Collateral under section 552(b) of the Bankruptcy Code. Subject to and immediately upon entry of the Final Order, the Debtors shall be deemed to have irrevocably waived, and to have agreed not to assert, any claim or right under sections 552 or 726 of the Bankruptcy Code seeking to avoid the imposition of the DIP Liens, Prepetition RBL Liens or the Adequate Protection Liens on any property acquired by any of the Debtors or any of their estates.

N. **Findings Regarding Corporate Authority**. Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

O. **Immediate Entry**. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

15

1.      **Approval of Interim Order**.  The Motion is approved on the terms and conditions set forth in this Interim Order.  Any objections to the relief granted in this Interim Order that have not previously been withdrawn are hereby overruled.  This Interim Order shall become effective immediately upon its entry.

2.      **Approval of DIP Loan Documents; Authority Thereunder**.  The Debtors are hereby authorized to enter into the DIP Loan Documents, including the DIP Credit Agreement, and such additional documents, instruments and agreements as may be reasonably required or requested by the DIP Agent and the DIP Lenders to implement the terms or effectuate the purposes of this Interim Order.  The Debtors are authorized to comply with and perform all of the terms and conditions contained in the DIP Loan Documents, and to repay amounts borrowed, together with interest and fees thereon, as well as any other outstanding DIP Obligations to the DIP Lenders in accordance with and subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order.

3.      **Authorization to Borrow DIP Facility Loans**.  Upon finalizing and executing the DIP Credit Agreement and the other DIP Loan Documents, the DIP Borrower is immediately authorized to borrow from the DIP Lenders, and the DIP Guarantors are immediately authorized to guaranty, an initial draw under the DIP Facility of a principal amount of up to $15 million of DIP Facility Loans, subject to and in accordance with the terms of this Interim Order and the DIP Credit Agreement.

4.      **Authorization to Use Cash Collateral**.  The Debtors are hereby authorized to use all Cash Collateral solely in accordance with the terms of the DIP Loan Documents and subject to the terms and conditions of this Interim Order.

SC1:4946509.1

5.      **Collections and Disbursements**.    From the Petition Date until the DIP Obligations have been paid in full in cash, all cash receipts, Cash Collateral and all proceeds from the sale or other disposition of, or other revenue of any kind attributable to, any DIP Collateral that is now in, or shall hereafter come into, the possession or control of any of the Debtors, or to which any of the Debtors is now or shall hereafter become entitled shall be (i) subject to the DIP Liens and the Adequate Protection Liens (and shall be treated in accordance with this Interim Order and the DIP Credit Agreement) and (ii) to the extent related to or arising from or in connection with Prepetition Collateral, promptly deposited only into a Controlled Account.

6.      **Perfection in Cash**.    Subject to the Carve-Out and the other provisions of this Interim Order, all financial institutions with which the Debtors maintain accounts containing Cash Collateral are authorized to comply with any reasonable request of the DIP Agent, while an Event of Default (as defined in the DIP Credit Agreement) has occurred and is continuing, to turn over to the DIP Agent all Cash Collateral therein without offset or deduction of any kind. The DIP Agent shall enjoy the benefit of all deposit account control agreements. Notwithstanding and without minimizing the force of the foregoing, the Debtors are authorized to enter into, and cause the financial institutions servicing the Debtors' deposit accounts to enter into, such deposit account control agreements and other collateral agreements with the DIP Agent and such financial institutions as the DIP Agent may reasonably require, or alternatively, the DIP Agent shall be entitled to enjoy the benefit of all control agreements to which the Debtor is a party, as set forth above, without the need to enter into any such new agreements.

7.      **Interest on DIP Facility Loans**.    The rate of interest to be charged for the DIP Facility Loans and any other extensions of credit to the Debtors pursuant to the DIP Credit

Agreement shall be the rates set forth in the DIP Credit Agreement and shall be payable at the times set forth in the DIP Credit Agreement.

8.    **Payment of DIP Fees and Expenses**.  The Debtors are authorized to pay (i) all fees when due under the DIP Credit Agreement in the amounts set forth in the DIP Credit Agreement and (ii) all costs, expenses and any other fees or other amounts payable under the terms of the DIP Loan Documents and all other reasonable, documented, out-of-pocket costs and expenses of the DIP Secured Parties in accordance with the terms of the DIP Loan Documents (including the reasonable, documented, out-of-pocket fees, costs and expenses of Winston & Strawn LLP, RPA Advisors, LLC, Young Conaway Stargatt & Taylor, LLP and one additional local counsel and specialist counsel in each relevant jurisdiction material to the interests of the DIP Lenders as a whole (other than Delaware)), whether incurred before or after the Petition Date.  Subject to the review procedures set forth below, none of such fees, costs and expenses shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.  Copies of any invoices of legal counsel with respect to such fees, expenses and costs shall be provided (in summary form and redacted, as necessary, to protect any applicable privilege) to the U.S. Trustee, which shall have ten (10) days from the date of such notice within which to object in writing to such payment.  In addition, the Debtors are hereby authorized to indemnify the DIP Agent and the other DIP Secured Parties (and each of their respective directors, officers, employees, agents, representatives, attorneys, consultants, advisors and controlling persons) against any liability arising in connection with the DIP Loan Documents, to the extent set forth in the DIP Loan Documents.  All such unpaid fees, costs, expenses and indemnities of the DIP Agent and DIP Lenders shall (i) constitute DIP Obligations, (ii) be

SC1:4946509.1

secured by the DIP Collateral, and (iii) be afforded all of the priorities and protections afforded

to DIP Obligations under this Interim Order and the DIP Loan Documents.

9.      **Validity of DIP Loan Documents**.   Upon execution and delivery of the DIP

Loan Documents, the DIP Loan Documents shall constitute, and are hereby deemed to be the

legal, valid and binding obligations of the Debtors, enforceable against each Debtor in

accordance with the terms thereof for all purposes during the Chapter 11 Cases, in any

subsequently converted case of any Debtor under chapter 7 of the Bankruptcy Code, or after

dismissal of any of the Chapter 11 Cases.   Any DIP Facility Loans advanced under the DIP

Credit Agreement pursuant to the Interim DIP Order will be made by the DIP Lenders only for

the purposes of funding post-petition administrative expenses, the Debtors' working capital and

the Debtors' sale efforts to the extent permitted under the DIP Credit Agreement, and paying

such other amounts as are required or permitted to be paid pursuant to the DIP Credit

Agreement, this Interim Order and any other orders of this Court, including, without limitation,

the fees, costs, expenses and indemnities described in Paragraph 8 hereof, all subject to and

solely in accordance with the Approved Budget.   No obligation, payment, transfer or grant of

security under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voided,

voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law,

or subject to any defense, reduction, setoff, recoupment or counterclaim.   Except set forth in this

Interim Order and the Final Order, no other superpriority claims shall be granted or allowed in

these Chapter 11 Cases.

10.      **DIP Superpriority Claims**.   In accordance with section 364(c)(1) of the

Bankruptcy Code, the DIP Obligations shall constitute superpriority administrative expense

claims (the "DIP Superpriority Claims") against each of the Debtors with priority in payment

over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, any and all administrative expenses or other claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to, and upon entry of, the Final Order), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject to the Carve-Out.  The DIP Superpriority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors, including, subject to and upon entry of the Final Order, proceeds of the Avoidance Actions (but, for the avoidance of doubt, not including the Avoidance Actions themselves).

11.    **DIP Priming Liens**.  As security for the DIP Obligations, the DIP Agent on behalf and for the benefit of the DIP Secured Parties is hereby granted (effective upon the date of this Interim Order, without the necessity of the execution by the Debtors or the filing or recordation of security agreements, lockbox or control agreements, financing statements, or any other instruments or otherwise) valid, binding and fully-perfected security interests in and liens upon (the "DIP Liens") all present and after-acquired property of the Debtors of any nature whatsoever (including, without limitation, "Collateral," as defined in the DIP Credit Agreement),

including, without limitation, licenses issued by any federal or state regulatory authority, any leasehold or other real property interests, and commercial tort claims of the Debtors; all cash and cash equivalents contained in any account maintained by any of the Debtors; and, subject to entry of a Final Order, all proceeds of Avoidance Actions of the Debtors or their estates (collectively with all proceeds and products of any or all of the foregoing, the "DIP Collateral"), subject only to the payment of the Carve-Out and Permitted Prior Senior Liens, which shall consist of:

(a)     Liens Priming Liens.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority, priming security interest in and lien on all encumbered property of the Debtors and their estates, which shall be senior to any existing liens or claims, subject and subordinated only to valid, perfected and non-avoidable liens on property of the Debtors (including the proceeds of such property) that are (A) RBL Permitted Liens or Permitted Liens (as defined in the Prepetition Term Loan Credit Agreement), (B) other liens in existence on the Petition Date or (C) liens perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (to the extent valid, perfected, non-avoidable and senior in priority to the Prepetition RBL Liens, the foregoing clauses (A), (B) and (C) being referred to collectively as the "Permitted Prior Senior Liens").

(b)     Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a junior, perfected lien and security interest upon all of the Debtors' right, title and interest in, to and under property of the Debtors and their estates, whether now existing or hereafter acquired, that is subject to any unavoidable Permitted Prior Senior Lien that was validly perfected prior to the Petition Date, or is validly perfected

21

subsequent to the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code, and is not subject to section 552(a) of the Bankruptcy Code.

(c)    <u>First Priority Lien on Unencumbered Property</u>.    Pursuant to section 364(c)(2) of the Bankruptcy Code, a continuing, enforceable, first priority, fully-perfected lien and security interest upon all of the Debtors' right, title and interest in, to, and under all property of the Debtors and their estates that was not, as of the Petition Date, encumbered by a validly perfected, enforceable, and non-avoidable security interest or lien (collectively, the "<u>Unencumbered Property</u>").    Subject only to and effective upon entry of the Final Order, Unencumbered Property shall also include the proceeds of estate causes of action under chapter 5 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code, whether now existing or hereafter acquired or arising and whether pursuant to federal law or applicable state law, and all proceeds thereof, recoveries related thereto, and property received thereby, whether by judgment, settlement, or otherwise (collectively, "<u>Avoidance Actions</u>").

(d)    <u>Liens Senior to Certain Other Liens</u>.    The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoidable for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any intercompany or affiliate liens among the Debtors.

12.    **Prepetition Secured Parties' Adequate Protection**.    Each of the Prepetition Secured Parties is entitled to adequate protection of its interests in the Prepetition Collateral on account of and in equal amount to the diminution in the value thereof as a result of (a) the provisions of this Interim Order granting priming liens on such Prepetition Collateral to the DIP Agent for the benefit of the DIP Secured Parties; (b) the authorization of the use of Cash

Collateral and other Prepetition Collateral; (c) the imposition of the automatic stay pursuant to

section 362 of the Bankruptcy Code; and/or (d) otherwise, pursuant to sections 361(a), 363(c)

and 364(d)(1) of the Bankruptcy Code (collectively, the "Adequate Protection Claims"). Each of

the Prepetition RBL Agent, on behalf and for the benefit of the Prepetition RBL Lenders, and the

Prepetition Term Lender are hereby granted the following (collectively, the "Adequate

Protection Obligations"):

        (a)      Adequate Protection Liens.   Valid, enforceable, unavoidable and fully

perfected replacement liens and security interests in postpetition DIP Collateral (the

"Adequate Protection Liens") in the amount sufficient to secure such Prepetition Secured

Party's Adequate Protection Claims, which shall be (i) junior only to the DIP Liens, and

the Permitted Prior Senior Liens, and (ii) subject to the Carve-Out, which Adequate

Protection Liens shall rank in the same relative priority and right as do the respective

security interests and liens in respect of the Prepetition Credit Agreements as of the

Petition Date.  The Adequate Protection Liens shall be deemed to be legal, valid, binding,

enforceable, perfected liens, not subject to subordination or avoidance, for all purposes in

the Chapter 11 Cases.  Except as otherwise set forth in this Paragraph 12 or otherwise in

this Interim Order, the Adequate Protection Liens shall not be subordinated to or be made

*pari passu* with any other lien under section 364(d) of the Bankruptcy Code or otherwise.

The Adequate Protection Liens shall be deemed to be perfected automatically upon the

entry of this Interim Order, without the need for (x) filing any UCC-1 financing

statement, state or federal notice, or other similar instrument or document in any state or

public record or office, (y) taking possession or control of any collateral, or (z) further

action of any kind (including entry into any security agreements, pledge agreements,

23

control agreements, lockbox agreements, or escrow agreements); provided, however, that, upon the request of the Prepetition RBL Agent or Prepetition Term Lender, the Debtors shall enter into any such agreement, and, if the Prepetition RBL Agent or Prepetition Term Lender determines, in their sole discretion, to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in such filings and the automatic stay shall be lifted without the need for further order of this Court to allow such filings.  Without limiting the foregoing, but subject and subordinate to the rights of the DIP Secured Parties and the holders of any Permitted Prior Senior Liens, in respect of the Adequate Protection Liens, the Prepetition Secured Parties shall enjoy the benefit of all deposit account control agreements, and escrow agreements to which any Debtor is a party;

(b)    Adequate Protection Superpriority Claims.  The Prepetition RBL Agent, on behalf and for the benefit of the Prepetition RBL Secured Parties, and Prepetition Term Lender are hereby granted superpriority administrative expense claims (the "Adequate Protection Superpriority Claims") in the amount of their respective Adequate Protection Claim under sections 503 and 507 of the Bankruptcy Code against the Debtors' estates, including, subject to and upon entry of the Final Order, proceeds of Avoidance Actions, which Adequate Protection Superpriority Claims, if any, shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to and effective upon entry of a Final Order), 507(a), 507(b), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases

24

pursuant to section 1112 of the Bankruptcy Code; provided, however, that at all times while such claim is in full force and effect pursuant to this Interim Order, Adequate Protection Superpriority Claims shall be junior in all respects to the DIP Superpriority Claims; further provided, Adequate Protection Superpriority Claims shall respectively among the Prepetition Secured Parties rank in the same right and priority as do their respective claims with respect to the Prepetition Credit Agreements as of the Petition Date.

(c)    Payment of Prepetition RBL Secured Parties' Fees and Expenses.  The Debtors are authorized to pay, from the proceeds of the DIP Facility Loans, and in accordance with the Prepetition RBL Loan Documents, the reasonable, documented, prepetition and postpetition out-of-pocket fees, costs and expenses incurred or accrued by the Prepetition RBL Secured Parties for legal counsel and financial advisors retained by the Prepetition RBL Lenders (which shall be limited to the reasonable and documented out-of-pocket fees and expenses of one primary legal counsel (which shall be Winston & Strawn LLP), one local counsel in each applicable material jurisdiction (including, without limitation, Delaware (which local counsel shall be Young Conaway Stargatt & Taylor, LLP) and Oklahoma) and one financial advisor (which shall be RPA Advisors, LLC) for the Prepetition RBL Lenders as a group), promptly upon receipt of written invoices therefor, provided that copies of any invoices (redacted, as necessary, to protect any applicable privilege) shall be provided to the U.S. Trustee and counsel to any Committee and each such party shall have ten (10) days from the date of receipt of each such invoice within which to objection in writing to such payment; provided that any fees, costs and expenses paid as adequate protection for the Prepetition RBL Secured

25

Parties shall be recharacterized as payments of principal if the Prepetition RBL Secured Parties are later determined to be undersecured.

13.    **No Waiver of Prepetition RBL Credit Agreement or Prepetition Term Loan Credit Agreement Provisions; Reservation of Rights**.    Except as otherwise specifically provided in this Interim Order, nothing contained in this Interim Order shall be deemed a waiver or constitute a consent to the modification of any provision contained in the Prepetition RBL Credit Agreements or the Prepetition Term Loan Credit Agreement by the Prepetition Secured Parties, including, but not limited to, the incurrence or issuance of any indebtedness by the Debtors, the incurrence of any lien in connection therewith or the making of any payment by the Debtors.

14.    **Rights of Access and Information**.    Without limiting the rights of access and information afforded the DIP Secured Parties under the DIP Loan Documents, the Debtors shall be, and hereby are, authorized to afford the representatives, agents, employees, attorneys, financial advisors, and investment bankers of the DIP Secured Parties reasonable access to the Debtors' premises and their books and records in accordance with the DIP Loan Documents and the Prepetition RBL Security Documents, as applicable, and are authorized to reasonably cooperate, consult with, and provide to such persons all such information as may reasonably be requested in accordance with the DIP Loan Documents.    In addition, the Debtors may authorize their independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the DIP Secured Parties all such information as may be reasonably requested in accordance with the DIP Loan Documents with respect to the business, results of operations and financial condition of any of the Debtors.

15.    **Carve-Out**.

(a)      The DIP Liens, DIP Superpriority Claims, Adequate Protection Superpriority Claims, Adequate Protection Liens, and Prepetition RBL Liens shall be subject to the payment of: (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United State Code (plus any applicable interest at the statutory rate), (ii) prior to the delivery (by email or otherwise) by the DIP Agent of a written notice to the Debtors, the Debtors' counsel, the U.S. Trustee, and lead counsel for the Committee (as defined below), if any, of the occurrence and continuance of an Event of Default (the "Carve-Out Notice"), the fees, costs and expenses accrued or incurred by any person or firm retained by the Debtors or the Committee as an estate professional (collectively, the "Professionals") and payable under sections 328, 330 and/or 331 of the Bankruptcy Code, to the extent allowed by an order of this Court (whether allowed prior to or after the delivery of the Carve-Out Notice); (iii) up to a maximum amount of $1,250,000.00 of fees, costs and expenses accrued or incurred by Professionals following the delivery of the Carve-Out Notice, payable under sections 328, 330 and/or 331 of the Bankruptcy Code and allowed by order of this Court; and (d) all reasonable and documented fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $50,000 (collectively, the "Carve-Out"); provided, however, that the Carve-Out shall be applied in accordance with paragraph 16 of this Interim Order.  So long as a Carve-Out Notice has not been delivered: (i) the Debtors shall be permitted to pay administrative expenses allowed and payable under sections 328, 330 and/or 331 of the Bankruptcy Code, as the same may become due and payable; and (ii) such payments shall not be applied to reduce the Carve-Out (to the extent such payments are ultimately permitted by the Court); provided,

SC1:4946509.1

<u>however</u>, that following a Carve-Out Notice any amounts actually paid to Professionals by any means will reduce the Carve-Out on a dollar-for-dollar basis.  Notwithstanding the foregoing, nothing contained herein is intended to constitute, nor should be construed as consent to, the allowance of any Professional's fees, costs or expenses by any party and shall not affect the right of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, any Committee, the U.S. Trustee, or any other party-in-interest to object to the allowance and payment or any amounts incurred or requested.

(b)      Prior to the payment of any DIP Secured Party or Prepetition Secured Party on account of adequate protection, the Debtors shall fund a reserve in an amount equal to the Carve-Out (the "<u>Carve-Out Reserve</u>") from all cash on hand (including Cash Collateral). The Carve-Out Reserve shall be held for the benefit of the Debtors in a segregated non-interest bearing account at the DIP Agent or another financial institution agreed to by the Debtors and the DIP Lenders in trust to pay the fees to the Professionals and other obligations benefitting from the Carve-Out until paid in full; <u>provided</u> that the DIP Agent shall follow the instructions of the Debtors with respect to the disbursement of the Carve-Out Reserve consistent with the provisions of this Interim Order; <u>provided</u> <u>further</u> that the DIP Agent shall not be liable to any Professional or any other person or entity with respect to the Carve-Out Reserve held at the DIP Agent, and all actions (or inactions) by the DIP Agent related thereto shall be exculpated by all such parties, except in the event a court of competent jurisdiction determines that the DIP Agent breached its obligations under this Interim Order by not following an instruction of the Debtors that was consistent with the provisions of this Interim Order with respect to the Carve-Out Reserve; <u>provided</u> <u>further</u> that, to the extent the Carve-Out Reserve has not been reduced

28

to zero after the payment in full of such obligations, it shall be used to pay the DIP Agent for the benefit of the DIP Secured Parties until the DIP Obligations have been indefeasibly paid in full in cash.  Notwithstanding anything to the contrary herein, the Prepetition RBL Agent and the DIP Agent, each on behalf of itself and the relevant secured parties, (y) shall not sweep or foreclose on the Carve-Out Reserve and (z) shall have a security interest upon any residual interest in the Carve-Out Reserve, available following satisfaction in cash in full of all obligations benefitting from the Carve-Out, and the priority of such lien on the residual shall be consistent with this Interim Order. Further, notwithstanding anything to the contrary herein, (A) the failure of the Carve-Out Reserve to satisfy in full the fees to the Professionals shall not affect the priority of the Carve-Out and (B) in no way shall the Carve-Out or the Carve-Out Reserve be construed as a cap or limitation on the amount of fees to the Professionals due and payable by the Debtors.

(c)    Notwithstanding anything to the contrary herein or in the DIP Loan Documents, the Carve-Out shall be senior to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Adequate Protection Obligations, the Adequate Protection Liens and all other liens and claims granted under this Interim Order, the DIP Loan Documents, or otherwise securing or in respect of the DIP Obligations or the Adequate Protection Obligations.

16.    **Limitation on Use of DIP Financing Proceeds and Collateral**.  No portion of the Carve-Out, DIP Facility, DIP Collateral, Prepetition Collateral or Cash Collateral shall include, apply to, or be available for any fees, costs or expenses incurred by any party, including the Debtors or any Committee, in connection with the initiation or prosecution of any claims,

SC1:4946509.1

causes of action, adversary proceedings, or other litigation against any of the DIP Secured Parties

or the Prepetition Secured Parties, including, without limitation, (i) challenging the amount,

validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim,

or offset to the DIP Loan Documents, DIP Obligations, DIP Superpriority Claims or DIP Liens

in respect thereof, (ii) challenging the amount, validity, extent, perfection, priority, or

enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition RBL Loan

Documents, Prepetition RBL Obligations, Adequate Protection Superpriority Claims or the

Adequate Protection Liens of the Prepetition Secured Parties in respect thereof or (iii) asserting

any claims or causes of action, including, without limitation, claims or actions to hinder or delay

the DIP Agent's or DIP Lenders' assertion, enforcement or realization on the DIP Collateral in

accordance with the DIP Loan Documents or this Interim Order; provided, however, that up to

$75,000 of the proceeds of the DIP Facility or any proceeds of the DIP Collateral and/or the

Carve-Out shall be made available, in the aggregate, to any Committee appointed in these

Chapter 11 Cases to fund a reasonable investigation in respect of the validity, perfection and

enforceability of the Prepetition RBL Liens and Prepetition RBL Obligations.  Furthermore,

none of the Carve-Out, DIP Collateral, Prepetition Collateral, Cash Collateral or any proceeds of

the DIP Facility shall be used to prevent, hinder or delay the DIP Secured Parties from enforcing

or realizing upon the DIP Collateral once an Event of Default has been determined by the Court

to have occurred and to be continuing under the DIP Loan Documents or this Interim Order.

17.    **Investigation Rights**.  The official committee of creditors holding unsecured

claims appointed in these Chapter 11 Cases, if any, pursuant to section 1102 of the Bankruptcy

Code (the "Committee"), shall have until the later of sixty (60) days from the date of the

Committee's appointment (provided that such appointment occurs within seventy-five (75) days

30

from the entry of this Interim Order) or seventy-five (75) days from the entry of this Interim Order, and all other non-debtor parties-in-interest (including a trustee, if appointed or elected prior to the Investigation Termination Date, as defined herein) shall have seventy-five (75) days from the Petition Date (each, as applicable, the "Investigation Termination Date") to investigate the validity, perfection and enforceability of the Prepetition RBL Liens and the Prepetition RBL Obligations, and to assert any other claims or causes of action against the Prepetition RBL Secured Parties.   If any Committee, or any non-debtor party-in-interest hereafter granted authority and standing by this Court, determines that there may be a claim or cause of action against the Prepetition RBL Secured Parties by the Investigation Termination Date, then upon five (5) days' written notice to the Debtors and the Prepetition RBL Secured Parties, such Committee, or other non-debtor party-in-interest hereafter granted authority and standing by this Court, shall be permitted to file and prosecute an objection or claim related thereto (each, a "Challenge"), and shall have only until the applicable Investigation Termination Date to file such objection or claim (or otherwise initiate an appropriate action on behalf of the Debtors' estates) setting forth the basis of any such challenge, claim or cause of action; provided, however, that nothing contained in the DIP Loan Documents or this Interim Order shall be deemed to confer standing on any Committee or any other party-in-interest to commence a challenge.   If a Challenge is not filed on or before the Investigation Termination Date, then, without further action by any party or any further order of this Court: (a) the agreements, acknowledgements and stipulations contained in Paragraph D of this Interim Order and its subparagraphs shall be deemed to be immediately and irrevocably binding on the Debtors and the Debtors' estates, the Committee and all parties-in-interest, and any and all successors-in-interest thereto shall thereafter be forever barred from bringing any Challenge; (b) the liens and security interests of

the Prepetition RBL Secured Parties shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Prepetition RBL Obligations shall be deemed to be finally allowed claims for all purposes in the Chapter 11 Cases and any subsequent chapter 7 cases, in the amounts set forth in Paragraph D and its subparagraphs and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise; and (d) the Debtors shall be deemed to have released, waived and discharged each of the Prepetition RBL Secured Parties (whether in their prepetition or postpetition capacity), together with their respective officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or successors, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition RBL Obligations or their prepetition relationship with such Debtor or any affiliate thereof relating to any of the Prepetition RBL Loan Documents or any transaction contemplated thereby, including, without limitation, any claims or defenses as to the extent, validity, priority, or enforceability of the Prepetition RBL Liens or the Prepetition RBL Obligations, any claims or defenses under chapter 5 of the Bankruptcy Code or any other causes of action.  The Prepetition RBL Agent and Prepetition RBL Lenders shall cooperate in all reasonable requests for information in order to assist the Committee in its investigation under this Paragraph 17.  Notwithstanding anything to the contrary herein: (a) if any such Challenge is timely commenced, the stipulations contained in Paragraph D of this Interim Order and its subparagraphs shall nonetheless remain binding on all parties-in-interest and preclusive except with respect to the party asserting the Challenge and to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (b) the Prepetition RBL Secured Parties reserve all of their rights to contest on any grounds any Challenge.  For the

32

avoidance of doubt, any trustee appointed or elected in these cases shall, until the Investigation Termination Date (and thereafter, if a Challenge is commenced on or prior to the Investigation Termination Date) for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph with respect to a Challenge (whether commenced by such trustee or commenced by any other party-in-interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations and stipulations of the Debtors in this Order.

18.    **Protection of DIP Lenders' Rights**.  So long as there are any DIP Facility Loans or DIP Obligations outstanding or the DIP Lenders have any outstanding commitments under the DIP Credit Agreement, the Prepetition Secured Parties (i) shall not take any action to foreclose upon or recover in connection with their respective liens and security interests, other agreements, or operation of law of this Interim Order, or otherwise exercise remedies against any DIP Collateral, except to the extent authorized herein or by any other order of this Court, (ii) shall be deemed to have consented to any release of DIP Collateral authorized under the DIP Loan Documents, (iii) shall not file any further financing statements, trademark filings, copyright filings, patent filings, mortgages, notices of lien or similar instruments, enter into any control agreement, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Agent files financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date and (iv) shall not seek to terminate or modify the use of Cash Collateral.

19.    **[Reserved]**.

20.    **Further Assurances**.  The Debtors are authorized to execute and deliver to the DIP Agent, the DIP Lenders, the Prepetition Secured Parties all such agreements, financing statements, instruments and other documents as the DIP Agent, DIP Lenders, Prepetition Secured Parties may reasonably request to evidence, confirm, validate or perfect the DIP Liens or the Adequate Protection Liens granted pursuant hereto.  Further, the Debtors are authorized to do and perform all acts, to make, execute and deliver all instruments and documents, and to pay all fees and expenses that may be required or necessary for the Debtors' performance under the DIP Loan Documents, including, without limitation, (i) the execution of the DIP Loan Documents and (ii) the payment of the fees, costs and other expenses described in the DIP Loan Documents as such become due.  If the DIP Agent, the Prepetition RBL Agent, or the Prepetition Term Lender hereafter reasonably requests that the Debtors execute and deliver to the DIP Agent, the Prepetition RBL Agent, or the Prepetition Term Lender financing statements, security agreements, collateral assignments, or other instruments and documents considered by such agent to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens or the Adequate Protection Liens, as applicable, the Debtors are hereby authorized to execute and deliver such financing statements, security agreements, collateral assignments, instruments, and documents, and the DIP Agent, the Prepetition RBL Agent, or the Prepetition Term Lender is hereby authorized to file or record such documents in its discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

21.    **506(c) Waiver**.  Upon the entry of the Final Order, except to the extent of the Carve-Out, the Debtors, on behalf of themselves and their estates, shall irrevocably waive and

shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Secured Parties or the Prepetition RBL Secured Parties (collectively, "Secured Lending Entities") upon the DIP Collateral or the Prepetition RBL Collateral (as applicable).  Subject to the entry of the Final Order, in no event shall the Secured Lending Entities be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral or the Prepetition RBL Collateral (as applicable).

22.    **Restrictions on Granting Postpetition Liens**.  Except as expressly permitted by the DIP Loan Documents, the Debtors will not, at any time during the Chapter 11 Cases, grant mortgages, security interests or liens in the DIP Collateral (or any portion thereof) having a priority senior to the DIP Liens to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

23.    **Automatic Effectiveness of Liens**.  Automatically upon entry of this Interim Order, the DIP Liens and the Adequate Protection Liens shall be deemed to be valid, perfected, enforceable, nonavoidable and effective by operation of law, and not subject to challenge as of the Petition Date, without the need for (a) executing any control agreements, landlord waivers (unless required by law or contract), mortgagee waivers, bailee waivers or warehouseman waivers; (b) giving, filing or recording of any UCC-1 financing statements, mortgages, deeds of trust, leasehold mortgages, notices to account debtors or other third parties, notices of lien or similar instruments in any jurisdiction (including filings with the United States Patent and Trademark Office, the United States Copyright Office or any similar agency in respect of trademarks, copyrights, trade names or patents with respect to intellectual property), (c) taking

35

possession or control of any collateral, or (d) further action of any kind (including execution of any security agreements, pledge agreements, control agreements, lockbox agreements or escrow agreements).

24.     **Automatic Stay**.  As provided herein, subject only to the provisions of the DIP Credit Agreement and without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Secured Parties to exercise, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions, so long as the DIP Agent has provided five (5) business days' prior written notice to the Debtors, their bankruptcy counsel, counsel to the Committee, counsel to the respective Secured Lending Entities and the U.S. Trustee: (a) foreclose on the Collateral; (b) enforce all of the guaranty rights; (c) accelerate all Loans and other outstanding obligations under the DIP Facility; and (d) declare the principal of and accrued interest, premiums, fees and expenses constituting the obligations under the DIP Facility Loans to be due and payable.  The rights and remedies of the DIP Agent and DIP Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Agent and the DIP Secured Parties may have under the DIP Loan Documents or otherwise.  The Debtors are authorized to cooperate fully with the DIP Agent and the DIP Secured Parties in their exercise of rights and remedies, whether against the DIP Collateral or otherwise.  This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

25.     **[Reserved]**

36

26.     **Credit Bid**.  Subject to any bidding or auction procedures subsequently approved by the Court and the establishment of the Wind-Down Budget:

(a)     the DIP Agent, at the direction of the Majority Lenders (as defined in the DIP Credit Agreement), shall have the right to credit bid up to the full amount of the DIP Facility Loans in any sale of the DIP Collateral under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code; and in each of case (i), (ii) and (iii), such credit bid by the DIP Agent shall be binding upon all DIP Lenders.

(b)     the Prepetition RBL Agent, at the direction of the Majority Lenders (as defined in the Prepetition RBL Credit Agreement), shall have the right to credit bid up to the full amount of the Prepetition RBL Loans in any sale of the Prepetition RBL Collateral under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code; and in each of case (i), (ii) and (iii), such credit bid by the Prepetition RBL Agent shall be binding upon all Prepetition RBL Lenders.

27.     **Binding Effect**.  To the extent permitted by law and subject to Paragraph 14, the provisions of this Interim Order shall be binding upon and inure to the benefit of the Secured Lending Entities, the Debtors, any Committee appointed in these Chapter 11 Cases, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of

37

the Debtors or with respect to the property of the estate of any of the Debtors).  To the extent permitted by applicable law, this Interim Order shall bind any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Interim Order.

28.    **Survival**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases (and, to the extent not satisfied in full in cash, the DIP Obligations shall not be discharged by the entry of any such order, pursuant to section 1141(d)(4) of the Bankruptcy Code, each of the Debtors having hereby waived such discharge); (ii) converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Interim Order as well as the DIP Superpriority Claims and the DIP Liens in the DIP Collateral granted pursuant to this Interim Order and the DIP Loan Documents (and with respect to the entry of any order as set forth in (ii) or (iii) herein, the Adequate Protection Liens and Adequate Protection Superpriority Claims) shall continue in full force and effect notwithstanding the entry of any such order.  Such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Loan Documents, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full in cash and discharged.  In no event shall any plan of reorganization or liquidation be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Loan Documents.

29.    **Reallocation**.  For the avoidance of doubt, in the event that it is determined by this Court that the Prepetition Secured Parties did not maintain valid, perfected and enforceable

liens on the Prepetition Collateral, the Court reserves the right to reallocate any payments made to the Prepetition Secured Parties and modify any liens and claims granted pursuant to this Order, including the grant of adequate protection to the Prepetition Secured Parties.

30. **Amendments and Modifications of DIP Loan Documents**.  Each of the Debtors is expressly authorized and empowered to enter into amendments or other modifications of the DIP Loan Documents without further order of the Court, in each case, in such form as the DIP Agent and the DIP Lenders may agree with the Debtors in writing; provided that notice of any modification or amendment shall be provided by the Debtors to the U.S. Trustee, counsel to the Prepetition RBL Agent, counsel to the Prepetition Term Lender and counsel to any Committee, which parties may object to such modification or amendment, in writing, within three (3) business days from the date of the transmittal of such notice (which, to the extent such contact information for such parties is known to the Debtors, shall be transmitted by fax or e-mail, and, if not known, by overnight mail); further provided that, notwithstanding the foregoing, any material modification of the DIP Loan Documents shall require Court approval; and further provided that, if such objection is timely provided, then such modification or amendment shall be permitted only pursuant to an order of the Court, the entry of which may be sought on an expedited basis.

31. **Insurance Policies**.  Upon entry of this Interim Order, the DIP Agent and DIP Secured Parties shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained now or in the future by any of the Debtors which in any way relates to the DIP Collateral. Notwithstanding the foregoing, the Debtors are authorized to take any actions that the DIP Agent

shall request, in its sole and absolute discretion, to have the DIP Agent, on behalf of the DIP

Secured Parties, added as an additional insured and loss payee on each insurance policy.

32.    **Limits on Lender Liability**.  Nothing in this Interim Order, any of the DIP Loan

Documents, or any other documents related thereto shall in any way be construed or interpreted

to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured

Parties of any liability for any claims arising from any activities by the Debtors in the operation

of their businesses or in connection with the administration of these Chapter 11 Cases.  The DIP

Secured Parties shall not, solely by reason of having made loans under the DIP Facility, be

deemed in control of the operations of the Debtors or to be acting as a "responsible person" or

"owner or operator" with respect to the operation or management of the Debtors (as such terms,

or any similar terms, are used in the United States Comprehensive Environmental Response,

Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or

state statute).  Nothing in this Interim Order or the DIP Loan Documents shall in any way be

construed or interpreted to impose or allow the imposition upon the DIP Secured Parties, any of

the Prepetition RBL Lenders or Prepetition Term Lender of any liability for any claims arising

from the prepetition or postpetition activities of any of the Debtors.

33.    **Release of Claims and Defenses**.  Subject to the entry of the Final Order, each

Debtor hereby releases and discharges each of the DIP Secured Parties, in their capacity as such,

together with their respective affiliates, agents, attorneys, officers, directors and employees

(collectively, the "Released Parties"), from any and all claims and causes of action arising out of,

based upon or related to, in whole or in part, any of the DIP Loan Documents or any loans under

the DIP Facility, any aspect of the relationship between the Debtors, on the one hand, and any or

all of the Released Parties, on the other hand, relating to any of DIP Loan Documents or any

transaction contemplated thereby or any other acts or omissions by any or all of the Released Parties in connection with the DIP Facility or any of the DIP Loan Documents or their prepetition relationship with such Debtor or any affiliate thereof relating to any of the DIP Loan Documents or any transaction contemplated thereby, including, without limitation, any claims or defenses under chapter 5 of the Bankruptcy Code or any other causes of action (collectively, the "Claims and Defenses").

34.    **Access to DIP Collateral**.  Subject to appropriate notice and entry of the Final Order, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agent, exercisable on behalf of the DIP Secured Parties, contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon seven (7) days' written notice to counsel to the Debtors, counsel to the Committee (if any) and to the landlord of any leased premises that an Event of Default or the Maturity Date has occurred and is continuing under the DIP Loan Documents, the DIP Agent may, subject to the applicable notice provisions, if any, in this Interim Order and any separate agreement by and between such landlord and the DIP Agent, enter upon any leased premises of the Debtors or any other party for the purpose of exercising any remedy with respect to DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlords thereunder, provided that the DIP Agent shall only be obligated to pay rent of the Debtors that first accrues after the DIP Agent's written notice referenced above and that is payable during the period of such occupancy by the DIP Agent, calculated on a daily per diem basis.  Nothing herein shall require the DIP Agent to assume any lease as a condition to the rights afforded to the DIP Agent in this Paragraph.  In addition, any landlord's lien, right of distraint or levy, security

interest or other interest that any landlord, warehousemen or landlord's mortgagee may have in any DIP Collateral of the Debtors located on such leased premises, to the extent the same is not void under section 545 of the Bankruptcy Code, is hereby subordinated to the DIP Obligations, DIP Liens, and DIP Superpriority Claims.

35. **Protection Under Section 364(e)**.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect the validity or enforceability of any DIP Obligation, DIP Lien, Adequate Protection Superpriority Claim (with respect to the Prepetition RBL Secured Parties), or Adequate Protection Lien (with respect to the Prepetition RBL Secured Parties), or any other claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Loan Documents or Adequate Protection Obligations owing to the Prepetition RBL Secured Parties incurred prior to the actual receipt by the DIP Agent or the Prepetition RBL Agent, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay. Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations, or Adequate Protection Obligations owing to the Prepetition RBL Secured Parties by the Debtors prior to the actual receipt by the DIP Agent or the Prepetition RBL Agent, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Interim Order, and the Prepetition RBL Secured Parties shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Interim Order, and the DIP Loan Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations and Adequate Protection Obligations owing to the Prepetition RBL Secured Parties.

36.    **Effect of Dismissal of Chapter 11 Cases**.  If the Chapter 11 Cases are dismissed, converted or substantively consolidated, such dismissal, conversion or substantive consolidation of these Chapter 11 Cases shall not affect the rights of the Secured Lending Entities under their respective DIP Loan Documents, Prepetition RBL Loan Documents or this Interim Order, and all of the respective rights and remedies thereunder of the Secured Lending Entities shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, or substantively consolidated.  If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that: (i) the DIP Liens and DIP Superpriority Claims granted to and conferred upon the DIP Agent and DIP Secured Parties and the protections afforded to the DIP Agent and the DIP Secured Parties pursuant to this Interim Order and the DIP Loan Documents shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been paid and satisfied in full (and that such DIP Liens, DIP Superpriority Claims and other protections shall, notwithstanding such dismissal, remain binding on all interested parties); (ii) those Prepetition RBL Liens, Adequate Protection Liens and Adequate Protection Superpriority Claims granted to and conferred upon the Prepetition RBL Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Prepetition RBL Obligations shall have been paid and satisfied in full (and that such Adequate Protection Liens, Adequate Protection Superpriority Claims, and other adequate protection granted to or conferred on the Prepetition RBL Secured Parties shall, notwithstanding such dismissal, remain binding on all interested parties); and (iii) to the greatest extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens, the Prepetition RBL

SC1:4946509.1

Liens, the Adequate Protection Liens, the DIP Superpriority Claims and the Adequate Protection Superpriority Claims referred to herein.

37. **Discharge**. The DIP Obligations and the Adequate Protection Payments provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted), on or before the effective date of such confirmed plan, unless each of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, as applicable, has agreed in writing.

38. **Jurisdiction**. The Bankruptcy Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facility or the DIP Loan Documents.

39. **Authorized Signatories**. The signature of any Authorized Officer (as defined in the Debtor's corporate resolutions filed with the Petition) or Debtors' attorneys, appearing on any one or more of the DIP Loan Documents shall be sufficient to bind the Debtors. No board of directors or other approval shall be necessary.

40. **Order Effective**. This Interim Order shall be effective as of the date of the signature by the Court.

41. **Controlling Effect of Interim Order**. To the extent any provision of this Interim Order conflicts or is inconsistent with any provision of the Motion, any prepetition agreement or any DIP Loan Document, the provisions of this Interim Order shall control.

42. **Final Hearing** The final hearing with respect to the relief requested in the Motion shall be held on _____, 2019 at __.m. (prevailing Eastern Time). Any objections or

SC1:4946509.1

responses to entry of the proposed Final Order shall be filed on or before 4:00 p.m. (prevailing Eastern Time) on _____, 2019 and served on the following parties:  (a) the Debtors, 301 N.W. 63rd St., Suite 600, Oklahoma City, Oklahoma 73116, Attn: Jeff Zanotti; (b) proposed counsel for the Debtors, Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004, Attn: Alexa J. Kranzley, and Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market St., 16th Floor, Wilmington, Delaware 19899, Attn: Derek C. Abbott; (c) counsel to any statutory committee appointed in the chapter 11 cases, (d) the U.S. Trustee and (e) counsel to the Prepetition Secured Parties.  Notice of this Interim Order will be served in accordance with Local Rule 9013-1(m).  If no objections are timely filed, this Court may enter the Final Order without further notice or a hearing.

Dated: _____, 2019

_____
United States Bankruptcy Judge

**<u>Exhibit 1 to Exhibit A</u>**

**Form of DIP Credit Agreement**

# DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of [_____], 2019,

among

WHITE STAR PETROLEUM HOLDINGS, LLC,
as Holdings,

WHITE STAR PETROLEUM, LLC,
as the Borrower,

The Several Lenders
from Time to Time Parties Hereto,

MUFG UNION BANK, N.A.,
as Administrative Agent and Collateral Agent

# TABLE OF CONTENTS

## ARTICLE I

### Definitions

Section 1.01.  Defined Terms ..................................................................................2

Section 1.02.  Terms Generally................................................................................43

Section 1.03.  Accounting Terms .............................................................................44

Section 1.04.  Rounding ...........................................................................................44

Section 1.05.  Times of Day......................................................................................44

Section 1.06.  Timing of Payment or Performance...................................................44

Section 1.07.  Classification of Loans and Borrowings............................................45

Section 1.08.  Hedging .............................................................................................45

Section 1.09.  Certain Determinations .....................................................................45

Section 1.10.  [Reserved] .........................................................................................45

Section 1.11.  References to Agreements, Laws, Etc. ..............................................45

Section 1.12.  Letter of Credit Amounts ..................................................................45

## ARTICLE II

### Amount and Terms of Credit

Section 2.01.  DIP Term Loan Facility ....................................................................46

Section 2.02.  Maximum Number of Borrowings.....................................................46

Section 2.03.  Notice of Borrowing .........................................................................46

Section 2.04.  Disbursement of Funds .....................................................................47

Section 2.05.  Repayment of Loans; Evidence of Debt ............................................48

Section 2.06.  Conversions and Continuations ........................................................49

Section 2.07.  Pro Rata Borrowings.........................................................................49

Section 2.08.  Interest...............................................................................................50

Section 2.09.  Interest Periods..................................................................................51

Section 2.10.  Increased Costs, Illegality, Etc..........................................................51

Section 2.11.  Compensation ....................................................................................53

Section 2.12.  Change of Lending Office .................................................................54

Section 2.13.  Notice of Certain Costs .....................................................................54

Section 2.14.  [Reserved]..........................................................................................54

i

Section 2.15.  Defaulting Lenders...........................................................................54

Section 2.16.  Super-Priority Nature of Obligations.................................................57

Section 2.17.  Payment of Obligations.....................................................................57

Section 2.18.  Waiver of Priming Liens....................................................................57

## ARTICLE III Letters of Credit

Section 3.01.  Letters of Credit ...............................................................................57

Section 3.02.  Letter of Credit Applications ............................................................59

Section 3.03.  Letter of Credit Participations..........................................................60

Section 3.04.  Agreement to Repay Letter of Credit Drawings ...............................62

Section 3.05.  New or Successor Issuing Bank........................................................63

Section 3.06.  Role of Issuing Bank.........................................................................64

Section 3.07.  L/C Cash Collateral...........................................................................65

Section 3.08.  Applicability of ISP and Uniform Customs.......................................66

Section 3.09.  Conflict with Issuer Documents........................................................66

Section 3.10.  Letters of Credit Issued for Restricted Subsidiaries .........................66

Section 3.11.  Increased Costs .................................................................................66

## ARTICLE IV
## Fees; Commitments

Section 4.01.  Fees ..................................................................................................67

Section 4.02.  Voluntary Reduction of Commitments...............................................68

Section 4.03.  Mandatory Termination of Commitments ..........................................68

## ARTICLE V

## Payments

Section 5.01.  Voluntary Prepayments.....................................................................69

Section 5.02.  Mandatory Prepayments; Application of Prepayments ......................70

Section 5.03.  Method and Place of Payment ..........................................................71

Section 5.04.  Net Payments ....................................................................................72

Section 5.05.  Computations of Interest and Fees....................................................76

Section 5.06.  Limit on Rate of Interest ...................................................................76

ii

# ARTICLE VI

## Conditions Precedent

Section 6.01.  Conditions Precedent to Initial Borrowing ............................................................77

# ARTICLE VII

## Conditions Precedent to All Credit Events

Section 7.01.  Conditions Precedent to All Credit Events ...........................................................79

# ARTICLE VIII

## Representations and Warranties

Section 8.01.  Corporate Status.....................................................................................................80

Section 8.02.  Corporate Power and Authority; Enforceability....................................................80

Section 8.03.  No Violation............................................................................................................81

Section 8.04.  Litigation.................................................................................................................81

Section 8.05.  Margin Regulations................................................................................................81

Section 8.06.  Governmental Approvals .......................................................................................81

Section 8.07.  Investment Company Act .......................................................................................81

Section 8.08.  True and Complete Disclosure...............................................................................81

Section 8.09.  Tax Matters ............................................................................................................82

Section 8.10.  Compliance with ERISA........................................................................................82

Section 8.11.  Subsidiaries ............................................................................................................83

Section 8.12.  Environmental Laws ..............................................................................................83

Section 8.13.  Security Matters .....................................................................................................83

Section 8.14.  Properties. ..............................................................................................................84

Section 8.15.  [Reserved] ..............................................................................................................85

Section 8.16.  Patriot Act; AML; OFAC; FCPA ..........................................................................85

Section 8.17.  Gas Imbalances, Prepayments ...............................................................................86

Section 8.18.  Marketing of Production ........................................................................................86

Section 8.19.  Hedge Agreements .................................................................................................86

Section 8.20.  [Reserved] ..............................................................................................................86

Section 8.21.  Subsidiaries. ...........................................................................................................86

Section 8.22.  Use of Proceeds......................................................................................................87

Section 8.23.   Insurance ................................................................................................87

Section 8.24.   EEA Financial Institutions ......................................................................87

Section 8.25.   Deposit Accounts .....................................................................................87

Section 8.26.   Approved Budget ......................................................................................87

## ARTICLE IX

### Affirmative Covenants

Section 9.01.   Reports and Other Information ................................................................87

Section 9.02.   Delivery of Reports .................................................................................91

Section 9.03.   Taxes ........................................................................................................92

Section 9.04.   Further Instruments and Acts ..................................................................92

Section 9.05.   Maintenance of Insurance .......................................................................93

Section 9.06.   Compliance with Laws ............................................................................93

Section 9.07.   Operation and Maintenance of Properties...............................................94

Section 9.08.   Company Existence ..................................................................................94

Section 9.09.   After-Acquired Property ..........................................................................95

Section 9.10.   [Reserved] ................................................................................................95

Section 9.11.   ERISA ......................................................................................................95

Section 9.12.   Use of Proceeds .......................................................................................96

Section 9.13.   [Reserved] ................................................................................................96

Section 9.14.   Reserve Reports .......................................................................................96

Section 9.15.   Patriot Act, Money Laundering Laws, OFAC, FCPA ...........................98

Section 9.16.   [Reserved] ................................................................................................98

Section 9.17.   Cash Management ....................................................................................98

Section 9.18.   Certain Post-Closing Matters ..................................................................98

Section 9.19.   Access to Consultants ..............................................................................98

Section 9.20.   Additional Reporting ...............................................................................98

Section 9.21.   Milestones ..............................................................................................100

## ARTICLE X

### Negative Covenants

Section 10.01. Limitation on Restricted Payments.........................................................101

Section 10.02. Limitation on Subsidiary Distributions...................................................101

Section 10.03. Limitation on Incurrence of Indebtedness ...........................................................101

Section 10.04. Asset Sales ...........................................................................................................103

Section 10.05. Transactions with Affiliates.................................................................................103

Section 10.06. Liens.....................................................................................................................104

Section 10.07. Limitation on Investments. ..................................................................................105

Section 10.08. Limitation on Fundamental Changes. ..................................................................105

Section 10.09. Limitations on Debt Payments and Amendments.................................................105

Section 10.10. Hedge Agreements ...............................................................................................106

Section 10.11. Variance Covenants .............................................................................................106

Section 10.12. Negative Pledge Agreements ...............................................................................106

Section 10.13. Drilling and Completion Capital Expenditures....................................................107

Section 10.14. Modifications to Orders .......................................................................................107

Section 10.15. Prohibited Conduct ..............................................................................................107

Section 10.16. Additional Restrictions on Credit Parties ............................................................108

# ARTICLE X-A

## Holdings Covenant

# ARTICLE XI

## Events of Default

Section 11.01. Events of Default ..................................................................................................109

Section 11.02. Application of Proceeds .......................................................................................113

# ARTICLE XII

## The Agents

Section 12.01. Appointment .........................................................................................................114

Section 12.02. Delegation of Duties ............................................................................................115

Section 12.03. Exculpatory Provisions ........................................................................................115

Section 12.04. Reliance by Agents ..............................................................................................116

Section 12.05. Notice of Default..................................................................................................116

Section 12.06. Non-Reliance on Administrative Agent, Collateral Agent and Other
Lenders................................................................................................................117

Section 12.07. Indemnification.....................................................................................................117

SC1:4941791.6

Section 12.08. Agents in Their Individual Capacities ................................................................118

Section 12.09. Successor Agents .................................................................................................119

Section 12.10. Withholding Tax .................................................................................................120

Section 12.11. Security Documents and Collateral Agent under Security Documents ..............120

Section 12.12. Right to Realize on Collateral and Enforce the Guarantee .................................121

Section 12.13. Administrative Agent May File Proofs of Claim.................................................121

Section 12.14. The Arrangers ......................................................................................................122

Section 12.15. Intercreditor Agreements ....................................................................................123

## ARTICLE XIII

### Miscellaneous

Section 13.01. Amendments, Etc..................................................................................................123

Section 13.02. Notices .................................................................................................................126

Section 13.03. No Waiver; Cumulative Remedies ......................................................................127

Section 13.04. Survival of Representations and Warranties........................................................127

Section 13.05. Payment of Expenses; Indemnification ...............................................................128

Section 13.06. Successors and Assigns; Participations and Assignments ...................................130

Section 13.07. Replacements of Lenders under Certain Circumstances .....................................134

Section 13.08. Adjustments; Set-off ...........................................................................................136

Section 13.09. Counterparts .........................................................................................................136

Section 13.10. Severability ..........................................................................................................137

Section 13.11. Integration ............................................................................................................137

Section 13.12. GOVERNING LAW.............................................................................................137

Section 13.13. Submission to Jurisdiction; Waivers....................................................................137

Section 13.14. Acknowledgments................................................................................................138

Section 13.15. WAIVERS OF JURY TRIAL ..............................................................................139

Section 13.16. Confidentiality .....................................................................................................139

Section 13.17. Release of Collateral and Guarantee Obligations ...............................................140

Section 13.18. USA Patriot Act ...................................................................................................141

Section 13.19. Payments Set Aside..............................................................................................142

Section 13.20. Reinstatement........................................................................................................142

Section 13.21. Disposition of Proceeds .......................................................................................142

Section 13.22. [Reserved].............................................................................................................142

vi

Section 13.23. Agency of the Borrower for the Other Credit Parties ..........................................142

Section 13.24. Acknowledgement and Consent to Bail-In of EEA Financial Institutions ..........143

Section 13.25. Financing Orders Control ...................................................................................143

SC1:4941791.6

Exhibits and Schedules

EXHIBITS

Exhibit A       Form of Reserve Report Certificate
Exhibit B       Form of Notice of Borrowing
Exhibit C       [Reserved]
Exhibit D       Form of Collateral Agreement
Exhibit E       Form of Guarantee
Exhibit F       [Reserved]
Exhibit G       Form of Assignment and Assumption
Exhibit H       Form of Promissory Note
Exhibit I       Form of Intercompany Note
Exhibit J       Form of Non-Bank Tax Certificate
Exhibit K       [Reserved]
Exhibit L       [Reserved]
Exhibit M       [Reserved]
Exhibit N       Form of Notice of Prepayment

SCHEDULES

Schedule 1.01(a)        Lender Commitments
Schedule 1.01(b)        Closing Date Subsidiary Guarantors
Schedule 1.01(c)        Chapter 11 Cases
Schedule 1.01(d)        Existing Investments
Schedule 1.01(e)        Existing Letters of Credit
Schedule 4.01           Initial Approved Budget
Schedule 8.04           Litigation
Schedule 8.11           Subsidiaries
Schedule 8.14           Properties
Schedule 8.17           Closing Date Gas Imbalances
Schedule 8.18           Closing Date Marketing Agreements
Schedule 8.19           Closing Date Hedge Agreements
Schedule 8.21           Outstanding Equity Commitments
Schedule 10.03          Closing Date Indebtedness
Schedule 10.05(b)(iv)   Closing Date Agreement Obligations
Schedule 10.06          Closing Date Liens
Schedule 10.12          Closing Date Negative Pledge Agreements
Schedule 13.02          Notice Addresses

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT** (this "Agreement"), dated as of [_____], 2019, among WHITE STAR PETROLEUM HOLDINGS, LLC, a debtor-in-possession under Chapter 11 of the Bankruptcy Code ("Holdings"), WHITE STAR PETROLEUM, LLC, a debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "Borrower"), the lenders from time to time party hereto (each a "Lender" and collectively, the "Lenders") and MUFG UNION BANK, N.A., as administrative agent and collateral agent for the Lenders.

## INTRODUCTORY STATEMENT:

WHEREAS, terms not defined above or in this Introductory Statement are as defined in Article I hereof or as defined elsewhere herein;

WHEREAS, on [_____] (the "Petition Date") the Credit Parties (in such capacity, each a "Debtor" and collectively, the "Debtors") commenced Chapter 11 Cases by filing a voluntary petition for reorganization under the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and each of the Credit Parties continues to operate its business and manage its properties as a debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, certain Lenders provided financing to White Star Petroleum, LLC (the "Prepetition Borrower") pursuant to the Revolving Credit Agreement, dated as of June 30, 2016 (as amended, modified or supplemented through the Petition Date, the "Prepetition Credit Agreement"), among the Prepetition Borrower, White Star Petroleum Holdings, LLC ("Prepetition Holdings"), the financial institutions from time to time party thereto (the "Prepetition Lenders") and MUFG Union Bank, N.A., as administrative agent (in such capacity, the "Prepetition Agent");

WHEREAS, the Debtors have requested that (a) the Lenders provide a priming, senior secured, superpriority term loan credit facility in an aggregate principal amount of up to $28,500,000 to the Borrower to fund the working capital requirements of the Credit Parties and for other purposes permitted under this Agreement during the pendency of the Chapter 11 Cases and (b) each Issuing Bank issue Letters of Credit (not to exceed the Letter of Credit Commitment) at any time and from time to time prior to the L/C Maturity Date, in an aggregate Stated Amount at any time outstanding not to exceed the Letter of Credit Commitments then in effect;

WHEREAS, the Administrative Agent is willing to act as agent for the Lenders and each Lender is willing to make available to the Borrower such term loan credit facility and letter of credit facilities upon the terms and subject to the conditions set forth herein; and

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

# ARTICLE I

## Definitions

Section 1.01.  <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings specified below:

"<u>Acceptable Plan</u>" shall mean a plan of reorganization or liquidation and related disclosure statement for each of the Chapter 11 Cases filed by the Debtors, in form and substance reasonably satisfactory to the Administrative Agent, as confirmed in writing by the Administrative Agent, that (i) contemplates a sale, to be indefeasibly paid for in cash, of all or substantially all of the assets of the Debtors, (ii) provides for the consideration for such sale to be indefeasibly paid in cash on the effective date of such sale, and (iii) provides the application of the proceeds of such sale in a manner permitted by the Bankruptcy Code.

"<u>Adjusted Total Commitments</u>" means, at any time, the Total Commitment less the aggregate amount of Commitments of all Defaulting Lenders.

"<u>Adjusted Total Outstandings</u>" means, at any time, the aggregate Total Outstandings of all Lenders less the aggregate Total Outstandings of all Defaulting Lenders.

"<u>Administrative Agent</u>" means MUFG Union Bank, N.A., as the administrative agent for the Lenders under this Agreement and the other Credit Documents, or any successor administrative agent appointed in accordance with the provisions of <u>Section 12.09</u>.

"<u>Administrative Agent's Office</u>" means the Administrative Agent's address and, as appropriate, account as provided on <u>Schedule 13.02</u>, or such other address or account as the Administrative Agent may from time to time notify in writing to the Borrower and the Lenders.

"<u>Administrative Questionnaire</u>" means, for each Lender, an administrative questionnaire in a form approved by the Administrative Agent.

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.  "Controlling" and "controlled" shall have meanings correlative thereto.  In no event shall the Administrative Agent or any Lender be deemed to be an Affiliate of the Borrower or any of its Subsidiaries.

"<u>Affiliate Transaction</u>" has the meaning set forth in <u>Section 10.05(a)</u>.

"<u>Agent Related Party</u>" means, with respect to any Agent, its Affiliates and the officers, directors, employees, agents, attorneys-in-fact, partners, trustees and advisors of such Agent and of such Agent's Affiliates.

2

"Agents" means the Administrative Agent and the Collateral Agent and any Subagent.

"Agreement" shall have the meaning provided in the recitals to this Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"Applicable Margin" means (i) in the case of Eurodollar Rate Loans, 10.00% per annum and (ii) in the case of Base Rate Loans, 9.00% per annum.

"Approved Bank" means any domestic or foreign commercial bank having capital and surplus of not less than five hundred million Dollars ($500,000,000).

"Approved Budget" means, at any time, the Initial Approved Budget or the most recent Proposed Budget approved in writing by the Administrative Agent.  From time to time (but not more than twice per month unless otherwise agreed by the Administrative Agent) the Borrower may provide to the Administrative Agent a proposed new 13-week cash flow projection and disbursements budget substantially similar in form to the Initial Approved Budget or in such other form as the Administrative Agent may agree in its reasonable discretion (any such proposed cash flow projection and disbursements budget, a "Proposed Budget").  To the extent any such Proposed Budget is approved in writing by the Administrative Agent in its reasonable discretion, such Proposed Budget shall thereafter be the Approved Budget for such period contained therein and for all purposes hereunder.  No such Proposed Budget shall become an Approved Budget until so approved in writing by the Administrative Agent; provided, that (a) if the Administrative Agent has not objected thereto in writing (including via e-mail) within five (5) Business Days after receipt thereof, then the Administrative Agent shall be deemed to have approved any such Proposed Budget and such Proposed Budget shall be deemed to constitute the Approved Budget upon the expiration of such five (5) Business Day period and (b) to the extent the Administrative Agent does provide such objection notice within such five (5) Business Day period, the then-existing Approved Budget shall constitute the Approved Budget for the projection period, without giving effect to any update, modification or supplement (with appropriate adjustments for the timing of monthly or semi-monthly disbursements), until such time as a Proposed Budget is approved by the Administrative Agent in its reasonable discretion.

"Approved Petroleum Engineers" means (a) Netherland, Sewell & Associates, Inc., (b) Schlumberger Limited, (c) W. D. Von Gonten & Co. Petroleum Engineering, (d) DeGolyer and MacNaughton, (e) Ryder Scott Company Petroleum Consultants, L.P. and (f) any other independent petroleum engineers selected by the Borrower and reasonably acceptable to the Administrative Agent.

"Approved Sale" has the meaning set forth in Section 9.21.

"Arranger" means MUFG Union Bank, N.A., in its capacity as lead arranger and bookrunner hereunder.

"ASC 715-30" has the meaning set forth in the definition of 'Unfunded Current Liability".

3

"Assignee" has the meaning set forth in Section 13.06(b)(i).

"Assignment and Assumption" means an assignment and assumption substantially in the form of Exhibit G (or such other form as shall be approved by the Administrative Agent).

"Assignment Taxes" has the meaning set forth in the definition of "Other Taxes".

"Attorney Costs" means all reasonable and documented out-of-pocket fees, expenses and disbursements of any law firm or other external legal counsel.

"Attorney and Advisor Costs" means all reasonable and documented out-of-pocket fees, expenses and disbursements of one primary counsel, one Delaware counsel and one Oklahoma counsel (as of the date hereof, Winston & Strawn LLP, Young Conaway Stargatt & Taylor, LLP and [___]), one additional local counsel, specialist counsel and conflicts counsel in each relevant jurisdiction material to the interests of the Lenders as a whole (other than Delaware) and one financial advisor (as of the date hereof, RPA Advisors), in each case, for the Agents and the Lenders as a group.

"Auction" has the meaning set forth in Section 9.21.

"Authorized Officer" means as to any Person, the President, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Chief Accounting Officer, the Controller, the Treasurer, the Assistant or Vice Treasurer, the Vice President-Finance, the General Counsel and any manager, managing member or general partner, in each case, of such Person, and any other senior officer designated as such in writing to the Administrative Agent by such Person.  Any document delivered hereunder that is signed by an Authorized Officer shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of the Borrower or any other Credit Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Person.

"Auto-Extension Letter of Credit" has the meaning set forth in Section 3.02(b).

"Available Commitment" means, at any time, (a) the Total Commitments of all Lenders at such time minus (b) the aggregate Total Outstandings of all Lenders at such time.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy" or any other applicable insolvency, debtor relief, or debt adjustment law, or any domestic or foreign law relating to bankruptcy, judicial management, insolvency, reorganization,

4

administration or relief of debtors in effect in its jurisdiction of incorporation, in each case as now or hereafter in effect, or any successor thereto.

"Bankruptcy Court" has the meaning set forth in the Introductory Statements; provided that if the Chapter 11 Cases are transferred to the United States Bankruptcy Court for the Western District of Oklahoma, Bankruptcy Court shall mean the United States Bankruptcy Court for such jurisdiction.

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Effective Rate plus one-half of one percent (½ of 1.0%), (b) the Prime Rate in effect on such day and (c) the Eurodollar Rate for a one-month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus one percent (1.0%); provided that, for the avoidance of doubt, the Eurodollar Rate for any day shall be the Screen Rate at approximately 11:00 a.m. London time on such day. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate shall take effect at the opening of business on the day specified in the public announcement of such change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate, respectively; provided that, in no event shall the Base Rate be less than the sum of (a) the one-month Eurodollar Rate *plus* (b) the difference between the Applicable Margin for Eurodollar Loans and the Applicable Margin for Base Rate Loans. Notwithstanding the foregoing, at no time shall the Base Rate be less than zero (0.0%).

"Base Rate Loan" means each Loan bearing interest based on the Base Rate.

"Benefited Lender" has the meaning set forth in Section 13.08(a).

"Bid Procedures Motion" has the meaning set forth in Section 9.21.

"Bid Procedures Order" has the meaning set forth in Section 9.21.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America (or any successors).

"Board of Directors" means, as to any Person, the board of directors or other governing body of such Person, or if such Person is owned or managed by a single entity, the board of directors or other governing body of such entity.

"Borrower" has the meaning set forth in the introductory paragraph hereto.

"Borrower Materials" has the meaning set forth in Section 9.02.

"Borrowing" means the incurrence of one Type of Loan on a given date (or resulting from conversions on a given date) having, in the case of Eurodollar Loans, the same Interest Period (provided that Base Rate Loans incurred pursuant to Section 2.10(b) shall be considered part of any related Borrowing of Eurodollar Loans).

"Borrowing Base Properties" means all Oil and Gas Properties of the Credit Parties.

5

"Budget Test Date" means the Friday of each week.

"Budget Test Period" means, as of any Budget Test Date, the rolling four-week period ending on such Budget Test Date, provided, that, for any Budget Test Date occurring prior to such time as four weeks have elapsed since the Petition Date, (a) in the case of determining compliance with the Permitted Expenditures Budget Variance, the Budget Test Period shall be the cumulative period from the Petition Date through such Budget Test Date, and (b) in the case of determining compliance with the Permitted Collections Budget Variance, the Budget Test Period shall be the four-week period ending on such Budget Test Period (including time elapsed prior to the Petition Date).

"Business Day" means any day excluding Saturday, Sunday and any other day on which banking institutions in New York City are authorized by law or other governmental actions to close, and, if such day relates to (a) any interest rate settings as to a Eurodollar Loan, (b) any fundings, disbursements, settlements and payments in respect of any such Eurodollar Loan, or (c) any other dealings pursuant to this Agreement in respect of any such Eurodollar Loan, such day shall be a day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurodollar market.

"Capital Stock" means:

(1)    in the case of a corporation, corporate stock or shares in the capital of such corporation;

(2)    in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)    in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)    any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person; provided that any instrument evidencing Indebtedness convertible or exchangeable into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock, shall not be deemed to be Capital Stock unless and until such instrument is so converted or exchanged.

"Capitalized Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP.

"Capitalized Leases" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is, or is required to be, accounted for as a capital lease on the balance sheet of that Person; provided that any lease that would be characterized as an operating lease in accordance with GAAP on the Closing Date (whether or not such operating lease was in effect on such date) shall continue to be accounted for as an operating lease (and not as a Capitalized Lease) for purposes of this

6

Agreement, regardless of any change in GAAP following the Closing Date that would otherwise require such lease to be re-characterized (on a prospective or retroactive basis or otherwise) as a Capitalized Lease.

"Carry Partners" means White Star Carry Partners, LLC, a Delaware limited liability company.

"Carryover" means, for any period, (i) with respect to Receipts, the amount of any actual Receipts during such period that exceed the projected Receipts set forth in the Approved Budget for such period (without giving effect to any Carryover Receipts from a prior period), (ii) with respect to Operating Disbursements, the amount of any budgeted Operating Disbursements not expended during such period (without giving effect to any Carryover of budgeted Operating Disbursements from a prior period), and (iii) with respect to the amount of "Employee Related" expenditures, "Lease Operating Expense", "CapEx" and "Transportation Fees" (each as referenced on the Approved Budget) of the Debtors, the amount of any such budgeted disbursements for each such line item not expended during such period (without giving effect to any Carryover of budgeted disbursements for each such line item from a prior period). For the avoidance of doubt, (a) the amount of Carryover Receipts from any period prior to the first Budget Test Period shall be zero, and (b) the amount of Carryover budgeted disbursements from any period prior to the Petition Date shall be zero.

"Carve-Out" shall have the meaning given to such term in the Financing Order.

"Cash Collateral" shall have the meaning given to such term in the Financing Order

"Cash Collateralize" has the meaning set forth in Section 3.07.

"Cash Equivalents" means:

(1)    United States Dollars;

(2)    securities issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of two (2) years or less from the date of acquisition;

(3)    certificates of deposit, time deposits and eurodollar time deposits with maturities of three years or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not exceeding three years and overnight bank deposits, in each case with an Approved Bank;

(4)    repurchase obligations for underlying securities of the types described in clauses (2) and (3) above or clauses (6) and (7) below entered into with any Approved Bank or recognized securities dealer meeting the qualifications specified in clause (3) above;

(5)    commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or

7

guaranteed by, a corporation (other than structured investment vehicles and other than corporations used in structured financing transactions) rated A-2 (or the equivalent thereof) or better by S&P, or P-2 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower) and in each case maturing within thirty-six (36) months after the date of acquisition thereof;

(6)     marketable short-term money market and similar liquid funds having a rating of at least P-2 (or the equivalent thereof) or A-2 (or the equivalent thereof) from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(7)     readily marketable direct obligations issued or fully guaranteed by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof; provided that each such readily marketable direct obligation shall have an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower with maturities of two (2) years or less from the date of acquisition);

(8)     Investments with average maturities of eighteen (18) months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(9)     investment funds investing substantially all of their assets in securities of the types described in clauses (1) through (8) above; and

(10)     Indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P and "A-2" from Moody's with maturities of two years or less from the date of acquisition.

"Cash Management Agreement" means any agreement in respect of Cash Management Services.

"Cash Management Services" means (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services) and (c) any other demand deposit or operating account relationships or other cash management services, including pursuant to any Cash Management Agreement.

"Casualty/Condemnation Event" means any event that gives rise to the receipt by the Credit Parties or any of their Subsidiaries of any insurance proceeds or condemnation awards in respect of any loss of, destruction of, damage to, condemnation or other taking of, equipment,

fixed assets or real property (including any improvements thereon), to replace or repair such equipment, fixed assets or real property.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change in Law" means (a) the adoption of any law, treaty, order, policy, rule or regulation after the Closing Date, (b) any change in any law, treaty, order, policy, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender with any guideline, request, directive or order enacted or promulgated after the Closing Date by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law); provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all guidelines, requests, directives, orders, rules and regulations adopted, enacted or promulgated thereunder, and (ii) all guidelines, requests, directives, orders, rules and regulations adopted, enacted or promulgated by the Bank for International Settlements, the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority) or the United States regulatory authorities, in each case, pursuant to Basel III, shall be deemed to have gone into effect after the Closing Date regardless of the date adopted, enacted or promulgated and shall be included as a Change in Law.

"Change of Control" means and shall be deemed to have occurred if:

(a)      (i) the Permitted Holders cease to own, in the aggregate, directly or indirectly, beneficially, at least greater than fifty and one-tenth percent (50.1%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower or (ii) (1) any Person (other than a Permitted Holder) or (2) Persons (other than one or more Permitted Holders) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person and its Subsidiaries, and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), becomes the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 of the Exchange Act), directly or indirectly, of Equity Interests representing more than the percentage of the aggregate ordinary voting power represented by the Equity Interests of the Borrower beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders; unless in any such case, the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the Board of Directors of Holdings or the Borrower;

(b)      the Borrower shall cease to be a direct Wholly Owned Subsidiary of Holdings (or any successor); or

(c)      a "Change of Control" or any other defined term having a similar purpose or meaning (as defined in the Prepetition Term Loan Credit Agreement or any documents governing any other Material Indebtedness) has occurred; or

(d)      all or substantially all of the assets of the Borrower shall have been sold.

9

"Chapter 11 Cases" means the case number identified across from each Credit Party's name set forth on Schedule 1.01(c) attached hereto and "Chapter 11 Cases" shall mean all of the foregoing.

"Claims" has the meaning set forth in the definition of "Environmental Claims".

"Closing Date" means the date on which the conditions specified in Section 6.01 are satisfied (or waived in accordance with Section 13.01).

"Co-Investors" means (a) the Sponsors and (b) a Controlled Investment Affiliate of any such Person (but excluding any portfolio companies of the foregoing Persons).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all Property of the Credit Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document or the Financing Orders, which includes, for the avoidance of doubt, all existing and after-acquired, tangible and intangible, personal and real property (including the Mortgaged Property) and assets of the Credit Parties and any proceeds thereof, including, subject to entry of the Final Order, any proceeds of, or property and interests recovered in respect of, claims or causes of action of the estates, including those arising under Chapter 5 of, or any other avoidance actions under, the Bankruptcy Code, but in no event shall Collateral include any Excluded Property or Excluded Equity Interests.

"Collateral Agent" means MUFG Union Bank, N.A., as collateral agent under the Security Documents, or any successor collateral agent appointed in accordance with the provisions of Section 12.09.

"Collateral Agreement" means the Collateral Agreement of even date herewith by and among the Borrower, the grantors party thereto and the Collateral Agent, for the benefit of the Secured Parties, substantially in the form of Exhibit D.

"Commitment" means the Term Loan Commitments and the L/C Commitments.

"Commitment Fee" has the meaning set forth in Section 4.01(a).

"Commitment Percentage" means, at any time, for each Lender, the percentage obtained by dividing (a) such Lender's Commitment at such time rounded to the ninth decimal by (b) the amount of the Total Commitment at such time rounded to the ninth decimal; provided that at any time when the Total Commitment shall have been terminated, each Lender's Commitment Percentage shall be the percentage obtained by dividing (i) such Lender's Total Outstandings at such time rounded to the ninth decimal by (ii) the aggregate Total Outstandings of all Lenders at such time rounded to the ninth decimal (with such Total Outstandings, and the component thereof, calculated using any applicable Lender's Commitment Percentage immediately prior to the termination of the Total Commitment).

"Committee" shall mean the official statutory unsecured creditors' committee, if any, appointed in the Chapter 11 Cases.

10

"<u>Commodity Account</u>" has the meaning assigned to such term in the UCC.

"<u>Commodity Exchange Act</u>" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended, the rules and regulations promulgated thereunder, and any successor statute.

"<u>Confidential Information</u>" has the meaning set forth in <u>Section 13.16</u>.

"<u>Contractual Requirement</u>" has the meaning set forth in <u>Section 8.03</u>.

"<u>Control Agreement</u>" means a deposit account control agreement or securities account control agreement (or similar agreement), as applicable, in form and substance reasonably satisfactory to the Administrative Agent, executed by the applicable Credit Party, the Administrative Agent and the relevant financial institution party thereto.

"<u>Controlled Account</u>" means (a) a Deposit Account or Securities Account that is subject to a Control Agreement or (b) a Deposit Account or Securities Account maintained with the Collateral Agent.

"<u>Controlled Investment Affiliate</u>" means, as to any Person, any other Person, other than any Sponsor, which directly or indirectly is in control of, is controlled by, or is under common control with such Person and is organized by such Person (or any Person controlling such Person) primarily for making direct or indirect equity or debt investments in the Borrower and/or other companies.

"<u>Credit Documents</u>" means this Agreement, the Security Documents, the Fee Letter, each Issuer Document and each Promissory Note entered into on or after the Closing Date in which the Collateral Agent is party.

"<u>Credit Event</u>" means and includes the making (but not the conversion or continuation) of a Loan and the issuance, amendment, extension or renewal of a Letter of Credit.

"<u>Credit Extension</u>" means the making of a Loan or the issuing of a Letter of Credit.

"<u>Credit Party</u>" means each of the Borrower and the Guarantors.

"<u>Debtor</u>" has the meaning set forth in the Introductory Statements.

"<u>Debtor Relief Laws</u>" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"<u>Default</u>" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

11

"Default Rate" has the meaning set forth in Section 2.08(c).

"Defaulting Lender" means any Lender whose acts or failures to act, whether directly or indirectly, cause it to meet any part of the definition of "Lender Default."

"Deposit Account" has the meaning assigned to such term in the UCC.

"DIP Facility" means this Agreement and the Commitments and the extensions of credit made hereunder.

"Dispose" or "Disposed of" has a correlative meaning to the defined term of "Disposition."

"Disposition" has the meaning set forth in Section 10.04.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation, scheduled redemption or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the Payment in Full of the Loans and all other Obligations, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests and other than as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior Payment in Full of the Loans and all other Obligations or (c) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Stock, in the case of each of clauses (a), (b) and (c), on or prior to the date that is one year after the earlier of (i) the Maturity Date and (ii) Payment in Full.

"Distressed Person" has the meaning set forth in the definition of "Lender-Related Distress Event."

"Dollars," "U.S. Dollars" and "$" means dollars in lawful currency of the United States of America.

"Domestic Subsidiary" means each Subsidiary of the Borrower that is organized under the laws of the United States or any state thereof, or the District of Columbia.

"Drawing" has the meaning set forth in Section 3.04(b).

"Due Date" means, with respect to any account payable or other accrued expense, liability or other obligation of any Person to pay the deferred purchase price of Property or services, the date by which the invoice evidencing such account payable or such expense, liability or other obligation would be otherwise due based upon the number of days contained in the payment terms applicable to such invoice, commencing on the date of receipt by the Borrower of such invoice; provided that in no case shall the Due Date with respect to any invoice occur more than sixty (60) calendar days after receipt by the Borrower of such invoice.

12

"EEA Financial Institution" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" has the meaning set forth in Section 13.06(a); provided that, for the avoidance of doubt, "Eligible Assignees" shall not include (A) any Person that is Defaulting Lender, (B) a natural person, or (C) the Borrower or any of its Affiliates.

"Environmental Claims" means any and all written actions, suits, orders, decrees, demands, demand letters, claims, liens, notices of noncompliance, restrictions on use, operations or transferability, violations or proceedings arising under or based upon any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereinafter, "Claims"), including, without limitation, (i) any and all Claims by any Governmental Authority for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief regarding the presence, release or threatened release of Hazardous Materials or arising from alleged injury or threat of injury to health or safety (to the extent relating to human exposure to Hazardous Materials), or the environment including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands.

"Environmental Law" means any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and common law now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment, including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands, or human health or safety (to the extent relating to human exposure to Hazardous Materials) or Hazardous Materials.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock; provided that any instrument evidencing Indebtedness convertible or exchangeable into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock, shall not be deemed to be an Equity Interest unless and until such instrument is so converted or exchanged, except, solely for purposes of a pledge of Equity Interests in connection with this Agreement, to the extent such instrument could be treated as "stock" of a CFC for purposes of Treasury Regulation Section 1.956-2(c)(2).

13

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time. Section references to ERISA are to ERISA as in effect on the Closing Date and any subsequent provisions of ERISA amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" means (a) any entity, whether or not incorporated, that is under common control with Borrower or any ERISA Affiliate within the meaning of Section 4001(a)(14) of ERISA; (b) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Code of which Borrower or any ERISA Affiliate is a member; (c) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code of which Borrower or any ERISA Affiliate is a member; and (d) with respect to Borrower or any ERISA Affiliate, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Code of which that Borrower or any ERISA Affiliate, any corporation described in clause (b) above or any trade or business described in clause (c) above is a member. Any former ERISA Affiliate of Borrower or any ERISA Affiliate shall continue to be considered an ERISA Affiliate of Borrower or any ERISA Affiliate within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Borrower or any ERISA Affiliate and with respect to liabilities arising after such period for which the Borrower or any ERISA Affiliate could be liable under the Code or ERISA.

"ERISA Event" means (a) a failure of any Plan to comply with any material provision of ERISA and/or the Code (and applicable regulations under either) or with the material terms of such Plan; (b) the assertion of a material claim (other than routine claims for benefits) against any Plan other than a Multiemployer Plan or the assets thereof, or against Borrower or any ERISA Affiliate or any of their respective ERISA Affiliates in connection with any Plan; (c) a Reportable Event with respect to a Plan; (d) a withdrawal by the Borrower or any ERISA Affiliate from a Plan subject to Section 4063 or 4064 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (e) the failure of the Borrower or any ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan; (f) a failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, or the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard, in each case with respect to a Plan, whether or not waived, or a failure to make any required contribution to a Multiemployer Plan; (g) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification to the Borrower or any ERISA Affiliate that a Multiemployer Plan is insolvent or is in reorganization within the meaning of Title IV of ERISA or is in "endangered" or "critical" status, within the meaning of Section 431 or 432 of the Code or Sections 304 and 305 of ERISA; (h) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, respectively, or the commencement of proceedings by the PBGC to terminate a Plan; (i) the appointment of a trustee to administer any Plan; (j) the imposition of any liability under Title IV of ERISA, including the imposition of a lien under Section 412 or 430(k) of the Code or Section 303(k) or 4068 of ERISA on any property (or rights to property, whether real or personal) of the Borrower or any ERISA Affiliate, but excluding PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the

14

Borrower or any ERISA Affiliate; (k) a determination that any Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303(i)(4)(A) of ERISA or Section 430(i)(4)(A) of the Code); (l) the occurrence of a non-exempt prohibited transaction with respect to any Plan maintained or contributed to by any Borrower (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in material liability to the Borrower; (m) the imposition of liability on Borrower or any ERISA Affiliate or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (n) the occurrence of an act or omission which could give rise to the imposition on Borrower or any ERISA Affiliate or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Plan; or (o) receipt from the IRS of notice of the failure of any Plan intended to be qualified under Section 401(a) of the Code to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Plan to qualify for exemption from taxation under Section 501(a) of the Code.

"ERISA Notice EOD" has the meaning set forth in Section 9.11.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurodollar Loan" means any Loan bearing interest at a rate determined by reference to the Eurodollar Rate (other than an Base Rate Loan bearing interest by reference to the Eurodollar Rate by virtue of clause (c) of the definition of "Base Rate").

"Eurodollar Rate" means the greater of (i) 0.00% and (ii) for any Interest Period with respect to any Borrowing of a Eurodollar Loan, the London interbank offered rate, or a comparable or successor rate, which rate is approved by the Administrative Agent in consultation with the Borrower, as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for Dollars for a period equal in length to such Interest Period as displayed on the applicable Bloomberg screen page (or, in the event that such rate does not appear on a Bloomberg screen page, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion; in each case, the "Screen Rate") at approximately 11:00 A.M. London time, two (2) Business Days prior to the commencement of such Interest Period; provided that, if the Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") with respect to Dollars then the Eurodollar Rate shall be the greater of (i) 0.00% and (ii) the Interpolated Rate, provided, further that to the extent a comparable or successor rate is approved by the Administrative Agent in consultation with the Borrower in connection herewith, the approved rate shall be applied in a manner consistent with market practice; provided, further that to the extent such market practice is not administratively feasible for the Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent in accordance with its customary practice.

"Event of Default" has the meaning set forth in Section 11.01.

15

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Excluded Equity Interests" means any Equity Interests owned by any Credit Party upon which, after giving effect to the terms and conditions of the Financing Orders, a security interest or lien may not be lawfully granted.

"Excluded Hedging Obligation" means, with respect to any Guarantor, any Hedging Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Hedging Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure to constitute an "eligible contract participant," as defined in the Commodity Exchange Act and the regulations thereunder (determined after giving effect to any applicable keepwell, support or other agreement for the benefit of such Guarantor and any and all guarantees by the other Credit Parties of such Guarantor's obligations in respect of Hedging Obligations), at the time the guarantee of or grant of such security interest by such Guarantor becomes or would become effective with respect to such Hedging Obligation.  If a Hedging Obligation arises under a master agreement governing more than one Hedging Obligation, such exclusion shall apply only to the portion of such Hedging Obligation that is attributable to Hedge Agreements for which such guarantee or security interest is or becomes illegal.

"Excluded Property" means any assets or property of any Credit Party upon which, after giving effect to the terms and conditions of the Financing Orders, a security interest or lien may not be lawfully granted.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Credit Party hereunder or under any other Credit Document, (i) Taxes imposed on or measured by its net income (however denominated, and including (for the avoidance of doubt) any backup withholding in respect thereof under Section 3406 of the Code or any similar provision of state, local or foreign law), branch profits Taxes and franchise Taxes imposed on it, in each case by a jurisdiction (including any political subdivision thereof) as a result of such recipient being organized in, having its principal office in, or in the case of any Lender, having its applicable lending office in, such jurisdiction, or as a result of any other present or former connection with such jurisdiction (other than any such connection arising solely from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced, any Credit Document), (ii) U.S. federal withholding Tax imposed on any payment by or on account of any obligation of any Credit Party hereunder or under any other Credit Document that is required to be imposed on amounts payable to or for the account of a Lender, other than to the extent such Lender is an assignee pursuant to a request by the Borrower under Section 13.07, pursuant to laws in force at the time such Lender acquires an interest in a Loan, Letter of Credit or Commitment (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the designation of a new lending office (or assignment), to receive additional amounts or indemnification payments from

16

any Credit Party with respect to such withholding Tax pursuant to <u>Section 5.04</u>, (iii) any Tax attributable to the Administrative Agent's, any Lender's or any other recipient's failure to comply with <u>Section 5.04(d)</u>, <u>(e)</u> or <u>(h)</u>; and <u>(iv)</u> any Tax imposed under FATCA.

"<u>Existing Letters of Credit</u>" means the letters of credit described on <u>Schedule 1.01(e)</u> that were issued under the Prepetition Credit Agreement and that shall be replaced with Letters of Credit that may be issued under this Agreement.

"<u>Fair Market Value</u>" means, with respect to any asset, group of assets or liability on any date of determination, the value of the consideration obtainable by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset as determined by the Borrower in good faith.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code.

"<u>FCPA</u>" has the meaning set forth in <u>Section 8.16(c)</u>.

"<u>Federal Funds Effective Rate</u>" means, for any day, the weighted average of the per annum rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published on the next succeeding Business Day by the Federal Reserve Bank of New York or, if such rate is not so published for any date that is a Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"<u>Fee Letter</u>" means the Fee Letter, dated as of [_____], 2019, among MUFG Union Bank, N.A., the Lenders party thereto and the Borrower.

"<u>Final Order</u>" shall mean, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be reasonably satisfactory in form and substance to the Administrative Agent, together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes the Credit Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Credit Documents, provides for the superpriority (to the extent provided for herein and therein) of the Administrative Agent's and the Lenders' claims, authorizes the use by the Credit Parties of their Cash Collateral in accordance with the terms of this Agreement and provides for adequate protection of the Liens and claims of the Prepetition Secured Parties under the Prepetition Credit Agreement.

"<u>Financial Officer</u>" of any Person means the Chief Financial Officer, Chief Accounting Officer, Controller or Treasurer of such Person.

"<u>Financing Order</u>" shall mean, the Interim Order or the Final Order, whichever is in effect at the time of any determination made hereunder, and "<u>Financing Orders</u>" shall mean the Interim Order and the Final Order, collectively.

"<u>First Day Orders</u>" has the meaning set forth in <u>Section 6.01(e)</u>.

"<u>Foreign Subsidiary</u>" means each Subsidiary of the Borrower that is not a Domestic Subsidiary.

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America, as in effect from time to time; <u>provided</u> <u>however</u>, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Majority Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"<u>Governmental Authority</u>" means any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, including a central bank or stock exchange.

"<u>Governmental Requirement</u>" means any law (including common law), statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other directive or requirement, whether now or hereinafter in effect, including applicable Environmental Laws, energy regulations and occupational, safety and health standards or controls, of any Governmental Authority.

"<u>Granting Lender</u>" has the meaning set forth in <u>Section 13.06(h)</u>.

"<u>Guarantee</u>" means the Guarantee made by any Guarantor in favor of the Collateral Agent for the benefit of the Secured Parties, substantially in the form of <u>Exhibit E</u>.

"<u>Guarantee Obligations</u>" means, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "<u>Primary Obligor</u>") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain financial condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability

18

of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; provided, however, that the term "Guarantee Obligations" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.  Guarantee Obligations shall not include Excluded Hedging Obligations.

"Guarantors" means Holdings and each Domestic Subsidiary listed on Schedule 1.01(b) that becomes a party to the Guarantee on the Closing Date (except to the extent released therefrom in accordance with the terms hereof) and each other Domestic Subsidiary that becomes a party to the Guarantee after the Closing Date pursuant to Section 9.09 or otherwise.

"Hazardous Materials" means (a) any petroleum or petroleum products, natural gas or natural gas liquids, radioactive materials, friable asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, and radon gas and (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or words of similar import, under any applicable Environmental Law or that would otherwise reasonably be expected to result in liability under any applicable Environmental Law.

"Hedge Agreements" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, future contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, total return swaps, credit spread transactions, repurchase transactions, reverse repurchase transactions, securities lending transactions, weather index transactions, spot contracts, fixed-price physical delivery contracts, whether or not exchange traded, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.  Notwithstanding the foregoing, agreements or obligations to physically sell any commodity at any index-based price shall not be considered Hedge Agreements.

19

"Hedging Obligations" means, with respect to any Person, the obligations of such Person under Hedge Agreements.

"Holdings" has the meaning set forth in the recitals to this Agreement.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous Hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests in Hydrocarbons and production payment interests, including any reserved or residual interests of whatever nature.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"Impacted Interest Period" has the meaning set forth in the definition of "Eurodollar Rate."

"Indebtedness" means, for any Person, the sum of the following (without duplication):  (a) all obligations of such Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, bank guarantees, surety or other bonds and similar instruments; (c) all accounts payable and all accrued expenses, liabilities or other obligations of such Person to pay the deferred purchase price of Property or services (including insurance premium payables), excluding (i) those that were incurred and exist prior to the Petition Date, (ii) those that are incurred in the ordinary course of business on or after the Petition Date that are not more than sixty (60) days past the applicable Due Date, or (iii) those that are incurred in the ordinary course of business on or after the Petition Date that are more than sixty (60) days past the applicable Due Date (x) to the extent the same are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP or (y) to the extent such Person intends to net such accounts payable, expenses, liabilities or obligations against receivables in the ordinary course of business as permitted by the applicable contractual arrangements); (d) all Capitalized Lease Obligations; (e) all Indebtedness (as defined in the other clauses of this definition) of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on any Property of such Person, whether or not such Indebtedness is assumed by such Person; (f) all Indebtedness (as defined in the other clauses of this definition) of others guaranteed by such Person or in which such Person otherwise assures a creditor against loss of the Indebtedness (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Indebtedness and the maximum stated amount of such guarantee or assurance against loss; (g) all obligations or undertakings of such Person to maintain or cause to be maintained the financial position or covenants of others or to purchase the Indebtedness or Property of others; (h) all obligations of such Person under take/ship or pay contracts if any goods or services are not actually received or utilized by such Person; (i) any Indebtedness of a partnership for which such Person is liable either by agreement, by operation of law or by a Governmental Requirement but only to the extent of such liability; and (j) the undischarged balance of any production payment created by such Person or for the creation of

20

which such Person directly or indirectly received payment.  The Indebtedness of any Person shall include all obligations of such Person of the character described above to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is not included as a liability of such Person under GAAP; provided, however, that notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller; (2) in-kind obligations relating to net oil, natural gas liquids or natural gas balancing positions arising in the ordinary course of business; (3) reserves for deferred income taxes; and (4) any amount otherwise considered outstanding pursuant to the payment terms applicable to any invoice to the extent that a check has been issued or an ACH or other electronic payment has been authorized, in each case to the applicable vendor or service provider.

"Indemnified Liabilities" has the meaning set forth in Section 13.05(b).

"Indemnified Taxes" means all Taxes imposed on or with respect to any payment by or on account of any obligation of any Credit Party hereunder or under any other Credit Document other than (a) Excluded Taxes and (b) Other Taxes.

"Indemnitees" has the meaning set forth in Section 13.05(b).

"Initial Approved Budget" has the meaning set forth in Section 6.01(g) hereof.

"Initial Borrowing" has the meaning set forth in Section 2.01(a).

"Initial Borrowing Amount" shall mean $15,000,000.

"Initial Reserve Report" means, collectively, (a) the White Star Legacy Final Reserve Report of Ryder Scott Company Petroleum Consultants, L.P. as of May 1, 2016 delivered May 25, 2016 and other related information delivered to the Prepetition Agent and (b) the Acquired Devon Assets Final Reserve Report of Ryder Scott Company Petroleum Consultants, L.P. as of May 1, 2016 delivered May 25, 2016 and other related information delivered to the Prepetition Agent.

"Intercompany Note" means an intercompany note in the form of Exhibit I, as it may be amended, restated, supplemented or otherwise modified from time to time.

"Interest Payment Date" means, as to any Loan or other amount, (a) the last Business Day of each month (commencing on [May 31, 2019]), (b) on any prepayment date (on the amount prepaid), (c) on the Maturity Date and (d) after the Maturity Date, on demand.

"Interest Period" means, with respect to any Loan, the interest period applicable thereto, as determined pursuant to Section 2.09.

"Interim Order" shall mean, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing, in form and substance reasonably satisfactory to the Administrative Agent, together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes and

21

approves, on an interim basis, (i) this DIP Facility, (ii) the Credit Parties to execute and perform under the terms of this Agreement and the other Credit Documents to which they are a party, incur Loans in an aggregate principal amount not to exceed the Initial Borrowing Amount prior to the date of entry of the Final Order and (iii) the transactions contemplated hereby, including the payment of adequate protection payments.

"Interpolated Rate" shall mean, at any time, for any Interest Period, the rate per annum (rounded to the same number of decimal places as the Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Screen Rate for the longest period (for which the Screen Rate is available for Dollars) that is shorter than the Impacted Interest Period; and (b) the Screen Rate for the shortest period (for which that Screen Rate is available for Dollars) that exceeds the Impacted Interest Period, in each case, at such time.

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other rating agency selected by the Borrower.

"Investment Grade Securities" means:

(1)    securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents),

(2)    securities that have an Investment Grade Rating, but excluding any debt securities or loans or advances between and among the Borrower and its Subsidiaries,

(3)    investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold cash pending investment and/or distribution, and

(4)    corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"Investments" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, credit card and debit card receivables, trade credit and advances to customers and commission, travel and similar advances to employees, directors, officers, members of management, manufacturers and consultants, in each case, made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, the purchase or acquisition (in one or a series of transactions) of Property of another Person constituting a business unit, Equity Interests or other securities issued by any other Person (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale) (excluding, in the case of the Borrower and its Subsidiaries, intercompany advances or indebtedness having a term not exceeding ninety (90) days (inclusive of any roll-over or extensions of terms and made in the ordinary course of business).

22

The amount of any Investment outstanding at any time shall be the original cost of such Investment, reduced by any dividend, distribution, interest payment, return of capital, repayment or other amount received in cash by the Borrower or a Restricted Subsidiary in respect of such Investment.

"IRS" has the meaning set forth in Section 5.04(e)(i).

"Lease Operating Statement" means a statement, in form and substance reasonably satisfactory to the Administrative Agent, prepared by the Borrower with respect to the Oil and Gas Properties owned by any Credit Party, which statement shall contain production, revenue, and expense data for the time period covered by such statement and such other information reasonably requested by the Administrative Agent.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" means, with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the applicable Issuing Bank and the Borrower (or any Restricted Subsidiary) or in favor of the applicable Issuing Bank and relating to such Letter of Credit.

"Issuing Bank" means (a) MUFG Union Bank, N.A. and any of its Affiliates and (b) if requested by the Borrower and reasonably acceptable to the Administrative Agent, any other Person who is a Lender at the time of such request and who accepts such appointment (it being understood that, if any such Person ceases to be a Lender hereunder, such Person will remain an Issuing Bank with respect to any Letter of Credit issued by such Person that remained outstanding as of the date such Person ceased to be a Lender). References herein and in the other Credit Documents to an Issuing Bank shall be deemed to refer to the Issuing Bank in respect of the applicable Letter of Credit or to all Issuing Banks, as the context requires. Any Lender may, from time to time, become an Issuing Bank under this Agreement with the protections and rights afforded to Issuing Banks hereunder by executing a joinder, in a form reasonably satisfactory to (and acknowledged and accepted by) the Administrative Agent and the Borrower, indicating such Lender's "Letter of Credit Commitment" and upon the execution and delivery of any such joinder, such Lender shall be an Issuing Bank for all purposes hereof.

"L/C Borrowing" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Borrowing.

"L/C Cash Collateral" has the meaning set forth in Section 3.07(c).

"L/C Commitment" means, with respect to each Lender, such Lender's Commitment Percentage of the aggregate amount of L/C Commitments. In the case of each Lender that is a Lender on the Closing Date, the amount of such Lender's L/C Commitment is set forth opposite such Lender's name on Schedule 1.01(a) as such Lender's "L/C Commitment". The aggregate amount of the L/C Commitments as of the Closing Date is one million six hundred fifteen thousand three hundred sixty Dollars ($1,615,360).

23

"L/C Maturity Date" means the date that is five (5) Business Days prior to the Maturity Date.

"L/C Obligations" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unpaid Drawings, including all L/C Borrowings. For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.12. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"L/C Participant" has the meaning set forth in Section 3.03(a).

"L/C Participation" has the meaning set forth in Section 3.03(a).

"Lender" has the meaning set forth in the recitals to this Agreement.

"Lender Default" means (a) the refusal or failure of any Lender to make available its portion of any incurrence of Loans or participations in Letters of Credit , which refusal or failure is not cured within two (2) Business Days after the date of such refusal or failure; (b) the failure of any Lender to pay over to the Administrative Agent, any Issuing Bank, or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, unless the subject of a good faith dispute; (c) a Lender has notified the Borrower or the Administrative Agent that it does not intend or expect to comply with any of its funding obligations or has made a public statement to that effect with respect to its funding obligations under the DIP Facility or its funding obligations generally under other agreements pursuant to which it has committed to extend credit; (d) the failure by a Lender to confirm in a manner reasonably satisfactory to the Administrative Agent or the Borrower that it will comply with its obligations under the DIP Facility, which failure is not cured after the date of such failure; or (e) a Distressed Person has admitted in writing that it is insolvent or such Distressed Person becomes subject to a Lender-Related Distress Event or Bail-In Action.

"Lender-Related Distress Event" means, with respect to any Lender, that such Lender or any Person that directly or indirectly controls such Lender (each, a "Distressed Person"), as the case may be, is or becomes subject to a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person or any Person that directly or indirectly controls such Distressed Person is subject to a forced liquidation, or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt; provided that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Lender or any Person that directly or indirectly controls such Lender by a Governmental Authority or an instrumentality thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the

24

United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender; provided, further, that the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator with respect to a Distressed Person under the Dutch Financial Supervision Act 2007 (as amended from time to time and including any successor legislation) shall be deemed to result in a Lender-Related Distress Event.

"Letter of Credit" has the meaning set forth in Section 3.01(a) and shall include the Letters of Credit existing on the Closing Date.

"Letter of Credit Application" has the meaning set forth in Section 3.02(a).

"Letter of Credit Commitment" means any amount of Letter of Credit commitments provided by Issuing Banks from time to time; provided that, the aggregate amount of Letter of Credit Commitments shall not exceed the aggregate amount of L/C Commitments at any time.

"Letter of Credit Exposure" means, with respect to any Lender, at any time, the sum of (a) the principal amount of any Unpaid Drawings in respect of which such Lender has made (or is required to have made) payments to the applicable Issuing Bank pursuant to Section 3.04(a) at such time and (b) such Lender's Commitment Percentage of the Letters of Credit Outstanding at such time (excluding the portion thereof consisting of Unpaid Drawings in respect of which the Lenders have made (or are required to have made) payments to the applicable Issuing Bank pursuant to Section 3.04(a)) minus the amount of cash or deposit account balances held by the Administrative Agent to Cash Collateralize outstanding Letters of Credit and Unpaid Drawings under Section 3.07.

"Letter of Credit Fee" has the meaning set forth in Section 4.01(b).

"Letters of Credit Outstanding" means at any time, the sum of, without duplication, (a) the aggregate Stated Amount of all outstanding Letters of Credit and (b) the aggregate principal amount of all Unpaid Drawings in respect of all Letters of Credit.

"Lien" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the UCC (or equivalent statutes) of any jurisdiction or Production Payments and Reserve Sales and the like payable out of Oil and Gas Properties; provided that in no event shall an operating lease be deemed to constitute a Lien.

"Loan" means any Term Loan and any Loan to reimburse Unpaid Drawings made by any Lender hereunder.

25

"Majority Lenders" means, at any date, Non-Defaulting Lenders having or holding at least fifty and one-tenth percent (50.1%) of the Adjusted Total Commitments and the Adjusted Total Outstandings at such date at such date.

"Margin Stock" has the meaning assigned to such term in Regulation U.

"Marketing Materials" has the meaning set forth in Section 6.01(l).

"Material Adverse Effect" means (i) the occurrence of a Production Decrease Event or (ii) a circumstance or condition affecting the business, assets, operations, properties or financial condition of Holdings, the Borrower and the Restricted Subsidiaries, taken as a whole, that, individually or in the aggregate, would materially adversely affect (a) the ability of the Borrower and the other Credit Parties, taken as a whole, to perform their obligations under any Credit Document, (b) the validity or enforceability of any Credit Document or (c) the rights and remedies of the Agents and the Lenders under the Credit Documents.

"Material Indebtedness" means (a) the Prepetition Term Loan Obligations, (b) the Prepetition Obligations, (c) the Prepetition Unsecured Notes and (d) any Indebtedness (other than the Loans) of one or more of the Borrower or any Restricted Subsidiary in an aggregate principal amount exceeding one million Dollars ($1,000,000).

"Maturity Date" means the earliest to occur of (a) the Scheduled Maturity Date; (b) the date of acceleration of the Loans and termination of the Commitments following an Event of Default; (c) the effective date of a plan of reorganization or liquidation confirmed in any of the Chapter 11 Cases, (d) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code or otherwise, other than in connection with a confirmed plan of reorganization or liquidation in the Chapter 11 Cases or as otherwise approved by the Administrative Agent in its reasonable discretion and (e) without the Administrative Agent's prior written consent, the date of filing or express written support by any Debtor of a plan of liquidation or reorganization and related disclosure statement that is not an Acceptable Plan.

"Maximum Letter of Credit Commitment" means, with respect to each Issuing Bank, the amount provided opposite such Issuing Bank's name in Schedule 1.01(a) hereto, as such schedule may be amended or modified from time to time by the Borrower, each Issuing Bank affected by such amendment or modification thereto and by the Administrative Agent.

"Milestones" has the meaning set forth in Section 9.21.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Money Laundering Laws" has the meaning set forth in Section 8.16(d).

"Mortgage" means a mortgage or a deed of trust, deed to secure debt, trust deed, assignment of as-extracted collateral, fixture filing or other security document entered into by the owner of a Mortgaged Property and the Collateral Agent for the benefit of the Secured Parties in

26

respect of that Mortgaged Property, in form and substance reasonably satisfactory to the Collateral Agent and consistent with any mortgages securing the Prepetition Obligations.

"Mortgaged Property" means, initially, each parcel of real estate and improvements thereto and assets integral to oil and gas production located therein owned by a Credit Party and mortgaged pursuant to a Mortgage on the Closing Date, and each other parcel of real property and improvements thereto with respect to which a Mortgage is required to be granted pursuant to Section 9.04.  However, notwithstanding any provision in this Agreement, any Mortgage, or any other Security Document to the contrary, in no event shall any Building (as defined in the applicable Flood Insurance Regulation) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulation) be included in the definition of "Mortgaged Property" and no Building or Manufactured (Mobile) Home shall be encumbered by any Mortgage.  As used herein, "Flood Insurance Regulations" means (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 (amending 42 U.S.C. 4001, et seq.), as the same may be amended or recodified from time to time, and (iv) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

"Multiemployer Plan" means a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Asset Sale Proceeds" means, with respect to any Disposition (other than dispositions of Hydrocarbons and mineral products in the ordinary course of business or other dispositions of assets specifically approved in writing in advance by the Administrative Agent (including, to the extent applicable, any disposition in accordance with the Approved Budget that was approved by Administrative Agent)), an amount equal to:  (i) the sum of cash payments and Cash Equivalents received by the Credit Parties or any of their Subsidiaries from such Disposition (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received), *minus* (ii) the sum of, without duplication, (a) taxes paid by the Credit Parties or any of their Subsidiaries in connection with such Disposition (after taking into account any available tax credits or deductions and any tax-sharing arrangements), (b) reasonable and documented out-of-pocket expenses (including reasonable attorneys' fees, investment banking fees, accounting fees and other reasonable professional and transactional fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes and reasonable brokerage, consultant and other commissions and fees) actually incurred by the Credit Parties or any of their Subsidiaries directly in connection with such Disposition and (c) the amount required to be paid as a result of such Disposition to repay Indebtedness (other than the Loans) secured by Liens on the applicable asset that are senior in priority to the Liens securing the Obligations or otherwise subject to a mandatory prepayment obligation with respect to any Indebtedness or other obligation that is senior in priority to the payment of the Obligations as a result of such Disposition; it being understood that "Net Asset Sale Proceeds" shall include any cash or Cash Equivalents received upon the sale of any non-cash consideration received by the Credit Parties or any of their Subsidiaries in any such Disposition.

27

"Net Insurance/Condemnation Proceeds" means an amount equal to: (i) any cash payments or proceeds received by the Credit Parties or any of their Subsidiaries in connection with any Casualty/Condemnation Event (a) under any casualty insurance policies in respect of any covered loss thereunder, or (b) as a result of the taking of any assets of the Credit Parties or any of their Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, *minus* (ii) the sum of, without duplication, (a) taxes paid by the Credit Parties or any of their Subsidiaries in connection with such Casualty/Condemnation Event (after taking into account any available tax credits or deductions and any tax-sharing arrangements), (b) reasonable and documented out-of-pocket expenses (including reasonable investment banking fees, attorneys' fees, accounting fees and other reasonable professional and transactional fees, and other reasonable fees and expenses) actually incurred by the Credit Parties or any of their Subsidiaries directly in connection with such Casualty/Condemnation Event and (c) the amount required to be paid as a result of such Casualty/Condemnation Event to repay Indebtedness (other than the Loans) secured by Liens on the applicable asset that are senior in priority to the Liens securing the Obligations or otherwise subject to a mandatory prepayment obligation with respect to any Indebtedness or other obligation that is senior in priority to the payment of the Obligations as a result of such Casualty/Condemnation Event; it being understood that "Net Insurance/Condemnation Proceeds" shall include any cash or Cash Equivalents received upon the sale of any non-cash consideration received by the Credit Parties or any of their Subsidiaries in any such Casualty/Condemnation Event.

"Non-Consenting Lender" has the meaning set forth in Section 13.07(b).

"Non-Defaulting Lender" means and includes each Lender other than a Defaulting Lender.

"Non-Extension Notice Date" has the meaning set forth in Section 3.02(b).

"Non-U.S. Lender" means any Lender (a) that is not disregarded as separate from its owner for U.S. federal income tax purposes and that is not a "United States person" as defined by Section 7701(a)(30) of the Code or (b) that is disregarded as separate from its owner for U.S. federal income tax purposes and whose regarded owner is not a "United States person" as defined by Section 7701(a)(30) of the Code.

"Notice of Borrowing" means a request of the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit B or such other form as shall be approved by the Administrative Agent (acting reasonably).

"Notice of Conversion or Continuation" has the meaning set forth in Section 2.06(a).

"NR Corp" means White Star NR Corporation, a Delaware corporation.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party and its Restricted Subsidiaries arising under any Credit Document or otherwise with respect to any Loan or Letter of Credit or, whether direct or indirect (including

28

those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Credit Party or any Affiliate thereof of any proceeding under any Debtor Relief Law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.  Without limiting the generality of the foregoing, the Obligations of the Credit Parties under the Credit Documents (and of their Restricted Subsidiaries to the extent they have obligations under the Credit Documents) include the obligation (including Guarantee Obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, reasonable and documented Attorney and Advisor Costs, indemnities and other amounts payable by any Credit Party under any Credit Document.  Notwithstanding the foregoing, Excluded Hedging Obligations shall not constitute Obligations.

"OFAC" has the meaning set forth in Section 8.16(b).

"Officer's Certificate" means a certificate signed on behalf of the Borrower by an Authorized Officer of the Borrower.

"Oil and Gas Properties" means (a) Hydrocarbon Interests, (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests, (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests, (d) all operating agreements, contracts and other agreements, including production-sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests, (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests, (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or property (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, gas processing plants and pipeline systems and any related infrastructure to any thereof, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Ongoing Hedges" means Hedge Agreements in respect of commodities entered into not for speculative purposes the net notional volumes for which (when aggregated with other commodity Hedge Agreements then in effect, other than puts, floors and basis differential swaps on volumes already hedged pursuant to other Hedge Agreements) do not exceed, as of the date

29

the latest hedging transaction is entered into under a Hedge Agreement, (x) eighty percent (80%) of the Credit Parties' reasonably anticipated Hydrocarbon production from Proved Reserves from the Credit Parties' Oil and Gas Properties for the twenty-four (24) month period from the date of creation of such hedging arrangement, (y) seventy percent (70%) of the Credit Parties' reasonably anticipated Hydrocarbon production from Proved Reserves from the Credit Parties' Oil and Gas Properties for the period from the twenty-fifth (25th) month from the date of creation of such hedging arrangement and thereafter.

"Operating Disbursements" means disbursements (including, for the avoidance of doubt, capital expenditures), other than disbursements on account of Professional Fees, adequate protection payments, distributions or escheatment of revenue on account of net revenue interests held by revenue interest partners and disbursements of pass-through revenue collected on behalf of Sequoyah Energy or any similar disbursements of pass-through revenue collected on behalf of other parties.

"Organization Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" means any and all present or future stamp, registration, documentary, intangible, recording, filing or any other excise, property or similar Taxes (including related reasonable out-of-pocket expenses with regard thereto) arising from any payment made hereunder or made under any other Credit Document or from the execution or delivery of, registration or enforcement of, consummation or administration of, or otherwise with respect to, this Agreement or any other Credit Document; provided that such term shall not include any of the foregoing Taxes (i) that result from an assignment, grant of a participation pursuant to Section 13.06(e), or transfer or assignment to or designation of a new lending office or other office for receiving payments under any Credit Document ("Assignment Taxes") to the extent such Assignment Taxes are imposed as a result of a connection between the assignor/participating Lender and/or the assignee/Participant and the taxing jurisdiction (other than a connection arising solely from any Credit Documents or any transactions contemplated thereunder), except to the extent that any such action described in this proviso is requested or required by the Borrower; or (ii) Excluded Taxes.

"Overnight Rate" means, for any day the greater of (i) the Federal Funds Effective Rate and (ii) the overnight Eurodollar Rate determined by the Administrative Agent or applicable Issuing Bank, as the case may be, in accordance with banking industry rules on interbank compensation.

"<u>Overriding Royalty Interest Assignment</u>" means that certain Conveyance of Term Overriding Royalty Interest, effective as of March 1, 2018, between the Borrower and EnLink Oklahoma Gas Processing, LP.

"<u>Parent Entity</u>" means any Person that is a direct or indirect parent company (which may be organized as a partnership) of Holdings and/or the Borrower, as applicable.

"<u>Participant</u>" has the meaning set forth in <u>Section 13.06(e)(i)</u>.

"<u>Participant Register</u>" has the meaning set forth in <u>Section 13.06(e)(ii)</u>.

"<u>Patriot Act</u>" or "<u>USA Patriot Act</u>" means the U.S.A. Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001).

"<u>Payment in Full</u>" means the Total Commitments have terminated and the Obligations (other than contingent indemnification and reimbursement obligations that are not yet due and payable and for which no claim has been asserted) have been paid in full and the Letters of Credit have expired or been terminated or Cash Collateralized (or otherwise collateralized or backstopped) on terms satisfactory to the Borrower and the relevant Issuing Bank.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"<u>Permitted Collections Variance</u>" has the meaning set forth in <u>Section 10.11(a)</u>.

"<u>Permitted Expenditures Variance</u>" has the meaning set forth in <u>Section 10.11(b)</u>.

"<u>Permitted Holders</u>" means, at any time, each of (i) the Sponsors, (ii) the other Co-Investors and (iii) any officers, directors, employees and other members of management of the Sponsors, the other Co-Investors, the Borrower (or any of its Parent Entities) or any of its Restricted Subsidiaries who are or become holders of Equity Interests of the Borrower (or any Parent Entity) (and their Controlled Investment Affiliates).

"<u>Permitted Investments</u>" means:

(a)    Investments reflected in the financial statements and which are disclosed to the Lenders in <u>Schedule 1.01(d)</u>;

(b)    accounts receivable arising in the ordinary course of business;

(c)    Investments in Cash Equivalents;

(d)    Investments (i) made among the Borrower and the other Subsidiaries which are Credit Parties, (ii) made between the Subsidiaries of the Borrower which are not Credit Parties or (iii) made by any Credit Party in or to the Borrower or to its Subsidiaries which are Credit Parties;

31

(e)      [reserved];

(f)      Investments the payment for which consists of Equity Interests (other than Disqualified Stock) of the Borrower or any Parent Entity thereof;

(g)      [reserved];

(h)      advances, loans or extensions of trade credit in the ordinary course of business by the Borrower or any of its Restricted Subsidiaries;

(i)      Investments in stock, obligations or securities received in settlement of debts arising from Investments permitted under Section 10.07 owing to the Borrower or any other Credit Party as a result of a bankruptcy or other insolvency proceeding of the obligor in respect of such debts or upon the enforcement of any Lien in favor of the Borrower or any of the other Restricted Subsidiaries; provided that the Borrower shall give the Administrative Agent prompt written notice in the event that the aggregate amount of all Investments held at any one time under this clause (i) exceeds $100,000;

(j)      Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practices;

(1)      Investments constituting non-cash proceeds of dispositions of assets to the extent otherwise permitted by the terms of this Agreement;

(k)      Investments pursuant to Hedge Agreements approved by the Bankruptcy Court and otherwise permitted under this Agreement; and

(l)      loans, advances or extensions of credit to suppliers or contractors under applicable contracts or agreements in the ordinary course of business in connection with oil and gas development activities of such Borrower or such Subsidiary.

"Permitted Liens" means, with respect to any Person: (a) pledges or deposits by such Person under workmen's compensation laws, unemployment insurance, health, disability or employee benefits (other than any such obligation imposed pursuant to Section 430(k) of the Code or Sections 303(k) or 4068 of ERISA), other social security laws or similar legislation or regulations or other insurance-related obligations (including, but not limited to, in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto) or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure plugging and abandonment obligations or public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business; (b) landlords', carriers', warehousemen's, materialmen's, repairmen's, construction and mechanics' Liens that arise under operation of law in the ordinary course of business or incident to the exploration,

32

development, operation and maintenance of Oil and Gas Properties in respect of (i) Prepetition Indebtedness or accounts payable and accrued expenses of such Person existing on the Petition Date or (ii) obligations that are not yet overdue or which are being contested in good faith by appropriate actions if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP; (c) Liens for taxes, assessments or other governmental charges not yet overdue or which are being contested in good faith by appropriate actions if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP; (d) contractual Liens which arise in the ordinary course of business of such Person under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements, in each case, which are usual and customary in the oil and gas business and relate to (i) Prepetition Indebtedness or accounts payable and accrued expenses of such Person existing on the Petition Date or (ii) claims which are not delinquent or which are being contested in good faith by appropriate actions if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP, provided that any such Lien referred to in this clause does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by the Borrower or any other Restricted Subsidiary; (e) Liens (i) of a collection bank arising under Section 4-208 of the UCC on items in the course of collection and (ii) in favor of banking institutions arising as a matter of law or under general terms and conditions encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry; (f) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Restricted Subsidiaries in the ordinary course of business; (g) terms, conditions, survey exceptions, limitations, encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, servitudes, sewers, electric lines, telegraph, telephone and cable television lines, pipelines, transportation lines, distribution lines for the removal of gas, oil, or other minerals, and other similar purposes, or zoning, building codes or other restrictions (including minor defects or irregularities in title and similar encumbrances) as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not interfere in any material respect with the business of the Borrower or Restricted Subsidiaries, taken as a whole, and for the purposes of this Agreement, minor defects or irregularities in title shall include, but not be limited to, terms, conditions, exceptions, limitations, easements, rights-of-way, servitudes, permits, surface leases and other similar rights in respect of surface operations, and easements for pipelines, streets, roads, alleys, highways, telephone lines, power lines, transmission lines, transportation lines, distribution lines, railways, removal of timber, grazing, logging operations, canals, ditches,

33

reservoirs and other like purposes, or for the joint or common use of real estate, rights-of-way, facilities and equipment and other easements and rights-of-way, on, over or in respect of any of the properties of any Credit Party that are customarily granted in the oil and gas industry; (h) Liens in favor of issuers of performance, surety, bid, indemnity, warranty, release, appeal or similar bonds, instruments or obligations or with respect to regulatory requirements or letters of credit or bankers' acceptance issued, and completion guarantees provided for, in each case, issued pursuant to the request of and for the account of such Person in the ordinary course of its business or consistent with past practice or industry practice; (i) judgment and attachment Liens not giving rise to an Event of Default; (j) any (i) interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor, sublessor, licensor or sublicensor under any lease, liens reserved in oil, gas or other Hydrocarbons, minerals, leases for bonus, royalty or rental payments and for compliance with the terms of such leases (ii) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to (including, without limitation, ground leases or other prior leases of the demised premises, mortgages, mechanics' liens, tax liens and easements) or (iii) subordination of the interest of the lessee or sublessee under such lease to any restrictions or encumbrance referred to in the preceding clause (ii); (k) Liens, titles and interests of lessors of personal Property leased by such lessors to the Borrower or any other Restricted Subsidiary, restrictions and prohibitions on encumbrances and transferability with respect to such Property and the Borrower's or such Restricted Subsidiary's interests therein imposed by such leases, and Liens and encumbrances encumbering such lessors' titles and interests in such Property and to which the Borrower's or such Restricted Subsidiary's leasehold interests may be subject or subordinate, in each case, whether or not evidenced by UCC financing statement filings or other documents of record; provided that such Liens do not secure Indebtedness of the Borrower or any other Restricted Subsidiary and do not encumber Property of the Borrower or any other Restricted Subsidiary other than the Property that is the subject of such leases, (l) Liens, titles and interests of licensors of software and other intangible personal Property licensed by such licensors to the Borrower or any other Restricted Subsidiary, restrictions and prohibitions on encumbrances and transferability with respect to such Property and the Borrower's or such Restricted Subsidiary's interests therein imposed by such licenses, and Liens and encumbrances encumbering such licensors' titles and interests in such Property and to which the Borrower's or such Restricted Subsidiary's license interests may be subject or subordinate, in each case, whether or not evidenced by UCC financing statement filings or other documents of record; provided that such Liens do not secure Indebtedness of the Borrower or any other Restricted Subsidiary and do not encumber Property of the Borrower or any other Restricted Subsidiary other than the Property that is the subject of such licenses; (m) Liens securing the payment of the Obligations or pursuant to a Credit Document; (n) Liens arising from UCC (or equivalent statute) financing statement filings regarding operating leases, consignments or accounts entered into by the Borrower and its Restricted Subsidiaries in the ordinary course of business or purported Liens evidenced by the filing of precautionary UCC (or equivalent statutes) financing statements or similar public filings; (o) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods entered into by the Borrower or any Restricted Subsidiary in the ordinary course of business; (p) Liens solely on any cash earnest money deposits made by the Borrower or any of its Restricted Subsidiaries in connection with any letter of intent or purchase agreement permitted under this Agreement; (q) Liens on pipelines or pipeline facilities that arise by operation of law or other like Liens arising by operation of law in the ordinary course of business

34

and incidental to the exploration, development, operation and maintenance of Oil and Gas Properties; (r) [reserved]; (s) all applicable Requirements of Law and rights reserved to or vested in any Governmental Authority (i) to control or regulate any Oil and Gas Property of the Borrower or any Restricted Subsidiary in any manner, (ii) by the terms of any right, power, grant or permit, or by any Requirements of Law, to terminate such right, power, grant or permit or to purchase, condemn, expropriate, or recapture or to designate a purchaser of, any of the Oil and Gas Property of the Borrower or any Restricted Subsidiary, (iii) to use such property in a manner which does not materially impair the use of such property for the purposes for which it is currently owned and (iv) to enforce any obligations or duties affecting any Oil and Gas Property of the Borrower or any Restricted Subsidiary to any Governmental Authority with respect to any permit; provided, however, that Liens described in clauses (a) through (e) shall remain "Permitted Liens" only for so long as no action to enforce such Lien has been commenced and no intention to subordinate the Liens granted in favor of the Administrative Agent and the Lenders is to be hereby implied or expressed by the permitted existence of any Permitted Liens.

"Permitted Variance" has the meaning set forth in Section 10.11(b).

"Person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"Petition Date" shall have the meaning given to such term in the Introductory Statement hereof.

"Petroleum Industry Standards" means the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question.

"Plan" means any multiemployer or single-employer plan, as defined in Section 4001 of ERISA and subject to Title IV of ERISA, that is or was within any of the preceding six plan years maintained for or contributed to by (or to which there is or was an obligation to contribute or to make payments to) the Borrower or an ERISA Affiliate.

"Platform" has the meaning set forth in Section 9.02.

"Preferred Stock" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution, or winding up.

"Prepetition" shall mean the time period ending immediately prior to the filing of the Chapter 11 Cases.

"Prepetition Agent" shall have the meaning given to such term in the Introductory Statement hereof.

"Prepetition Collateral" shall have the meaning given to the term "Prepetition Collateral" in the Financing Order.

"<u>Prepetition Credit Agreement</u>" shall have the meaning given to such term in the Introductory Statement hereof.

"<u>Prepetition Credit Documents</u>" means the "Credit Documents" under, and as defined in, the Prepetition RBL Credit Agreement.

"<u>Prepetition Indebtedness</u>" shall mean any Indebtedness owing by any Credit Party that existed as of the Petition Date.

"<u>Prepetition Intercreditor Agreement</u>" means the Intercreditor Agreement dated as of May 9, 2018, by and among MUFG Union Bank, N.A., as Priority Lien Agent (as defined therein) and EnLink Oklahoma Gas Processing, LP, as Second Lien Collateral Agent (as defined therein), the Prepetition Borrower, Prepetition Holdings and certain Subsidiaries of the Prepetition Borrower party thereto, as the same may be amended, restated, modified, supplemented or replaced from time to time in accordance with the terms thereof.

"<u>Prepetition Lenders</u>" shall have the meaning given to such term in the Introductory Statement hereof.

"<u>Prepetition Loans</u>" means the "Loans" under, and as defined in, the Prepetition Credit Agreement.

"<u>Prepetition Obligations</u>" means the "Obligations" under, and as defined in, the Prepetition Credit Agreement.

"<u>Prepetition Secured Parties</u>" means the "Secured Parties" under, and as defined in, the Prepetition Credit Agreement.

"<u>Prepetition Term Loan Credit Agreement</u>" means that certain Term Loan Credit Agreement, dated as of May 9, 2018, among Prepetition Holdings, the Prepetition Borrower and EnLink Oklahoma Gas Processing, LP, as amended, supplemented, restated, replaced or modified from time to time in accordance with the terms of the Prepetition Intercreditor Agreement.

"<u>Prepetition Term Loan Credit Documents</u>" means the Prepetition Term Loan Credit Agreement, any Security Documents and each other Credit Document (each as defined in the Prepetition Term Loan Credit Agreement) and the Prepetition Intercreditor Agreement, each as amended, supplemented, restated, replaced or modified from time to time in accordance with the terms of the Prepetition Intercreditor Agreement.

"<u>Prepetition Third-Party Indebtedness</u>" shall mean, with respect to any Credit Party, Indebtedness of such Credit Party owing to a third party other than the Prepetition Agent and the other Prepetition Secured Parties as of the Petition Date.

"<u>Prepetition Unsecured Notes</u>" means the Borrower's outstanding 9.00% Senior Notes due 2022 in an amount not greater than ten million five hundred thousand Dollars ($10,500,000).

36

"Primary Obligor" has the meaning set forth in the definition of "Guarantee Obligations."

"Prime Rate" means the rate of interest per annum publicly announced from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by the Administrative Agent in connection with extensions of credit to debtors).

"Proceeding" has the meaning set forth in Section 12.07.

"Production Decrease Event" means the decrease in the Debtors' aggregate volume of production of Hydrocarbons during any monthly period in an amount in excess of 10% of the projected amount of production of Hydrocarbons set forth in the Approved Budget for such monthly period.

"Production Report" means, a report, in form, substance and detail reasonably satisfactory to the Administrative Agent, detailing the volume of production of Hydrocarbons from the Oil and Gas Properties of the Credit Parties for the applicable period covered by such report, and any variance in the actual volume of production of Hydrocarbons during such period as compared against the projected volume of production of Hydrocarbons set forth in the Approved Budget for such period.

"Professional Fees" means the fees and reimbursable expenses of Professional Persons.

"Professional Person" means a Person who is an attorney, financial advisor, accountant, appraiser, auctioneer or other professional person and who is retained, with Bankruptcy Court approval, by (a) the Borrower pursuant to Section 327 of the Bankruptcy Code or (b) a Committee pursuant to Section 1103(a) of the Bankruptcy Code.

"Projections" means financial estimates, forecasts and other forward-looking information prepared by or on behalf of the Borrower or any of its representatives and that have been made available to any Lenders or the Administrative Agent.

"Promissory Note" means a promissory note substantially in the form of Exhibit H, as it may be amended, restated, supplemented or otherwise modified from time to time.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including cash, securities, accounts and contract rights.

"Proposed Budget" has the meaning set forth in the definition of "Approved Budget".

"Proved Reserves" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following:

37

(a) "Developed Producing Reserves," (b) "Developed Non-Producing Reserves" or (c) "Undeveloped Reserves."

"Public Lender" has the meaning set forth in Section 9.02.

"Purchased Assets" has the meaning set forth in Section 9.21.

"Qualified ECP Guarantor" means, in respect of any Hedging Obligations, each Credit Party that constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualified Equity Interests" means any Equity Interests that are not Disqualified Stock.

"Receipts" means (x) all cash, or other collections received from operations, other than cash proceeds or collections from Dispositions (other than Dispositions of Hydrocarbons and mineral interests in the ordinary course of business) that are used to prepay the Loans, Casualty/Condemnation Events (including insurance proceeds or condemnation awards) that are used to prepay the Loans, any Loans and any pass-through revenue collected on behalf of Sequoyah Energy or any similar collection of pass-through revenue on behalf of other parties, minus (y) any revenue distributed or escheated on account of net revenue interests held by revenue interest partners.

"Register" has the meaning set forth in Section 13.06(d).

"Regulation T" means Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Regulation U" means Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Regulation X" means Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Reimbursement Date" has the meaning set forth in Section 3.04(a).

"Related Indemnified Person" means, with respect to an Indemnitee, (1) any controlling Person or controlled Affiliate of such Indemnitee, (2) the respective directors, officers, or employees of any of its controlling Persons or controlled Affiliates and (3) the respective agents and representatives of any of its controlling Persons or controlled Affiliates, in the case of this clause (3), acting at the instructions of such Indemnitee, controlling Person or such controlled Affiliate.

"Reportable Event" means an event described in Section 4043(c) of ERISA and the regulations thereunder, other than any event as to which the 30-day notice period has been waived.

38

"<u>Required Cash Collateral Amount</u>" has the meaning set forth in <u>Section 3.07(c)</u>.

"<u>Requirement of Law</u>" or "<u>Requirements of Law</u>" means, as to any Person, any law, treaty, rule, regulation, statute, order, ordinance, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding upon such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"<u>Reserve Report</u>" means a report delivered by the Borrower within the time period specified in <u>Section 9.14</u> setting forth the Borrower's and the Guarantors' Proved Reserves and information with respect to title to oil and gas properties with associated Proved Reserves.

"<u>Reserve Report Certificate</u>" means a certificate of an Authorized Officer of the Borrower in substantially the form of <u>Exhibit A</u> certifying as to the matters set forth in <u>Section 9.14(c)</u>.

"<u>Restricted Payments</u>" means all such payments and other actions to (i) pay any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests (other than dividends and distributions on Equity Interests payable solely by the issuance of additional Qualified Equity Interests), (ii) redeem, purchase, retire or otherwise acquire for value any of its Equity Interests or the Equity Interests of any Parent Entity or set aside any amount for any such purpose (other than through the issuance of additional Qualified Equity Interests), or (iii) permit any Restricted Subsidiary to purchase or otherwise acquire for consideration (except in connection with an Investment permitted under **Error! Reference source not found.**) any Equity Interests of the Borrower or any Parent Entity, now or hereafter outstanding.

"<u>Restricted Subsidiary</u>" means any Subsidiary of the Borrower.

"<u>S&P</u>" means Standard & Poor's Financial Services LLC, and any successor to its rating agency business.

"<u>Sale Order</u>" has the meaning set forth in <u>Section 9.21</u>.

"<u>Sale Process</u>" has the meaning set forth in <u>Section 9.21</u>.

"<u>Sale/Leaseback Transaction</u>" means any arrangement providing for the leasing by the Borrower or any of its Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Borrower or such Restricted Subsidiary to a third Person in contemplation of such leasing.

"<u>Sanctioned Country</u>" has the meaning set forth in <u>Section 8.16(b)</u>.

"<u>Sanctioned Person</u>" has the meaning set forth in <u>Section 8.16(b)</u>.

"<u>Sanctions</u>" has the meaning set forth in <u>Section 8.16(b)</u>.

39

"Scheduled Maturity Date" means December 31, 2019; provided, that the Scheduled Maturity Date may be extended one time by up to three (3) months upon written request from the Borrower received by the Administrative Agent not later than ten (10) Business Days prior to December 31, 2019, so long as (a) the Administrative Agent shall have granted its prior written consent to such extension in response to Borrower's written request and (b) no Default or Event of Default shall exist on December 31, 2019.

"Screen Rate" has the meaning set forth in the definition of "Eurodollar Rate."

"SEC" means the U.S. Securities and Exchange Commission or any successor thereto.

"Secured Parties" means, collectively, the Agents, each Issuing Bank, and the Lenders.

"Securities Account" has the meaning assigned to such term in the UCC.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Documents" means, collectively, (a) the Guarantee (b) the Collateral Agreement, (c) the Financing Orders, (d) the Mortgages, if any, (e) any Control Agreement and (f) each other security agreement, control agreement or other instrument or document executed and delivered pursuant to Section 9.04 or Section 9.09 or pursuant to any other such Security Documents or otherwise to secure or perfect the security interest in any or all of the Obligations.

"Sequoyah Energy" means Sequoyah Energy Holdings, LLC.

"Sponsors" means any of Arcadia Capital AEW, LLC, EMG White Star Holdings, LLC, The Energy & Minerals Group Fund III, LP, EMG Fund III Offshore Holdings, LP, EMG White Star Co-Investment, LP and EMG White Star Blocker, Inc. and any of their respective Affiliates and funds or partnerships managed or advised by any of them or any of their respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"SPV" has the meaning set forth in Section 13.06(h).

"Stated Amount" of any Letter of Credit means the maximum amount from time to time available to be drawn thereunder, determined without regard to whether any conditions to drawing could then be met.

"Stalking Horse Asset Purchase Agreement" has the meaning set forth in Section 9.21.

"Subagent" has the meaning set forth in Section 12.02.

"Subsequent Borrowing" has the meaning set forth in Section 2.01(a).

"Subsidiary" means, with respect to any Person:

(1)    any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than fifty percent (50.0%) of the total voting power of shares of Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, members of management or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and

(2)    any partnership, joint venture, limited liability company or similar entity of which:

(a)    more than fifty percent (50.0%) of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and

(b)    such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

Unless otherwise expressly provided or context otherwise requires, all references herein to a "Subsidiary" mean a Subsidiary of the Borrower.

"Subsidiary Guarantor" means each Subsidiary that is a Guarantor.

"Taxes" means any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority and any interest, fines, penalties or additions to tax with respect to the foregoing.

"Term Loan" has the meaning set forth in Section 2.01(a).

"Term Loan Commitment" means, (a) with respect to each Lender that is a Lender on the Closing Date, the amount set forth opposite such Lender's name on Schedule 1.01(a) as such Lender's "Term Loan Commitment" and (b) in the case of any Lender that becomes a Lender after the Closing Date, the amount specified as such Lender's "Term Loan Commitment" in the Assignment and Assumption pursuant to which such Lender assumed a portion of the Term Loan Commitments, in each case as the same may be changed from time to time pursuant to the terms of this Agreement.  The aggregate amount of the Term Loan Commitments as of the Closing Date is twenty-six million eight hundred eighty-four thousand six hundred forty Dollars ($26,884,640).

"Termination Date" means the earlier to occur of (a) the Maturity Date and (b) the date on which the Total Commitment shall have terminated.

"Total Commitment" means the sum of the Commitments of the Lenders.

41

"Total Outstandings" means, with respect to any Lender at any time, the sum of (a) the aggregate principal amount of the Loans of such Lender then outstanding, and (b) such Lender's Letter of Credit Exposure at such time .

"Transferee" has the meaning set forth in Section 13.06(f).

"Type" means, when used in respect of any Loan, the Rate by reference to which interest on such Loan is determined.  For purposes hereof, "Rate" shall include the Eurodollar and the Base Rate.

"UCC" means the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"Unfunded Current Liability" of any Plan means the amount, if any, by which the Accumulated Benefit Obligation (as defined under Accounting Standards Codification No. 715-30 ("ASC 715-30")) under the Plan as of the close of its most recent plan year, determined in accordance with ASC 715-30 as in effect on the date hereof, exceeds the Fair Market Value of the assets allocable thereto.

"Uniform Customs" means with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits as approved by the International Chamber of Commerce, commencing on July 1, 2007 (or such later version thereof as may be in effect at the time of issuance).

"Unpaid Drawing" has the meaning set forth in Section 3.04(a).

"Unused Commitment Fee Rate" means, for any day, with respect to the Available Commitment on such day, a rate per annum equal to 1.00%.

"U.S. Lender" means any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"Variance Covenants" means the covenants contained in Section 10.11.

"Variance Report" has the meaning set forth in Section 9.20(a).

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person under ordinary circumstances.

"Wholly Owned Subsidiary" of any Person means a Subsidiary of such Person, one hundred percent (100.0%) of the outstanding Equity Interests of which (other than directors' qualifying shares and shares of Capital Stock issued to foreign nationals as required under applicable law) shall at the time be owned by such Person and/or by one or more Wholly Owned Subsidiaries of such Person.

42

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02.    Terms Generally.  With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Credit Document shall refer to such Credit Document as a whole and not to any particular provision thereof.

(c)    Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

(d)    The term "including" is by way of example and not limitation.

(e)    The word "or" is not exclusive.

(f)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(g)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(h)    Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Credit Document.

(i)    Any reference to any Person shall be constructed to include such Person's successors or assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(j)    Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

(k)    The word "will" shall be construed to have the same meaning as the word "shall."

(l)    The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

43

(m)    Unless the context otherwise requires, any reference to an "Article," "Section" "clause," or "paragraph" refers to an Article, Section, clause or paragraph, as the case may be, of this Agreement.

(n)    The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

(o)    No provision of any Credit Document shall be interpreted or construed against any Person solely because such Person or its legal counsel drafted such provision.

(p)    The permitted existence of any Permitted Liens or any other Liens shall not be interpreted to expressly or impliedly subordinate any Liens granted in favor of the Administrative Agent and the other Secured Parties as there is no intention to subordinate the Liens granted in favor of the Collateral Agent and the other Secured Parties except to the extent required by law.

Section 1.03.    Accounting Terms.    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  Except as otherwise provided herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Accounting Standards Codification Topic No. 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value," as defined therein and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification Topic No. 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

Section 1.04.    Rounding.  Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

Section 1.05.    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to New York City (daylight saving or standard, as applicable).

Section 1.06.    Timing of Payment or Performance.    When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than

44

as described in <u>Section 2.09</u>) or performance shall extend to the immediately succeeding Business Day.

Section 1.07.  <u>Classification of Loans and Borrowings</u>.  For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "<u>Eurodollar Loan</u>").

Section 1.08.  <u>Hedging</u>.  For purposes of any determination with respect to Hedging Obligations or any other calculation under or requirement of this Agreement in respect of hedging shall be calculated separately for oil, gas and natural gas liquids; <u>provided</u>, <u>however</u>, that nothing in this Agreement shall limit the ability of the Borrower or any Restricted Subsidiary from entering into commodity price hedging in respect of oil in order to hedge the price of natural gas liquids.

Section 1.09.  <u>Certain Determinations</u>.  For purposes of determining compliance with any of the covenants set forth in <u>Article IX</u>, <u>Article X</u> or <u>X-A</u>, but subject to any limitation expressly set forth therein, as applicable, at any time (whether at the time of incurrence or thereafter), any Lien, Investment, Indebtedness, disposition, Restricted Payment, Affiliate Transaction, prepayment, redemption or the consummation of any other transaction meets the criteria of one, or more than one, of the categories permitted pursuant to <u>Article IX</u>, <u>Article X</u> or <u>X-A</u>, as applicable, the Borrower shall, in its sole discretion, determine under which category such Lien, Investment, Indebtedness, sale of assets, Restricted Payment, Affiliate Transaction, prepayment, redemption or the consummation of any other transaction (or, in each case, any portion thereof) is permitted.

Section 1.10.  [Reserved].

Section 1.11.  <u>References to Agreements, Laws, Etc.</u>  Unless otherwise expressly provided herein, (a) references to organizational documents, agreements (including the Credit Documents) and other Contractual Requirements shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted by any Credit Document and (b) references to any Requirement of Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Requirement of Law.

Section 1.12.  <u>Letter of Credit Amounts</u>.  Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; <u>provided</u>, <u>however</u>, that with respect to any Letter of Credit that, by its terms or the terms of any Issuer Document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such times.

## ARTICLE II

## Amount and Terms of Credit

Section 2.01.         DIP Term Loan Facility.

(a)      Each Lender having a Term Loan Commitment agrees, severally and not jointly, to make, subject to satisfaction (or waiver by the Administrative Agent at the direction of the Majority Lenders) of the conditions precedent set forth in Sections 6.01 and 7.01, upon written request by the Borrower, Term Loans to the Borrower, in an aggregate principal amount up to such Lender's Commitment (collectively, the "Term Loans") in multiple Borrowings from time to time (subject to the limitations contained below) on and after the date of the entry of the Interim Order and prior to the Termination Date; provided, that, (i) after giving effect to the making of any Term Loans, in no event shall the aggregate principal amount of all Term Loans pending extension exceed the unused portion of the Term Loan Commitments at such time, (ii) the aggregate amount of Term Loans made prior to the entry of the Final Order shall not exceed the Initial Borrowing Amount, which amount shall be made in a single Borrowing within two (2) Business Days after the entry of the Interim Order by the Bankruptcy Court (the "Initial Borrowing"), and (iii) the remainder of the Term Loans shall be made in a single Borrowing following the entry of the Final Order by the Bankruptcy Court (the "Subsequent Borrowing"). Amounts prepaid or repaid in respect of the Term Loans may not be reborrowed.  Each Lender's Commitment shall (x) automatically and permanently be reduced by the amount of each Term Loan made hereunder and (y) terminate immediately and without further action on the Maturity Date.  Subject to Sections 5.01 and 5.02, all amounts owed hereunder with respect to the Loans shall be paid in full no later than the Maturity Date.

(b)      Such Loans may, at the option of the Borrower, be incurred and maintained as, or converted into, Base Rate Loans or Eurodollar Loans; provided that all Loans made by each of the Lenders pursuant to the same Borrowing shall, unless otherwise specifically provided herein, consist entirely of Loans of the same Type.

(c)      Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that (i) any exercise of such option shall not affect the obligation of the Borrower to repay such Loan and (ii) in exercising such option, such Lender shall use its reasonable efforts to minimize any increased costs to the Borrower resulting therefrom (which obligation of the Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it determines would be otherwise disadvantageous to it and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of Section 2.11 shall apply).

Section 2.02.  Maximum Number of Borrowings.  No more than two Borrowings of Term Loans may be incurred.

Section 2.03.  Notice of Borrowing.

46

(a)     Whenever the Borrower desires to incur Loans (other than borrowings to repay Unpaid Drawings), the Borrower shall give the Administrative Agent at the Administrative Agent's Office, (i) prior to 1:00 p.m. (New York City time) at least three (3) Business Days' prior written notice (or telephonic notice promptly confirmed in writing) of each Borrowing of Loans if such Loans are initially Eurodollar Loans and (ii) written notice (or telephonic notice promptly confirmed in writing) prior to 11:00 a.m. (New York City time) at least one (1) Business Day prior to the date of each Borrowing of Loans that are to be Base Rate Loans.  Such Notice of Borrowing shall specify (A) the aggregate principal amount of the Loans to be made pursuant to such Borrowing, (B) the date of the proposed Borrowing (which shall be a Business Day), (C) whether the respective Borrowing shall consist of Base Rate Loans or Eurodollar Loans, (D) if Eurodollar Loans, the Interest Period to be initially applicable thereto (if no Interest Period is selected, the Borrower shall be deemed to have selected an Interest Period of one month's duration), and (E) the location and number of the Borrower's account to which funds are to be disbursed.  The Administrative Agent shall promptly give each Lender written notice (or telephonic notice promptly confirmed in writing) of each proposed Borrowing of Loans, of such Lender's Commitment Percentage thereof and of the other matters covered by the related Notice of Borrowing.

(b)     Borrowings to reimburse Unpaid Drawings shall be made upon the notice specified in Section 3.04(a).

(c)     Without in any way limiting the obligation of the Borrower to confirm in writing any notice it may give hereunder by telephone, the Administrative Agent may act prior to receipt of written confirmation without liability upon the basis of such telephonic notice believed by the Administrative Agent in good faith to be from an Authorized Officer of the Borrower.

Section 2.04.   Disbursement of Funds.

(a)     No later than 1:00 p.m. (New York City time) on the date specified in each Notice of Borrowing, each Lender will make available its pro rata portion of each Borrowing requested to be made on such date in the manner provided below; provided that on the Closing Date, if the Initial Borrowing is to occur on the Closing Date, such funds shall be made available by 10:00 a.m. (New York City time) or such earlier time as may be agreed among the Lenders, the Borrower and the Administrative Agent.

(b)     Each Lender shall make available all amounts it is to fund to the Borrower under any Borrowing in immediately available funds to the Administrative Agent at the Administrative Agent's Office in Dollars, and the Administrative Agent will (except in the case of Borrowings to repay Unpaid Drawings) make available to the Borrower, by depositing or wiring to a Controlled Account.  Unless the Administrative Agent shall have been notified by any Lender prior to the date of any such Borrowing that such Lender does not intend to make available to the Administrative Agent its portion of the Borrowing or Borrowings to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing, and the Administrative Agent, in reliance upon such assumption, may (in its sole discretion and without any obligation to do so) make available to the Borrower a corresponding amount.  If such corresponding amount is not in fact made available to the Administrative Agent by such Lender and the Administrative Agent

47

has made available such amount to the Borrower, the Administrative Agent shall be entitled to recover such corresponding amount from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Administrative Agent in Dollars. The Administrative Agent shall also be entitled to recover from such Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower to the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if paid by such Lender, the Overnight Rate plus any administrative, processing or similar fees customarily charged by the Administrative Agent or (ii) if paid by the Borrower, the then-applicable rate of interest or fees, calculated in accordance with Section 2.08, for the respective Loans.

(c)    Nothing in this Section 2.04 shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to fulfill its commitments hereunder).

Section 2.05.    Repayment of Loans; Evidence of Debt.

(a)    The Borrower shall repay to the Administrative Agent for the ratable account of the applicable Lenders on the Maturity Date, the then due and outstanding Loans.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the appropriate lending office of such Lender resulting from each Loan made by such lending office of such Lender from time to time, including the amounts of principal and interest payable and paid to such lending office of such Lender from time to time under this Agreement.

(c)    The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 13.06(d), and a subaccount for each Lender, in which the Register and subaccounts (taken together) shall be recorded (i) the amount of each Loan made hereunder, the Type of each Loan made and the Interest Period(s) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)    The entries made in the Register and accounts and subaccounts maintained pursuant to Section 2.05(b) and (c) shall, to the extent permitted by applicable Requirements of Law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

Section 2.06.        Conversions and Continuations.

(a)        Subject to the penultimate sentence of this paragraph (a), (i) the Borrower shall have the option on any Business Day to convert all or a portion equal to at least one million Dollars ($1,000,000) (and in multiples of one hundred thousand Dollars ($100,000) in excess thereof) of the outstanding principal amount of Loans of one Type into a Borrowing or Borrowings of another Type and (ii) the Borrower shall have the option on any Business Day to continue the outstanding principal amount of any Eurodollar Loans as Eurodollar Loans for an additional Interest Period; provided that (A) no partial conversion of Eurodollar Loans shall reduce the outstanding principal amount of Eurodollar Loans made pursuant to a single Borrowing to less than one million Dollars ($1,000,000), (B) Base Rate Loans may not be converted into Eurodollar Loans if a Default or an Event of Default is in existence on the date of the conversion and the Administrative Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such conversion, (C) Eurodollar Loans may not be continued as Eurodollar Loans for an additional Interest Period if a Default or an Event of Default is in existence on the date of the proposed continuation and the Administrative Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such continuation, and (D) Borrowings resulting from conversions pursuant to this Section 2.06 shall be limited in number as provided in Section 2.02.  Each such conversion or continuation shall be effected by the Borrower by giving the Administrative Agent at the Administrative Agent's Office prior to 1:00 p.m. (New York City time) at least (x) three (3) Business Days', in the case of a continuation of or conversion to Eurodollar Loans or (y) the date of conversion, in the case of a conversion into Base Rate Loans, prior written notice (or telephonic notice promptly confirmed in writing) (each, a "Notice of Conversion or Continuation") specifying the Loans to be so converted or continued, the Type of Loans to be converted into or continued and, if such Loans are to be converted into or continued as Eurodollar Loans, the Interest Period to be initially applicable thereto (if no Interest Period is selected, the Borrower shall be deemed to have selected an Interest Period of one month's duration).  The Administrative Agent shall give each applicable Lender notice as promptly as practicable of any such proposed conversion or continuation affecting any of its Loans.

(b)        If any Event of Default is in existence at the time of any proposed continuation of any Eurodollar Loans and the Administrative Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such continuation, such Eurodollar Loans shall be automatically converted on the last day of the current Interest Period into Base Rate Loans.  Subject to the foregoing, if upon the expiration of any Interest Period in respect of Eurodollar Loans, the Borrower has failed to elect a new Interest Period to be applicable thereto as provided in paragraph (a) above, the Borrower shall be deemed to have elected to continue such Borrowing of Eurodollar Loans into a Borrowing of Eurodollar Loans with an Interest Period of one month, unless a Default or Event of Default is then in existence in which case the Borrower shall be deemed to have elected to convert such Borrowing of Eurodollar Loans into a Borrowing of Base Rate Loans, in each case, effective as of the expiration date of such current Interest Period.

Section 2.07.  Pro Rata Borrowings.  Each Borrowing of Loans under this Agreement shall be made by the Lenders pro rata on the basis of their then applicable Commitment Percentages.  It is understood that (a) no Lender shall be responsible for any default

by any other Lender in its obligation to make Loans hereunder and that each Lender severally but not jointly shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to fulfill its commitments hereunder and (b) failure by a Lender to perform any of its obligations under any of the Credit Documents shall not release any Person from performance of its obligation under any Credit Document.

Section 2.08.    <u>Interest</u>.

(a)    The unpaid principal amount of each Base Rate Loan shall bear interest from the date of the Borrowing thereof until maturity (whether by acceleration or otherwise) at a rate per annum that shall at all times be the Applicable Margin <u>plus</u> the Base Rate, in each case, in effect from time to time.

(b)    The unpaid principal amount of each Eurodollar Loan shall bear interest from the date of the Borrowing thereof until maturity thereof (whether by acceleration or otherwise) at a rate per annum that shall at all times be the Applicable Margin <u>plus</u> the relevant Eurodollar Rate, in each case, in effect from time to time.

(c)    If any Event of Default is in existence, the principal amount of all Loans outstanding and, to the extent permitted by applicable Requirements of Law, any interest, fees or other amounts owed hereunder shall bear interest at a rate per annum (the "<u>Default Rate</u>") equal to the rate per annum, (i) in the case of outstanding principal, the rate that would otherwise be applicable thereto <u>plus</u> two percent (2.00%), and (ii) in the case of any other amount, the rate otherwise payable at such time on Base Rate Loans <u>plus</u> two percent (2.00%), but in no event to exceed an amount not permitted by the applicable Requirements of Law.  Interest that accrues pursuant to this <u>Section 2.08(c)</u> shall be payable on demand and shall otherwise be payable in arrears on each Interest Payment Date.

(d)    Interest on each Loan shall accrue from and including the date of any Borrowing to but excluding the date of any repayment thereof and shall be payable in Dollars; <u>provided</u> that any Loan that is repaid on the same date on which it is made shall bear interest for one day.

(e)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(f)    All computations of interest hereunder shall be made in accordance with <u>Section 5.05</u>.

(g)    The Administrative Agent, upon determining the interest rate for any Borrowing of Eurodollar Loans, shall promptly notify the Borrower and the relevant Lenders thereof.  Each such determination shall, absent clearly demonstrable error, be final and conclusive and binding on all parties hereto.

Section 2.09.        Interest Periods.

At the time the Borrower gives a Notice of Borrowing or Notice of Conversion or Continuation in respect of the making of, or conversion into or continuation as, a Borrowing of Eurodollar Loans in accordance with Section 2.06(a), the Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of the Interest Period applicable to such Borrowing, which Interest Period shall be a one month period.

Notwithstanding anything to the contrary contained above:

(a)    the initial Interest Period for any Borrowing of Eurodollar Loans shall commence on the date of such Borrowing (including the date of any conversion from a Borrowing of Base Rate Loans) and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the next preceding Interest Period expires;

(b)    if any Interest Period relating to a Borrowing of Eurodollar Loans begins on the last Business Day of a calendar month or begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)    if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided that, if any Interest Period in respect of a Eurodollar Loan would otherwise expire on a day that is not a Business Day, but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day; and

(d)    the Borrower shall not be entitled to elect any Interest Period in respect of any Eurodollar Loan if such Interest Period would extend beyond the Maturity Date.

Section 2.10.        Increased Costs, Illegality, Etc.

(a)    In the event that (x) in the case of paragraph (i) below, the Majority Lenders or (y) in the case of paragraphs (ii) and (iii) below, any Lender, shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto):

(i)    on any date for determining the Eurodollar Rate for any Interest Period that (A) deposits in the principal amounts of the Loans comprising such Eurodollar Loan are not generally available in the relevant market or (B) by reason of any changes arising on or after the Closing Date affecting the interbank Eurodollar market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of Eurodollar Rate; or

(ii)    any Lender shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto), that a Change in Law occurring at any time after the Closing Date shall (A) impose, modify or deem applicable any reserve, special deposit, compulsory loan,

51

insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender, (B) subject any Lender to any Tax (other than (i) Indemnified Taxes or Other Taxes indemnifiable under <u>Section 5.04</u>, or (ii) Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, or (C) impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Eurodollar Loans made by such Lender, which results in the cost to such Lender of making, converting into, continuing or maintaining Eurodollar Loans or participating in Letters of Credit (in each case hereunder) increasing by an amount which such Lender reasonably deems material or the amounts received or receivable by such Lender hereunder with respect to the foregoing shall be reduced; or

        (iii)     at any time, that the making or continuance of any Eurodollar Loan has become unlawful as a result of compliance by such Lender in good faith with any Requirement of Law (or would conflict with any such Requirement of Law not having the force of law even though the failure to comply therewith would not be unlawful);

then, and in any such event, such Lenders (or the Administrative Agent, in the case of <u>paragraph (i)</u> above) shall within a reasonable time thereafter give notice (if by telephone, confirmed in writing) to the Borrower and to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (x) in the case of <u>paragraph (i)</u> above, Eurodollar Loans shall no longer be available until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist (which notice the Administrative Agent agrees to give at such time when such circumstances no longer exist), and any Notice of Borrowing or Notice of Conversion or Continuation given by the Borrower with respect to Eurodollar Loans that have not yet been incurred shall be deemed rescinded by the Borrower, (y) in the case of <u>paragraph (ii)</u> above, the Borrower shall pay to such Lender, promptly (but no later than fifteen (15) days) after receipt of written demand therefor such additional amounts as shall be required to compensate such Lender for such increased costs or reductions in amounts receivable hereunder (it being agreed that a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto and (z) in the case of <u>paragraph (iii)</u> above, the Borrower shall take one of the actions specified in <u>Section 2.10(b)</u> as promptly as possible and, in any event, within the time period required by applicable Requirements of Law.

        (b)     At any time that any Eurodollar Loan is affected by the circumstances described in <u>Section 2.10(a)(ii)</u> or <u>(iii)</u>, the Borrower may (and in the case of a Eurodollar Loan affected pursuant to <u>Section 2.10(a)(iii)</u> shall) either (1) if the affected Eurodollar Loan is then being made pursuant to a Borrowing, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower was notified by a Lender pursuant to <u>Section 2.10(a)(ii)</u> or <u>(iii)</u> or (2) if the affected Eurodollar Loan is then outstanding, upon at least two (2) Business Days' notice to the Administrative Agent, require the affected Lender to convert each such Eurodollar Loan into an Base Rate Loan;

provided that if more than one Lender is affected at any time, then all affected Lenders must be treated in the same manner pursuant to this Section 2.10(b).

(c)    If, after the Closing Date, any Change in Law relating to capital adequacy or liquidity requirements of any Lender or compliance by any Lender or its parent with any Change in Law relating to capital adequacy or liquidity requirements occurring after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or its parent's capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent could have achieved but for such Change in Law (taking into consideration such Lender's or its parent's policies with respect to capital adequacy or liquidity requirements), then from time to time, promptly (but in any event no later than fifteen (15) days) after written demand by such Lender (with a copy to the Administrative Agent), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any applicable Requirement of Law as in effect on the Closing Date.  Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the Borrower, which notice shall set forth in reasonable detail the basis of the calculation of such additional amounts, although the failure to give any such notice shall not, subject to Section 2.13, release or diminish the Borrower's obligations to pay additional amounts pursuant to this Section 2.10(c) upon receipt of such notice.

(d)    During any period in which any Eurodollar Loan is affected by the circumstances described in Section 2.10(a)(i), (ii) or (iii), the Borrower may request that the Administrative Agent request the Majority Lenders to confirm that such circumstances continue to be in effect; provided that (A) the Borrower shall not be permitted to submit any such request more than once in any 30-day period and (B) nothing contained in this Section 2.10 or the failure to provide confirmation of the continued effectiveness of such circumstances shall in any way affect the Administrative Agent's or Majority Lenders' right to provide any additional notices of such circumstances as provided in this Section 2.10.  If the Majority Lenders have not confirmed within ten (10) Business Days after request of such report from the Borrower that such circumstances continue to occur, then such circumstances shall be deemed to be no longer existing.

Section 2.11.    Compensation.

If (a) any payment of principal of any Eurodollar Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such Eurodollar Loan as a result of a payment or conversion pursuant to Section 2.05, Section 2.06, Section 2.10, Section 5.01, Section 5.02 or Section 13.07, as a result of acceleration of the maturity of the Loans pursuant to Article XI or for any other reason, (b) any Borrowing of Eurodollar Loans is not made on the date specified in a Notice of Borrowing, (c) any Base Rate Loan is not converted into a Eurodollar Loan on the date specified in a Notice of Conversion or Continuation, (d) any Eurodollar Loan is not continued as a Eurodollar Loan on the date specified in a Notice of Conversion or Continuation or (e) any prepayment of principal of any Eurodollar Loan is not made as a result of a withdrawn notice of prepayment pursuant to Section

53

13.07, Section 5.01 or Section 5.02, the Borrower shall, after the Borrower's receipt of a written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amount), pay to the Administrative Agent (within fifteen (15) days after such request) for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of such payment, failure to convert, failure to continue or failure to prepay, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such Eurodollar Loan.

Section 2.12.    Change of Lending Office.    Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii), 2.10(a)(iii), 2.10(c), 3.11 or 5.04 with respect to such Lender, it will, if requested by the Borrower use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; provided that such designation does not cause such Lender or its lending office to suffer any economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section. Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Section 2.10, Section 3.11 or Section 5.04.

Section 2.13.    Notice of Certain Costs.    Notwithstanding anything in this Agreement to the contrary, to the extent any notice required by Section 2.10, Section 2.11, Section 3.11 or Section 5.04 is given by any Lender more than one hundred eighty (180) days after such Lender has knowledge (or should have had knowledge) of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, Tax or other additional amounts described in such Sections, such Lender shall not be entitled to compensation under Section 2.10, Section 2.11, Section 3.11 or Section 5.04, as the case may be, for any such amounts incurred or accruing prior to the 181st day prior to the giving of such notice to the Borrower; provided that if the circumstances giving rise to such claim is retroactive, then the one hundred and eighty (180)-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.14.    [Reserved].

Section 2.15.    Defaulting Lenders.    Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)    Commitment Fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 4.01(a);

(b)    The Commitment and Total Outstandings of such Defaulting Lender shall not be included in determining whether all Lenders or the Majority Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 13.01); provided that any waiver, amendment or modification requiring the consent of all Lenders pursuant to Section 13.01(a) or requiring the consent of each affected Lender pursuant to Section 13.01(a)(i) shall require the consent of such Defaulting Lender (which for the avoidance of doubt would include any change to the Maturity Date applicable to such Defaulting

54

Lender, decreasing or forgiving any principal or interest due to such Defaulting Lender, any decrease of any interest rate applicable to Loans made by such Defaulting Lender (other than the waiving of post-default interest rates) and any increase in or extension of such Defaulting Lender's Commitment);

(c)     If any Letter of Credit Exposure exists at the time a Lender becomes a Defaulting Lender, then (i) all or any part of such Letter of Credit Exposure of such Defaulting Lender will, subject to the limitation in the first proviso below, automatically be reallocated (effective on the day such Lender becomes a Defaulting Lender) among the Non-Defaulting Lenders pro rata in accordance with their respective Commitment Percentages; provided that (A) each Non-Defaulting Lender's Letter of Credit Exposure may not in any event exceed the Commitment Percentage of the L/C Commitment of such Non-Defaulting Lender as in effect at the time of such reallocation, (B) each Non-Defaulting Lender's Letter of Credit Exposure may not in any event exceed such Non-Defaulting Lender's L/C Commitment, and (C) neither such reallocation nor any payment by a Non-Defaulting Lender pursuant thereto will constitute a waiver or release of any claim the Borrower, the Administrative Agent, the Issuing Banks or any other Lender may have against such Defaulting Lender or cause such Defaulting Lender to be a Non-Defaulting Lender, (ii) to the extent that all or any portion of the Defaulting Lender's Letter of Credit Exposure cannot, or can only partially, be so reallocated to Non-Defaulting Lenders, whether by reason of the first proviso in Section 2.15(c)(i) or otherwise, the Borrower shall, within two (2) Business Days following notice by the Administrative Agent, Cash Collateralize for the benefit of the applicable Issuing Bank only the Borrower's obligations corresponding to such Defaulting Lender's Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to clause (i) above), in accordance with the procedures set forth in Section 3.07 for so long as such Letter of Credit Exposure is outstanding, (iii) if the Borrower Cash Collateralizes any portion of such Defaulting Lender's Letter of Credit Exposure pursuant to this Section 2.15(c), the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 4.01(b) with respect to such Defaulting Lender's Letter of Credit Exposure during the period such Defaulting Lender's Letter of Credit Exposure is Cash Collateralized (and such fees shall be payable to the Issuing Banks), (iv) if the Letter of Credit Exposure of the Non-Defaulting Lenders is reallocated pursuant to this Section 2.15(c), then the Letter of Credit Fees payable for the account of the Lenders pursuant to Section 4.01(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Commitment Percentages and the Borrower shall not be required to pay any Letter of Credit Fees to the Defaulting Lender pursuant to Section 4.01(b) with respect to such Defaulting Lender's Letter of Credit Exposure during the period that such Defaulting Lender's Letter of Credit Exposure is reallocated, or (v) if any Defaulting Lender's Letter of Credit Exposure is neither Cash Collateralized nor reallocated pursuant to this Section 2.15(c), then, without prejudice to any rights or remedies of any Issuing Bank or any Lender hereunder, all Letter of Credit Fees payable under Section 4.01(b) with respect to such Defaulting Lender's Letter of Credit Exposure shall be payable to such Issuing Bank until such Letter of Credit Exposure is Cash Collateralized and/or reallocated;

(d)     So long as any Lender is a Defaulting Lender, no Issuing Bank will be required to issue any new Letter of Credit or amend any outstanding Letter of Credit to increase the Stated Amount thereof, alter the drawing terms thereunder or extend the expiry date thereof, unless each Issuing Bank is reasonably satisfied that any exposure that would result from the exposure to such Defaulting Lender is eliminated or fully covered by the Commitments of the

55

Non-Defaulting Lenders or by Cash Collateralization or a combination thereof in accordance with paragraph (c) above or otherwise in a manner reasonably satisfactory to such Issuing Bank, and participating interests in any such newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.15(c)(i) (and Defaulting Lenders shall not participate therein);

(e)    [Reserved];

(f)    [Reserved];

(g)    If the Borrower, Issuing Bank and the Administrative Agent agree in writing in their discretion that a Lender that is a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon, as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will cease to be a Defaulting Lender and will be a Non-Defaulting Lender and any applicable L/C Cash Collateral shall be promptly returned to the Borrower and any Letter of Credit Exposure of such Lender reallocated pursuant to Section 2.15(c) shall be reallocated back to such Lender; provided that, except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender; and

(h)    Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article XI or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 13.08), shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment on a pro rata basis of any amounts owing by that Defaulting Lender to each Issuing Bank hereunder; *third*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fourth*, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; *fifth*, to the payment of any amounts owing to the Lenders, each Issuing Bank as a result of any final judgment of a court of competent jurisdiction obtained by any Lender or such Issuing Bank against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; *sixth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any final judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and *seventh*, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is a payment of the principal amount of any Loans or Unpaid Drawings, such payment shall be applied solely to pay the relevant Loans of, and Unpaid Drawings owed to, the relevant non-Defaulting Lenders on a pro rata basis prior to being applied in the manner set forth in this Section 2.15(h). Any payments, prepayments or other amounts paid or payable to a

56

Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post L/C Cash Collateral pursuant to <u>Section 3.07</u> shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

Section 2.16.    <u>Super-Priority Nature of Obligations</u>.  The priority of the Collateral Agent's Liens on the Collateral owned by the Credit Parties shall be set forth in the Financing Order.

Section 2.17.    <u>Payment of Obligations</u>.  On the Maturity Date, the Secured Parties shall be entitled to immediate payment of all outstanding Obligations without further application to or order of the Bankruptcy Court.

Section 2.18.    <u>Waiver of Priming Liens</u>.  Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, each Credit Party hereby irrevocably waives any right pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations, other than as set forth in the Financing Orders or unless the Administrative Agent otherwise consents thereto in writing.

# ARTICLE III

# Letters of Credit

Section 3.01.          <u>Letters of Credit</u>.

(a)      Subject to and upon the terms and conditions herein set forth, at any time and from time to time on and after the fifth (5th) Business Day after the date of entry of the Interim Order and prior to the L/C Maturity Date, each Issuing Bank, severally, and not jointly, agrees, in reliance upon the agreements of the Lenders set forth in this <u>Article III</u>, to issue upon the request of the Borrower and for the direct or indirect benefit of the Borrower and the Restricted Subsidiaries, a letter of credit or letters of credit (the "<u>Letters of Credit</u>" and each, a "<u>Letter of Credit</u>"), in such form and with such Issuer Documents as may be approved by the applicable Issuing Bank in its reasonable discretion; <u>provided</u> that the Borrower shall be a co-applicant of, and jointly and severally liable with respect to, each Letter of Credit issued for the account of a Restricted Subsidiary.  Notwithstanding anything to the contrary, (i) each Letter of Credit may be issued solely for the purpose of replacing an Existing Letter of Credit, (ii) no Letter of Credit shall be issued in favor of any beneficiary other than the beneficiary of the Existing Letter of Credit which such Letter of Credit is intended to replace, or any successors, assigns or replacements of such beneficiary, (iii) no Letter of Credit shall be issued in an amount that exceeds the Existing Letter of Credit which such Letter of Credit is intended to replace, and (iv) no Letter of Credit shall be issued unless the corresponding Existing Letter of Credit which such Letter of Credit is intended to replace is terminated or cancelled substantially simultaneously with the issuance of such Letter of Credit.

(b)      Notwithstanding the foregoing, (i) no Letter of Credit shall be issued the Stated Amount of which, when added to the Letters of Credit Outstanding at such time, would

57

exceed the Letter of Credit Commitment then in effect, (ii) no Letter of Credit shall be issued the Stated Amount of which would cause the aggregate amount of all Lenders' Letter of Credit Exposure at such time to exceed the aggregate amount of all Lenders' L/C Commitments then in effect, (iii) each Letter of Credit shall have an expiration date occurring no later than one year after the date of issuance or such longer period of time as may be agreed by the applicable Issuing Bank, unless otherwise agreed upon by the Administrative Agent, the applicable Issuing Bank and the Requisite Lenders or as provided under Section 3.02(b); provided that any Letter of Credit may provide for automatic renewal thereof for additional periods of up to twelve (12) months or such longer period of time as may be agreed upon by the applicable Issuing Bank, subject to the provisions of Section 3.02(b); provided, further, that in no event shall such expiration date occur later than the L/C Maturity Date unless arrangements which are reasonably satisfactory to the applicable Issuing Bank to Cash Collateralize (or backstop) such Letter of Credit have been made, (iv) no Letter of Credit shall be issued if (A) it would be illegal under any applicable Requirement of Law for the beneficiary of the Letter of Credit to have a Letter of Credit issued in its favor, (B) any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Issuing Bank from issuing the Letter of Credit, or any Requirement of Law applicable to the Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the Issuing Bank shall prohibit, or request that the Issuing Bank refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon Issuing Bank with respect to the Letter of Credit any restriction, reserve or capital requirement (for which the Issuing Bank is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which, in each case, the Issuing Bank in good faith deems material to it or (C) the issuance of the Letter of Credit would violate one or more policies of the Issuing Bank applicable to letters of credit generally as certified to the Borrower in writing by such Issuing Bank, (v) no Letter of Credit shall be issued by an Issuing Bank after it has received a written notice from any Credit Party or the Administrative Agent or the Majority Lenders stating that a Default or Event of Default has occurred and is continuing until such time as such Issuing Bank shall have received a written notice (A) of rescission of such notice from the party or parties originally delivering such notice, (B) of the waiver of such Default or Event of Default in accordance with the provisions of Section 13.01 or (C) that such Default or Event of Default is no longer continuing, (vi) no Issuing Bank shall have an obligation to issue a Letter of Credit in a Stated Amount which, when added to the outstanding Letters of Credit issued by such Issuing Bank, would exceed such Issuing Bank's Maximum Letter of Credit Commitment, and (vii) without the consent of the applicable Issuing Bank, no Letter of Credit shall be issued in any currency other than Dollars.

(c)     No Issuing Bank shall be under any obligation to issue any Letter of Credit if any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Issuing Bank from issuing the Letter of Credit, or any law applicable to such Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the Issuing Bank shall prohibit, or request that such Issuing Bank refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon such Issuing Bank with respect to the Letter of Credit any restriction, reserve or capital requirement (for which such Issuing Bank is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon such

58

Issuing Bank any unreimbursed loss, cost or expense (for which such Issuing Bank is not otherwise compensated hereunder) which was not applicable on the Closing Date and which such Issuing Bank reasonably and in good faith deems material to it.

(d)      Upon at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent and the applicable Issuing Bank (which notice the Administrative Agent shall promptly transmit to each of the applicable Lenders), the Borrower shall have the right, on any day, permanently to terminate or reduce the Letter of Credit Commitment in whole or in part; provided that, after giving effect to such termination or reduction, the Letters of Credit Outstanding shall not exceed the Letter of Credit Commitment.

Section 3.02.   Letter of Credit Applications.

(a)      Whenever the Borrower desires that a Letter of Credit be issued, amended or renewed for its account on its own behalf, or on behalf of its Restricted Subsidiaries, the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the applicable Issuing Bank) to the applicable Issuing Bank and the Administrative Agent a Letter of Credit application, amendment request or any such document as may be approved by the applicable Issuing Bank (each, a "Letter of Credit Application").  Upon receipt of any Letter of Credit Application or amendment request, (A) the applicable Issuing Bank will use its best efforts to process such Letter of Credit Application on the Business Day on which such Letter of Credit Application is received; provided that such Letter of Credit Application is received no later than 1:00 p.m. (New York City time) on such Business Day, or (B) otherwise, the first Business Day next succeeding receipt of such Letter of Credit Application.  No Issuing Bank shall issue any Letters of Credit unless such Issuing Bank shall have received notice from the Administrative Agent that the conditions to such issuance have been met.

(b)      If the Borrower so requests in any applicable Letter of Credit Application, the applicable Issuing Bank may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided that any such Auto-Extension Letter of Credit must permit such Issuing Bank to prevent any such extension at least once in each 12-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such 12-month period to be agreed upon at the time such Letter of Credit is issued.  Unless otherwise directed by the applicable Issuing Bank, the Borrower shall not be required to make a specific request to such Issuing Bank for any such extension.  Once an Auto-Extension Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the applicable Issuing Bank to permit the extension of such Letter of Credit at any time to an expiry date not later than the L/C Maturity Date; provided, however, that such Issuing Bank shall not permit any such extension if (i) such Issuing Bank has determined that it would not be permitted, or would have no obligation, at such time to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of Section 3.01(b) or otherwise), or (ii) it has received notice (which may be by telephone or in writing) on or before the day that is five (5) Business Days before the Non-Extension Notice Date (A) from the Administrative Agent that the Majority Lenders have

59

elected not to permit such extension or (B) from the Administrative Agent, any Lender or the Borrower that one or more of the applicable conditions specified in Article VII are not then satisfied, and in each such case directing such Issuing Bank not to permit such extension.

(c)    Each Issuing Bank (other than the Administrative Agent or any of its Affiliates) shall, at least once each week, provide the Administrative Agent with a list of all Letters of Credit issued by it that are outstanding at such time; provided that, upon written request from the Administrative Agent, such Issuing Bank shall thereafter notify the Administrative Agent in writing on each Business Day of all Letters of Credit issued on the prior Business Day by such Issuing Bank.

Section 3.03.    Letter of Credit Participations.

(a)    Immediately upon the issuance by an Issuing Bank of any Letter of Credit, such Issuing Bank shall be deemed to have sold and transferred to each Lender (each such Lender, in its capacity under this Section 3.03, an "L/C Participant"), and each such L/C Participant shall be deemed irrevocably and unconditionally to have purchased and received from such Issuing Bank, without recourse or warranty, an undivided interest and participation (each, an "L/C Participation"), to the extent of such L/C Participant's Commitment Percentage, in each Letter of Credit, each substitute therefor, each drawing made thereunder and the obligations of the Borrower under this Agreement with respect thereto, and any security therefor or guaranty pertaining thereto.

(b)    In determining whether to pay under any Letter of Credit, the relevant Issuing Bank shall have no obligation relative to the L/C Participants other than to confirm that (i) any documents required to be delivered under such Letter of Credit have been delivered, (ii) such Issuing Bank has examined the documents with reasonable care and (iii) the documents appear to comply on their face with the requirements of such Letter of Credit.  Any action taken or omitted to be taken by the relevant Issuing Bank under or in connection with any Letter of Credit issued by it, if taken or omitted in the absence of gross negligence or willful misconduct (as finally determined by a court of competent jurisdiction), shall not create for such Issuing Bank any resulting liability.

(c)    In the event that an Issuing Bank makes any payment under any Letter of Credit issued by it and the Borrower shall not have repaid such amount in full to such Issuing Bank pursuant to Section 3.04(a), such Issuing Bank shall promptly notify the Administrative Agent and each L/C Participant of such failure, and each such L/C Participant shall promptly and unconditionally pay to the Administrative Agent for the account of such Issuing Bank, the amount of such L/C Participant's Commitment Percentage of such unreimbursed payment in Dollars and in immediately available funds.  Each L/C Participant shall make available to the Administrative Agent for the account of the relevant Issuing Bank such L/C Participant's Commitment Percentage of the amount of such payment no later than 1:00 p.m. (New York City time) on the first Business Day after the date notified by such Issuing Bank in immediately available funds.  If and to the extent such L/C Participant shall not have so made its Commitment Percentage of the amount of such payment available to the Administrative Agent for the account of the relevant Issuing Bank, such L/C Participant agrees to pay to the Administrative Agent for the account of such Issuing Bank, forthwith on demand, such amount, together with interest

60

thereon for each day from such date until the date such amount is paid to the Administrative Agent for the account of such Issuing Bank at a rate per annum equal to the Overnight Rate from time to time then in effect, plus any administrative, processing or similar fees customarily charged by such Issuing Bank in connection with the foregoing.  The failure of any L/C Participant to make available to the Administrative Agent for the account of any Issuing Bank its Commitment Percentage of any payment under any Letter of Credit shall not relieve any other L/C Participant of its obligation hereunder to make available to the Administrative Agent for the account of such Issuing Bank its Commitment Percentage of any payment under such Letter of Credit on the date required, as specified above, but no L/C Participant shall be responsible for the failure of any other L/C Participant to make available to the Administrative Agent such other L/C Participant's Commitment Percentage of any such payment.

(d)     Whenever an Issuing Bank receives a payment in respect of an unpaid reimbursement obligation as to which the Administrative Agent has received for the account of such Issuing Bank any payments from the L/C Participants pursuant to paragraph (c) above, such Issuing Bank shall pay to the Administrative Agent and the Administrative Agent shall promptly pay to each L/C Participant that has paid its Commitment Percentage of such reimbursement obligation, in Dollars and in immediately available funds, an amount equal to such L/C Participant's share (based upon the proportionate aggregate amount originally funded by such L/C Participant to the aggregate amount funded by all L/C Participants) of the principal amount so paid in respect of such reimbursement obligation and interest thereon accruing after the purchase of the respective L/C Participations at the Overnight Rate.

(e)     The obligations of the L/C Participants to make payments to the Administrative Agent for the account of an Issuing Bank with respect to Letters of Credit shall be irrevocable and not subject to counterclaim, set-off or other defense or any other qualification or exception whatsoever and shall be made in accordance with the terms and conditions of this Agreement under all circumstances, including under any of the following circumstances:

(i)     any lack of validity or enforceability of this Agreement or any of the other Credit Documents;

(ii)     the existence of any claim, set-off, defense or other right that the Borrower or any other Person (including an L/C Participant) may have at any time against a beneficiary named in a Letter of Credit, any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), the Administrative Agent, any Issuing Bank, any Lender or other Person, whether in connection with this Agreement, any Letter of Credit, the transactions contemplated herein or any unrelated transactions (including any underlying transaction between the Borrower and the beneficiary named in any such Letter of Credit);

(iii)     any draft, certificate or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv)     the surrender or impairment of any security for the performance or observance of any of the terms of any of the Credit Documents;

61

(v)        the occurrence of any Default or Event of Default; or

(vi)       any other event, condition of circumstance, whether or not similar to the foregoing.

Section 3.04.        Agreement to Repay Letter of Credit Drawings.

(a)        The Borrower hereby agrees to reimburse the relevant Issuing Bank by making payment in Dollars or to the Administrative Agent for the account of such Issuing Bank (whether with its own funds or with proceeds of the Loans) in immediately available funds, for any payment or disbursement made by such Issuing Bank under any Letter of Credit issued by it (each such amount so paid until reimbursed, an "Unpaid Drawing") (i) within one Business Day of the date of such payment or disbursement if such Issuing Bank provides notice to the Borrower of such payment or disbursement prior to 10:00 a.m. (New York City time) on such next succeeding Business Day (from the date of such payment or disbursement) or (ii) if such notice is received after such time, on the next Business Day following the date of receipt of such notice (such required date for reimbursement under paragraph (i) or (ii), as applicable, on such Business Day (the "Reimbursement Date")), with interest on the amount so paid or disbursed by such Issuing Bank, from and including the date of such payment or disbursement to but excluding the Reimbursement Date, at the per annum rate for each day equal to the rate described in Section 2.08(a); provided that, notwithstanding anything contained in this Agreement to the contrary, with respect to any Letter of Credit, (i) unless the Borrower shall have notified the Administrative Agent and such Issuing Bank prior to 11:00 a.m. (New York City time) on the Reimbursement Date that the Borrower intends to reimburse such Issuing Bank for the amount of such drawing with funds other than the proceeds of Loans, the Borrower shall be deemed to have given a Notice of Borrowing requesting that the Lenders make Loans (which shall be Base Rate Loans) on the Reimbursement Date in an amount equal to the amount at such drawing, and (ii) the Administrative Agent shall promptly notify each L/C Participant of such drawing and the amount of its Loan to be made in respect thereof, and each L/C Participant shall be irrevocably obligated to make a Loan to the Borrower in the manner deemed to have been requested in the amount of its Commitment Percentage of the applicable Unpaid Drawing by 12:00 noon (New York City time) on such Reimbursement Date by making the amount of such Loan available to the Administrative Agent. Such Loans made in respect of such Unpaid Drawing on such Reimbursement Date shall be made without regard to the minimum Borrowing amount and without regard to the satisfaction of the conditions set forth in Article VII. The Administrative Agent shall use the proceeds of such Loans solely for purpose of reimbursing the relevant Issuing Bank for the related Unpaid Drawing. In the event that any Letter of Credit that is outstanding on the L/C Maturity Date is not Cash Collateralized by the Borrower, the full amount of the Letters of Credit Outstanding in respect of such Letter of Credit shall be deemed to be an Unpaid Drawing subject to the provisions of this Section 3.04 except that such Issuing Bank shall hold the proceeds received from the Lenders as contemplated above as L/C Cash Collateral for such Letter of Credit to reimburse any Drawing under such Letter of Credit and shall use such proceeds first, to reimburse itself for any Drawings made in respect of such Letter of Credit following the L/C Maturity Date, second, to the extent such Letter of Credit expires or is returned undrawn while any such L/C Cash Collateral remains, to the repayment of obligations in respect of any Loans that have not paid at such time and third, to the Borrower or as otherwise directed by a court of competent jurisdiction (including the Bankruptcy Court). Nothing in this

62

Section 3.04(a) shall affect the Borrower's obligation to repay all outstanding Loans when due in accordance with the terms of this Agreement.

(b)     The obligations of the Borrower under this Section 3.04 to reimburse the relevant Issuing Bank with respect to Unpaid Drawings (including, in each case, interest thereon) shall be absolute, unconditional and irrevocable under any and all circumstances and irrespective of any set-off, counterclaim or defense to payment that the Borrower or any other Person may have or have had against such Issuing Bank, the Administrative Agent or any Lender (including in its capacity as an L/C Participant), including any defense based upon (i) the failure of any drawing under a Letter of Credit (each, a "Drawing") to conform to the terms of the Letter of Credit, (ii) any non-application or misapplication by the beneficiary of the proceeds of such Drawing, (iii) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (iv) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect or (v) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 3.04, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder; provided that the foregoing shall not be construed to excuse the relevant Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by such Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The Borrower agrees that any action taken or omitted to be taken by an Issuing Bank under or in connection with any Letter of Credit or the related drafts or documents, if done in the absence of gross negligence or willful misconduct (as finally determined by a court of competent jurisdiction), shall be binding on the Borrower and shall not result in any liability of such Issuing Bank to the Borrower; provided that the foregoing shall not be construed to excuse such Issuing Bank from liability to the Borrower to the extent of any direct damages suffered by the Borrower that are caused by such Issuing Bank's failure to exercise care, when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof as determined by a final and non-appealable judgment of a court of competent jurisdiction. In furtherance of the foregoing, the parties hereto agree that, with respect to documents presented which appear on their face to be in compliance with the terms of a Letter of Credit, the Issuing Bank that issued such Letter of Credit may in its sole discretion either accept or make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit (unless the Borrower shall consent to payment thereon not withstanding such lack of strict compliance).

Section 3.05.   New or Successor Issuing Bank.

(a)     Any Issuing Bank may resign as an Issuing Bank upon thirty (30) days' prior written notice to the Administrative Agent, the Lenders and the Borrower. The Administrative Agent may replace any Issuing Bank for any reason upon written notice to such Issuing Bank and the Borrower and may add Issuing Banks at any time upon notice to the Borrower. If an Issuing Bank shall resign or be replaced, or if the Administrative Agent shall

63

decide to add a new Issuing Bank under this Agreement, then the Administrative Agent may appoint from among the Lenders (who have agreed to act as successor issuer of Letters of Credit or a new Issuing Bank) a successor issuer of Letters of Credit or a new Issuing Bank, as the case may be, or, with the consent of the Borrower (such consent not to be unreasonably withheld) and such new Issuing Bank, another successor or new issuer of Letters of Credit, whereupon such successor issuer shall succeed to the rights, powers and duties of the replaced or resigning Issuing Bank under this Agreement and the other Credit Documents, or such new issuer of Letters of Credit shall be granted the rights, powers and duties of an Issuing Bank hereunder, and the term "Issuing Bank" means such successor or such new issuer of Letters of Credit effective upon such appointment.  The acceptance of any appointment as an Issuing Bank hereunder whether as a successor issuer or new issuer of Letters of Credit in accordance with this Agreement, shall be evidenced by an agreement entered into by such new or successor issuer of Letters of Credit, in a form reasonably satisfactory to the Borrower and the Administrative Agent and, from and after the effective date of such agreement, such new or successor issuer of Letters of Credit shall become an "Issuing Bank" hereunder.  After the resignation or replacement of an Issuing Bank hereunder, the resigning or replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement and the other Credit Documents with respect to Letters of Credit issued by it prior to such resignation or replacement, but shall not be required to issue additional Letters of Credit.  In connection with any resignation or replacement pursuant to this paragraph (a) (but, in case of any such resignation, only to the extent that a successor issuer of Letters of Credit shall have been appointed), either (i) the Borrower, the resigning or replaced Issuing Bank and the successor issuer of Letters of Credit shall arrange to have any outstanding Letters of Credit issued by the resigning or replaced Issuing Bank replaced with Letters of Credit issued by the successor issuer of Letters of Credit or (ii) the Borrower shall cause the successor issuer of Letters of Credit, if such successor issuer is reasonably satisfactory to the replaced or resigning Issuing Bank, to issue "back-stop" Letters of Credit naming the resigning or replaced Issuing Bank as beneficiary for each outstanding Letter of Credit issued by the resigning or replaced Issuing Bank, which new Letters of Credit shall have a Stated Amount equal to the Letters of Credit being back-stopped and the sole requirement for drawing on such new Letters of Credit shall be a drawing on the corresponding back-stopped Letters of Credit.  After any resigning or replaced Issuing Bank's resignation or replacement as Issuing Bank, the provisions of this Agreement relating to an Issuing Bank shall inure to its benefit as to any actions taken or omitted to be taken by it (A) while it was an Issuing Bank under this Agreement or (B) at any time with respect to Letters of Credit issued by such Issuing Bank.

(b)      To the extent that there are, at the time of any resignation or replacement as set forth in paragraph (a) above, any outstanding Letters of Credit, nothing herein shall be deemed to impact or impair any rights and obligations of any of the parties hereto with respect to such outstanding Letters of Credit (including any obligations related to the payment of fees or the reimbursement or funding of amounts drawn), except that the Borrower, the resigning or replaced Issuing Bank and the successor issuer of Letters of Credit shall have the obligations regarding outstanding Letters of Credit described in paragraph (a) above.

Section 3.06.   Role of Issuing Bank.  Each Lender and the Borrower agree that, in paying any drawing under a Letter of Credit, no Issuing Bank shall have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required

64

by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the Issuing Banks, the Administrative Agent, any of their respective affiliates nor any correspondent, participant or assignee of any Issuing Bank shall be liable to any Lender for (a) any action taken or omitted in connection herewith at the request or with the approval of the Majority Lenders, (b) any action taken or omitted in the absence of gross negligence or willful misconduct or (c) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document. The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the Issuing Banks, the Administrative Agent, any of their respective affiliates nor any correspondent, participant or assignee of any Issuing Bank shall be liable or responsible for any of the matters described in Section 3.03(e); provided that anything in such Section to the contrary notwithstanding, the Borrower may have a claim against an Issuing Bank, and such Issuing Bank may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower that are caused by such Issuing Bank's bad faith, willful misconduct or gross negligence (as finally determined by a court of competent jurisdiction) or such Issuing Bank's unlawful failure (as finally determined by a court of competent jurisdiction) to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, any Issuing Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and no Issuing Bank shall be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

Section 3.07.   L/C Cash Collateral.

(a)     Upon the request of the Majority Lenders if, as of the L/C Maturity Date, there are any Letters of Credit Outstanding, the Borrower shall immediately Cash Collateralize the then Letters of Credit Outstanding.

(b)     If any Event of Default shall occur and be continuing, the Majority Lenders may require that the L/C Obligations be Cash Collateralized.

(c)     For purposes of this Agreement, "Cash Collateralize" means to (i) pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Issuing Banks and the Lenders, as collateral for the L/C Obligations, cash or deposit account balances in an amount equal to one hundred five percent (105%) of the amount (the "Required Cash Collateral Amount") of the Letters of Credit Outstanding required to be Cash Collateralized or (ii) if the relevant Issuing Bank benefiting from such collateral shall agree in its reasonable discretion, other forms of credit support (including any backstop letter of credit) in a face amount equal to the Required Cash Collateral Amount from an issuer reasonably satisfactory to such Issuing Bank, in each case under clauses (i) and (ii) above pursuant to documentation in form and

65

substance reasonably satisfactory to the Administrative Agent and the relevant Issuing Bank (which documents are hereby consented to by the Lenders).  The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Banks and the L/C Participants, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing.  Such L/C Cash Collateral shall be maintained in blocked, interest bearing deposit accounts established by and in the name of the Borrower, but under the "control" (as defined in Section 9-104 of the UCC) of the Administrative Agent.  "L/C Cash Collateral" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

Section 3.08.  Applicability of ISP and Uniform Customs.  Unless otherwise expressly agreed to by the relevant Issuing Bank and the Borrower when a Letter of Credit is issued (a) the rules of the ISP or the Uniform Customs shall apply to each standby Letter of Credit and (b) the rules of the Uniform Customs, as most recently published by the International Chamber of Commerce at the time of issuance, shall apply to each commercial Letter of Credit.

Section 3.09.  Conflict with Issuer Documents.  In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

Section 3.10.  Letters of Credit Issued for Restricted Subsidiaries. Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Restricted Subsidiary, the Borrower shall be obligated to reimburse the relevant Issuing Bank hereunder for any and all drawings under such Letter of Credit.  The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of Restricted Subsidiaries inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of such Restricted Subsidiaries.

Section 3.11.  Increased Costs.  If, after the Closing Date, the adoption of any Change in Law shall either (a) impose, modify or make applicable any reserve, deposit, capital adequacy, liquidity or similar requirement against Letters of Credit issued by any Issuing Bank, or any L/C Participant's L/C Participation therein, or (b) impose on any Issuing Bank or any L/C Participant any other conditions, costs or expenses affecting its obligations under this Agreement in respect of Letters of Credit or L/C Participations therein or any Letter of Credit or such L/C Participant's L/C Participation therein, and the result of any of the foregoing is to increase the cost to such Issuing Bank or such L/C Participant of issuing, maintaining or participating in any Letter of Credit, or to reduce the amount of any sum received or receivable by such Issuing Bank or such L/C Participant hereunder (other than (i) Indemnified Taxes or Other Taxes indemnifiable under Section 5.04, or (ii) Excluded Taxes) in respect of Letters of Credit or L/C Participations therein, then, promptly (and in any event no later than fifteen (15) days) after receipt of written demand to the Borrower by such Issuing Bank or such L/C Participant, as the case may be (a copy of which notice shall be sent by such Issuing Bank or such L/C Participant to the Administrative Agent), the Borrower shall pay to such Issuing Bank or such L/C Participant such additional amount or amounts as will compensate such Issuing Bank or such L/C Participant for such increased cost or reduction, it being understood and agreed, however, that no Issuing Bank or L/C Participant shall be entitled to such compensation as a result of such Person's compliance with, or pursuant to any request or directive to comply with, any such Requirement of Law as in effect on the Closing Date (except as otherwise set forth in the

66

definition of Change in Law).  A certificate submitted to the Borrower by the relevant Issuing Bank or an L/C Participant, as the case may be (a copy of which certificate shall be sent by such Issuing Bank or such L/C Participant to the Administrative Agent), setting forth in reasonable detail the basis for the determination of such additional amount or amounts necessary to compensate such Issuing Bank or such L/C Participant as aforesaid shall be conclusive and binding on the Borrower absent clearly demonstrable error.

## ARTICLE IV
### Fees; Commitments

Section 4.01.  <u>Fees</u>.

(a)    The Borrower agrees to pay to the Administrative Agent in Dollars, for the account of each Lender (in each case pro rata according to the respective Commitment Percentages of the Lenders), a commitment fee (the "<u>Commitment Fee</u>") for each day from the Closing Date until but excluding the Termination Date.  Each Commitment Fee shall be payable by the Borrower (i) monthly in arrears on the last Business Day of each month (for the one-month period (or portion thereof) ended on such day for which no payment has been received) and (ii) on the Termination Date (for the period ended on such date for which no payment has been received pursuant to <u>clause (i)</u> above), and shall be computed for each day during such period (based on a 360-day year) at a rate per annum equal to the Available Commitments on such date, multiplied by the Unused Commitment Fee Rate.

(b)    The Borrower agrees to pay to the Administrative Agent in Dollars for the account of the Lenders pro rata on the basis of their respective Letter of Credit Exposure, a fee in respect of each Letter of Credit (the "<u>Letter of Credit Fee</u>"), for the period from the date of issuance of such Letter of Credit until the termination or expiration date of such Letter of Credit computed at the per annum rate for each day equal to the Applicable Margin for Eurodollar Loans times the daily stated amount of such Letter of Credit.  Such Letter of Credit Fees shall be due and payable (i) quarterly in arrears on the last Business Day of each March, June, September and December and (ii) on the Termination Date (for the period for which no payment has been received pursuant to <u>clause (i)</u> above).

(c)    The Borrower agrees to pay to each Issuing Bank a fee in respect of each Letter of Credit issued by it (the "<u>Fronting Fee</u>"), for the period from the date of issuance of such Letter of Credit to the termination or expiration date of such Letter of Credit, computed at the rate for each day equal to one quarter of a percent (0.25%) per annum (or such other amount as may be agreed in a separate writing between the Borrower and the relevant Issuing Bank) on the daily Stated Amount of such Letter of Credit (or at such other rate per annum as agreed in writing between the Borrower and the relevant Issuing Bank).  Such Fronting Fees shall be due and payable by the Borrower (i) quarterly in arrears on the last Business Day of each March, June, September and December and (ii) on the Termination Date (for the period for which no payment has been received pursuant to <u>clause (i)</u> above).

(d)    The Borrower agrees to pay directly to each Issuing Bank upon each issuance of, drawing under, and/or amendment of, a Letter of Credit issued by it in such amount

67

as the relevant Issuing Bank and the Borrower shall have agreed upon for issuances of, drawings under or amendments of, letters of credit issued by it.

(e)    The Borrower agrees to pay to the Administrative Agent, for its own account, administrative agent fees described in the Fee Letter.

Section 4.02.    <u>Voluntary Reduction of Commitments</u>.

(a)    Upon at least two (2) Business Days' prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent at the Administrative Agent's Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders), the Borrower shall have the right, without premium or penalty, on any day, permanently to terminate or reduce the Commitments, in whole or in part; <u>provided</u> that (a) with respect to the Commitments, any such termination or reduction shall apply proportionately and permanently to reduce the Commitments of each of the Lenders, (b) any partial reduction pursuant to this <u>Section 4.02</u> shall be in the amount of at least one million Dollars ($1,000,000) or any whole multiple of one million Dollars ($1,000,000) in excess thereof and (c) after giving effect to such termination or reduction and to any cancellation or Cash Collateralization of Letters of Credit made on the date thereof in accordance with this Agreement, the aggregate amount of Letters of Credit Outstanding shall not exceed the aggregate amount of L/C Commitments.

(b)    The Borrower may terminate the unused amount of the Commitment of a Defaulting Lender upon not less than two (2) Business Days' prior notice to the Administrative Agent (which will promptly notify the Lenders thereof), and in such event the provisions of <u>Section 2.15(f)</u> will apply to all amounts thereafter paid by the Borrower for the account of such Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity or other amounts); <u>provided</u> that such termination will not be deemed to be a waiver or release of any claim the Borrower, the Administrative Agent, any Issuing Bank, or any Lender may have against such Defaulting Lender.

Notwithstanding anything to the contrary contained in this Agreement, any such notice of commitment termination pursuant to this <u>Section 4.02</u> may state that it is conditioned upon the occurrence or non-occurrence of an Approved Sale, in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such Approved Sale is not consummated or delayed; <u>provided</u>, that the Borrower shall promptly (but in any event within ten (10) Business Days after any such rescission) compensate each Secured Party for any loss, cost or expense incurred by such Secured Party and payable by the Borrower pursuant to <u>Section 2.11</u> as a result thereof.

Section 4.03.    <u>Mandatory Termination of Commitments</u>.

(a)    The Total Commitment shall terminate at 5:00 p.m. (New York City time) on the Termination Date.

68

## ARTICLE V

### Payments

Section 5.01. <u>Voluntary Prepayments</u>. The Borrower shall have the right to prepay Loans, in each case, without premium or penalty, in whole or in part from time to time on the following terms and conditions:

(a) the Borrower shall give the Administrative Agent at the Administrative Agent's Office written notice substantially in the form of <u>Exhibit N</u> hereto (or telephonic notice promptly confirmed in writing) of its intent to make such prepayment, the amount of such prepayment and (in the case of Eurodollar Loans) the specific Borrowing(s) being prepaid, which notice shall be given by the Borrower no later than 1:00 p.m. (New York City time) (i) in the case of Eurodollar Loans, two (2) Business Days prior to, and (ii) in the case of Base Rate Loans, on the date of, such prepayment and shall promptly be transmitted by the Administrative Agent to each of the Lenders;

(b) each partial prepayment of (i) Eurodollar Loans shall be in a minimum amount of five hundred thousand Dollars ($500,000) and in multiples of one hundred thousand Dollars ($100,000) in excess thereof or a lesser amount to the extent such lesser amount represents the entire aggregate outstanding Eurodollar Loans at such time, and (ii) any Base Rate Loans shall be in a minimum amount of five hundred thousand Dollars ($500,000) and in multiples of one hundred thousand Dollars ($100,000) in excess thereof or a lesser amount to the extent such lesser amount represents the entire aggregate outstanding Base Rate Loans at such time; <u>provided</u> that no partial prepayment of Eurodollar Loans made pursuant to a single Borrowing shall reduce the outstanding Eurodollar Loans made pursuant to such Borrowing to an amount less than one million Dollars ($1,000,000) for such Eurodollar Loans; and

(c) any prepayment of Eurodollar Loans pursuant to this <u>Section 5.01</u> on any day other than the last day of an Interest Period applicable thereto shall be subject to compliance by the Borrower with the applicable provisions of <u>Section 2.11</u>.

Each such notice shall specify the date and amount of such prepayment and the Type of Loans to be prepaid. At the Borrower's election in connection with any prepayment pursuant to this <u>Section 5.01</u>, such prepayment shall not be applied to any Loans of a Defaulting Lender.

Notwithstanding anything to the contrary contained in this Agreement, any such notice of prepayment pursuant to this <u>Section 5.01</u> may state that it is conditioned upon the occurrence or non-occurrence of an Approved Sale, in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such Approved Sale is not consummated or delayed; <u>provided</u>, that the Borrower shall promptly (but in any event within ten (10) Business Days after any such rescission) compensate each Secured Party for any loss, cost or expense incurred by such Secured Party and payable by the Borrower pursuant to <u>Section 2.11</u> as a result thereof.

Section 5.02.    Mandatory Prepayments; Application of Prepayments.

(a)    Asset Sales.  No later than three (3) Business Days following the date of receipt by the Credit Parties or any of their Subsidiaries of any Net Asset Sale Proceeds in excess of $25,000 with respect to any single Disposition, the Borrower shall cause an aggregate amount equal to 100% of such Net Asset Sale Proceeds to be applied to repay the Obligations in accordance with Section 5.02(f); provided, that, with the prior written consent of the Administrative Agent in each case, the Borrower shall be permitted to utilize all or a portion of such Net Asset Sale Proceeds in accordance with the Approved Budget (subject to the Permitted Variance).

(b)    Insurance/Condemnation Proceeds.  No later than three (3) Business Days following the date of receipt by the Credit Parties or any of their Subsidiaries of any Net Insurance/Condemnation Proceeds, the Borrower shall cause an aggregate amount equal to 100% of such Net Insurance/Condemnation Proceeds to be applied to repay the Obligations in accordance with Section 5.02(f); provided, that, with the prior written consent of the Administrative Agent in each case, the Borrower shall be permitted to utilize all or a portion of such Net Insurance/Condemnation Proceeds in accordance with the Approved Budget (subject to the Permitted Variance).

(c)    Issuance of Debt.  No later than three (3) Business Days following the date of receipt by the Credit Parties or any of their Subsidiaries of any cash proceeds from the incurrence of any Indebtedness of the Credit Parties or any of their Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 10.03), the Borrower shall cause an aggregate amount equal to one hundred percent (100%) of such proceeds, net of reasonable commissions, costs and other reasonable out-of-pocket fees (including reasonable attorneys', investment banking and accountants' fees), transfer and similar taxes (but not including any federal or state income taxes), and, subject to the Administrative Agent's consent (which consent shall not be unreasonably withheld), net of other reasonable out-of-pocket costs and expenses actually and directly incurred by the Credit Parties or any of their Subsidiaries directly in connection therewith, to be applied to repay the Obligations in accordance with Section 5.02(f).

(d)    Letters of Credit following Optional Reduction of Commitments.  If, after giving effect to any termination or reduction of the Commitments pursuant to Section 4.02(a), the aggregate Letter of Credit Exposure of all Lenders exceeds the aggregate amount of L/C Commitments of all Lenders (as reduced), then the Borrower shall on the same Business Day pay to the Administrative Agent on behalf of the Issuing Banks and the L/C Participants an amount equal to such excess in cash or otherwise Cash Collateralize an amount equal to such excess as provided in Section 3.07.

(e)    Prepayment Certificate.  Concurrently with any prepayment of the Loans pursuant to Sections 5.02(a)-(c), the Borrower shall deliver to Administrative Agent and each Lender a certificate of an Authorized Officer demonstrating the calculation in reasonable detail of the amount giving rise to the prepayment.  In the event that the Borrower shall subsequently determine that the actual amount required to be prepaid pursuant to the applicable clause of Section 5.02 exceeded the amount set forth in such certificate, the Borrower shall promptly cause

70

an amount equal to such excess to be applied to repay Obligations in accordance with Section 5.02(f), and the Borrower shall concurrently therewith deliver to Administrative Agent and each Lender a certificate of an Authorized Officer demonstrating in reasonable detail such excess.

(f)    Application of Prepayments.  Any voluntary prepayment of any Loan pursuant to Section 5.01 and any mandatory prepayment of any Loan pursuant to this Section 5.02 shall be applied as follows:

*first*, to the payment of any accrued interest on the Loans being prepaid at the Default Rate, if any, until paid in full;

*second*, to the payment of any accrued and unpaid interest on the Loans being prepaid (other than that calculated at the Default Rate and paid in clause "*first*" above) and Letter of Credit fees until paid in full; and

*third*, to prepay the principal amount of Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof) until paid in full.

(g)    Application to Loans.  With respect to each prepayment of Loans elected under Section 5.01 or required by this Section 5.02, the Borrower may designate (i) the Types of Loans that are to be prepaid and the specific Borrowing(s) being repaid and (ii) the Loans to be prepaid; provided that (A) each prepayment of any Loans made pursuant to a Borrowing shall be applied pro rata among such Loans, and (B) notwithstanding the provisions of the preceding clause (A), no prepayment of Loans shall be applied to the Loans of any Defaulting Lender unless otherwise agreed to in writing by the Borrower.  In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.11.

Section 5.03.        Method and Place of Payment.

(a)    Except as otherwise specifically provided herein, all payments under this Agreement shall be made by the Borrower, without set-off, counterclaim or deduction of any kind, to the Administrative Agent, for the ratable account of the Lenders entitled thereto or the Issuing Banks entitled thereto, as the case may be, not later than 2:00 p.m. (New York City time), in each case, on the date when due and shall be made in immediately available funds at the Administrative Agent's Office or at such other office as the Administrative Agent shall specify for such purpose by notice to the Borrower, it being understood that written or facsimile notice by the Borrower to the Administrative Agent to make a payment from the funds in the Borrower's account at the Administrative Agent's Office shall constitute the making of such payment to the extent of such funds held in such account.  All repayments or prepayments of any Loans hereunder and all other payments under each Credit Document (whether of principal, interest or otherwise) shall be made in U.S. Dollars.  The Administrative Agent will thereafter cause to be promptly distributed on the same day (if payment was actually received by the Administrative Agent prior to 2:00 p.m. (New York City time) or, otherwise, on the next Business Day in the sole discretion of the Administrative Agent) like funds relating to the

71

payment of principal or interest or fees ratably to the Lenders or the Issuing Banks, as applicable, entitled thereto.

(b)    For purposes of computing interest or fees, any payments under this Agreement that are made later than 2:00 p.m. (New York City time) shall be deemed to have been made on the next succeeding Business Day in the sole discretion of the Administrative Agent.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

Section 5.04.    Net Payments.

(a)    Any and all payments made by or on behalf of the Borrower or any Guarantor under this Agreement or any other Credit Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes; provided that if the Borrower, any Guarantor or the Administrative Agent or any other applicable withholding agent shall be required by applicable Requirements of Law to deduct or withhold any Taxes from such payments, then (i) the applicable withholding agent shall make such deductions or withholdings as are reasonably determined by the applicable withholding agent to be required by any applicable Requirement of Law, (ii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Requirements of Law, and (iii) to the extent withholding or deduction is required to be made on account of Indemnified Taxes or Other Taxes, the sum payable by the Borrower or such Guarantor shall be increased as necessary so that after all required deductions and withholdings have been made (including deductions or withholdings of Indemnified Taxes or Other Taxes applicable to additional sums payable under this Section 5.04) the Administrative Agent, the Collateral Agent or the applicable Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made.  After any payment of Taxes by any Credit Party or the Administrative Agent to a Governmental Authority as provided in this Section 5.04, the Borrower shall deliver to the Administrative Agent or the Administrative Agent shall deliver to the Borrower, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by law to report such payment or other evidence of such payment reasonably satisfactory to the Borrower or the Administrative Agent, as the case may be.

(b)    The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Requirements of Law, or at the option of the Administrative Agent timely reimburse it for, any Other Taxes (whether or not such Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority).

(c)    The Borrower shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender within fifteen (15) Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes imposed on the Administrative Agent, the Collateral Agent or such Lender, as the case may be (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 5.04), and any reasonable expenses arising therefrom or with respect thereto,

72

whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender, the Administrative Agent or the Collateral Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error and shall constitute a required notice for purposes of Section 2.13 hereof.

(d)     Each Lender shall deliver to the Borrower and the Administrative Agent, at such time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (A) whether or not any payments made hereunder or under any other Credit Document are subject to Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of any payments to be made to such Lender by any Credit Party pursuant to any Credit Document or otherwise to establish such Lender's status for withholding tax purposes in the applicable jurisdiction.  In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(e)     Without limiting the generality of Section 5.04(d), each Lender with respect to any Loan made to the Borrower shall, to the extent it is legally eligible to do so:

(i)     deliver to the Borrower and the Administrative Agent, in the case of a U.S. Lender, two copies of Internal Revenue Service ("IRS") Form W-9 (or substitute or successor form), properly completed and duly executed, certifying that such U.S. Lender is exempt from United States federal backup withholding, on or prior to the date on which such Lender becomes a Lender under this Agreement;

(ii)     deliver to the Borrower and the Administrative Agent, in the case of a Non-U.S. Lender, on or prior to the date on which such Lender becomes a Lender under this Agreement, two copies of (A) in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," IRS Form W-8BEN or IRS Form W-8BENE (or any applicable successor form) (together with a certificate substantially in the form of Exhibit J hereto, representing that such Non-U.S. Lender is not a bank for purposes of Section 881(c)(3)(A) of the Code, is not a "10 percent shareholder" (within the meaning of Section 881(c)(3)(B) of the Code) of the Borrower, is not a CFC described in Section 881(c)(3)(C) of the Code and the interest payments in question are not effectively connected with the conduct by such Lender of a trade or business within the United States), (B) IRS Form W-8BEN, IRS Form W-8BENE or IRS Form W-8ECI (or any applicable successor form), in each case properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or reduced rate of, U.S. federal withholding tax on payments by the Borrower under this Agreement, (C) IRS Form W-8IMY (or any applicable successor form) and all necessary attachments

73

(including the forms described in clauses (A) and (B) above; provided that if the Non-U.S. Lender is a partnership and not a participating Lender, and one or more of the partners is claiming portfolio interest treatment, a certificate substantially in the form of Exhibit J hereto may be provided by such Non-U.S. Lender on behalf of such partners) or (D) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made; provided, however, that such other form and supplementary documentation described in this clause (D) (other than forms and documentation also described in clauses (A), (B), or (C)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender; and

(iii)     deliver to the Borrower and the Administrative Agent two further copies of any such form or certification (or any applicable successor form) promptly after such form or certification expires or becomes obsolete or invalid, after the occurrence of any event requiring a material change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, or promptly notify in writing the Borrower and the Administrative Agent of such Lender's inability to do so.

Each Person that shall become a Participant pursuant to Section 13.06 or a Lender pursuant to Section 13.06 shall, upon the effectiveness of the related transfer, be required to provide all the forms and statements required pursuant to this Section 5.04(e); provided that in the case of a Participant such Participant shall furnish all such required forms and statements to the Person from which the related participation shall have been purchased.

In addition, to the extent it is legally eligible to do so, each Agent shall deliver to the Borrower (x)(I) prior to the date on which the first payment by the Borrower is due hereunder or (II) prior to the first date on or after the date on which such Agent becomes a successor Agent pursuant to Section 12.09 on which payment by the Borrower is due hereunder, as applicable, two copies of a properly completed and executed IRS Form W-9 certifying its exemption from U.S. Federal backup withholding or a properly completed and executed applicable IRS Form W-8 certifying its non-U.S. status and its entitlement to any treaty benefits and its status as a qualified intermediary or withholding foreign partnership, and (y) on or before the date on which any such previously delivered documentation expires or becomes obsolete or invalid, after the occurrence of any event requiring a change in the most recent documentation previously delivered by it to the Borrower, and from time to time if reasonably requested by the Borrower, two further copies of such documentation.

(f)     If any Lender, the Administrative Agent or the Collateral Agent, as applicable, determines, in its sole discretion exercised in good faith, that it has received a refund of an Indemnified Tax or Other Tax for which it has been indemnified pursuant to this Section 5.04 (including by the payment of additional amounts pursuant to this Section 5.04), then the Lender, the Administrative Agent or the Collateral Agent, as the case may be, shall reimburse the Borrower or such Guarantor for such amount (net of all reasonable out-of-pocket expenses of

74

such Lender, the Administrative Agent or the Collateral Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund) as the Lender, Administrative Agent or the Collateral Agent, as the case may be, determines in its sole discretion exercised in good faith to be the proportion of the refund as will leave it, after such reimbursement, in no better or worse net after-tax position (taking into account expenses or any taxes imposed on the refund) than it would have been in if the payment had not been required; provided that the Borrower or such Guarantor, upon the request of the Lender, the Administrative Agent or the Collateral Agent, agrees to repay the amount paid over to the Borrower or such Guarantor (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender, the Administrative Agent or the Collateral Agent in the event the Lender, the Administrative Agent or the Collateral Agent is required to repay such refund to such Governmental Authority.  In such event, such Lender, the Administrative Agent or the Collateral Agent, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (provided that such Lender, the Administrative Agent or the Collateral Agent may delete any information therein that it deems confidential).  A Lender, the Administrative Agent or the Collateral Agent shall claim any refund that it determines is available to it, unless it concludes in its sole discretion, that it would be adversely affected by making such a claim.  No Lender nor the Administrative Agent nor the Collateral Agent shall be obliged to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Credit Party in connection with this paragraph (f) or any other provision of this Section 5.04.

(g)    If the Borrower determines that a reasonable basis exists for contesting an Indemnified Tax or Other Tax for which a Credit Party has paid additional amounts or indemnification payments, each Lender or Agent, as the case may be, shall use reasonable efforts to cooperate with the Borrower as the Borrower may reasonably request in challenging such Tax. The Borrower shall indemnify and hold each Lender and Agent harmless against any out-of-pocket expenses incurred by such Person in connection with any request made by the Borrower pursuant to this Section 5.04.  Nothing in this Section 5.04 shall obligate any Lender or Agent to take any action that such Person, in its sole judgment, determines may result in a material detriment to such Person.

(h)    If a payment made to any Lender or any Agent under this Agreement or any other Credit Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender or such Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or such Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has or has not complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this Section 5.04, "FATCA" shall include any amendments made to FATCA after the Closing Date.

(i)      For the avoidance of doubt, for purposes of this Section 5.04 the term "Lender" includes any Issuing Bank and "applicable law" or "Requirement of Law" includes FATCA.

(j)      The agreements in this Section 5.04 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 5.05.    Computations of Interest and Fees.

(a)      Except as provided in the next succeeding sentence, interest on Eurodollar Loans shall be calculated on the basis of a 360-day year for the actual days elapsed.  Interest on Base Rate Loans shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed.

(b)      Fees and the daily Stated Amount of Letters of Credit shall be calculated on the basis of a 360-day year for the actual days elapsed.

Section 5.06.    Limit on Rate of Interest.

(a)      No Payment Shall Exceed Lawful Rate.  Notwithstanding any other term of this Agreement, the Borrower shall not be obligated to pay any interest or other amounts under or in connection with this Agreement or otherwise in respect to any of the Obligations in excess of the amount or rate permitted under or consistent with any applicable law, rule or regulation.

(b)      Payment at Highest Lawful Rate.  If the Borrower is not obligated to make a payment that it would otherwise be required to make, as a result of Section 5.06(a), the Borrower shall make such payment to the maximum extent permitted by or consistent with applicable laws, rules and regulations.

(c)      Adjustment if Any Payment Exceeds Lawful Rate.  If any provision of this Agreement or any of the other Credit Documents would obligate the Borrower or any other Credit Party to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate that would be prohibited by any applicable Requirement of Law, then notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable Requirements of Law, such adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid by the Borrower to the affected Lender under Section 2.07.

(d)      Rebate of Excess Interest.  Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received from the Borrower an amount in excess of the maximum permitted by any applicable Requirement of Law, then the Borrower shall be entitled, by notice in writing to the Administrative Agent to obtain reimbursement from that Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to the Borrower.

76

# ARTICLE VI

## Conditions Precedent

Section 6.01.  Conditions Precedent to Initial Borrowing.  The obligation of each Lender to make the Initial Borrowing is subject to the satisfaction of the following conditions precedent (in addition to the conditions precedent set forth in Section 7.01 below), except as otherwise agreed or waived pursuant to Section 13.01.

(a)    Credit Agreement. The Administrative Agent (or its counsel) shall have received from the Borrower and Holdings (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include e-mail transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(b)    Officer's Certificates.  The Administrative Agent (or its counsel) shall have received, in the case of each Credit Party, each of the items referred to in paragraphs (i) and (ii) below:

(i)    a copy of the certificate or articles of incorporation or certificate of formation, including all amendments thereto, of each Credit Party, in each case, certified as of a recent date by the Secretary of State (or other similar official) of the jurisdiction of its organization, and a certificate as to the good standing (to the extent such concept or a similar concept exists under the laws of such jurisdiction) of each such Credit Party as of a recent date from such Secretary of State (or other similar official);

(ii)    a certificate of an Authorized Officer of each Credit Party dated the Closing Date and certifying:

(1)    that attached thereto is a true and complete copy of the by-laws (or limited liability company agreement or other equivalent governing documents) of such Credit Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in paragraph (2) below,

(2)    that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors (or managing member or equivalent) of such Credit Party authorizing the execution, delivery and performance of the Credit Documents to which such Person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect on the Closing Date,

(3)    that the certificate or articles of incorporation or certificate of formation of such Credit Party has not been amended since the date of the last amendment thereto disclosed pursuant to paragraph (i) above,

(4)    as to the incumbency and specimen signature of each officer executing any Credit Document or any other document delivered in connection herewith on behalf of such Credit Party,

77

(5)     as to the receipt of all material consents from third parties and Governmental Authorities in connection with the transactions contemplated hereby, and

(6)     a certificate of a director or an officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary or similar officer executing the certificate pursuant to paragraph (ii) above.

(c)     Credit Documents.  The Administrative Agent (or its counsel) shall have received executed copies of the Guarantee and the Collateral Agreement, executed by Holdings, the Borrower and each Restricted Subsidiary on the Closing Date.

(d)     Interim Order; First Day Orders.  The Interim Order (i) shall have been entered and shall be in full force and effect no later than two (2) Business Days after the Petition Date (or such later date as the Administrative Agent may agree) and (ii) shall not have been amended, supplemented, appealed, altered, stayed, vacated, rescinded or otherwise modified, in each case, in any manner adverse in any material respect to the Lenders without the prior written consent of the Administrative Agent, it being agreed that any modification in connection with a transfer of venue of the Chapter 11 Cases shall not be deemed to be adverse to the Lenders.  The "first day" orders (including a cash management order), which shall be in form and substance reasonably satisfactory to the Administrative Agent, shall have been entered upon an application or motion of the Credit Parties in form and substance reasonably satisfactory to the Administrative Agent (the "First Day Orders").

(e)     Fees.  All fees and expenses required to be paid hereunder on or prior the Closing Date shall have been paid, including all fees and documented out-of-pocket expenses for which invoices have been presented prior to the Closing Date (except as otherwise reasonably agreed by the Borrower) shall, in each case, have been paid in full in cash (or may be paid) from the proceeds of the initial Credit Extension.

(f)     Budget.  The Administrative Agent shall have received a cash flow forecast and initial budget for the 13-week period commencing on the Petition Date setting forth line items of sufficient detail to reflect the Credit Parties' projected Receipts and Operating Disbursements for such 13-week period, in form and substance reasonably satisfactory to the Administrative Agent, as confirmed in writing by the Administrative Agent, a copy of which is hereto as Schedule 4.01 (the "Initial Approved Budget").

(g)     Projections.  The Administrative Agent shall have received Projections of the financial condition of the Credit Parties and their Subsidiaries for each period from the Closing Date through the Maturity Date, which projections shall be in form and substance reasonably satisfactory to the Administrative Agent.

(h)     Cash Management System.  The Credit Parties shall have established a cash management system reasonably satisfactory to the Administrative Agent and as described in Section 9.17.

(i)     Marketing Process for Approved Sale.  The Debtors' financial advisors shall have commenced a marketing process for a sale of all or substantially all of the Debtors'

78

assets by having prepared a buyers list, a non-disclosure agreement to utilize in the marketing process and a marketing teaser (together with the non-disclosure agreement, collectively, the "Marketing Materials") that have been approved by the Debtors.

## ARTICLE VII

## Conditions Precedent to All Credit Events

Section 7.01.   Conditions Precedent to All Credit Events. The agreement of each Lender to make any Loan requested to be made by it on any date (including the Closing Date) and the obligation of any Issuing Bank to issue, amend, renew or extend any Letter of Credit on any date is subject to the satisfaction of the following conditions precedent:

(a)      At the time of each such Credit Event and also after giving effect thereto, (i) no Default or Event of Default shall have occurred and be continuing or would result from such proposed Credit Event, (ii) all representations and warranties made by any Credit Party contained herein or in the other Credit Documents shall be true and correct in all material respects (except to the extent that such representations and warranties are qualified by materiality, in which case such representations and warranties shall be true and correct in all respects) with the same effect as though such representations and warranties had been made on and as of the date of such Credit Event (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date, without duplication of any materiality qualifier) and (iii) the aggregate amount of all Term Loans made by Lenders (including the Loans requested to be made on such date) shall not exceed the aggregate amount of Term Loan Commitments, and (iv) the aggregate amount of Letter of Credit Exposure of all Lenders shall not exceed the aggregate amount of L/C Commitments.

(b)      Prior to the making of each Loan (other than any Loan made pursuant to Section 3.04(a)), the Administrative Agent shall have received a Notice of Borrowing (whether in writing or by telephone) meeting the requirements of Section 2.03.

(c)      Prior to the issuance of each Letter of Credit (or an amendment, extension or renewal of a Letter of Credit), the Administrative Agent and the applicable Issuing Bank shall have received a Letter of Credit Application meeting the requirements of Section 3.02(a).

(d)      The making of the Loans shall not violate any Requirement of Law and shall not be enjoined, temporarily, preliminarily or permanently.

(e)      With respect to the making of the Subsequent Borrowing, the Final Order shall have been entered by the Bankruptcy Court on or prior to such date.

(f)      The Financing Orders (or, in the case of the Initial Borrowing, only the Interim Order) shall be in full force and effect and shall not have been vacated, reversed, modified, amended or subject to a stay, in each case, in any manner adverse in any material respect to the Lenders without the prior written consent of the Administrative Agent, it being agreed that any modification in connection with a transfer of venue of the Chapter 11 Cases shall not be deemed to be adverse to the Lenders.

79

(g)     The Debtors shall not have filed any motion or pleading objecting to (or in support of an objection to) an Acceptable Plan.

(h)     No shareholder of any Debtor (or any Affiliate of any shareholder of a Debtor) shall have filed or supported a motion, or sought an order contesting in any respect, the relief requested with respect to entry into the DIP Facility.

The acceptance of the benefits of each Credit Event after the Closing Date shall constitute a representation and warranty by each Credit Party to each of the Lenders that all the applicable conditions specified in this Article VII above have been satisfied as of that time.

## ARTICLE VIII

### Representations and Warranties

In order to induce the Lenders to enter into this Agreement and to make the Loans, each of Holdings (solely in respect of Section 8.01, Section 8.02, Section 8.07, Section 8.14, Section 8.16, Section 8.18, Section 8.19 and Section 8.24) and the Borrower makes (on the Closing Date and on each other date as required as a condition to Borrowing pursuant to Section 7.01), on the date of each applicable Credit Extension, the following representations and warranties to the Lenders, all of which shall survive the execution and delivery of this Agreement and the making of the Loans.

Section 8.01.    Corporate Status.    Each of Holdings, the Borrower and each Restricted Subsidiary of the Borrower (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) subject to the entry of the Financing Orders and subject to the terms thereof and any restrictions arising on account of any Credit Party's status as "debtor" under the Bankruptcy Code, has the corporate or other organizational power and authority to own its property and assets and to transact its business as now conducted, except where the failure to do so would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and (c) has duly qualified and is authorized to do business and is in good standing (if applicable) in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 8.02.    Corporate Power and Authority; Enforceability.    Subject to the entry of the Financing Orders and subject to the terms thereof, each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Credit Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Credit Documents to which it is a party.    Subject to the entry of the Financing Orders and subject to the terms thereof, each Credit Party has duly executed and delivered each Credit Document to which it is a party and each such Credit Document constitutes the legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law).

80

Section 8.03.  <u>No Violation</u>.  Subject to the entry of the Financing Orders and subject to the terms thereof, none of the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party or the compliance with the terms and provisions thereof will (a) contravene any Requirement of Law, except to the extent such contravention would not reasonably be expected to result in a Material Adverse Effect, (b) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the property or assets of such Credit Party or any of the Restricted Subsidiaries (other than Liens created under the Credit Documents or the Financing Orders and Liens permitted hereunder) pursuant to the terms of any indenture, loan agreement, lease agreement, mortgage, deed of trust, agreement or other instrument to which such Credit Party or any of the Restricted Subsidiaries is a party or by which it or any of its property or assets is bound (any such term, covenant, condition or provision, a "<u>Contractual Requirement</u>") except to the extent such breach, default or Lien that would not reasonably be expected to result in a Material Adverse Effect or (c) violate any provision of the Organization Documents of such Credit Party or any of the Restricted Subsidiaries.

Section 8.04.  <u>Litigation</u>.  Except as set forth on <u>Schedule 8.04</u> and the Chapter 11 Cases, there are no actions, suits or proceedings (including Environmental Claims) pending or, to the knowledge of the Borrower, threatened in writing with respect to the Borrower or any of its Restricted Subsidiaries not fully covered by insurance (except for normal deductibles) as to which there is a reasonable probability of an adverse determination that, if adversely determined, would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 8.05.  <u>Margin Regulations</u>.  Neither the making of any Loan hereunder nor the use of the proceeds thereof nor any Letter of Credit issued hereunder will violate the provisions of Regulation T, Regulation U or Regulation X of the Board and no Loan or Letter of Credit hereunder shall be used to purchase or carry any Margin Stock or to extend credit to other Persons to purchase or carry Margin Stock.

Section 8.06.  <u>Governmental Approvals</u>.  Subject to the entry of the Financing Orders and subject to the terms thereof, the execution, delivery and performance of each Credit Document do not require any consent or approval of, registration or filing with, or other action by, any Governmental Authority, except for (a) such as have been obtained or made and are in full force and effect, (b) filings and recordings in respect of the Liens created pursuant to the Security Documents and (c) such consents, approvals, registrations, filings or actions the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

Section 8.07.  <u>Investment Company Act</u>.  No Credit Party is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 8.08.  <u>True and Complete Disclosure</u>.

(a)      All written factual information delivered on or prior to the Closing Date (other than any Projections, the Approved Budget, forward-looking statements, estimates and

81

information of a general economic nature or general industry nature) concerning Holdings, the Borrower, the Restricted Subsidiaries and any other transactions contemplated hereby prepared by or on behalf of the foregoing or their representatives and made available to any Lenders or the Administrative Agent in connection with any other transactions contemplated hereby (as modified or supplemented by other information so furnished and all other publicly available information), when taken as a whole, was true and correct in all material respects, as of the Closing Date and did not, taken as a whole, contain any untrue statement of a material fact as of the Closing Date or omit to state a material fact necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements were made.

(b)       Neither the Borrower nor any Restricted Subsidiary has any Material Indebtedness (including Disqualified Stock), any material guarantee obligations, contingent liabilities, off balance sheet liabilities, partnership liabilities for taxes or unusual forward or long-term commitments that, in each case, have not been disclosed to the Administrative Agent, except as would not reasonably be expected to result in a Material Adverse Effect.

Section 8.09.  <u>Tax Matters</u>.  Except where the failure of which would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect, each of the Borrower and the Restricted Subsidiaries has filed all federal income and other material Tax returns, domestic and foreign, required to be filed by it (including in its capacity as a withholding agent) and has paid all Taxes payable by it that have become due, other than those (i) that are not yet delinquent, (ii) that are being contested in good faith by appropriate proceedings and as to which adequate reserves have been provided to the extent required by and in accordance with GAAP (or in the case of a Foreign Subsidiary, the comparable accounting principles in the relevant jurisdiction), or (iii) where such payment would be in violation of the Expenditures Budget Variance covenant set forth in <u>Section 10.11</u>.

Section 8.10.  <u>Compliance with ERISA</u>. Except to the extent excused by the Bankruptcy Code or as a result of the filing of the Chapter 11 Cases, (a) each Plan is in compliance with ERISA, the Code and any applicable Requirement of Law; (b) no Reportable Event has occurred with respect to any Plan; (c) no Plan is "insolvent" (within the meaning of Section 4245 of ERISA) or in "reorganization" (within the meaning of Section 4245 of ERISA) or is in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), and no written notice of any such insolvency, reorganization, or endangered or critical status has been given to the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate; (d) each Plan that is subject to Title IV of ERISA has satisfied the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, and there has been no determination that any such Plan is, or is expected to be, in "at risk" status (within the meaning of Section 303(i)(4) of ERISA); (e) none of the Borrower or any ERISA Affiliate has incurred (or is reasonably likely to incur) any liability to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code nor has the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate, been notified in writing that it will incur any liability under any of the foregoing Sections with respect to any Plan; (f) no proceedings have been instituted (or are reasonably likely to be instituted) to terminate or to reorganize any Plan (excluding Multiemployer Plans) or to appoint a trustee to administer any Plan (excluding

82

Multiemployer Plans), and no written notice of any such proceedings has been given to the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate; (g) no lien imposed under the Code or ERISA on the assets of the Borrower or any ERISA Affiliate exists (or is reasonably likely to exist) nor has the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate been notified in writing that such a lien will be imposed on the assets of the Borrower or any ERISA Affiliate on account of any Plan; and (h) no liability to the PBGC (other than required premium payments), the IRS, any Plan or any trust established under Title IV of ERISA has been or is expected to be incurred by Borrower or any ERISA Affiliates; (i) all amounts required by applicable law with respect to, or by the terms of, any retiree welfare benefit arrangement maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate has an obligation to contribute have been accrued in accordance with Accounting Standard Codification Topic 715-60; and (j) no ERISA Event has or is reasonably likely to occur with respect to any Plan and neither Borrower nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event, in each case, except to the extent that a breach of any of the representations or warranties in this Section 8.10(a), would not result, individually or in the aggregate, in an amount of liability that would be reasonably likely to have a Material Adverse Effect.  No Plan (other than a Multiemployer Plan) has an Unfunded Current Liability that would, individually or when taken together with any other liabilities referenced in this Section 8.10(a), be reasonably likely to have a Material Adverse Effect.  With respect to Plans that are Multiemployer Plans, the representations and warranties in this Section 8.10(a) other than any made with respect to (i) liability under Section 4201 or 4204 of ERISA or (ii) liability for "termination" or "reorganization" (within the meaning of Title IV of ERISA) of such Plans under ERISA, are made to the knowledge of the Borrower.

Section 8.11.  Subsidiaries.  Schedule 8.11 lists each Subsidiary of the Borrower (and the direct and indirect ownership interest of the Borrower therein), in each case existing on the Closing Date.  Each Guarantor as of the Closing Date (after giving effect to the transactions) has been so designated on Schedule 8.11.

Section 8.12.  Environmental Laws.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) the Borrower and each of the Subsidiaries and all Oil and Gas Properties are in compliance with all applicable Environmental Laws; (ii) neither the Borrower nor any Subsidiary has received written notice of any Environmental Claim; (iii) neither the Borrower nor any Subsidiary is conducting or has been ordered by a Governmental Authority to conduct any investigation, removal, remedial or other corrective action pursuant to any Environmental Law at any location; and (iv) neither the Borrower nor any of the Subsidiaries has treated, stored, transported, released or disposed or arranged for disposal or transport for disposal of Hazardous Materials at, on, under or from any currently or formerly owned or leased Oil and Gas Properties or facility in a manner that would reasonably be expected to give rise to liability of the Borrower or any Subsidiary under Environmental Law.

Section 8.13.  Security Matters.

(a)    Subject to the entry of the Financing Orders, each of the Security Documents is effective to create in favor of the Collateral Agent, for the ratable benefit of the

Secured Parties, a legal, valid and enforceable Lien in the Collateral described therein and, upon entry of the Financing Orders, each of the Liens and security interests created by each of the Security Documents shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the grantors thereunder in such of the Collateral covered thereby.

(b)    Subject to the entry of the Financing Orders, as of the Closing Date, no filings or recordings are required in order to perfect the security interests created under the Security Documents.

Section 8.14.    Properties.

(a)    Other than as a result of the Chapter 11 Cases, and assuming that all applicable Governmental Authorities have granted approvals, made recordations and taken such other actions as are necessary and any assignments made in connection therewith, except as set forth on Schedule 8.14 hereto, each Credit Party has good and defensible title to the Borrowing Base Properties evaluated in the most recently delivered Reserve Report delivered in accordance with the Prepetition Credit Agreement (other than those (i) disposed of in compliance with Section 10.04, (ii) leases that have expired in accordance with their terms and (iii) with title defects disclosed in writing to the Administrative Agent), and valid title to all its material personal properties, in each case, free and clear of all Liens other than Liens permitted by Section 10.06, except in each case where the failure to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Other than as a result of the Chapter 11 Cases, and after giving full effect to the Liens permitted by Section 10.06, the Borrower or the Restricted Subsidiary specified as the owner owns the working interests and net revenue interests attributable to the Hydrocarbon Interests as such working interests and net revenue interests are reflected in the most recently delivered Reserve Report, and the ownership of such properties shall not in any material respect obligate the Borrower or such Restricted Subsidiary to bear the costs and expenses relating to the maintenance, development and operations of each such property in an amount in excess of the working interest of each property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in the Borrower's or such Restricted Subsidiary's net revenue interest in such property.

(b)    Other than as a result of the Chapter 11 Cases, all material leases and agreements necessary for the conduct of the business of the Borrower and the Restricted Subsidiaries are valid and subsisting, in full force and effect, except to the extent that any such failure to be valid or subsisting would not reasonably be expected to have a Material Adverse Effect.

(c)    Other than as a result of the Chapter 11 Cases, the rights and properties presently owned, leased or licensed by the Credit Parties including all easements and rights of way, include all rights and properties necessary to permit the Credit Parties to conduct their respective businesses as currently conducted, except to the extent any failure to have any such rights or properties would not reasonably be expected to have a Material Adverse Effect.

(d)    All of the properties of the Borrower and the Restricted Subsidiaries that are reasonably necessary for the operation of their businesses are in good working condition and

84

are maintained in accordance with prudent business standards, except to the extent any failure to satisfy the foregoing would reasonably be expected to have a Material Adverse Effect.

Section 8.15.    [Reserved].

Section 8.16.    Patriot Act; AML; OFAC; FCPA.

(a)    Each Credit Party is in compliance in all material respects with the material provisions of the USA Patriot Act.

(b)    None of Holdings, the Borrower or any of its Subsidiaries nor, to the knowledge of Holdings, the Borrower or such Subsidiary, any of their respective directors, officers or employees is (i) currently (as of the date of the making of any Loan or issuance of any Letter of Credit) the subject of any economic sanctions enforced by the U.S. government including those administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"), the U.S. Department of State, and the U.S. Department of Commerce, the United Nations Security Council, Her Majesty's Treasury, or any other applicable sanctions authority (collectively "Sanctions"), (ii) a Person listed on OFAC's list of "Specially Designated Nationals and Blocked Persons," OFAC's list of Foreign Sanctions Evaders, or any other restricted party list maintained by the U.S. government, (iii) located, organized, or resident in or a citizen of a country that is, or whose government is, the subject of Sanctions (each a "Sanctioned Country;" for the avoidance of doubt, as of the signing of this Agreement, Cuba, Iran, Sudan, Syria and North Korea is each a Sanctioned Country), or (iv) owned or controlled by any of (i), (ii) or (iii) (collectively, each a "Sanctioned Person"); the Borrower will not directly or indirectly use the proceeds of the Loans or any Letters of Credit, or otherwise make such proceeds available to any Person, for the purpose of financing any activities, transactions or dealings (i) with any Person currently (as of the date of the making of any Loan or Letter of Credit) the subject of any Sanctions, (ii) in or with any Sanctioned Country or any government of any Sanctioned Country, or (iii) that would result in a violation by any Person of Sanctions or that would be sanctionable under Sanctions.

(c)    None of the Borrower, Holdings or any of the Subsidiaries, nor, to the knowledge of the Borrower, Holdings or any of the Subsidiaries, any of their directors, officers, agents or employees has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity, (ii) made any direct or indirect unlawful payment to any government official or employee from corporate funds, (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "FCPA") or the Bribery Act 2010 of the United Kingdom or similar law of the European Union or any European Union Member State or similar law of a jurisdiction in which the Borrower, Holdings or any of the Subsidiaries conduct their business and to which they are lawfully subject or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

(d)    The operations of Holdings, the Borrower and their Subsidiaries are and have been conducted at all times in material compliance with applicable financial recordkeeping and reporting requirements including those of the Bank Secrecy Act, as amended by the Patriot Act, and the applicable anti-money laundering statutes of jurisdictions where Holdings, the

85

Borrower and its Subsidiaries conduct business, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "Money Laundering Laws"), and no material action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving Holdings, the Borrower or any of its Subsidiaries with respect to the Money Laundering Laws is pending or, to the best knowledge of the Borrower, threatened.

Section 8.17.  Gas Imbalances, Prepayments.  Except as set forth on Schedule 8.17 or on any supplement to such Schedule delivered in connection with any Reserve Report, on a net basis, there are no gas imbalances, take-or-pay or other prepayments exceeding two percent (2.0%) of the aggregate volumes of Hydrocarbons (on an Mcf equivalent basis) listed in the most recent Reserve Report, with respect to the Credit Parties' Oil and Gas Properties that would require any Credit Party to deliver Hydrocarbons either generally or produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

Section 8.18.  Marketing of Production.  Except as set forth on Schedule 8.18 or on any supplement to such Schedule delivered in connection with any Reserve Report, no material agreements exist (which are not cancelable on one hundred twenty (120) days' notice or less without penalty or detriment) for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other rights to purchase, production, whether or not the same are currently being exercised) that (i) represent in respect of such agreements two and five tenths percent (2.5%) or more of the Borrower's average monthly production of Hydrocarbon volumes and (ii) have a maturity or expiry date of longer than six (6) months from the Closing Date.

Section 8.19.  Hedge Agreements.  Schedule 8.19 sets forth, as of the Closing Date, a true and complete list of all material commodity Hedge Agreements of each Credit Party, the terms thereof relating to the type, term, effective date, termination date and notional amounts or volumes, the net mark to market value thereof (as of the last Business Day of the most recent fiscal quarter preceding the Closing Date and for which a mark to market value is reasonably available), all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

Section 8.20.  [Reserved].

Section 8.21.  Subsidiaries.

(a)    Schedule 8.11 sets forth as of the Closing Date the name and jurisdiction of incorporation, formation or organization of each direct or indirect Subsidiary of Holdings and, as to each such Subsidiary, the percentage of each class of Equity Interests owned by Holdings or by any such Subsidiary.

(b)    As of the Closing Date and except as set forth on Schedule 8.20, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of

86

any nature relating to any Equity Interests owned or held by Holdings, the Borrower or any of the other Restricted Subsidiaries.

Section 8.22.  Use of Proceeds.  The Borrower will use the proceeds of the DIP Facility in a manner consistent with the Approved Budget (as in effect from time to time) and the Financing Orders and as permitted by Section 9.12.

Section 8.23.  Insurance.  The Borrower has, and has caused all of its Restricted Subsidiaries to maintain insurance policies sufficient to comply with Section 9.05.

Section 8.24.  EEA Financial Institutions.  No Credit Party is an EEA Financial Institution.

Section 8.25.  Deposit Accounts.  Such Credit Party does not maintain any deposit or securities accounts other than those established and maintained in compliance with the requirements of Section 9.17.

Section 8.26.  Approved Budget.  The Approved Budget reasonably presents, in all material respects, on a pro forma basis, the projected financial operations and disbursements of the Debtors and their Subsidiaries for the period specified therein and such projections are reasonably achievable based upon reasonable assumptions and other information available to the Borrower as of the first day of such period.

## ARTICLE IX

### Affirmative Covenants

The Borrower hereby covenants and agrees that on the Closing Date and thereafter, until Payment in Full:

Section 9.01.  Reports and Other Information.

(a)  Reporting Generally.  The Borrower will furnish to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(i)  beginning with the fiscal year ending after the Closing Date, within ninety (90) days after the end of each fiscal year, (A) the audited consolidated balance sheets of the Borrower and the Restricted Subsidiaries, in each case as at the end of such fiscal year, and the related consolidated statements of operations, shareholders' equity and cash flows, plus a customary narrative review for such fiscal year and (B) a report on the annual financial statements by independent public accountants of recognized national standing (without any qualification or exception as to the scope of such audit other than a "going concern" qualification), (C) the volume of production of Hydrocarbons and sales attributable to production of Hydrocarbons (and the prices at which such sales were made and the revenues derived from such sales) for the last fiscal quarter of such fiscal year from the Oil and Gas Properties of the Credit Parties described in the most recent Reserve Report and (D) the unaudited balance sheet, income statement and related statement of

87

cash flows as of the end of such fiscal year which provides consolidating statements, in such form as would be presentable to the auditors of the Borrower;

(ii)    within ninety (90) days after the end of the fiscal quarter ending June 30, 2019, and thereafter within sixty (60) days after the end of each of the first three fiscal quarters of each fiscal year, (A) the consolidated balance sheets of the Borrower and the Restricted Subsidiaries, in each case as at the end of such quarterly period and the related consolidated statements of operations, shareholders' equity and cash flows, plus a customary narrative review for such fiscal quarter, (B) the volume of production of Hydrocarbons and sales attributable to production of Hydrocarbons (and the prices at which such sales were made and the revenues derived from such sales) for such quarter from the Oil and Gas Properties of the Credit Parties described in the most recent Reserve Report and (C) the unaudited balance sheet, income statement and related statement of cash flows as of the end of such quarterly period which provides consolidating statements, in such form as would be presentable to the auditors of the Borrower;

(iii)    beginning with the calendar month ending after the Closing Date, within sixty (60) days after the end of each month, (A) the consolidated balance sheets of the Borrower and the Restricted Subsidiaries, in each case as at the end of such monthly period and the related consolidated statements of operations, shareholders' equity and cash flows for such month, (B) the volume of production of Hydrocarbons and sales attributable to production of Hydrocarbons (and the prices at which such sales were made and the revenues derived from such sales) for such month from the Oil and Gas Properties of the Credit Parties described in the most recent Reserve Report and (C) the unaudited balance sheet, income statement and related statement of cash flows as of the end of such monthly period which provides consolidating statements, in such form as would be presentable to the auditors of the Borrower;

(iv)    concurrently with the delivery of financial statements under clauses (i) and (ii) above, if the Borrower or any of its Restricted Subsidiaries is a party to a Hedge Agreement, a report summarizing (A) all Hedge Agreements of the Borrower and its Restricted Subsidiaries then in effect and (B) the Credit Parties' reasonably anticipated production for the twenty-four (24) month period thereafter; provided that the period covered by such statement shall be increased to cover any period up to sixty (60) months for which Ongoing Hedges have been entered into, from the end of the relevant fiscal quarter, in each case as compared to the corresponding information in the most recently delivered summary operating budget delivered to the Prepetition Agent pursuant to the Prepetition Credit Agreement, which report shall be certified by an Authorized Officer that such report has been prepared in good faith based upon assumptions believed by the Borrower to be reasonable (it being understood that actual results may vary materially), as of the date such report was furnished to the Lenders;

(v)    with reasonable promptness, such other information regarding the operations, business affairs and the financial condition of the Credit Parties and their respective Subsidiaries, or compliance with the terms of the Credit Documents, as the Administrative Agent on its own behalf or on behalf of any Lender (acting through the Administrative Agent) may reasonably request in writing from time to time.

Notwithstanding anything to the contrary in this <u>clause (v)</u>, neither the Borrower nor any Restricted Subsidiary will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (A) constitutes non-financial trade secrets or non-financial proprietary information, (B) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by any Requirements of Law or any binding agreement or (C) that is subject to attorney-client privilege or similar privilege or constitutes attorney work product; and

(b)    <u>Conference Calls and Update Meetings</u>.  The Borrower shall, upon the reasonable request of the Administrative Agent, on a date to be mutually agreed upon by the Borrower and the Administrative Agent (but, so long as no Event of Default has occurred and is continuing, no more than twice per month), participate in a conference call or an in-person meeting at the Borrower's corporate office (as reasonably requested by Administrative Agent) with the Administrative Agent and the Lenders to discuss the financial condition and results of operations of the Borrower and its Restricted Subsidiaries, the status of the Chapter 11 Cases or such other matters as may be reasonably requested by Administrative Agent or the Lenders.

(c)    <u>Satisfaction of Reporting Obligations by SEC Filings</u>.  Notwithstanding the foregoing, the obligations in <u>Section 9.01(a)(i)</u> or <u>Section 9.01(a)(ii)</u> may be satisfied with respect to financial information relating to the Borrower and the Restricted Subsidiaries by furnishing (i) the applicable financial statements of the Borrower (or any Parent Entity of the Borrower) or (ii) the Borrower's (or any Parent Entity thereof), as applicable, Form 10-K or 10-Q, as applicable, filed with the SEC; <u>provided</u> that, with respect to <u>Section 9.01(a)(i)</u> and <u>Section 9.01(a)(ii)</u>, to the extent such information relates to a Parent Entity of the Borrower, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to the Borrower (or such Parent Entity), on the one hand, and the information relating to the Borrower and the Restricted Subsidiaries on a stand-alone basis, on the other hand.

(d)    <u>Notice of Default; Litigation</u>.  Promptly, (i) after an Authorized Officer of the Borrower or any of the Restricted Subsidiaries obtains actual knowledge thereof, notice of the occurrence of any Default or Event of Default, which notice shall specify the nature thereof and what action the Borrower proposes to take with respect thereto and (ii) notice of any litigation or governmental proceeding pending against the Borrower or any of the Subsidiaries that would reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect, in each case, other than the Chapter 11 Cases.

(e)    <u>Environmental Matters</u>.  Promptly, unless such environmental matters would not, individually, or when aggregated with all other such matters, be reasonably expected to result in a Material Adverse Effect, notice of:

(i)    any Environmental Claim brought, filed or threatened in writing against any Credit Party; and

(ii)    the actual release or threatened release of any Hazardous Material on, at, under or from any facility owned or leased by a Credit Party in violation of

89

Environmental Laws or as would reasonably be expected to result in liability under Environmental Laws or the conduct of any investigation, or any removal, remedial or other corrective action under Environmental Laws in response to the actual or alleged presence, release or threatened release of any Hazardous Material on, at, under or from any facility owned or leased by a Credit Party.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the response thereto.

(f)     [Reserved.]

(g)     <u>Lists of Purchasers</u>.  At the time of the delivery of the financial statements provided for in <u>Section 9.01(a)(i)</u> and <u>Section 9.01(a)(ii)</u> a certificate of an Authorized Officer of the Borrower setting forth a list of Persons purchasing Hydrocarbons from the Borrower or any other Credit Party which account for greater than 25% of the revenues resulting from the sale of all Hydrocarbons from the Borrower and such other Credit Parties during the fiscal year for which such financial statements relate.

(h)     <u>Financial Officer's Certificate Regarding Hedge Agreements</u>. Concurrently with any delivery of financial statements under <u>Section 9.01(a)(i)</u> or <u>Section 9.01(a)(ii)</u>, if the Borrower or any of its Restricted Subsidiaries is a party to a Hedge Agreement, a certificate of a Financial Officer of the Borrower setting forth, as of the last Business Day of the most recently ended fiscal year or period, as applicable, or such other more recent date as may be reasonably practicable, a true and complete list of all Hedge Agreements of the Borrower and its Restricted Subsidiaries and setting forth the type, term, agreement date, settlement date, notional amounts or volumes, all credit support relating thereto (including any margin required or supplied) and the counterparty (and exposure thereto) of each such agreement (but only to the extent such counterparty (x) is not rated at least BBB+ (or the equivalent thereof) by S&P or Baa1 (or the equivalent thereof) by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower)) or (y) is not at such time a Lender or Agent or an Affiliate of a Lender or Agent).

(i)     <u>Inspection Rights</u>.  The Borrower will, and will cause each Restricted Subsidiary to, permit a reasonable number of representatives designated by the Administrative Agent or the Majority Lenders (coordinated through and together with the Administrative Agent), upon reasonable prior notice to the Borrower, to visit and inspect its Oil and Gas Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times during the Borrower's or such Restricted Subsidiary's normal business hours (and in a manner so as not to unreasonably interfere with the normal business operations of the Borrower or such Restricted Subsidiary) not more than two (2) times per financial year or, if an Event of Default then exists, as often as reasonably requested.  The Borrower shall bear the cost of such inspections and examinations.  The Administrative Agent and the Majority Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this <u>Section 9.01(i)</u>, neither the Borrower nor any Restricted Subsidiary will be required to disclose, permit the inspection,

90

examination or making copies or abstracts of, or discussion of, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by any Requirements of Law or any binding agreement or (iii) that is subject to attorney-client privilege or similar privilege or constitutes attorney work product.

(j)     ERISA Notices.  The Borrower or an ERISA Affiliate that is a direct or indirect Subsidiary of the Borrower shall provide, promptly following receipt thereof, copies of (i) any documents described in Sections 101(k) or 101(l) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan or any documents described in Section 101(f) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Plan; provided that if the relevant Borrower or ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plans, then, upon reasonable request of the Administrative Agent, such Borrower or the ERISA Affiliate shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof.

(k)     Promptly upon receipt any notice from the Oklahoma Corporation Commission or any other Governmental Authority requesting the Borrower or any of its Subsidiaries to curtail saltwater disposal in the State of Oklahoma.

Section 9.02.  Delivery of Reports.  It is understood that documents required to be delivered pursuant to Section 9.01(a) through (k) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 13.02 or (ii) on which such documents are transmitted by electronic mail to the Administrative Agent; provided that (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of documents delivered pursuant to Section 9.01(a) and (e) to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Arrangers may, but shall not be obligated to, make available to the Lenders and the Issuing Bank materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on Debt Domain, IntraLinks, Syndtrak, ClearPar, or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that so long as the

91

Borrower is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering or is actively contemplating issuing any such securities (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Arrangers, the Issuing Bank and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Confidential Information, they shall be treated as set forth in Section 13.16); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent and the Arrangers shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information." Notwithstanding the foregoing, the Borrower shall be under no obligation to mark any Borrower Materials "PUBLIC."

Section 9.03.    Taxes.    The Borrower shall, and shall cause each of its Restricted Subsidiaries to, pay or discharge, prior to delinquency, its obligations in respect of all Taxes, lawful assessments, and governmental levies except (a) where the amount or validity thereof is being contested in good faith and by appropriate proceedings and as to which adequate reserves have been provided to the extent required by and in accordance with GAAP (or in the case of a Foreign Subsidiary, comparable accounting principles in the relevant jurisdiction), (b) where the failure to effect such payment or discharge could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, or (c) where such payment would be in violation of the Expenditures Budget Variance covenant set forth in Section 10.11.

Section 9.04.    Further Instruments and Acts.

(a)    Subject to the applicable limitations set forth in the Security Documents, the Borrower will, and will cause each other Credit Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions that the Collateral Agent or the Majority Lenders may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the applicable Security Documents, all at the expense of the Borrower and the Restricted Subsidiaries. In addition, at the Administrative Agent's reasonable request, the Borrower, at its sole expense, shall provide any information requested to identify any Collateral, a customary "lease to well" reconciliation schedule, list or similar item or exhibits to Mortgages in form and substance reasonably satisfactory to the Administrative Agent (which such exhibits shall be in recordable form for the applicable jurisdiction) or any other information reasonably requested in connection with the identification of any Collateral.

(b)    Notwithstanding anything herein to the contrary, if the Collateral Agent and the Borrower reasonably determine in writing that the cost of creating or perfecting any Lien on any property is excessive in relation to the benefits afforded to the Lenders thereby, then such property may be excluded from the Collateral for all purposes of the Credit Documents. In addition, notwithstanding anything to the contrary in this Agreement, the Guarantee, the

Collateral Agreement, or any other Credit Document, the Administrative Agent may grant extensions of time for or waivers of the requirements of the creation or perfection of security interests in or the obtaining of title opinions or other title information, legal opinions, appraisals, flood insurance and surveys with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Credit Parties on such date) where it reasonably determines, in consultation with the Borrower, that perfection or obtaining of such items is not required by law or cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the other Credit Documents.

(c)    Notwithstanding the foregoing provisions of this Section 9.04 or anything in this Agreement or any other Credit Document to the contrary, except as otherwise provided in the Financing Orders:  (A) Liens required to be granted from time to time shall be subject to exceptions and limitations set forth in the Collateral Agreement and the other Credit Documents and, to the extent appropriate in any applicable jurisdictions, as agreed between the Administrative Agent and the Borrower; (B) the Collateral shall not include any Excluded Property; and (C) no actions in any jurisdiction outside of the United States or that are necessary to comply with any Requirement of Law of any jurisdiction outside of the United States shall be required in order to create any security interest in assets located, titled, registered or filed outside of the United States or to perfect such security interests (it being understood that there shall be no collateral agreements, security agreements, pledge agreements, or share charge (or mortgage) agreements governed under the laws of any jurisdiction outside of the United States).

Section 9.05.    Maintenance of Insurance.

The Borrower will, and will cause each Restricted Subsidiary to, at all times maintain in full force and effect, pursuant to self-insurance arrangements or with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its business; and will furnish to the Administrative Agent, upon written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried.  The Secured Parties shall be the additional insureds on any such liability insurance as their interests may appear and, if property insurance is obtained, the Collateral Agent shall be the loss payee under any such property insurance.

Section 9.06.  Compliance with Laws.  The Borrower shall, and shall cause each Restricted Subsidiary to, comply with all laws, rules, regulations and judgments, writs, injunctions, decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, applicable to it or its property (including without limitation the USA Patriot Act and Environmental Laws), except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect; provided that this Section 9.06 shall not apply to laws related to Taxes, which are the subject of Section 9.03.

93

Section 9.07.   <u>Operation and Maintenance of Properties</u>.   The Borrower, at its own expense will, and will cause each Restricted Subsidiary to:

(a)     operate its Oil and Gas Properties and other material properties or cause such Oil and Gas Properties and other material properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Requirements of Law, including applicable proration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom, except, in each case, where the failure to do so would not reasonably be expected to have a Material Adverse Effect;

(b)     keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear and depletion excepted) all of its Oil and Gas Properties and other material properties, including all equipment, machinery and facilities, except, in each case, where the failure to do so would not reasonably be expected to have a Material Adverse Effect;

(c)     promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Oil and Gas Properties and do all other things necessary to keep unimpaired its rights with respect thereto and prevent any forfeiture thereof or default thereunder, except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect; <u>provided</u>, that, no Credit Party shall be obligated to pay any such delay rentals, royalties, expenses and indebtedness, the nonpayment of which is permitted by the Bankruptcy Code; and

(d)     promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with customary industry standards, the obligations required by the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties and other material properties, except, in each case, where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

To the extent the Borrower or one of its Restricted Subsidiaries is not the operator of any property, the Borrower shall use reasonable efforts to cause the operator to comply with this <u>Section 9.07</u>, but failure of the operator so to comply will not constitute a Default or an Event of Default hereunder.  Nothing in this <u>Section 9.</u>07 shall prevent any Credit Party from rejecting any contract in connection with the pendency of the Chapter 11 Cases which is permitted pursuant to the Financing Orders, any Acceptable Plan or as otherwise permitted hereunder.

Section 9.08.   <u>Company Existence</u>.   The Borrower shall do or cause to be done all things necessary to preserve and keep in full force and effect its company existence, and the corporate, partnership or other existence of each of its Restricted Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Borrower or any such Restricted Subsidiary; <u>provided</u> that the Borrower shall not be

94

required to preserve the corporate, partnership or other existence of its Restricted Subsidiaries, if the Borrower in good faith shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower and its Restricted Subsidiaries, taken as a whole.

Section 9.09.   After-Acquired Property.

(a)      Subject to any applicable limitations set forth in the Security Documents, the Borrower will cause any Subsidiary formed or otherwise purchased or acquired after the Closing Date within twenty (20) days from the date of such formation, acquisition or cessation, as applicable (or such longer period as the Administrative Agent may agree in its reasonable discretion) to execute (A) a supplement to the Guarantee, substantially in the form of the Exhibit I thereto, in order to become a Guarantor thereunder, (B) a supplement to the Collateral Agreement, substantially in the form of Exhibit I thereto, in order to become a grantor and a pledgor thereunder and (C) a joinder to the Intercompany Note.

(b)      Subject to the terms of the Security Documents, the Borrower will pledge, and, if applicable, will cause each other Guarantor (or Person required to become a Guarantor pursuant to this Section 9.09) to pledge, to the Collateral Agent, for the benefit of the Secured Parties, (i) all of the Equity Interests (other than any Excluded Equity Interests) of each Subsidiary directly owned by the Borrower or any Guarantor (or Person required to become a Guarantor pursuant to this Section 9.09), in each case, formed or otherwise purchased or acquired after the Closing Date, pursuant to supplements to the Collateral Agreement substantially in the form of Exhibit I thereto and, (ii) except with respect to intercompany Indebtedness which is required to be pledged via the Intercompany Note pursuant to Section (c) below, all evidences of Indebtedness for borrowed money that is owing to the Borrower or any Guarantor (or Person required to become a Guarantor pursuant this Section 9.09) (which shall be evidenced by a promissory note), in each case pursuant to supplements to the Collateral Agreement substantially in the form of Exhibit I thereto.

(c)      The Borrower agrees that all Indebtedness of the Borrower and each of its domestic Restricted Subsidiaries that is owing to any Credit Party (or a Person required to become a Subsidiary Guarantor pursuant to this Section 9.09) shall be evidenced by the Intercompany Note, which promissory note shall be required to be pledged to the Collateral Agent, for the benefit of the Secured Parties, pursuant to the Collateral Agreement.

Section 9.10.   [Reserved].

Section 9.11.   ERISA.   As soon as possible upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event that reasonably could be expected to result in an Event of Default (an "ERISA Notice EOD"), the Borrower shall provide to the Administrative Agent (i) a written notice specifying the nature thereof, what action Borrower or any ERISA Affiliate has taken, is taking or proposes to take with respect to such ERISA Notice EOD and, when known, any action taken or threatened by the IRS, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness, upon Administrative Agent's request, copies of (1) each Schedule SB (Actuarial Information) to the annual report (Form 5500 Series) filed by Borrower or any ERISA Affiliate with the IRS with respect to each Plan with respect to which such ERISA Notice EOD has arisen; (2) all notices received by

95

Borrower or any ERISA Affiliate from a Plan sponsor concerning such ERISA Notice EOD; and three (3) copies of such other documents or governmental reports or filings relating to any Plan as Administrative Agent shall reasonably request with respect to such ERISA Notice EOD.

Section 9.12.   Use of Proceeds.

(a)      The Borrower will use the proceeds of the Loans solely for: (i) the payment of the allowed administrative costs and expenses of the Chapter 11 Cases, (ii) the payment of certain payments pursuant to the First Day Orders, (iii) the payment of adequate protection payments as set forth in the Financing Orders, (iv) current interest and fees due to the Administrative Agent and the Lenders pursuant to the terms of this Agreement, and (v) working capital purposes of the Credit Parties from and after the Closing Date, in each case, solely in a manner consistent with the Approved Budget (as in effect from time to time and subject to the Permitted Variance) and the Financing Orders.

(b)      The Borrower will use Letters of Credit for general corporate purposes.

(c)      The Borrower will not request any Borrowing or Letter of Credit, and the Borrower shall not directly or, to the knowledge of the Borrower, indirectly use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not directly or, to the knowledge of such Person, indirectly use, the proceeds of any Borrowing or Letter of Credit (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country to the extent such activities, businesses or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 9.13.   [Reserved].

Section 9.14.   Reserve Reports.

(a)      As soon as reasonably practicable following written request from Administrative Agent from time to time, the Borrower shall furnish to the Administrative Agent a Reserve Report evaluating, as of the last day of the most recently-ended calendar quarter (or such other date reasonably requested by Administrative Agent), the Proved Reserves of the Borrower and the Credit Parties located within the geographic boundaries of the United States of America and other applicable Oil and Gas Properties of the Credit Parties; provided, that, the Borrower shall not be obligated to provide more than two (2) such Reserve Reports in any trailing twelve month period, unless an Event of Default exists, in which case the Borrower shall provide a Reserve Report as often as reasonably requested.

(b)      At the election of the Administrative Agent, up to one (1) such Reserve Report during any trailing twelve month period shall be prepared by any Approved Petroleum Engineer.  Each other Reserve Report shall be prepared internally by the Borrower in a form reasonably acceptable to the Administrative Agent.

96

(c)    With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent a Reserve Report Certificate from an Authorized Officer of the Borrower certifying that in all material respects:

(i)    such Reserve Report has been prepared, except as otherwise specified therein, in accordance with the procedures used in the immediately preceding Reserve Report or the Initial Reserve Report, if no Reserve Report has been delivered hereunder;

(ii)    the information contained in the Reserve Report and any other information delivered in connection therewith is true and correct (it being understood that projections concerning volumes attributable to the Oil and Gas Properties and production and cost estimates contained in such Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Borrower and the Subsidiaries do not warrant that such opinions, estimates and projections will ultimately prove to be accurate);

(iii)    other than a result of the Chapter 11 Cases, and assuming that all applicable Governmental Authorities have granted approvals, made recordations and taken such other actions as are necessary in connection herewith and any assignments made in connection therewith, except as set forth in an exhibit to such certificate, the Borrower or another Credit Party has good and defensible title to the Borrowing Base Properties evaluated in such Reserve Report (other than those (x) Disposed of in compliance with Section 10.04 since delivery of such Reserve Report, (y) leases that have expired in accordance with their terms and (z) with title defects disclosed in writing to the Administrative Agent) and such Borrowing Base Properties are free of all Liens except for Liens permitted by Section 10.06;

(iv)    except as set forth on an exhibit to such certificate, on a net basis there are no gas imbalances, take-or-pay or other prepayments exceeding two percent (2.0%) of the aggregate volumes of Hydrocarbons (on an Mcf equivalent basis) listed in the most recent Reserve Report, with respect to the Credit Parties' Oil and Gas Properties that would require any Credit Party to deliver Hydrocarbons either generally or produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor;

(v)    [reserved]; and

(vi)    the certificate shall also attach, as schedules thereto, a list of all material marketing agreements (which are not cancellable on one hundred and twenty (120) days' notice or less without penalty or detriment) entered into subsequent to the later of the Closing Date and the most recently delivered Reserve Report for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other parties rights to purchase, production, whether or not the same are currently being exercised) that represent in respect of such agreements two and five tenths percent (2.5%) or more of the Borrower's average monthly production of Hydrocarbon volumes

97

and that have a maturity date or expiry date of longer than six (6) months from the last day of such fiscal year or period, as applicable.

Section 9.15.  Patriot Act, Money Laundering Laws, OFAC, FCPA.  Now and hereafter to the extent applicable to this Agreement, the transactions contemplated hereby or the Credit Parties' execution, delivery and performance of the Credit Documents, do and will comply, as applicable, in all material respects with the USA Patriot Act, Money Laundering Laws, OFAC and FCPA, and with respect to each statute, any successor statute thereto.

Section 9.16.  [Reserved].

Section 9.17.  Cash Management.

(a)    The Borrower will, and will cause each Credit Party to, hold the proceeds of any Loans made under this Agreement in a Controlled Account with the Collateral Agent until such proceeds are transferred to a non-Affiliate in accordance with the Credit Documents.

(b)    The Borrower will, and will cause each Credit Party to, maintain their cash management system as it existed prior to April 30, 2019, with such changes as may be required by an order of the Bankruptcy Court or as may be made with the prior written consent of the Administrative Agent.

(c)    The Borrower will, and will cause each Credit Party to, maintain all Deposit Accounts and Securities Accounts at MUFG Union Bank, N.A.

Section 9.18.  Certain Post-Closing Matters.  The Credit Parties shall deliver to the Collateral Agent the insurance endorsements described in Section 9.05 within thirty (30) days after written request from Collateral Agent at any time after the Closing Date (subject to extension in the reasonable discretion of the Collateral Agent).

Section 9.19.  Access to Consultants.  As soon as reasonably practicable after written request from the Administrative Agent, the Borrower will provide the Administrative Agent and the Lenders with reasonable access to any consultant, turnaround management, broker or financial advisory firm retained by the Borrower or its Subsidiaries in any of the Chapter 11 Cases and, if requested, copies of all retention agreements for each such consultant.

Section 9.20.  Additional Reporting.  The Borrower will furnish to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a)    Variance Report.  On or before 12:00 PM (New York City time) on Thursday of each calendar week (commencing with the Thursday falling during the first full calendar week after the Petition Date), a report in form, substance and detail reasonably acceptable to the Administrative Agent, reflecting variances in actual Receipts and Operating Disbursements from the Approved Budget on a line-by-line basis and a cumulative basis, which report shall include an explanation of any variances in each line item and shall detail the following (a "Variance Report"):

(i)     the actual amount of Receipts and other cash flow of the Debtors during the Budget Test Period most recently ended;

(ii)    any variance (whether plus or minus and expressed as a percentage, on a line-item and cumulative basis) between the aggregate amount of actual Receipts of the Debtors during such Budget Test Period against the aggregate amount of Receipts set forth in the Approved Budget for such Budget Test Period;

(iii)   the actual amount of Operating Disbursements and other disbursements of the Debtors during the Budget Test Period most recently ended; and

(iv)    any variance (whether plus or minus and expressed as a percentage, on a line-item and cumulative basis) between the actual amount of Operating Disbursements of the Debtors during such Budget Test Period against the amount of Operating Disbursements set forth in the Approved Budget for such Budget Test Period.

(b)     <u>Sale Process Reports</u>.  On or before 12:00 PM (New York City time) on Thursday of each calendar week (commencing with the Thursday falling during the first full calendar week after the Petition Date), a weekly report with respect to the Sale Process, in form and scope reasonably agreed by the Borrower and the Administrative Agent.  In addition, the Borrower will grant access to any data room established for potential bidders to the Administrative Agent and its financial advisor and counsel and furnish to the Administrative Agent and its financial advisor and counsel, as they become available (and, in any event, together with the next weekly report delivered pursuant to this <u>Section 9.20(b)</u>), full copies of any preliminary and final bids received and any draft purchase and sale agreements).

(c)     <u>Production Reports; Lease Operating Statements</u>.  Promptly, and in any event no later than ten (10) Business Days after the end of each calendar month (and at such other times as may be reasonably requested by Administrative Agent), a Production Report with respect to such calendar month.  As soon as available following the end of each calendar month, a Lease Operating Statement with respect to such calendar month.

(d)     <u>Aging Reports</u>.  Promptly, and in any event no later than ten (10) Business Days after the end of each calendar month, a detailed accounts payable aging report of each Credit Party as of the end of such calendar month, in form and substance reasonably satisfactory to the Administrative Agent (it being agreed that any report substantially consistent in form and detail with the reports delivered to the Prepetition Agent shall be reasonably satisfactory to the Administrative Agent).

(e)     <u>Court Filings</u>.  Substantially concurrently with the filing thereof with the Bankruptcy Court, copies of the monthly operating reports required to be filed with the Bankruptcy Court.  Prior to the filing thereof, copies of all material pleadings, motions and applications to be filed by or on behalf of the Credit Parties with the Bankruptcy Court or provided to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or the Committee, or if it is not practicable to provide copies of the same in advance of filing, then advance notice of all such material pleadings, motions and applications and copies of all such documents promptly after each such document is filed with the Bankruptcy Court or to

99

the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or the Committee.

Section 9.21. <u>Milestones</u>. The Debtors shall achieve the following milestones (collectively, the "<u>Sale Process</u>") in accordance with the deadlines specified below (or, to the extent any Milestone requires a court hearing, as soon as practicable thereafter based on scheduling availability of the Bankruptcy Court), which deadlines in all cases may be extended by the Administrative Agent in its reasonable discretion (collectively, the "<u>Milestones</u>"):

(a) on the Petition Date, the Debtors shall have filed a motion seeking approval of the DIP Facility in an interim and final basis;

(b) on or before the date that is 5 calendar days after the Petition Date, the Interim Order, in form and substance reasonably satisfactory to the Administrative Agent, shall have been entered by the Bankruptcy Court;

(c) on or before the date that is 14 calendar days after the Petition Date, the Debtors shall have filed a motion (the "<u>Bid Procedures Motion</u>") with the Bankruptcy Court to approve bid procedures and establish the date of an auction (the "<u>Auction</u>") to determine a winning bidder or bidders for the Debtors' assets and sell all or substantially all of the Debtors' assets (the "<u>Purchased Assets</u>"). The bid procedures shall require that any bid contain a cash component sufficient to repay in full all Obligations outstanding under the DIP Facility. The Bid Procedures Motion shall allow for the selection of a stalking horse bidder and entry into a stalking horse asset purchase agreement, subject to better and higher bids as set forth therein, in form and substance reasonably satisfactory to the Administrative Agent (a "<u>Stalking Horse Asset Purchase Agreement</u>");

(d) on or before the date that is 40 calendar days following the entry of the Interim Order, the Final Order shall have been entered by the Bankruptcy Court;

(e) on or before the date that is 60 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Bid Procedures Motion (the "<u>Bid Procedures Order</u>"), in form and substance reasonably satisfactory to the Administrative Agent in its reasonable discretion as confirmed by the Administrative Agent in writing;

(f) on or before the date that is 120 calendar days after the Petition Date, the Debtors shall conduct the Auction for the Purchased Assets (if qualified bids are received);

(g) on or before the date that is 30 calendar days (or 45 calendar days, to the extent such proposed sale is contested) after the Auction, the Bankruptcy Court shall have entered an order approving the sale (the "<u>Approved Sale</u>") of the Purchased Assets to the party determined to have made the highest or otherwise best bid (which shall also include a "successful back-up bidder") (the "<u>Sale Order</u>"), which shall be in form and substance reasonably satisfactory to the Administrative Agent as confirmed by the Administrative Agent in writing; and

(h) on or before the date that is 35 calendar days (or 60 calendar days, to the extent such proposed sale is contested) after the Auction, the Debtors shall have consummated

100

the Approved Sale to the party determined to have made the highest or otherwise best bid for the Debtors' assets in accordance with the Sale Order.

## ARTICLE X

## Negative Covenants

The Borrower hereby covenants and agrees that on the Closing Date and thereafter, until Payment in Full:

Section 10.01. Limitation on Restricted Payments.

(a)    The Borrower will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly make any Restricted Payment, except for Restricted Payments by a Credit Party to another Credit Party.

Section 10.02. Limitation on Subsidiary Distributions.

(a)    The Borrower will not, and will not permit any of its Restricted Subsidiaries that is not a Guarantor to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction (provided that dividend or liquidation priority between classes of Capital Stock, or subordination of any obligation (including the application of any remedy bars thereto) to any other obligation, will not be deemed to constitute such an encumbrance or restriction) on the ability of any such Restricted Subsidiary to pay dividends or make any other distributions to the Borrower or any Restricted Subsidiary that is a Guarantor on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, except as permitted by Section 10.02(b).

(b)    The restrictions in Section 10.02(a) will not apply to encumbrances or restrictions existing under or by reason of:

(i)    contractual encumbrances or restrictions in effect on the Closing Date, including (x) pursuant to the Credit Documents and the related documentation (including any guarantee thereof) incurred in connection with the Loans, (y) pursuant to any documentation in respect of the Prepetition Credit Agreement, the Prepetition Term Loan Credit Agreement or the Prepetition Unsecured Notes and (z) those in effect on the Closing Date and permitted under the Prepetition Credit Agreement; and

(ii)    applicable Requirements of Law.

Section 10.03. Limitation on Incurrence of Indebtedness.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable contingently or otherwise (collectively, "incur" and collectively, an "incurrence") with respect to any Indebtedness other than the following:

(a)    the Loans or other Obligations under the Credit Documents;

101

(b)　　　Indebtedness in existence on the Closing Date and set forth on Schedule 10.03;

(c)　　　(i) Indebtedness under the Prepetition Credit Documents, (ii) Indebtedness under the Prepetition Unsecured Notes existing on the Closing Date and (iii) Indebtedness under the Prepetition Term Loan Credit Documents existing on the Closing Date;

(d)　　　Indebtedness incurred by the Borrower or any of its Restricted Subsidiaries constituting reimbursement obligations with respect to letters of credit, bank guarantees, banker's acceptances, warehouse receipts, or similar instruments issued or created in the ordinary course of business, including in respect of workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance, unemployment insurance or other social security legislation or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance;

(e)　　　Indebtedness of the Borrower to a Restricted Subsidiary which is a Guarantor or of a Restricted Subsidiary to the Borrower or another Restricted Subsidiary which is a Guarantor;

(f)　　　obligations in respect of self-insurance and obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with industry practice;

(g)　　　(i) any guarantee by the Borrower or a Guarantor of Indebtedness or other obligations of any Restricted Subsidiary so long as the incurrence of such Indebtedness incurred by such Restricted Subsidiary is permitted under the terms of this Agreement, or (ii) any guarantee by a Guarantor of Indebtedness of the Borrower so long as the incurrence of such Indebtedness by the Borrower is permitted under the terms of this Agreement; provided that such guarantee is incurred in accordance with, if applicable, Section 9.09;

(h)　　　to the extent constituting Indebtedness, (A) customer deposits and advance payments (including progress premiums) received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business or (B) in respect of obligations to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services so long as such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business;

(i)　　　Indebtedness in respect of Cash Management Services;

(j)　　　Indebtedness incurred by a Restricted Subsidiary in connection with bankers' acceptances, discounted bills of exchange or the discounting or factoring of receivables for credit management purposes, in each case incurred or undertaken in the ordinary course of business on arm's-length commercial terms;

102

(k)    Indebtedness of the Borrower or any of its Restricted Subsidiaries consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements in each case, incurred in the ordinary course of business or consistent with past practice;

(l)    any take-or-pay agreements or in-kind obligations, in each case relating to net oil or natural gas balancing positions arising in the ordinary course of business or customary in the oil and gas business, including the take-or-pay, gas balances and other similar arrangements not prohibited under Section 8.17; and

(m)    Professional Fees, fees payable to the U.S. Trustee, and fees payable to the Clerk of the Bankruptcy Court.

Section 10.04. Asset Sales.

The Borrower will not, and will not permit any of the Restricted Subsidiaries to, without consent of the Administrative Agent, (x) sell, convey, transfer or dispose (whether in a single transaction or a series of related transactions) of property or assets (including by way of Production Payments and Reserve Sales and Sale/Leaseback Transactions) (each referred to in this definition as a "Disposition"); or (y) issue or sell Equity Interests (other than directors' qualifying shares and shares issued to foreign nationals or other third parties to the extent required by applicable law) of any Restricted Subsidiary, whether in a single transaction or a series of related transactions; in each case, other than the following, each of which requires advance written notice to the Administrative Agent (which advance written notice may be provided through inclusion, to the extent expressly identified, in the Initial Approved Budget or any Proposed Budget):

(a)    any disposition of inventory or goods (or other assets) held for sale in the ordinary course of business, including Hydrocarbons and mineral products;

(b)    any Approved Sale or any other sale of assets set out in an Acceptable Plan; and

(c)    the unwinding of any Hedging Obligations; provided after the consummation of such unwinding(s), the Borrower shall apply received net cash proceeds to the principal amount of Loans outstanding.

To the extent any Collateral is Disposed of as expressly permitted by this Section 10.04 to any Person other than a Credit Party, the cash proceeds of Disposed Collateral that are not applied to repayment of the Loans shall be held in a deposit account subject to a first priority perfected Lien in favor of the Collateral Agent, for the benefit of the Secured Parties, until such proceeds are transferred to a non-Affiliate in accordance with the Credit Documents.

Section 10.05. Transactions with Affiliates.

(a)    The Borrower will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend

103

any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Borrower (each of the foregoing, an "Affiliate Transaction"), unless such Affiliate Transaction is on terms that are not materially less favorable to the Borrower or its relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Borrower or such Restricted Subsidiary with an unrelated Person on an arm's-length basis.

(b)    The foregoing provisions will not apply to the following:

(i)    transactions between or among the Borrower and any Restricted Subsidiary of the Borrower that is a Credit Party;

(ii)    (A) Restricted Payments permitted by Section 10.01, (B) other Investments constituting "Permitted Investments" and (C) payments of Indebtedness permitted by Section 10.09;

(iii)    the payment of customary fees and out-of-pocket expenses paid to, and indemnities and reimbursements and employment and severance arrangements provided on behalf of or for the benefit of present, future or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates) of the Borrower, any of Parent Entity or any of its Restricted Subsidiaries, in each case, in a manner consistent with the Approved Budget (subject to the Permitted Variance);

(iv)    the existence of, or the performance by the Borrower, or any of its Restricted Subsidiaries of its (or any Parent Entity of the Borrower (solely to the extent such Parent Entity's sole activity is the ownership and operation of the Borrower and its Subsidiaries and activities that would be permitted if such Parent Entity were subject to Article X-A hereof)) obligations under the terms of, any agreement as in effect as of the Closing Date set forth in Schedule 10.05(b)(iv) or any amendment thereto or replacement thereof (so long as any such amendment or replacement is not disadvantageous in any material respect to the Lenders as compared to the applicable agreement as in effect on the Closing Date);

(v)    the transactions contemplated hereby and the payment of all fees and expenses related to the transactions contemplated hereby; and

(vi)    any contribution to the capital (and any corresponding issuance of Equity Interests) of the Borrower.

Section 10.06. Liens.

The Borrower will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create, incur or assume any Lien that secures obligations under any Indebtedness or any related guarantee of Indebtedness, on any asset or property of the Borrower or any Restricted Subsidiary, or any income or profits therefrom, or assign or convey any right to receive income therefrom except:

(a)    Liens securing obligations in respect of the Obligations and the Prepetition Obligations;

(b)    Liens existing on the Closing Date and disclosed on <u>Schedule 10.06</u>;

(c)    Permitted Liens;

(d)    Liens existing on the Closing Date securing Capitalized Lease Obligations permitted under the Prepetition Credit Agreement but only on the Property that is the subject of any such lease, accessions and improvements thereto, insurance thereon, and the proceeds of the foregoing; and

(e)    Liens securing Indebtedness under the Prepetition Term Loan Credit Agreement existing on the Closing Date, so long as the creation, incurrence, assumption or existence of such Liens is permitted under, and granted in compliance with, the Prepetition Intercreditor Agreement.

Section 10.07. <u>Limitation on Investments</u>.  The Borrower will not, and will not permit any of the Restricted Subsidiaries to, make any Investment other than Investments that are Permitted Investments at the time such Investments are made.

Section 10.08. <u>Limitation on Fundamental Changes</u>.

(a)    The Borrower will not merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property to any other Person, (whether now owned or hereafter acquired) (any such transaction, a "consolidation"), or liquidate or dissolve, except for Dispositions permitted by <u>Section 10.04</u>.

(b)    No Guarantor will, and the Borrower will not permit any Guarantor to, consolidate, amalgamate or merge with or into or wind up into (whether or not such Subsidiary Guarantor is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to any Person except for Dispositions permitted by <u>Section 10.04</u>.

Section 10.09. <u>Limitations on Debt Payments and Amendments</u>.

(a)    The Borrower will not, and will not permit any Restricted Subsidiary to make any payment or other transfer with respect to any Indebtedness arising prior to the Petition Date that is subject to the automatic stay provisions of the Bankruptcy Code or otherwise, except pursuant to a confirmed Acceptable Plan, pursuant to the First Day Orders or any other order consented to by the Administrative Agent in its reasonable discretion or otherwise in accordance with the Approved Budget.

(b)    The Borrower will not amend or modify the terms of (i) the Prepetition Term Loan Credit Agreement, to the extent not permitted by the applicable Prepetition Intercreditor Agreement, or (ii) the document governing any other Material Indebtedness, in each

105

case, other than amendments or modifications that: (A) would not be materially adverse to the Lenders or (B) the Administrative Agent has consented to in writing.

Section 10.10. <u>Hedge Agreements</u>.  The Borrower will not, and will not permit any Restricted Subsidiary to, enter into any Hedge Agreements other than those that exist on the Closing Date.

Section 10.11. <u>Variance Covenants</u>. No Credit Party shall, nor shall it permit any Subsidiary to, pay any expenses or other disbursements other than in accordance with the Approved Budget, subject to the Permitted Variance.

(a)     <u>Collections Budget Variance</u>.  As of any Budget Test Date, for the Budget Test Period ending on such Budget Test Date, commencing with the Budget Test Date occurring during the first full week ended after the Petition Date, the sum of (x) the Debtors' cumulative Receipts for such Budget Test Period, <u>plus</u> (y) the amount of any Carryover Receipts from the immediately preceding Budget Test Period which are not included in the current Budget Test Period (i.e. limited to the amount of any Carryover Receipts from the weekly period immediately preceding the current Budget Test Period), shall not be less than 85% of the projected Receipts set forth in the Approved Budget for such Budget Test Period (the foregoing permitted variance from the Approved Budget, the "<u>Permitted Collections Budget Variance</u>").

(b)     <u>Expenditures Budget Variance</u>.  As of any Budget Test Date, for the Budget Test Period ending on such Budget Test Date, commencing with the Budget Test Date occurring during the first full week ended after the Petition Date, (i) the Debtors' cumulative Operating Disbursements shall not be greater than (x) 110% of the budgeted Operating Disbursements set forth in the Approved Budget for such Budget Test Period, <u>plus</u> (y) the amount of any Carryover budgeted Operating Disbursements from the immediately preceding Budget Test Period which are not included in the current Budget Test Period (i.e. limited to the amount of Carryover budgeted Operating Disbursements from the weekly period immediately preceding the current Budget Test Period), and (ii) the actual amount of "Employee Related" expenditures, "Lease Operating Expense", "CapEx" and "Transportation Fees" (each as referenced on the Approved Budget) of the Debtors shall not be greater than (x) 115% of the budgeted disbursements for each such line item set forth in the Approved Budget for the corresponding Budget Test Period, <u>plus</u> (y) the amount of any Carryover budgeted disbursements for each such line item from the immediately preceding Budget Test Period which are not included in the current Budget Test Period (i.e. limited to the amount of Carryover budgeted Operating Disbursements for each such line item from the weekly period immediately preceding the current Budget Test Period) (the foregoing permitted variances from the Approved Budget described in <u>clauses (i)</u> and <u>(ii)</u>, the "<u>Permitted Expenditures Budget Variance</u>"; and together with the Permitted Collections Budget, collectively, the "<u>Permitted Variance</u>").

The date of determination as to whether the Debtors are in compliance with the Variance Covenants set forth in this <u>Section 10.11</u> shall be the scheduled date of delivery of the Variance Report required pursuant to <u>Section 9.20(a)</u>.

Section 10.12. <u>Negative Pledge Agreements</u>.  The Borrower will not, and will not permit any of the Restricted Subsidiaries to, enter into or permit to exist any Contractual

Requirement (other than this Agreement or any other Credit Document or any documentation in respect of the Prepetition Credit Agreement, the Prepetition Term Loan Credit Agreement or the Prepetition Unsecured Notes) otherwise permitted hereunder that limits the ability of the Borrower or any Guarantor to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Secured Parties with respect to the Obligations or under the Credit Documents; provided that the foregoing shall not apply to each of the following Contractual Requirements that:

(a)    exist on the Closing Date and (to the extent not otherwise permitted by this Section 10.12 or pursuant to the Prepetition Credit Agreement) are listed on Schedule 10.12; or

(b)    are imposed by Requirements of Law.

Section 10.13. Drilling and Completion Capital Expenditures.  The Borrower will not incur drilling and completion capital expenditures, except in accordance with the Approved Budget.

Section 10.14. Modifications to Orders.  No Credit Party will seek or consent to any amendment, supplement or any other modification of any of the terms of the Financing Orders after such orders are entered by the Bankruptcy Court without the prior written consent of the Administrative Agent.

Section 10.15. Prohibited Conduct.  Without the prior written consent of the Administrative Agent, no Credit Party shall, nor shall it permit any of its Subsidiaries to, do any of the following:

(a)    object to or contest the validity or enforceability of any Financing Order, any Liens granted to the Collateral Agent and Lenders therein, or any terms of the Credit Documents or cooperate with any party with respect to such an objection or contest;

(b)    seek to modify any of the rights granted under the Financing Orders to any of Administrative Agent or Lenders in any manner that would be materially adverse to the Administrative Agent or the Lenders (without the consent of the Administrative Agent); provided that the foregoing clauses (a) and (b) shall not apply to (x) any action taken by a party (other than the Credit Parties) that has been granted standing by the Bankruptcy Court to take such action on behalf of the Credit Parties and (y) any modification in connection with a transfer of venue of the Chapter 11 Cases;

(c)    make any payment in settlement or satisfaction of any prepetition claim, unless made in accordance with the Approved Budget and approved by the Bankruptcy Court;

(d)    except as expressly provided or permitted hereunder (including, without limitation, to the extent expressly identified in any line item in the Approved Budget) or any order by the Bankruptcy Court, make any payment or distribution to any non-Debtor Affiliate, holder of Capital Stock or insider of any Debtor outside of the ordinary course of business (provided that in no event shall any management or consulting fees be paid to any Affiliate of the Debtors); or

107

(e)    incur, create, assume, suffer to exist or permit any administrative expense, unsecured claim, or other superpriority claim which is pari passu with or senior to the claims of the Secured Parties against the Credit Parties hereunder, or apply to the Bankruptcy Court for authority to do so, except for the Carve-Out and as permitted hereunder and by the terms of the Financing Order.

Section 10.16. <u>Additional Restrictions on Credit Parties</u>.    Without the prior written consent of the Administrative Agent, no Credit Party shall, nor shall it permit any of its Subsidiaries to, do any of the following:

(a)    (i) pay any management, consulting or similar fees to executives, directors, officers or shareholders of any Credit Party by direct payment or otherwise (other than in a manner consistent with the Approved Budget) or (ii) enter into any employment or consulting agreements, or assume any existing contracts, with current management, shareholders or directors of Borrower or its Affiliates;

(b)    enter into any employee incentive or retention plan that would result in an Event of Default under <u>Section 11.01(i)(x)</u>, or pay any bonuses or severance to any employees, or increase the salary of any employee;

(c)    create any new Subsidiaries;

(d)    open or establish any new Deposit Account;

(e)    assume or reject any material lease or executory contract (other than leases and executory contracts designated in an Acceptable Plan) (such consent of the Administrative Agent not to be unreasonably withheld or delayed); and

(f)    make any payments on account of any creditor's claims incurred prior to the Petition Date, other than "critical vendor" payments approved by the Bankruptcy Court and subject to compliance with the Variance Covenants.

## ARTICLE X-A

### Holdings Covenant

(a)    Holdings covenants and agrees that on the Closing Date and thereafter, until Payment in Full it will not engage at any time in any business or business activity other than (i) the ownership of the Equity Interests in the Borrower, (ii) performance of its obligations under and in connection with the Credit Documents, the Guarantee Obligations pursuant to the Guarantee and the Collateral Agreement, Prepetition Credit Agreement, Prepetition Term Loan Credit Agreement, the Overriding Royalty Interest Assignment, Prepetition Unsecured Notes (and any document related thereto) and performance of Indebtedness not prohibited by Section 10.03, (iii) [reserved], (iv) paying Taxes, (v) holding directors' and shareholders' meetings, preparing corporate and similar records and other activities (including the ability to incur fees, costs and expenses relating to such maintenance) required to maintain its corporate or other legal structure or to participate in tax, accounting or other administrative matters as a member of the consolidated group of the Credit Parties, (vi) preparing reports to, and preparing and making

108

notices to and filings with, Governmental Authorities and to its holders of Equity Interests, (vii) receiving, and holding proceeds of, Restricted Payments from the Borrower and the Subsidiaries and distributing the proceeds thereof to the extent not prohibited by Section 10.01 or Section 10.05, (viii) activities in connection with the formation and maintenance of the existence of any Parent Entity (it being understood that notwithstanding anything to the contrary herein or in any Credit Document, there shall be no restriction on the formation of any Parent Entity), (ix) providing indemnification to officers and directors, (x) activities permitted hereunder or as otherwise required by Requirements of Law and (xi) activities incidental to the business or activities described in each foregoing clause of this Article X-A, in each case, to the extent not otherwise prohibited hereunder or under any other Credit Document.

(b)    Holdings will not create, incur, assume or suffer to exist any Lien upon any Equity Interests of the Borrower, whether now owned or hereafter acquired other than Liens securing the Obligations or otherwise existing as of the Closing Date.

## ARTICLE XI

### Events of Default

Section 11.01. Events of Default.  An "Event of Default," wherever used herein, means any one of the following events:

(a)    the Borrower shall fail to (i) pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or upon redemption, acceleration or otherwise, (ii) pay when due any interest on the Loans, fees or any other amounts owing hereunder or under any other Credit Document;

(b)    any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or any certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made;

(c)    (i) failure by the Borrower or Holdings to comply with their obligations under Section 9.01(d)(i), Section 9.17, Section 9.18, Section 9.20(a), Section 9.21, ARTICLE X, and ARTICLE X-A, (ii) failure by the Borrower, Holdings or any Restricted Subsidiary to comply with Section 9.19 and such failure shall continue for five (5) Business Days after receipt of a written request from Administrative Agent, (iii) failure by the Borrower to comply with Section 9.20 (other than Section 9.20(a)) and such failure shall continue for five (5) Business Days, or (iv) failure by the Borrower, Holdings or any Restricted Subsidiary for thirty (30) days after the earlier of (A) an Authorized Officer of the Borrower or such other Restricted Subsidiary otherwise becoming aware of such Default and (B) receipt of written notice given by the Administrative Agent to comply with any of its obligations, covenants or agreements (other than a default referred to in clauses (a), (c)(i), (c)(ii) or (c)(iii) of this Section 11.01) contained in this Agreement or in any other Credit Document;

(d)    [reserved]:

109

(e)    failure by the Borrower or any Restricted Subsidiary to pay final non-appealable judgments with respect to any post-Petition Date liability aggregating in excess of one million Dollars ($1,000,000) (net of amounts covered by insurance policies issued by reputable insurance companies), which final judgments remain unpaid, undischarged, unwaived and unstayed for a period of more than sixty (60) days after such judgment becomes final, and in the event such judgment is covered by insurance, an enforcement proceeding has been commenced by any creditor upon such judgment or decree which is not promptly stayed;

(f)    [reserved];

(g)    [reserved];

(h)    a Change of Control shall have occurred, other than as a part of a transaction reasonably acceptable to the Administrative Agent;

(i)    Bankruptcy Matters:

(i)    the Bankruptcy Court shall enter any order dismissing any of the Chapter 11 Cases (other than in connection with a transfer of venue of such Chapter 11 Case, so long as there remains a pending proceeding in the Bankruptcy Court under the Bankruptcy Code with respect to each Credit Party) or converting any of the Chapter 11 Cases to a Chapter 7 case;

(ii)    the Bankruptcy Court shall enter any order appointing a Chapter 11 trustee or a receiver, or appointing an examiner with enlarged powers relating to the operation of the business of any Credit Party under Section 1106(b) of the Bankruptcy Code in any of the Chapter 11 Cases;

(iii)    the Bankruptcy Court shall enter an order granting relief from the any stay of proceeding (including the automatic stay) to any Person holding or asserting a Lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Credit Party or any Subsidiary which have an aggregate value in excess of $500,000, except as otherwise approved by the Administrative Agent in its reasonable discretion;

(iv)    the Bankruptcy Court shall enter any order granting or allowing any other superpriority claim (other than the Carve-Out) or granting any other lien (including any adequate protection lien) having a priority equal or superior to the claims and Liens in favor of the Collateral Agent securing the Obligations in any of the Chapter 11 Cases, without the prior written consent of the Administrative Agent (or as otherwise provided in the Financing Orders or in the Credit Documents);

(v)    (A) the Bankruptcy Court shall enter an order confirming (or the filing by any Credit Party of any motion or pleading requesting confirmation of or otherwise in support of) a plan of reorganization or liquidation with respect to any Debtor, in each case, that is not an Acceptable Plan, without the prior written consent of the Administrative Agent or (B) the termination of the Credit Parties' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization;

110

(vi)      the Bankruptcy Court shall enter any order staying, reversing, vacating or otherwise modifying, without the prior written consent of the Administrative Agent, the DIP Facility, the Interim Order or the Final Order, other than in connection with a transfer of venue of the Chapter 11 Cases (and such order is not stayed or reversed within two (2) Business Days after entry thereof);

(vii)     the payment or granting of adequate protection with respect to Prepetition Indebtedness (other than as described herein or the applicable Financing Order) in a manner that requires cash expenditures either (x) not contemplated by the Approved Budget or (y) that would have a material adverse effect on the Collateral (as reasonably determined by the Administrative Agent), in each case, without the prior written consent of the Administrative Agent;

(viii)    the Final Order (x) shall not have been entered within forty (40) days after the Petition Date (or such later date as the Administrative Agent) or (y) shall, at any time, cease to be in full force and effect, or the Bankruptcy Court shall enter any order amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Final Order, other than in connection with a transfer of venue of the Chapter 11 Cases (and such order is not stayed or reversed within two (2) Business Days after entry thereof), without the prior written consent of the Administrative Agent;

(ix)      any Lien granted in favor of the Collateral Agent in any of the Collateral under the Financing Orders or any Security Document or any DIP Superpriority Claims (as defined in the Financing Orders) shall cease to have the validity, perfection or priority set forth in this Agreement, the other Credit Documents or the Financing Orders;

(x)       the filing of a motion or seeking of an order to approve any employee incentive or retention plan, in each case, that includes proposed payments to insiders (as that term is defined in the Bankruptcy Code), that is not reasonably acceptable to the Administrative Agent in its reasonable discretion;

(xi)      the occurrence of any Production Decrease Event;

(xii)     any Credit Party fails to comply with any material term of the Financing Orders and such failure continues for 5 days after the earlier of the date on which (A) any Credit Party or any Subsidiary receives notice thereof and (B) an Authorized Officer of any Credit Party obtains or, with the exercise of reasonable diligence, should have obtained, knowledge thereof; or

(xiii)    the filing by any Credit Party of any motion, pleading or other paper seeking or otherwise consenting to or supporting the appointment of a Chapter 11 trustee, a receiver, or appointment of an examiner with enlarged powers relating to the operation of the business of any Credit Party under Section 1106(b) of the Bankruptcy Code in any of the Chapter 11 Cases;

(xiv)     other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget (subject to the Permitted Variance) and which

111

are authorized by one or more First Day Orders or other orders reasonably satisfactory to the Administrative Agent, any Credit Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Third-Party Indebtedness or Prepetition payables (including, without limitation, reclamation claims);

(xv)    (A) any Credit Party engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of any of the Credit Documents or the Prepetition Credit Documents or the Liens securing the Obligations or the Prepetition Obligations, including without limitation seeking to equitably subordinate or avoid the Liens securing such obligations; or (B) any Credit Party engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly supports assertion of the same) against the Administrative Agent, any Lender, the Prepetition Agent or any Prepetition Lenders, in each case, in their capacity as such; provided, however, that it shall not constitute an Event of Default if the Credit Parties provide information with respect to the Prepetition Credit Documents to a party in interest, or are compelled to provide information by an order of the Bankruptcy Court so long as the Administrative Agent has been served with the request for such an order or, if no such service has been made prior to the time the Credit Parties are required to provide information, so long as the Credit Parties provide prior written notice to the Administrative Agent of any intention or requirement to do so;

(xvi)    the filing of any motion by any Credit Party seeking an order from the Bankruptcy Court substantively consolidating any of the Credit Parties' estates, other than in connection with an Acceptable Plan;

(xvii)    any Credit Party shall file a motion in any of the Chapter 11 Cases to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code pari passu with, or senior to, the Obligations;

(xviii)    [reserved];

(xix)    any Credit Party shall file a motion seeking relief under Section 506(c) or 552(b) of the Bankruptcy Code that would have an adverse effect on the Collateral, without the prior written consent of the Administrative Agent;

(xx)    the consummation of a sale of any material portion of the Collateral (other than a sale in the ordinary course of business that is contemplated by the Approved Budget) other than pursuant to the Approved Sale or as otherwise permitted under the Credit Documents; or

(xxi)    the filing by any Credit Party with the Bankruptcy Court, prior to the consummation of the Approved Sale and indefeasible payment in full in cash of all Obligations, of any disclosure statement or plan of reorganization or liquidation other than in support of an Acceptable Plan.

For the avoidance of doubt, the transfer of venue of the Chapter 11 Cases to the United States Bankruptcy Court for the Western District of Oklahoma, by itself, shall not be an

112

Event of Default hereunder or entitle the Administrative Agent or the Lenders to exercise remedies as set forth in the next succeeding paragraph.

Then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, (I) the Administrative Agent, upon the written request of the Majority Lenders, shall (subject to the terms of this Agreement), (A) deliver a notice to the Borrower of the Event of Default, (B) charge the Default Rate, (C) terminate the Total Commitment, whereupon the Commitment of each Lender shall forthwith terminate immediately and any fees theretofore accrued shall forthwith become due and payable without any other notice of any kind; and (ii) upon five (5) Business Days' written notice to the Borrower and the Administrative Agent from the Majority Lenders, in their sole and absolute discretion, the automatic stay of section 362 of the Bankruptcy Code shall be terminated without order of the Bankruptcy Court, without the need for filing any motion for relief from the automatic stay or any other pleading, for the purpose of permitting the Lenders to do any of the following: (A) direct the Collateral Agent to foreclose on the Collateral, (B) enforce all of their rights under the Guarantee, (C) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder and under the other Credit Documents), shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party.  In addition to the foregoing, upon the occurrence of any Event of Default, and at any time thereafter, the Administrative Agent, with the consent of the Majority Lenders, in accordance with the provisions of this Agreement may exercise any or all of its rights and remedies provided by law and equity and any other rights and remedies pursuant to the Credit Documents.

Section 11.02. <u>Application of Proceeds</u>.   Any amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral) or any Lender under <u>Section 2.11</u> following any acceleration of the Obligations under this Agreement shall be applied:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, disbursements and other charges of counsel payable under <u>Section 12.07</u> and amounts payable under <u>Article II</u>) payable to the Administrative Agent and/or the Collateral Agent in such Person's capacity as such;

<u>Second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest and Letter of Credit fees) payable to the Lenders and the Issuing Banks (including fees, disbursements and other charges of counsel payable under <u>Section 12.07</u>) arising under the Credit Documents and amounts payable under <u>Article II</u>, ratably among them in proportion to the respective amounts described in this <u>clause Second</u> payable to them;

<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and Letter of Credit Fees, and, ratably among the Secured Parties in proportion to the respective amounts described in this <u>clause Third</u> payable to them;

113

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans to Cash Collateralize that portion of Letters of Credit Outstanding comprising the aggregate undrawn amount of Letters of Credit to the extent not otherwise Cash Collateralized by the Borrower pursuant to Section 3.07 ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them and;

Fifth, to the payment of all other Obligations of the Credit Parties owing under or in respect of the Credit Documents that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

Last, the balance, if any, after all of the Obligations have been paid in full, to the Borrower and held subject to further order of the Bankruptcy Court or as otherwise required by Requirements of Law.

## ARTICLE XII

## The Agents

Section 12.01. Appointment.

(a)    Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Credit Documents and irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto.  The provisions of this Article XII (other than Section 12.01(c) with respect to the Arrangers, and Sections 12.09, 12.11, 12.12 and the last sentence of Section 12.04 with respect to the Borrower) are solely for the benefit of the Agents and the Lenders, and the Borrower shall not have rights as third party beneficiary of any such provision.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against the Administrative Agent.

(b)    The Administrative Agent, each Lender and each Issuing Bank hereby irrevocably designate and appoint the Collateral Agent as the agent with respect to the Collateral, and each of the Administrative Agent, each Lender and each Issuing Bank irrevocably authorizes the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Collateral Agent shall not have any duties or responsibilities except those expressly set forth herein, or any

114

fiduciary relationship with any of the Administrative Agent, the Lenders or the Issuing Banks, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against the Collateral Agent.

(c)    The Collateral Agent, each Lender and each Issuing Bank hereby irrevocably designate and appoint the Administrative Agent as the agent with respect to the matters relating to the Loans, and the Collateral Agent, each Lender and each Issuing Bank irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities except those expressly set forth herein, or any fiduciary relationship with any of the Collateral Agent, the Lenders or the Issuing Banks, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against the Administrative Agent.

(d)    No Arranger, in its capacity as such, shall have any obligations, duties or responsibilities under this Agreement but shall be entitled to all benefits of this Article XII.

Section 12.02. Delegation of Duties.  The Administrative Agent and the Collateral Agent may each execute any of its duties under this Agreement and the other Credit Documents by or through agents, sub-agents, employees or attorneys-in-fact (each, a "Subagent") and shall be entitled to advice of counsel concerning all matters pertaining to such duties; provided, however, that no such Subagent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Administrative Agent.  If any Subagent, or successor thereto, shall die, become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Subagent, to the extent permitted by law, shall automatically vest in and be exercised by the Administrative Agent until the appointment of a new Subagent.  Neither the Administrative Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any Subagents selected by it in the absence of gross negligence or willful misconduct (as determined in the final judgment of a court of competent jurisdiction).

Section 12.03. Exculpatory Provisions.

No Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by any of them under or in connection with this Agreement or any other Credit Document (except for its or such Person's own bad faith, gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein) or (b) responsible in any manner to any of the Lenders or any participant for any recitals, statements, representations or warranties made by any of the Borrower, any other Credit Party or any officer thereof contained in this Agreement or any other Credit Document or in any certificate, report, statement or other document referred to or provided for in, or received by such

115

Agent under or in connection with, this Agreement or any other Credit Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Credit Document, or, the perfection or priority of any Lien or security interest created or purported to be created under the Security Documents or for any failure of the Borrower or any other Credit Party to perform its obligations hereunder or thereunder.  No Agent shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party or any Affiliate thereof.  Neither the Administrative Agent nor the Collateral Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing

Section 12.04. <u>Reliance by Agents</u>.  The Administrative Agent and the Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or instruction believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent or the Collateral Agent.  The Administrative Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  The Administrative Agent and the Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such advice or concurrence of the Majority Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent and the Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a request of the Majority Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans; <u>provided</u> that the Administrative Agent and Collateral Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Credit Document or applicable Requirements of Law.  For purposes of determining compliance with the conditions specified in <u>Article VI</u> on the Closing Date, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 12.05. <u>Notice of Default</u>.   Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent or the Collateral Agent, as applicable, has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." In the event that the Administrative Agent receives such a notice, it shall give notice thereof to the Lenders and the Collateral Agent.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Majority

116

Lenders; provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Secured Parties except to the extent that this Agreement requires that such action be taken only with the approval or consent of the Majority Lenders, each individual Lender or directly adversely affected Lender, as applicable.

Section 12.06. <u>Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders</u>.  Each Lender expressly acknowledges that neither the Administrative Agent nor the Collateral Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent or the Collateral Agent hereinafter taken, including any review of the affairs of the Borrower or any other Credit Party, shall be deemed to constitute any representation or warranty by the Administrative Agent or the Collateral Agent to any Lender or any Issuing Bank.  Each Lender and each Issuing Bank represents to the Administrative Agent and the Collateral Agent that it has, independently and without reliance upon the Administrative Agent, the Collateral Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of an investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower and each other Credit Party and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Credit Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrower and any other Credit Party.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Administrative Agent nor the Collateral Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of the Borrower or any other Credit Party that may come into the possession of the Administrative Agent or the Collateral Agent or any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates.

Section 12.07. <u>Indemnification</u>.  The Lenders severally agree to indemnify the Administrative Agent and the Collateral Agent, each in its capacity as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to their respective portions of the Commitments or Loans, as applicable, outstanding in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their respective portions of the Total Outstandings in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans) be imposed on, incurred by or asserted against the Administrative Agent or the Collateral Agent in any way relating to or arising out of any actual

117

or prospective threatened claim, action, suit, litigation, investigation or proceeding based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (each, a "Proceeding") relating to the Commitments, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent or the Collateral Agent under or in connection with any Proceeding; provided that no Lender shall be liable to the Administrative Agent or the Collateral Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Administrative Agent's or the Collateral Agent's, as applicable, gross negligence, bad faith or willful misconduct as determined by a final judgment of a court of competent jurisdiction; provided, further, that no action taken in accordance with the directions of the Majority Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) shall be deemed to constitute gross negligence, bad faith or willful misconduct for purposes of this Section 12.07.  In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans), this Section 12.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.    Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent and the Collateral Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney and Advisor Costs) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Credit Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrower; provided that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto.  If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided that in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata portion thereof; and provided further, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from such Agent's gross negligence, bad faith or willful misconduct.  The agreements in this Section 12.07 shall survive the payment of the Loans and all other amounts payable hereunder.

Section 12.08. Agents in Their Individual Capacities.    Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower and any other Credit Party as though such Agent were not an Agent hereunder and under the other Credit Documents.  With respect to the Loans made by it, each Agent shall have the same rights and powers under this Agreement and the other Credit Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

118

Section 12.09. <u>Successor Agents</u>.    Each of the Administrative Agent and the Collateral Agent may at any time give notice of its resignation to the Lenders, the Issuing Banks and the Borrower.  If the Administrative Agent and/or the Collateral Agent becomes a Defaulting Lender, then such Administrative Agent or the Collateral Agent may be removed as Administrative Agent or the Collateral Agent, as the case may be, at the reasonable request of the Borrower or the Majority Lenders.  Upon receipt of any such notice of resignation or removal, as the case may be, the Majority Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably conditioned, withheld or delayed) so long as no Default under <u>Section 11.01(a)</u> is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If, in the case of a resignation of a retiring Agent, no such successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the Issuing Banks, appoint a successor Agent meeting the qualifications set forth above (<u>provided</u> that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by the Agent on behalf of the Lenders or Issuing Banks under any Credit Document, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed and (b) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender or Issuing Bank directly, until such time as the Majority Lenders appoint a successor Agent as provided for above in this <u>Section 12.09</u>).    Upon the acceptance of a successor's appointment as the Administrative Agent or the Collateral Agent, as the case may be, hereunder, and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Majority Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this <u>Section 12.09</u>).  After the retiring Agent's resignation hereunder and under the other Credit Documents, the provisions of this <u>Article XII</u> (including <u>Section 12.07</u>) and <u>Section 13.05</u> shall continue in effect for the benefit of such retiring Agent, its Subagents and their respective Agent Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

Any resignation of any Person as Administrative Agent pursuant to this <u>Section 12.09</u> shall also constitute its resignation as Issuing Bank.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank, (b) the retiring Issuing Bank shall be discharged from all of its duties and obligations hereunder and under the other Credit Documents, and (c) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit.

119

Section 12.10. <u>Withholding Tax</u>.    To the extent required by any applicable Requirement of Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.  If the IRS or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by any applicable Credit Party and without limiting the obligation of any applicable Credit Party to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including penalties, additions to Tax and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Credit Document against any amount due to the Administrative Agent under this <u>Section 12.10</u>.  For the avoidance of doubt, for purposes of this <u>Section 12.10</u>, the term "Lender" includes any Issuing Bank.

Section 12.11. <u>Security Documents and Collateral Agent under Security Documents</u>.  Each Secured Party hereby authorizes the Administrative Agent or the Collateral Agent, as applicable, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Collateral and the Security Documents. Subject to <u>Section 13.01</u>, without further written consent or authorization from any Secured Party, the Administrative Agent or the Collateral Agent, as applicable, may (a) execute any documents or instruments necessary in connection with a Disposition permitted by this Agreement, (b) release any Lien encumbering any item of Collateral that is (i) the subject of such Disposition or otherwise becomes an Excluded Equity Interest or Excluded Property, (ii) to the extent such release is required pursuant to the terms of any order of the Bankruptcy Court, (iii) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guarantee in accordance with <u>Section 5(g)</u> of the Guarantee or otherwise in accordance with this Agreement or (iv) with respect to which Majority Lenders (or such other Lenders as may be required to give such consent under <u>Section 13.01</u>) have otherwise consented or (c) release any applicable Guarantor from the Guarantee or the Collateral Agreement (i) in connection with such Disposition, (ii) to the extent such release is required pursuant to the terms of any order of the Bankruptcy Court, or (iii) with respect to which Majority Lenders (or such other Lenders as may be required to give such consent under <u>Section 13.01</u>) have otherwise consented.  The Lenders and the Issuing Banks irrevocably agree that (x) the Collateral Agent is authorized, without any further consent of any Lender, to enter into or amend any applicable intercreditor agreement with the collateral agent or other representatives of the holders of Indebtedness that is permitted to be secured by a Lien on the Collateral that is permitted under this Agreement, in each case for the purpose of adding the holders of such Indebtedness (or their representative) as a party thereto and otherwise causing such Indebtedness to be subject thereto (it being understood that any such amendment, amendment and restatement or supplement may make such other changes to the applicable intercreditor agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and with any material modifications to be reasonably satisfactory to the Administrative Agent), (y) the Collateral Agent may rely exclusively on a

120

certificate of an Authorized Officer of the Borrower as to whether any such other Liens are permitted and (z) any such intercreditor agreement referred to in clause (x) above, entered into by the Collateral Agent, shall be binding on the Secured Parties.

Section 12.12. Right to Realize on Collateral and Enforce the Guarantee. Anything contained in any of the Credit Documents to the contrary notwithstanding, the Borrower, the Agents and each Secured Party hereby agree that (a) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee or the Collateral Agreement, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent, and (b) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Collateral Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Majority Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other disposition.

Section 12.13. Administrative Agent May File Proofs of Claim.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid hereunder or under any other Credit Document in respect of the Loans and all other Indebtedness that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel, to the extent due under Section 13.05) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, to the extent due under Section 13.05.

121

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Indebtedness or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Majority Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar laws in any other jurisdictions to which a Credit Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof, shall be governed, directly or indirectly, by the vote of the Majority Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Majority Lenders contained in clause (a) of Section 13.01 of this Agreement, (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

Section 12.14. The Arrangers.    The Arrangers shall have no duties, responsibilities or liabilities under this Agreement and the other Credit Documents other than their duties, responsibilities and liabilities in their capacity as Lenders hereunder.

122

Section 12.15. <u>Intercreditor Agreements</u>.  Each Lender (on behalf of itself and its Affiliates) hereby agrees that (a) the Agents may, from time to time on and after the Closing Date, without any further consent of any Lender, enter into, and enter into amendments to, amendments and restatements of, supplements to and/or replacements of, any intercreditor agreement with the Collateral Agent or other representatives of the holders of Indebtedness that is permitted to be secured by a Lien on the Collateral that is permitted under this Agreement, in each case, in order to effect the first-priority Liens on the Collateral and to provide for certain additional rights, obligations and limitations in respect of, any Liens required by the terms of this Agreement to be pari passu with or junior to the Liens securing the Obligations with respect to part or all of the Collateral, which are, in each case, incurred in accordance with <u>Article X</u> of this Agreement, and to establish certain relative rights as between the holders of the Obligations and the holders of the Indebtedness secured by such Liens, (b) the Agents may rely exclusively on a certificate of an Authorized Officer of Borrower as to whether any such Liens are permitted, and (c) such intercreditor agreement referred to in the foregoing <u>clause (a)</u> entered into by the Agents shall be binding on the Secured Parties.  Furthermore, each Lender (on behalf of itself and its Affiliates) hereby authorizes the Agents to release any Lien on any property granted to or held by the Agents under any Credit Document as provided in <u>Section 13.17</u>.

# ARTICLE XIII

## Miscellaneous

Section 13.01. <u>Amendments, Etc.</u>

(a)    Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Credit Document, and no consent to any departure by any Credit Party therefrom, shall be effective unless in writing signed by the Majority Lenders (or by the Administrative Agent with the consent of the Majority Lenders) and the applicable Credit Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u> that no such amendment, waiver or consent shall:

(i)    forgive or reduce any portion of any Loan or reduce the stated rate (it being understood that only the consent of the Majority Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the Default Rate or amend <u>Section 2.08(c)</u>), or forgive or reduce any portion, or extend the date for the payment (including the Maturity Date), of any principal, interest or fee payable hereunder (other than as a result of waiving the applicability of any post-default increase in interest rates), or extend the final expiration date of any Lender's Commitment (<u>provided</u> that (1) any Lender, upon the request of the Borrower, may extend the final expiration date of its Commitment without the consent of any other Lender, including the Majority Lenders, and (2) it is being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default shall not constitute an increase of the Commitments of any Lender) or extend the final expiration date of any Letter of Credit beyond the L/C Maturity Date, or increase the amount of the Commitment of any Lender (<u>provided</u> that any Lender, upon the request of the Borrower, may increase the amount of its Commitment without the consent of any other Lender, including the Majority Lenders),

123

or make any Loan, interest, fee or other amount payable in any currency other than Dollars, in each case without the written consent of each Lender directly and adversely affected thereby;

(ii)    amend, modify or waive any provision of this <u>Section 13.01</u> in a manner that would reduce the voting rights of any Lender, or reduce the percentages specified in the definitions of the term "Majority Lenders" (it being understood that, with the consent of the Majority Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Majority Lenders on substantially the same basis as the Loans and Commitments are included on the Closing Date), consent to the assignment or transfer by the Borrower of its rights and obligations under any Credit Document to which it is a party (except as permitted pursuant to **Error! Reference source not found.**), in each case without the written consent of each Lender directly and adversely affected thereby;

(iii)    amend the provisions of <u>Section 11.02</u> or <u>Section 13.08</u> or any analogous provision of any Security Document, in a manner that would by its terms alter the pro rata sharing of payments required thereby, without the prior written consent of each Lender directly and adversely affected thereby;

(iv)    amend, modify or waive any provision of <u>Article XII</u> without the written consent of the then-current Administrative Agent and Collateral Agent, as applicable, or any other former or current Agent to whom <u>Article XII</u> then applies in a manner that directly and adversely affects such Person;

(v)    amend, modify or waive any provision of <u>Article III</u> with respect to any Letter of Credit without the written consent of each Issuing Bank to whom <u>Article III</u> then applies in a manner that directly and adversely affects such Person;

(vi)    [reserved];

(vii)    release all or substantially all of the aggregate value of the guarantees made by any Guarantor (as defined in the Guarantee) pursuant to the Guarantee (except as expressly permitted or required by the Guarantee or this Agreement) without the prior written consent of each Lender;

(viii)    release all or substantially all of the Collateral under the Security Documents (except as expressly permitted or required by the Security Documents) without the prior written consent of each Lender;

(ix)    amend <u>Section 2.09</u> so as to permit Interest Period intervals greater than six (6) months without regard to availability to Lenders, without the written consent of each Lender directly and adversely affected thereby;

(x)    [reserved]; or

124

(xi)    affect the rights or duties of, or any fees or other amounts payable to, any Agent under this Agreement or any other Credit Document without the prior written consent of such Agent.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the affected Lenders and shall be binding upon the Borrower, such Lenders, the Administrative Agent and all future holders of the affected Loans.  In the case of any waiver, the Borrower, the Lenders and the Administrative Agent shall be restored to their former positions and rights hereunder and under the other Credit Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; it being understood that no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.  In connection with the foregoing provisions, the Administrative Agent may, but shall have no obligations to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender whose consent is required hereunder.

(b)    Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that the Commitment of such Defaulting Lender may not be increased or extended without the consent of such Defaulting Lender (it being understood that any Commitments or Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders) and no such amendment, waiver or consent shall disproportionately materially adversely affect such Defaulting Lender as compared to other Lenders without such Defaulting Lender's consent.

(c)    Without the consent of any Lender or Issuing Bank, the Credit Parties and the Administrative Agent or the Collateral Agent may (in their respective sole discretion, or shall, to the extent required by any Credit Document) enter into any amendment, modification or waiver of any Credit Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law or this Agreement or in each case to otherwise enhance the rights or benefits of any Lender under any Credit Document.

(d)    Notwithstanding anything to the contrary contained in this <u>Section 13.01</u>, guarantees, collateral security documents and related documents executed by Credit Parties in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Requirements of Law or advice of local counsel, (ii) to cure ambiguities, omissions, mistakes, defects or inconsistencies or (iii)  to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Credit Documents.

125

(e)     If the Administrative Agent and the Borrower shall have jointly identified an obvious error (including, but not limited to, an incorrect cross-reference) or any error or omission of a technical or immaterial nature, in each case, in any provision of this Agreement or any other Credit Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Credit Document), then the Administrative Agent (acting in its sole discretion) and the Borrower or any other relevant Credit Party shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Credit Document.    Notification of such amendment shall be made by the Administrative Agent to the Lenders and the Issuing Banks promptly upon such amendment becoming effective.

Section 13.02. Notices.

(a)     Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Credit Document shall be in writing (including by facsimile transmission).    All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to Holdings or the Borrower, the Administrative Agent, the Collateral Agent or any Issuing Bank, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 13.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(ii)     if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower, the Administrative Agent, the Collateral Agent and the Issuing Banks.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (A) actual receipt by the relevant party hereto and (B)(1) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (2) if delivered by mail, three (3) Business Days after deposit in the mails, postage prepaid; (3) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (4) if delivered by electronic communications, as set forth in paragraph (b) below; provided that notices and other communications to the Administrative Agent or the Lenders pursuant to Section 2.03 and Section 5.01 shall not be effective until received.

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices to any Lender pursuant to Section 2.03 if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Section by electronic communication.    The Administrative Agent or the Borrower may, in its discretion,

126

agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided the approval of such procedures may be limited to particular notices or communications.  Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment) and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing paragraph (i) or notification that such notice or communication is available and identifying the website address therefor.

(c)     The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT RELATED PARTIES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT RELATED PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Agent Related Parties have any liability to the Borrower, any Lender, the Issuing Bank or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's, any Credit Party's or the Administrative Agent's transmission of Borrower Materials or notices through the Platform, any other electronic platform or electronic messaging service, or through the Internet.

Section 13.03.  No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Credit Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Requirements of Law.

Section 13.04.  Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Credit Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.  Such representations and warranties shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations, in any such case, not yet due and payable).

127

Section 13.05. <u>Payment of Expenses; Indemnification</u>.

(a)    The Borrower agrees to pay or reimburse (a) all reasonable and documented out-of-pocket costs and expenses of the Administrative Agent and the Lenders, in each case incurred on or after the Closing Date (promptly following receipt of a written demand therefor, together with backup documentation (in summary form) reasonably supporting such reimbursement request) incurred in connection with the preparation, execution, delivery, syndication and administration of this Agreement and the other Credit Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof, limited in the case of attorney and advisor costs and expenses to the Attorney and Advisor Costs, and (b) after the Closing Date, all reasonable and documented out-of-pocket costs and expenses of the Administrative Agent, the Issuing Bank and the Lenders (promptly following receipt of a written demand therefor, together with a summary statement and backup documentation (in summary form) reasonably supporting such reimbursement request) incurred in connection with the interpretation, enforcement or protection of any rights or remedies under this Agreement or the other Credit Documents (including all such costs and expenses incurred during any work-out, restructuring, negotiations in respect thereto or legal proceeding, including any proceeding under any Debtor Relief Law), limited in the case of attorney and advisor costs and expenses to the Attorney and Advisor Costs, and (c) all reasonable and documented out-of-pocket costs and expenses of the Administrative Agent and the Lenders incurred in connection with the Chapter 11 Cases, limited in the case of attorney and advisor costs and expenses to the Attorney and Advisor Costs.  The agreements in this <u>Section 13.05</u> shall survive the repayment of all other Obligations and shall remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement, any other Credit Document or any provision hereof or thereof.  All amounts due under this <u>Section 13.05</u> shall be paid within thirty (30) days after written demand therefor (together with backup documentation (in summary form) reasonably supporting such reimbursement request); <u>provided</u> that, with respect to the Closing Date, all amounts due under this <u>Section 13.05</u> shall be paid on the Closing Date solely to the extent invoices are presented to the Borrower prior to the Closing Date.  If any Credit Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Credit Document, such amount may be paid on behalf of such Credit Party by the Administrative Agent in its discretion.

(b)    The Borrower shall indemnify and hold harmless the Administrative Agent, the Collateral Agent, the Arrangers and the Lenders and their Affiliates, and their respective successors, permitted assigns, officers, directors, employees, partners, agents, advisors and other representatives of the foregoing (collectively the "<u>Indemnitees</u>") from and against any and all liabilities, losses, damages, claims, or out-of-pocket expenses (including Attorney Costs but limited in the case of legal fees and expenses to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if reasonably necessary, one local counsel for all Indemnitees taken as a whole in each relevant jurisdiction, and solely in the case of a conflict of interest, one additional counsel (and if reasonably necessary, one local counsel in each relevant jurisdiction) to the affected Indemnitees similarly situated) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any

128

Credit Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) any Commitment or Loan or the use or proposed use of the proceeds therefrom, or (iii) any actual or alleged Environmental Claim regarding, or liability or obligation under Environmental Law of, the Credit Parties or any Subsidiary and regardless of whether any Indemnitee is a party thereto or whether or not such Proceeding is brought by the Borrower or any other Person and, in each case, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee (all of the foregoing, collectively, the "Indemnified Liabilities"); provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, losses, damages, claims or out-of-pocket expenses resulted from the gross negligence or willful misconduct of such Indemnitee or of any of its Related Indemnified Persons, as determined by a final non-appealable judgment of a court of competent jurisdiction; provided further that the Borrower (or its subsidiaries or affiliates) shall not have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Credit Document or arising out of activities in connection herewith or therewith (whether before or after the Closing Date) (other than in respect of any such damages paid by or claimed from an Indemnitee to a third party).  The Borrower also agrees that neither any Indemnitee nor any of such affiliates, partners, members, directors, agents, employees or controlling persons will have any liability based on its or their exclusive or contributory negligence or otherwise to the Borrower or any person asserting claims on behalf of or in right of the Borrower or any other person in connection with any Indemnified Liability, except to the extent that any losses, claims, damages, liabilities or expenses incurred by the Borrower or its affiliates, shareholders, partners or other equity holders have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee; provided, however, that in no event will such Indemnitee or such other parties have any liability for any indirect, consequential, special or punitive damages in connection with or as a result of such Indemnitee's or such other parties' activities related to this Agreement or any other Credit Document arising out of activities in connection herewith or therewith (whether before or after the Closing Date).  All amounts due under this Section 13.05 shall be paid within thirty (30) days after written demand therefor (together with backup documentation (in summary form) reasonably supporting such reimbursement request); provided however, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of this Section 13.05.  The agreements in this Section 13.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender and the repayment, satisfaction or discharge of all the other Obligations.  For the avoidance of doubt, this Section 13.05(b) shall not apply to Taxes, except any Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, prepayments, suits, costs, expenses and disbursements arising from any non-Tax claims.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials obtained through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (except for direct (as opposed to indirect, special, punitive or consequential) damages resulting from the gross negligence, bad faith or willful misconduct, as determined by a court of competent jurisdiction in a final and non-appealable judgment, of such Indemnitee).

129

To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under this Section 13.05 to be paid by it to the Administrative Agent (or any sub-agent thereof), or any Agent Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Agent Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Agent Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity. For the avoidance of doubt, for purposes of this Section 13.05, the term "Lender" includes any Issuing Bank.

Section 13.06. <u>Successors and Assigns; Participations and Assignments</u>.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of each Issuing Bank that issues any Letter of Credit), except that (i) except as expressly permitted by **Error! Reference source not found.**, the Credit Parties may not assign or otherwise transfer any of their respective rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by any Credit Party without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (A) to an Assignee pursuant to an assignment made in accordance with the provisions of Section 13.06(b)(such an assignee, an "<u>Eligible Assignee</u>"), (B) by way of participation in accordance with the provisions of Section 13.06(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 13.06(g) or (iv) to an SPV in accordance with the provisions of Section 13.06(h) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of each Issuing Bank that issues any Letter of Credit), Participants to the extent provided in Section 13.06(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i)    Subject to the conditions set forth in paragraph (a) above and clause (ii) below, any Lender may assign to one or more assignees (other than the Borrower or any of its Affiliates, any natural person or any Defaulting Lender) ("<u>Assignees</u>") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans (including participation in L/C Obligation) at the time owing to it) with the prior written consent (such consent not to be unreasonably conditioned, withheld, or delayed) of:

(A)    the Borrower, provided, that no consent of the Borrower shall be required (1) if an Event of Default has occurred and is continuing, (2) if the Assignee is a Lender or an Affiliate of a Lender, or (3) with respect to any assignment following entry of the Final Order and funding of the Subsequent Borrowing; provided, further, that the Borrower shall be deemed to have

130

consented to any such assignment unless it shall have objected thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof; and

(B)     the Administrative Agent and each Issuing Bank (in each case, not to be unreasonably withheld or delayed).

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the cases of an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans and of an assignment to an affiliate or other Lender, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than an amount of  two million five hundred thousand Dollars ($2,500,000), and shall be in increments of an amount of two million five hundred thousand Dollars ($2,500,000), in excess thereof unless each Issuing Bank and the Administrative Agent otherwise consents (such consent not to be unreasonably withheld or delayed);

(B)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of three thousand, five hundred Dollars ($3,500) payable by the assignor to the Assignee (unless (1) waived or reduced by the Administrative Agent in its sole discretion, or (2) the Assignee is a Lender or an Affiliate of a Lender, and the Administrative Agent shall enter the relevant information in the Register pursuant to Section 13.06(d); and

(D)     the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and applicable tax forms (including those described in Sections 5.04(d), (e) and (h), as applicable).

(c)     Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 13.06(d), from and after the effective date specified in each Assignment and Assumption, (i) the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and (ii) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.11, 5.04 and 13.05 with respect to facts and circumstances occurring prior to the effective date of such

131

assignment).  Upon request, and the surrender by the assigning Lender of its Promissory Note, the Borrower (at its expense) shall execute and deliver a Promissory Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph (c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 13.06(e).

(d)    The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders (including any SPVs that provide all or any part of a Loan pursuant to Section 13.06(h) hereof, and the Commitments of, and principal amount (and stated interest amounts) of the Loans and L/C Obligations and any payment made by each Issuing Bank under any applicable Letter of Credit owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  Further, the Register shall contain the name and address of the Administrative Agent and the lending office through which each such Person acts under this Agreement.  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, the Collateral Agent, each Issuing Bank and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Collateral Agent, each Issuing Bank and, solely with respect to itself, each other Lender, at any reasonable time and from time to time upon reasonable prior notice.

Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 13.06(b) (unless waived) and any written consent to such assignment required by Section 13.06(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.

(e)    (i)    Any Lender may at any time sell participations to any Person (other than a natural person, Holdings, the Borrower or any Subsidiary of the Borrower or their respective Affiliates or a Defaulting Lender) (each, a "Participant") without the consent of the Borrower, the Administrative Agent or any Issuing Bank in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, each Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other Credit Document; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in paragraphs (i) through (ii) of the first proviso to Section 13.01(a) (to the extent affecting such Participant). Subject to Section 13.06(e)(ii), the Borrower agrees that each Participant shall be entitled to the

132

benefits of Sections 2.10, 2.11 and 5.04 to the same extent as if it were a Lender (subject to the limitations and requirements of those Sections and Sections 2.12 and 13.07) as though it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section 13.06). To the extent permitted by Requirements of Law, each Participant also shall be entitled to the benefits of Section 13.08(b) as though it were a Lender; provided such Participant agrees to be subject to Section 13.08(a) as though it were a Lender.

(ii)    A Participant shall not be entitled to receive any greater payment under Sections 2.10, 2.11 and 5.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent; provided that the Participant shall be subject to the provisions in Section 2.12 as if it were an assignee under Section 13.06(a) and Section 13.06(b). Each Lender that sells a participation shall, acting solely for this purpose as a nonfiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest amounts) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"). The entries in the Participant Register shall be conclusive, absent manifest error, and each party hereto shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. No Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

(f)    Subject to Section 13.16, the Borrower authorizes each Lender to disclose to any Participant, secured creditor of such Lender or assignee (each, a "Transferee") and any prospective Transferee any and all financial information in such Lender's possession concerning the Borrower and its Affiliates that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates pursuant to this Agreement or that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates in connection with such Lender's credit evaluation of the Borrower and its Affiliates prior to becoming a party to this Agreement.

(g)    Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender, and this Section 13.06 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto. In order to facilitate such pledge or assignment or for any other reason, the Borrower hereby agrees that, upon request of any Lender at any time and from time to time after the Borrower has made its initial borrowing hereunder, the Borrower shall provide to such Lender, at the Borrower's own expense, a Promissory Note evidencing the Loans owing to such Lender.

SC1:4941791.6

(h)    Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (a "SPV"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make the Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it shall not institute against, or join any other person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this Section 13.06, any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.  This Section 13.06(h) may not be amended without the written consent of the SPV.  Notwithstanding anything to the contrary in this Agreement, subject to the following sentence, each SPV shall be entitled to the benefits of Sections 2.10, 2.11 and 5.04 to the same extent as if it were a Lender (subject to the limitations and requirements of Sections 2.10, 2.11 and 5.04 as though it were a Lender, and Sections 2.12 and 13.07), and has acquired its interest by assignment pursuant to Section 13.06(a) and Section 13.06(b).  Notwithstanding the prior sentence, an SPV shall not be entitled to receive any greater payment under Section 2.10, 2.11 and 5.04 than its Granting Lender would have been entitled to receive absent the grant to such SPV, unless such grant to such SPV is made with the Borrower's prior written consent.

Section 13.07. Replacements of Lenders under Certain Circumstances.

(a)    In the event that any Lender (i) requests reimbursement under the Credit Documents for amounts owing pursuant to Section 2.10 or 5.04 (other than Section 5.04(b)), (ii) is affected in the manner described in Section 2.10(a)(iii) and as a result thereof any of the actions described in such Section is required to be taken or (iii) becomes a Defaulting Lender, the Borrower shall be entitled to replace such Lender or terminate the Commitment of such Lender; provided that (x) in the case of a replacement, (A) such replacement does not conflict with any Requirement of Law, (B) the replacement bank or institution shall purchase, at par, all Loans and the Borrower shall pay all other amounts (other than any disputed amounts), pursuant to Section 2.10 or 5.04, as the case may be) owing to such replaced Lender prior to the date of

134

replacement, (C) the replacement bank or institution, if not already a Lender, and the terms and conditions of such replacement, shall be reasonably satisfactory to the Administrative Agent and each Issuing Bank (except to the extent such Issuing Bank is, or is an Affiliate of, the Lender being replaced) and (D) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 13.06(b) (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein so long as the replacement Lender pays such fee) and (y) in the case of a termination, the Borrower shall repay all Obligations (including amounts (other than any disputed amounts) owing pursuant to Section 2.10 or 5.04, as the case may be) owing to such Lender as of such termination date (and, in the case of an Issuing Bank, cancel or backstop on terms satisfactory to such Issuing Bank any Letters of Credit issued by it).

(b)    If any Lender (such Lender, a "Non-Consenting Lender") has failed to consent to a proposed amendment, waiver, discharge or termination that pursuant to the terms of Section 13.01 requires the consent of all of the Lenders affected, the Majority Lenders and with respect to which the Majority Lenders shall have granted their consent, then, the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) to (x) replace such Non-Consenting Lender by requiring such Non-Consenting Lender to assign its Loans and its Commitments hereunder to one or more assignees reasonably acceptable to the Administrative Agent, and each Issuing Bank (except to the extent such Issuing Bank is, or is an Affiliate of, the Lender being replaced) or (y) terminate the Commitment of such Lender; provided that: (x) in the case of a replacement, (i) all Obligations of the Borrower owing to such Non-Consenting Lender being replaced (other than principal and interest) shall be paid in full to such Non-Consenting Lender concurrently with such assignment, (ii) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon and (iii) the Borrower, the Administrative Agent and such Non-Consenting Lender shall otherwise comply with Section 13.06 (provided that the Borrower shall not be obligated to pay the registration and processing fee referred to therein as long as the replacement Lender pays of such fee) and (y) in the case of a termination, all Obligations under the Credit Documents owing to such Non-Consenting Lender shall be paid in full concurrently with such termination.

(c)    Notwithstanding anything herein to the contrary, (i) each party hereto agrees that any assignment pursuant to the terms of this Section 13.07 may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent, each Issuing Bank and the assignee and that the Lender making such assignment need not be a party thereto and (ii) no termination of Commitments may be made pursuant to this Section 13.07 unless the Letter of Credit Exposure of the terminated Lender is Cash Collateralized on terms reasonably satisfactory to the Issuing Bank.

(d)    Any such Lender replacement or Commitment termination pursuant to this Section 13.07 shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

135

Section 13.08. <u>Adjustments; Set-off</u>.

(a)      If any Lender (a "<u>Benefited Lender</u>") shall at any time receive any payment in respect of any principal of or interest on all or part of the Loans made by it, or the participations in Letter of Credit Obligations held by it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender entitled thereto, if any, in respect of such other Lender's Loans, or interest thereon, such Benefited Lender shall (i) notify the Administrative Agent of such fact, and (ii) purchase for cash at face value from the other Lenders a participating interest in such portion of each such other Lender's Loans, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably in accordance with the aggregate principal of and accrued interest on their respective Loans and other amounts owing them; <u>provided</u> <u>however</u>, that (A) if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest and (B) the provisions of this paragraph shall not be construed to apply to (1) any payment made by the Borrower or any other Credit Party pursuant to and in accordance with the terms of this Agreement and the other Credit Documents, (2) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans, Commitments or participations in Drawings to any assignee or participant or (3) any disproportionate payment obtained by a Lender as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or Commitments or any increase in the Applicable Margin in respect of Loans or Commitments of Lenders that have consented to any such extension.  Each Credit Party consents to the foregoing and agrees, to the extent it may effectively do so under Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Credit Party rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Credit Party in the amount of such participation.

(b)      After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders provided by Requirements of Law, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable Requirements of Law, upon any amount becoming due and payable by the Borrower hereunder or under any Credit Document (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower.  Each Lender agrees promptly to notify the Borrower (and the Credit Parties, if applicable) and the Administrative Agent after any such set-off and application made by such Lender; <u>provided</u> that the failure to give such notice shall not affect the validity of such set-off and application.

Section 13.09. <u>Counterparts</u>.  This Agreement and each other Credit Document may be executed by one or more of the parties to this Agreement on any number of separate

counterparts (including by facsimile or other electronic transmission, *i.e.*, a "pdf" or a "tif"), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 13.10. <u>Severability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 13.11. <u>Integration</u>.  This Agreement and the other Credit Documents represent the agreement of the Borrower, the Guarantors, the Collateral Agent, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Borrower, the Guarantors, any Agent nor any Lender relative to subject matter hereof not expressly set forth or referred to herein or in the other Credit Documents.

Section 13.12. <u>GOVERNING LAW</u>.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

Section 13.13. <u>Submission to Jurisdiction; Waivers</u>.  Each party hereto hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Credit Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the Bankruptcy Court, and if the Bankruptcy Court does not have (or abstains from or refuses to exercise) jurisdiction, the jurisdiction of the courts of the State of New York and the courts of the United States of America for the Southern District of New York, in each case located in New York County, and appellate courts from any thereof; <u>provided</u> that nothing contained herein or in any other Credit Document will prevent any Lender, the Collateral Agent or the Administrative Agent from bringing any action to enforce any award or judgment or exercise any right under the Credit Documents or against any Collateral or any other property of any Credit Party in any other forum in which jurisdiction can be established;

137

(b)      consents that any such action or proceeding shall be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person at its address set forth on Schedule 13.02 at such other address of which the Administrative Agent shall have been notified pursuant to Section 13.02;

(d)      agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by Requirements of Law or shall limit the right to sue in any other jurisdiction;

(e)      without limitation of Sections 12.07 and 13.05, waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 13.13 any special, exemplary, punitive or consequential damages (other than, in the case of any Credit Party, in respect of any such damages incurred or paid by or claimed from an Indemnitee to a third party, or which are included in a third-party claim, and for any out-of-pocket expenses related thereto); and

(f)      agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 13.14. Acknowledgments.    Each of Holdings and the Borrower hereby acknowledges that:

(a)      it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents;

(b)      (i)    the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document) are an arm's-length commercial transaction between the Borrower and the other Credit Parties, on the one hand, and the Administrative Agent, the Lenders and the other Agents on the other hand, and the Borrower and the other Credit Parties are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each of the Administrative Agent, other Agents and the Lenders, is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for any of the Borrower, any other Credit Parties or any of their respective Affiliates, equity holders, creditors or employees or any other Person; (iii) neither the Administrative Agent, any other Agent, any Arranger, nor any Lender has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower or any other Credit Party with respect to any of the transactions contemplated hereby or the process leading

138

thereto, including with respect to any amendment, waiver or other modification hereof or of any other Credit Document (irrespective of whether the Administrative Agent or any other Agent, any Arranger, or any Lender has advised or is currently advising any of the Borrower, the other Credit Parties or their respective Affiliates on other matters) and none of the Administrative Agent, any Agent, any Arranger or any Lender has any obligation to any of the Borrower, the other Credit Parties or their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; (iv) the Administrative Agent and its Affiliates, each other Agent and each of its Affiliates and each Lender and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its respective Affiliates, and none of the Administrative Agent, any other Agent or any Lender has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) none of the Administrative Agent, any Agent or any Lender has provided and none will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Credit Document) and each of Holdings and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Each of Holdings and the Borrower hereby waives and releases, to the fullest extent permitted by law, for itself and the other Credit Parties, any claims that it may have against the Administrative Agent and each Agent with respect to any breach or alleged breach of agency or fiduciary duty; and

(c)    no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower and the other Credit Parties, on the one hand, and any Lender, on the other hand.

Section 13.15. <u>WAIVERS OF JURY TRIAL</u>.  HOLDINGS, THE BORROWER, EACH AGENT, EACH ISSUING BANK AND EACH LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

Section 13.16. <u>Confidentiality</u>.  The Administrative Agent, each other Agent, any Issuing Bank and each other Lender shall hold all information not marked as "public information" and furnished by or on behalf of the Borrower or any of its Subsidiaries in connection with such Lender's evaluation of whether to become a Lender hereunder or obtained by such Lender, the Administrative Agent, any Issuing Bank or such other Agent pursuant to the requirements of this Agreement ("<u>Confidential Information</u>") confidential in accordance with customary procedures for handling confidential information of this nature, but in any event may make disclosure (a) (i) as required or requested by any Governmental Authority, self-regulatory agency or representative thereof or (ii) pursuant to legal process or applicable Requirements of Law, (b) to such Lender's or the Administrative Agent's, any Issuing Bank's or such other Agent's attorneys, professional advisors, independent auditors, trustees, agents, directors, officers, employees, members, partners or Affiliates (and any Affiliate's attorneys, professional advisors, independent auditors, trustees, agents, directors, officers, employees, members or partners), in each case who need to know such information in connection with the administration of the Credit Documents and are informed of the confidential nature of such information, (c) to an investor or prospective investor in a securitization that agrees its access to information

139

regarding the Credit Parties, the Loans and the Credit Documents is solely for purposes of evaluating an investment in a securitization and who agrees to treat such information as confidential, (d) to a trustee, collateral manager, servicer, backup servicer, noteholder or secured party in connection with the administration, servicing and reporting on the assets serving as collateral for a securitization and who agrees to treat such information as confidential, (e) to a nationally recognized ratings agency that requires access to information regarding the Credit Parties, the Loans and Credit Documents in connection with ratings issued with respect to a securitization, (f) to the extent such information becomes available to the Administrative Agent, any other Agent, any Issuing Bank or any Lender on a nonconfidential basis from a source other than the Borrower and its Affiliates and, to the Administrative Agent, Issuing Bank or Lender's knowledge, such source was not subject to a confidentiality agreement with respect to such information, (g) to the extent such information was independently developed or already in possession by the Administrative Agent, any other Agent, any Issuing Bank or any Lender prior to disclosure from the Borrower, (h) to any other party to this Agreement and (i) to the extent such Confidential Information becomes public other than by reason of disclosure by such Person in breach of this Agreement; <u>provided</u> that unless specifically prohibited by applicable Requirements of Law, each Lender, the Administrative Agent, any Issuing Bank and each other Agent shall endeavor to notify the Borrower (without any liability for a failure to so notify the Borrower) of any request made to such Lender, the Administrative Agent, any Issuing Bank or such other Agent, as applicable, by any Governmental Authority, self-regulatory agency or representative thereof (other than any such request in connection with an examination of the financial condition of such Lender by such Governmental Authority or self-regulatory agency) for disclosure of any such non-public information prior to disclosure of such information and shall limit such disclosure to the extent necessary to comply with such request or demand and, to the extent permitted by law and, at your request and sole expense, cooperate in seeking a protective order in respect thereof or in resisting such disclosure; <u>provided</u> <u>further</u> that in no event shall any Lender, the Administrative Agent, any Issuing Bank or any other Agent be obligated or required to return any materials furnished by the Borrower or any Subsidiary.  In addition, each Lender, the Administrative Agent and each other Agent may provide Confidential Information to prospective Transferees or to any pledgee referred to in <u>Section 13.06</u> or to prospective direct or indirect contractual counterparties in Hedge Agreements to be entered into in connection with Loans made hereunder as long as such Person is advised of and agrees to be bound by the provisions of this <u>Section 13.16</u> or confidentiality provisions at least as restrictive as those set forth in this <u>Section 13.16</u>.

Section 13.17. <u>Release of Collateral and Guarantee Obligations</u>.

(a)      The Lenders hereby irrevocably agree that the Liens granted to the Collateral Agent by the Credit Parties on any Collateral shall be automatically released (i) in full, as set forth in <u>paragraph (b)</u> below, (ii) upon the Disposition of such Collateral (including as part of or in connection with any other Disposition permitted hereunder) to any Person other than another Credit Party (other than Holdings), to the extent such Disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Credit Party upon its reasonable request without further inquiry), (iii) to the extent such release is required pursuant to the terms of any order of the Bankruptcy Court, (iv) to the extent such Collateral is comprised of property leased to a Credit Party, upon termination or expiration of such lease, (v) if the release of such Lien is approved,

140

authorized or ratified in writing by the Majority Lenders (or, in the case of the release of all or substantially all of the Collateral under the Security Documents, by each Lender as required pursuant to <u>Section 13.01(a)(viii)</u>), (vi) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guarantee in accordance with this Agreement or <u>Section 5(g)</u> of the Guarantee, (vii) as required by the Collateral Agent to effect any Disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Security Documents and (viii) upon any Collateral becoming an Excluded Equity Interest or Excluded Property, except in connection with a transaction prohibited hereunder.  Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Credit Parties in respect of) all interests retained by the Credit Parties, including the proceeds of any Disposition, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Credit Documents.  Additionally, the Lenders hereby irrevocably agree that the Guarantors shall be released from the Guarantee and the Collateral Agreement (i) if the release of the Guarantor's obligations under the Guarantee is approved, authorized or ratified in writing by the Majority Lenders (or, in the case of the release of all or substantially all of the aggregate value of the guarantees, by each Lender, as required pursuant to <u>Section 13.01(a)(vii)</u>), (ii) to the extent such release is required pursuant to the terms of any order of the Bankruptcy Court.  The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender.  Any representation, warranty or covenant contained in any Credit Document relating to any such Collateral or Guarantor shall no longer be deemed to be repeated.  In connection with any release hereunder, the Administrative Agent and Collateral Agent shall promptly (and the Lenders hereby authorize the Administrative Agent and Collateral Agent to) take such action and execute any such documents as may be reasonably requested by the Borrower and at the Borrower's expense in connection with the release of any Liens created by any Credit Document in respect of such Subsidiary, property or asset.

(b)    Notwithstanding anything to the contrary contained herein or any other Credit Document, when Payment in Full has occurred, upon request of the Borrower, the Administrative Agent and/or the Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions (and the Secured Parties hereby authorize the Administrative Agent and Collateral Agent to take such actions) as shall be required to release its security interest in all Collateral, and to release all obligations under any Credit Document.  Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

Section 13.18. <u>USA Patriot Act</u>.  The Agents and each Lender hereby notify the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify

and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Agent and such Lender to identify each Credit Party in accordance with the USA Patriot Act.

Section 13.19. <u>Payments Set Aside</u>.   To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

Section 13.20. <u>Reinstatement</u>.   This Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Administrative Agent or any other Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any substantial part of its property, or otherwise, all as though such payments had not been made.

Section 13.21. <u>Disposition of Proceeds</u>.   The Security Documents contain an assignment by the Borrower and/or the Guarantors unto and in favor of the Collateral Agent for the benefit of the Lenders of all of the Borrower's or each Guarantor's interest in and to their as-extracted collateral in the form of production and all proceeds attributable thereto which may be produced from or allocated to the Mortgaged Property.  The Security Documents further provide in general for the application of such proceeds to the satisfaction of the Obligations described therein and secured thereby.   Notwithstanding the assignment contained in such Security Documents, until the occurrence of an Event of Default, (a) the Administrative Agent and the Lenders agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Administrative Agent or the Lenders, but the Lenders will instead permit such proceeds to be paid to the Borrower and its Subsidiaries and (b) the Lenders hereby authorize the Administrative Agent to take such actions as may be necessary to cause such proceeds to be paid to the Borrower and/or such Subsidiaries.

Section 13.22. [<u>Reserved</u>].

Section 13.23. <u>Agency of the Borrower for the Other Credit Parties</u>.   Each of the other Credit Parties hereby appoints the Borrower as its agent for all purposes relevant to this Agreement and the other Credit Documents, including the giving and receipt of notices and the execution and delivery of all documents, instruments and certificates contemplated herein and therein and all modifications hereto and thereto.

142

Section 13.24. <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 13.25. <u>Financing Orders Control</u>.    In the event of any inconsistency between the provisions of the Financing Orders and this Agreement or any other Credit Document, the provisions of the Financing Orders shall govern.

[Signature Pages Follow.]

143

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

WHITE STAR PETROLEUM, LLC, as the Borrower

By: _____

    Name:
    Title:

WHITE STAR PETROLEUM HOLDINGS, LLC, as Holdings

By: _____

    Name:
    Title:

[Signature Page to Credit Agreement]

MUFG Union Bank, N.A.,
as Administrative Agent


By: _____
    Name:
    Title:

[Signature Page to Credit Agreement]

MUFG Union Bank, N.A.,
as Issuing Bank and as a Lender


By:_____
Name:
Title:

[LENDER],
as a Lender

By:_____
Name:
Title:

[Signature Page to Credit Agreement]

**ANNEX I**

**Schedule 1.01(a)**

**Lender Commitments**

| Lender | Term Loan Commitment | L/C Commitment |
|---|---|---|
| MUFG Union Bank, N.A. | $[_____] | $[_____] |
| [_____] | $[_____] | $[_____] |
| [_____] | $[_____] | $[_____] |
| [_____] | $[_____] | $[_____] |
| [_____] | $[_____] | $[_____] |
| [_____] | $[_____] | $[_____] |
| [_____] | $[_____] | $[_____] |
| [_____] | $[_____] | $[_____] |
| [_____] | $[_____] | $[_____] |
| **Total** | **$26,884,640.00** | **$1,615,360.00** |

## Exhibit B

**Bijoor Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

———————————————————————x

In re                                                                     :        Chapter 11

                                                                              :        Case No. (19-_____) (___)

WHITE STAR PETROLEUM HOLDINGS, LLC, *et*        :
*al.*,[1]                                                                   :        Joint Administration Pending

                                                                              :

                                       Debtors.               :

———————————————————————x

**DECLARATION OF AJAY BIJOOR IN SUPPORT OF THE DEBTORS' MOTION FOR
ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO
11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507, (I) AUTHORIZING THE
DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION
FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV)
GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Ajay Bijoor hereby declares and says:

1.        I am a Managing Director at Guggenheim Securities, LLC ("Guggenheim

Securities"), a financial advisory firm that maintains an office at 330 Madison Avenue, New

York, New York 10017.  I submit this declaration (this "Declaration") in support of the *Motion*

*of Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363,*

*364, 503, 506, and 507, (I) Authorizing the Debtors to Obtain Senior Secured Superpriority*

*Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims,*

*(III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying*

*the Automatic Stay, (VI) Scheduling Final Hearing, and (VII) Granting Related Relief (the "DIP*

---

[1]        The Debtors in these chapter 11 cases, and the last four digits of their U.S. taxpayer identification numbers are:
White Star Petroleum Holdings, LLC (0575) ("WSTR Holdings"), White Star Petroleum, LLC (0977)
("WSTR"), White Star Petroleum II, LLC (4347) ("WSTR II"), White Star Petroleum Operating, LLC (5387)
("WSTR Operating") and WSP Finance Corporation (9152) ("WSP Finance" and together with WSTR
Holdings, WSTR, WSTR II and WSTR Operating, the "Debtors").  The Debtors' corporate headquarters is
located at 301 N.W. 63rd Street, Suite 600, Oklahoma City, OK 73116.

Motion")[2] filed by White Star Petroleum Holdings, LLC and certain of its affiliated debtors and

debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases.

## Qualifications

2.        I am a Managing Director at Guggenheim Securities, which I joined in

2016.  Guggenheim Securities, a subsidiary of Guggenheim Partners, LLC, is a full-service

investment banking firm providing financial advisory services, including with respect to mergers

and acquisitions, capital raising, and restructuring transactions, across a broad range of industries.

Guggenheim Securities and its senior professionals have extensive experience with respect to the

reorganization and restructuring of distressed companies, both out of court and in chapter 11

proceedings.

3.        I have over 17 years of investment banking and corporate development

experience, including over 12 years of financing and restructuring-related investment banking

experience (both in and out of court) across a wide range of industries.  Prior to joining

Guggenheim Securities, I was a Managing Director at Peter J. Solomon Company, a boutique

investment bank, where I focused on advising on restructuring matters from 2012 to 2016.  Prior

to that, I was a Vice President at Miller Buckfire & Co., where I focused on restructuring

advisory matters from 2006 to 2012.  I received a Bachelor of Arts degree in Economics from the

University of Pennsylvania in 1998, and a Master of Business Administration degree from The

Wharton School at the University of Pennsylvania in 2006.

4.        In addition to working with the Debtors in the above-captioned chapter 11

cases, my experience includes representing companies, boards, creditors, and other stakeholders

in a variety of situations across a broad range of industries, including the chapter 11 cases of:

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP
       Motion.

Charming Charlie; Dana Corporation; The Dolan Company; Energy Future Holdings; Lear Corporation; Mattress Firm; Meridian Technologies; Overseas Shipholding Group; Quiksilver; and Station Casinos.

5.     I am not being compensated separately for this testimony other than through payments received by Guggenheim Securities as the investment banker proposed to be retained by the Debtors.  Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by Guggenheim Securities professionals involved in advising the Debtors in these chapter 11 cases, or information provided to me by the Debtors.  If called upon to testify, I could and would testify to the facts set forth herein on that basis.  I am authorized to submit this Declaration on behalf of the Debtors.

### Background

6.     As described in the *Declaration of Jeffrey J. Zanotti in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "Zanotti First Day Declaration"), the Debtors acquire, develop, operate and produce unconventional oil and natural gas properties.  More specifically, through oil and gas leases entered into with mineral rights owners throughout the Mid-Continent region, the Debtors hold working interests in oil and gas properties that provide for the right to drill and maintain wells.  I understand that the Debtors and third-party operators operate these wells with the expectation of producing hydrocarbons, and the hydrocarbons are then transported by pipeline or by tanker truck to various end users.  As described in the Zanotti First Day Declaration, after receipt of proceeds, the Debtors distribute funds to various working interest holders, royalty interest holders, governmental entities, and other parties, as applicable, in addition to retaining the Debtors' proportionate share of the proceeds.

7.　　　Further information regarding the Debtors, their assets, liabilities and operations, and the commencement of these chapter 11 cases is set forth in detail in the Zanotti First Day Declaration and the *Declaration of Edgar W. Mosley II, Managing Director at Alvarez & Marsal North America, LLC in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "Mosley First Day Declaration" and together with the Zanotti First Day Declaration, the "First Day Declarations").

<u>Facts Specific to the Relief Requested</u>

**I.    The Debtors' Prepetition Indebtedness**

A.　　　The First Lien Revolving Credit Facility

8.　　　As set forth in the Zanotti First Day Declaration, the Debtors are party to the Revolving Credit Agreement, dated as of June 30, 2016 (the "RBL Credit Agreement"), which provides for a first lien revolving credit facility, among WSTR as borrower, the several lenders from time to time parties thereto (the "RBL Lenders") and MUFG Union Bank, N.A., as administrative agent and collateral agent for the RBL Lenders (the "RBL Agent").  As further noted in the Zanotti First Day Declaration, (i) each of WSTR Holdings, WSTR, WSP Finance and WSTR Operating is a guarantor of the RBL Credit Agreement pursuant to the RBL Amended and Restated Guarantee Agreement, dated as of June 30, 2016, (ii) borrowings under the RBL Credit Agreement are to be used for, among other things, the acquisition, development and exploration of oil and gas properties, investments, capital expenditures and other transactions, working capital and other general corporate purposes, (iii) interest under the RBL Credit Agreement is based on the prime rate or LIBOR plus a margin that varies based on the utilization of the facility, and (iv) the RBL Credit Agreement's stated maturity is June 30, 2020.

B-4

9.      As noted in the Zanotti First Day Declaration, as of the Petition Date, the Debtors have drawn substantially all of the availability under the RBL Credit Agreement (approximately $274 million).

B.      The Second Lien Term Loan

10.     As noted in the Zanotti First Day Declaration, on May 9, 2018 WSTR entered into a five-year second lien Term Loan with EnLink (the "Term Loan" and together with the revolving facility under the RBL Credit Agreement, the "Prepetition Secured Debt").  I am advised by the Debtors that EnLink Oklahoma Gas Processing, LP ("EnLink"), the RBL Agent and the RBL Lenders together constitute the prepetition secured parties (collectively, the "Prepetition Secured Parties").  As further noted in the Zanotti First Day Declaration, (i) the principal amount of the Term Loan is $58 million, which amortizes pursuant to a specified amortization schedule, (ii) interest is payable on the Term Loan every quarter at an annual rate of 8.0%, beginning in the first quarter of 2020, and (iii) each of the Debtors is a guarantor of the Term Loan pursuant to the Term Loan Guarantee Agreement, dated as of May 9, 2018.

C.      The Unsecured Notes due September 15, 2022

11.     As set forth in the Zanotti First Day Declaration, I understand that WSTR and its wholly owned subsidiary WSP Finance have approximately $10.3 million outstanding in 9% senior notes due 2022 (the "Unsecured Notes").  I understand that the Unsecured Notes mature on September 15, 2022 and that interest is payable at an annual rate of 9.0%, semi-annually, in arrears, on March 15 and September 15 of each year.  I am also advised that, for the years ended December 31, 2018 and 2017, WSTR recorded approximately $0.9 million in interest expense for the Unsecured Notes each year.

B-5

D.      Sale-Leaseback

12.      As set forth in the Zanotti First Day Declaration, on May 31, 2017, WSTR entered into a sale-leaseback transaction for its primary field office in Stillwater, Oklahoma for $4.9 million.  As noted in the Zanotti First Day Declaration, approximately $4.5 million currently remains outstanding and WSTR has remained the tenant and leased back the 17-acre property, which is its central northern Oklahoma field office.

II.    **The Debtors' Immediate Need for Postpetition Financing and Access to Cash Collateral**

13.      As set forth in the Zanotti First Day Declaration, the Debtors had extremely limited access to liquidity following the events of April 30, 2019, when the Debtors received notice that the RBL Agent had declared an event of default and swept $8.1 million of cash from the Debtors' accounts.  As further stated in the Zanotti Declaration, the Debtors' access to the proposed DIP Facility will provide the Debtors with immediate access to the liquidity necessary to fund critical payments in the ordinary course of business that are essential to the Debtors' operational viability.

14.      I understand that pursuant to negotiations with the RBL Agent and its advisors, the RBL Lenders agreed to provide the Debtors with access to some of the swept cash to fund outstanding checks and ACH revenue payments, as well as other expenditures specifically approved by the RBL Agent.  I further understand that the Debtors have been operating with the RBL Agent authorizing specific expenditures since the April 30 sweep.

15.      Additionally, as set forth in the Zanotti First Day Declaration, the Debtors state that they do not have sufficient available sources of working capital and financing to operate their businesses or to maintain their properties in the ordinary course of business—let alone pursue the various options available to create value for stakeholders—without debtor-in-

B-6

possession financing and the authorized use of "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral").

16.     As set forth in the DIP Motion, I understand the DIP Lenders are willing to provide liquidity on the terms provided in the DIP Credit Agreement and the Interim Order and the Final Order, and that the Debtors, moreover, believe that the liquidity to be provided by the DIP Facility, together with the use of Cash Collateral, will enable the Debtors to fund their operations during the course of these chapter 11 cases.

17.     As stated in the DIP Motion, the Debtors thus believe (x) that their ability to finance their operations, maintain business relationships, pay their employees, protect the value of their assets and pursue a strategy to maximize value for their creditors requires the availability of working capital from the DIP Facility and the ability to use Cash Collateral, and (y) that the absence of such sources of financing would immediately and irreparably harm the Debtors, their estates, and their creditors and the possibility for successful administration of these chapter 11 cases.

## III.     The Debtors' Prepetition Debtor-in-Possession Financing Marketing Efforts

18.     Prior to commencing these chapter 11 cases, I understand that the Debtors engaged in unsuccessful efforts to raise capital to refinance their Prepetition Secured Debt, as described in the Zanotti First Day Declaration.  Following the Debtors' determination that chapter 11 proceedings would be required for an effective restructuring of the Debtors' balance sheet, the Debtors, with the assistance of Guggenheim Securities as well as the Debtors' restructuring advisor, Alvarez & Marsal North America, LLC ("A&M") and the Debtors' restructuring counsel, Sullivan & Cromwell LLP ("S&C" and, collectively with Guggenheim Securities and A&M, the "Advisors"), immediately began to size a debtor-in-possession financing facility and identify potential sources of postpetition financing.

B-7

19.     Since May 6, 2019, the Debtors, with the assistance of Guggenheim Securities, made extensive inquiries into alternatives for financing and solicited proposals for debtor-in-possession financing from various lending institutions with experience in providing such financing and other potential sources of capital.  More specifically, 20 prospective third-party lenders were contacted, 13 of which were either already subject to non-disclosure agreements with the Debtors or entered into new non-disclosure agreements to evaluate the financing opportunity.  The Debtors ultimately received three indicative term proposals, including that of the DIP Lenders.  I believe that the marketing process used to determine the most viable postpetition financing facility for the Debtors was appropriate under the circumstances, including, without limitation, in light of the Debtors' condition, timing concerns, and the Debtors' existing capital structure.

20.     Concurrently with these marketing efforts, the Debtors, with the assistance of their Advisors, had been engaged in discussions with the RBL Agent and the RBL Lenders' advisors regarding their interest in providing debtor-in-possession financing or their willingness to consent to third-party debtor-in-possession financing.  The RBL Agent and the RBL Lenders' advisors insisted that they would not consent to any priming of their security interests as part of a third-party debtor-in-possession financing.  Further, I understand that the Debtors do not have unencumbered assets of sufficient value to support enough collateralized financing to meet the Debtors' cash needs during these chapter 11 cases, and all of the proposals received by the third-parties contacted only expressed an interest in providing the Debtors with debtor-in-possession financing with a superpriority priming lien on the existing first lien interests.  Further, each of the other third-party debtor-in-possession financing proposals required an upfront work fee and expense deposit in order to provide a financing commitment.  However, I understand that the

B-8

RBL Lenders were unwilling to disburse cash for such work fees.  Consequently, the Debtors

concluded that the debtor-in-possession financing facility being discussed with the RBL Agent

and the RBL Lenders' advisors was the only practical option, given (x) that the other prospective

lenders were unwilling to undertake a priming fight without such a work fee and expense deposit

and (y) that such priming of liens was likely to be contested by the RBL Lenders and potentially

involve costly and disruptive litigation at the early stages of these chapter 11 cases.  As a result,

in parallel with seeking third-party financing proposals, the Debtors continued to negotiate the

terms of a potential debtor-in-possession financing with the RBL Agent and the RBL Lenders'

advisors.

21.     Following negotiations with the RBL Agent and the RBL Lenders'

advisors, the Debtors proposed that certain of the RBL Lenders provide a debtor-in-possession

financing facility to the Debtors with the consent of a majority of the RBL Lenders (the "DIP

Facility"). The negotiations among the Debtors and the DIP Lenders with respect to the DIP

Facility were, in my view, conducted at arm's length.  Negotiations over the economic terms,

milestones and structure of the DIP Facility continued into the days leading up to the Petition

Date.

22.     The terms of the DIP Facility are detailed in the DIP Motion, as well as in

that certain Debtor-In-Possession Credit Agreement by and among WSTR as borrower, WSTR

Holdings, MUFG Union Bank, N.A., as administrative agent and collateral agent and the lenders

party thereto (the "DIP Lenders") (as such agreement may be amended, restated, supplemented

or otherwise modified from time to time pursuant to the terms thereof, the "DIP Credit

Agreement"), a form of which is attached as Exhibit 1 to the Interim Order attached to the DIP

Motion.  As noted in the DIP Motion, the DIP Facility contemplates postpetition financing in the

B-9

form of a non-amortizing senior secured priming multi-draw term loan in the aggregate principal amount of up to $28.5 million, $15 of which is proposed to be available on an interim basis and the remaining portion of which is proposed to be available on a final basis.  As further noted in the DIP Motion, in exchange for access to the DIP Facility, the Debtors have agreed, among other things and subject to the Carve-Out (as defined in the Interim Order) to grant the DIP Lenders allowed superpriority administrative expense claims status in these chapter 11 cases, as well as automatically perfected first priority liens on substantially all of the Debtors' Collateral (as defined in the DIP Credit Agreement) that is not subject to valid, perfected and non-avoidable liens as of the Petition Date and all collateral that secures obligations under the RBL Credit Agreement.

23.    The Debtors negotiated several key concessions from the DIP Lenders over the course of the weeks preceding the filing, including the following concessions, the terms of which are described in further detail in the DIP Motion: (i) improved economic terms (i.e. no roll-up of prepetition balances), (ii) additional financing flexibility under the facility's financial covenants, including budget and variance requirements, (iii) additional time under the proposed milestones, and (iv) an increase in the funding commitment relative to initial indications.  I understand that all of the aforementioned concessions contributed to the Debtors selecting the DIP Lenders' proposal.

24.    Based on my experience with debtor-in-possession financing transactions as well as my involvement in the marketing and negotiation of the various postpetition financing alternatives available to the Debtors, I believe that the financial terms proposed under the DIP Facility are customary and usual for debtor-in-possession financings of this type.  Specifically, the contemplated pricing, fees, interest rate, default rate, and other economic terms of the DIP

Facility were, in my view, negotiated among the Debtors and the DIP Lenders at arm's length and are in aggregate generally consistent with the cost of debtor-in-possession financings in comparable circumstances, particularly for a distressed borrower with a stated urgent need for liquidity.  Also, the terms of the DIP Facility are the result of a marketing process.  As set forth above, the Debtors, with the assistance of their Advisors, including Guggenheim Securities, solicited and considered other sources of postpetition financing to determine whether the Debtors could obtain debtor-in-possession financing on better terms and engaged in discussions with multiple third parties.  Notably, none of the other third party lenders referenced above that provided indicative term proposals were willing to provide the Debtors with debtor-in-possession financing on an unsecured or non-superpriority basis.  Accordingly, I believe that, in light of the marketing process and other facts described above, the DIP Facility is the best financing option presently available to the Debtors under the circumstances.

## IV.    The Proposed Adequate Protection Provisions

25.    As noted in the DIP Motion, the Debtors have agreed to provide to the Prepetition Secured Parties the following forms of adequate protection to the extent of any diminution in value of their collateral and subject, in each case, to the Permitted Prior Senior Liens and the Carve-Out (collectively, the "Adequate Protection Obligations"):

(a)    Current cash reimbursement of the reasonable and documented fees, costs, and expenses (including reasonable and documented professional fees) of the RBL Agent;

(b)    Replacement or, if applicable, new liens on the DIP Collateral to secure adequate protection claims that are junior to the DIP Liens and ranking in the same relative priority and right as do the respective security interests and liens of the respective Prepetition Secured Parties; and

(c)    Superpriority claims as provided for in section 507(b) of the Bankruptcy Code that are junior to the DIP Superpriority Claims and ranking among the Prepetition Secured Parties in the same relative priority and right as do the respective claims thereof as of the Petition Date.

B-11

26.     Based on my experience as a restructuring professional, this proposed package is not inconsistent with adequate protection provided to lenders in connection with debtor-in-possession financings of this type.

## **Conclusion**

27.     In sum, based on my experience with debtor-in-possession financing transactions as well as my involvement in the marketing and negotiation of the various postpetition financing alternatives described above, I believe that the DIP Facility is the best financing option presently available to the Debtors under the circumstances and contains terms that are customary and usual for debtor-in-possession financings of this type.  Further, the negotiations among the Debtors and the DIP Lenders with respect to the DIP Facility were, in my view, conducted at arm's length.

SC1:4946507.1

I, the undersigned Managing Director at Guggenheim Securities, LLC, declare under penalty of perjury that the foregoing is true and correct.

Dated: May 28, 2019

/s/ Ajay Bijoor
Ajay Bijoor
Managing Director
Guggenheim Securities, LLC
*Proposed Investment Banker to the Debtors and Debtors-in-Possession*

B-13